UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILDLANDS<br>40 East Main Street, # 2<br>Bozeman, MT  59715<br>(406) 586-8175<br><br>BUD LILLY<br>2007 Sourdough Road<br>Bozeman, MT  59715<br>(406) 586-5140<br><br>MONTANA ENVIRONMENTAL<br>INFORMATION CENTER<br>107 West Lawrence<br>Helena, MT  59624<br>(406) 443-2520<br><br>WESTERN WATERSHEDS PROJECT<br>16 West Croy Street, Suite N<br>Hailey, ID 83333<br>(208) 788-2290<br><br>CLEARWATER BIODIVERSITY PROJECT<br>1804 Victoria Drive<br>Moscow, ID  83843<br>(208) 835-2999<br><br>           Plaintiffs,<br><br>     vs.<br><br>GALE NORTON<br>Secretary, U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C.  20240<br><br>MATTHEW HOGAN<br>Acting Director, U.S. Fish and Wildlife Service<br>1849 C Street, N.W.<br>Washington, D.C.  20240<br><br>           Defendants. | Civil No.: _____<br><br><br><br><br><br>**COMPLAINT** |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.	The future of the westslope cutthroat trout ("WCT") is at stake in this case. WCT are disappearing as they interbreed or "hybridize" with fish that have been introduced into their native waters. Plaintiffs American Wildlands, et al. (collectively "American Wildlands") seek to compel the U.S. Fish and Wildlife Service ("FWS") to address this mounting threat to WCT as the Endangered Species Act ("ESA"), 16 U.S.C. § 1521 et seq. requires.

2.	Despite the agency's recognition that hybridization poses a threat to WCT survival, FWS has determined that ESA listing is "not warranted" because fish that look like WCT, including known hybrid stocks, are widely distributed throughout the range of the subspecies. This determination is based on the novel presumption that hybrids are equivalent to WCT so long as hybridization is not visibly detectable — that is, until a population is up to 50% hybridized. Because this presumption is indefensible in light of the best available scientific data, FWS' "not warranted" WCT finding violates the ESA. Accordingly, American Wildlands requests that this Court remand FWS' negative listing determination and order FWS to undertake a principled assessment of hybridization, which is now long overdue.

## JURISDICTION AND VENUE

4.	This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1331 (federal question) and 16 U.S.C. § 1540(g) (ESA citizen-suit provision).

5.	American Wildlands has provided FWS with sixty days' written notice of the violations alleged herein pursuant to 16 U.S.C. § 1540(g). American Wildlands has formally demanded that FWS correct the violations of the ESA alleged herein, but FWS has failed to

comply with these demands and continues to do so. Thus, an actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a) (Declaratory Judgment).

6. Venue lies in this judicial district by virtue of 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because defendants reside here.

## PARTIES

7. Plaintiff American Wildlands is a regional, non-profit conservation organization with its main offices in Bozeman, Montana. American Wildlands' mission is to use science and law to protect, preserve, and restore biodiversity. American Wildlands promotes these goals by advocating for sustainable management of public lands in the Rocky Mountain West. Since 1995, American Wildlands has pursued a coordinated campaign to conserve and protect the WCT and its habitat, emphasizing public education, science, and the need for legal protections.

8. Plaintiff Bud Lilly, a fly-fishing guide and conservationist, has fished the streams of his native Montana for more than fifty years, and is probably the most famous trout-fishing guide in America. The Trout Shop in West Yellowstone, Montana that bears his name is internationally known for tackle, guide services, and hospitality. Mr. Lilly was founding president of Montana Trout Unlimited, first chairman of the International Fly Fishing Center, and a founder of the Montana Trout Foundation. For many years, he has served as a senior advisor to the Federation of Fly Fishers and also as a director of American Wildlands. Bud Lilly continues to fish and guide in the WCT's range. He is extremely concerned about the WCT's decline, particularly as his opportunities for catching WCT are increasingly rare.

9. Plaintiff Western Watersheds Project, Inc. ("WWP") is a non-profit corporation based in Hailey, Idaho with approximately 500 members. WWP's mission is to protect and restore Idaho public school endowment lands that have been degraded by livestock mismanagement, to improve returns to the Idaho school endowment fund, and to raise public consciousness regarding the importance of all shared public lands and waters as well as the plants and animals that depend on them. In May 1996, the Board of WWP enlarged its mission to include all public lands in Idaho watersheds, including areas in Wyoming, Montana, Nevada, Utah and Oregon. In particular, WWP and its members seek to protect the WCT and restore its home waters. Members of WWP are involved in many recreational activities on lands that contain WCT habitat, and so they are regularly confronted with the degraded condition of WCT streams.

10. Montana Environmental Information Center ("MEIC") is a non-profit organization founded in 1973 with members throughout the United States and the state of Montana. MEIC is dedicated to preserving and enhancing Montana's natural resources and natural environment and to educating its members and the general public concerning their rights and obligations under state and federal environmental law. MEIC seeks to ensure that state and federal officials fully uphold laws designed to protect and preserve native species including the WCT.

11. Plaintiff Clearwater Biodiversity Project ("CBP") is a small grassroots organization in Northwestern Idaho interested in public lands management and fisheries protection. CBP has a long history of involvement with fisheries, wildlife, and timber issues in the Clearwater National Forest. CBP seeks to influence public lands management through public participation in decision-making processes and through public education programs

4

designed to inform the regional public of the status of its wild forests, clean water, and rich plant and animal populations. In its efforts to protect these natural resources, CBP is especially concerned about the ongoing threats to the westslope cutthroat trout and its habitat in northern Idaho.

12.     Plaintiffs and their members observe and study the WCT, make guided and unguided recreational fishing trips for WCT, and photograph and paint the WCT. They derive aesthetic, recreational, scientific, inspirational and educational benefits from these activities and have an interest in preserving the opportunity to engage in these activities in the future. Maintaining healthy WCT populations is integral to Plaintiffs' and their members' use and enjoyment of the watersheds where the trout still survives. Plaintiffs' and their members' continued enjoyment of WCT depends on the existence of strong wild populations throughout the trout's range.

13.     Plaintiffs and their members will suffer irreparable injury to their aesthetic, recreational, scientific, educational, and conservation interests unless the Service affords critically needed ESA protections for the WCT.

14.     Defendant Gale Norton is the Secretary of the Interior. The Secretary of the Interior is the federal official vested with responsibility for listing inland fish species such as the WCT. Defendant Norton is sued in her official capacity.

15.     Defendant Matthew Hogan is the Acting Director of the United States Fish and Wildlife Service. The Service is the federal agency to which the Secretary of the Interior has delegated responsibility for listing inland fish species such as WCT. Defendant Hogan is sued in his official capacity.

## THE ESA'S STAUTORY FRAMEWORK

16.     Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species." 16 U.S.C. § 1531(a)(1). To this end, the ESA requires the Secretary of Interior, acting through FWS, to identify endangered or threatened species for listing and to respond to listing petitions submitted by the public. Id. § 1533(a)(1), (b)(3)(A).

17.     Once listed, the ESA makes it illegal to "take" – i.e. kill, harm, collect, or otherwise harass – any member of an endangered species. Id. § 1538. Further, before undertaking action that could affect listed species, federal agencies must consult with FWS to ensure that contemplated actions will not jeopardize the species. Id. § 1536(a)(2). Also, when a species is listed, the Secretary must ordinarily designate critical habitat. Id. § 1533(b)(2).

18.     Under the ESA, a species is "threatened" when it is "likely to become an endangered species in the foreseeable future." 16 U.S.C. § 1532(20). In determining whether a species is threatened, FWS is required to consider the following five factors, any one of which may justify listing: "A) the present or threatened destruction; modification; or curtailment of its habitat or range; B) overutilization for commercial, recreational, scientific, or educational purposes; C) disease or predation; D) the inadequacy of existing regulatory mechanisms; or E) other natural and manmade factors affecting its continued existence." Id. § 1533(a)(1).

19.     FWS must make this listing determination "solely on the basis of the best scientific and commercial data available." Id. § 1533(b)(1)(A).

## THE WESTSLOPE CUTTHROAT TROUT

20.     The WCT, <u>Oncorhynchus clarki lewisi</u>, is an important part of the natural heritage of the Northern Rockies.  The fish, which was once tremendously abundant throughout the greater Northwest was named in honor of Lewis and Clark, who first described the "cutthroat trout" in 1805 — two hundred years ago, this bicentennial year.

21.     The WCT derives its common name "cutthroat" from the distinctive red-orange "slash" beneath its gills.  It has an olive to black-olive back, metallic silvery sides, a rosy underside and a scattered distribution of small black spots that becomes more dense near the tail.  It can grow to more than twenty inches in length and can weigh up to six pounds.

22.     Of the 14 subspecies of native inland cutthroat trout, the WCT was once the most widely distributed.  The WCT colonized the inland Northwest during the last ice age and settled all over the upper reaches of river basins that drain into the Pacific Ocean, Hudson Bay, and the Gulf of Mexico.  Its historic range stretched from the headwaters of the Columbia River Basin in British Columbia, east to the South Saskatchewan River Basin in Alberta, south to the Missouri River Basin in central and western Montana and northern Wyoming; and west to the tributaries of the Columbia River in northern and central Idaho.  Disjunct populations of WCT were also carried to eastern Washington state and the John Day River in central Oregon, presumably by catastrophic flooding of glacial lakes during the ice ages.

23.     Today, WCT survive in only a small fraction of their former range due to widespread human development including damming, mining, logging, road building, and poor grazing and irrigation practices.   It is currently estimated that genetically pure WCT

Case 1:05-cv-01043-EGS   Document 1   Filed 05/23/2005   Page 8 of 14

persist in only 2.5% of their historic range in Montana and 4% of their historic range in Idaho.

## THE THREAT POSED BY HYBRIDIZATION

24.　These remaining WCT populations are increasingly threatened by interbreeding, otherwise termed as "hybridization" or "introgression," with sportfish, especially rainbow trout that were introduced into the WCT's native waters.

25.　As this Court has recognized previously, there are "several significant harms stemming from hybridization, including impairment of growth, survival, fertility, developmental rate, and the ability of individuals to develop properly." See American Wildlands v. Norton, 193 F. Supp. 2d 244, 253 (D.D.C. 2002) (internal quotations and record citations omitted).  Ultimately, hybridization threatens the loss of WCT as a subspecies.

26.　Losing genetic heritage has serious implications not only for WCT, but also for western trout more generally.  As distinct trout lineages disappear, the work of millions of years of evolution is undone.  Adaptations to local environmental conditions are lost, and trout populations are no longer equipped with a diversified "portfolio" of genes to combat floods, fires, drought, and disease.  In short, as western trout become more homogenous, the entire fishery becomes more vulnerable to a crash.  For these reasons, the leading experts on WCT recognize hybridization as a major threat to the survival of the subspecies.

27.　While FWS has long recognized that hybridization threatens WCT, the agency has assumed that the spread of hybridization would be stopped in WCT "strongholds" by high elevations and cold water temperatures that favor WCT over rainbow trout.   However, a recent study in one of these presumptive strongholds, the North Fork of the Flathead River in Glacier National Park, reveals that elevation and temperature are not effective barriers to

8

hybridization. WCT-rainbow trout hybrids are rapidly moving upstream, hybridizing pure WCT populations as they go. Accordingly, the same scientists who are recognized by FWS as the leading experts on WCT have warned that current levels of hybridization will not remain stable. Rather, hybridization is a progressive problem that is only getting worse.

## LITIGATION TO COMPEL ESA PROTECTION FOR WCT

28.  American Wildlands has been seeking to secure protection for WCT under the ESA for the past eight years. Yet after prevailing in three successive lawsuits to compel FWS to take action under the ESA, American Wildlands has yet to obtain an honest agency assessment of the WCT's imperiled status in light of widespread hybridization.

29.  American Wildlands first petitioned to list the WCT as a threatened species in 1997. On March 17, 1998, American Wildlands brought suit in this Court to compel the Service to issue a 90-day finding on its petition as required by the ESA, 16 U.S.C. § 1533(b)(3)(A). FWS settled the lawsuit with an agreement to prepare a 90-day finding, and on June 10, 1998, FWS published its determination that American Wildlands' petition provided substantial information to indicate that listing the WCT as a threatened species "may be warranted." 63 Fed. Reg. 31,691 (June 10, 1998).

30.  Based on this positive 90-day finding, FWS was required to undertake a comprehensive status review for WCT and issue a 12-month finding whether listing is warranted. See 16 U.S.C § 1533(b)(3)(B). More than a year after its statutory deadline had passed, FWS still had not issued the required 12-month finding. Therefore, on August 4, 1999, American Wildlands filed suit to compel FWS to issue its 12-month finding. In March, 2000, FWS entered into a settlement agreement to publish its 12-month finding for WCT on or before April 10, 2000.

31.     On April 14, 2000, FWS published a 12-month finding in which it determined that listing the WCT was not warranted based on the widespread distribution of the subspecies. While genetic testing revealed that many of the fish stocks counted as WCT in this "widespread distribution" were either known hybridized stocks or likely hybridized stocks, FWS simply treated them as WCT based on the visual judgments of local fisheries managers. Even though FWS had acknowledged hybridization as a major threat to WCT, it relied on the existence of hybridized fish as a reason not to list the WCT as a threatened species.

32.     On November 2, 2001, American Wildlands brought suit challenging FWS' 12-month finding. This Court granted summary judgment in American Wildlands' favor, holding that "the agency wholly fails to reconcile its recognition of hybridization as a threat to WCT's viability with its inclusion of hybrid stocks in the population assessed for listing." American Wildlands v. Norton, 193 F. Supp. 2d at 255. The Court recognized there was an "extensive administrative record" that "describe[d] FWS' decision to include hybrid stock in the population as resting on a determination that visual professional judgments were the best indication of the WCT population." Id. at 257. This Court found that "this determination was not supported by the best available science and was arbitrary and capricious." Id.

33.     Accordingly, the Court remanded FWS' 12-month WCT finding to the agency with instructions to "evaluate the threat of hybridization as it bears on the ESA's statutory listing factors." Id. at 258. Specifically, this Court ordered FWS to determine: "(1) the current distribution of the species, taking into account the prevalence of hybridization, 16 U.S.C. § 1533(a)(1)(A); (2) whether the WCT population is an endangered or threatened species because of hybridization, 16 U.S.C. § 1533(a)(1)(E); and (3) if existing regulatory mechanisms are

adequate to address threats posed by hybridizing non-native fish. 16 U.S.C. § 1533(a)(1)(D)."

Id.

### FWS' CONSIDERATION OF HYBRIDIZATION ON REMAND

34. Pursuant to this Court's remand order, FWS initiated a new status review. On August 7, 2003, FWS published a second finding that listing is not warranted because the "WCT subspecies is widely distributed and there are numerous robust WCT populations and aggregates of populations throughout the subspecies' historic range." See 68 Fed. Reg. 46,989, 47,006 (Aug. 7, 2003).

35. However, just as FWS counted hybrid fish as viable WCT in the previous 12-month finding that was overturned by this Court, FWS once again counted hybrid stocks as "robust" WCT populations. Even though FWS identified hybridization as the "greatest threat" to WCT, it based its assessment of the WCT's status on the distribution of fish fitting the physical description of WCT regardless of genetics. Id. at 47,006.

36. This finding hinges on the novel presumption that hybrid WCT that look the same as WCT also behave the same as WCT and are therefore equivalent to WCT. Based on this presumption, FWS effectively discounted widespread hybridization as a problem, announcing that "individual fish or populations conforming to the scientific taxonomic description of WCT shall not be considered a threat to the continued existence of the subspecies." Id. at 46,995.

37. In an effort to provide some genetic grounding for this focus on visual judgments, FWS further attempted to justify its finding by asserting that fish that look like WCT are likely to be at least 80% genetically pure.

11

38.     There is no scientific support for FWS' presumption that the loss of genetic integrity is only problematic when it is visible to the naked eye. The best available data, which is cited in FWS' finding, indicates that: (1) there is <u>no</u> safe threshold for hybridization; (2) hybrid WCT look-alikes do <u>not</u> behave like WCT; and (3) that fish stocks may be up to 50% hybridized before hybridization becomes visibly apparent.

39.     The scientists who authored the very studies cited by FWS in support of its finding have stressed both in correspondence to the agency and in a peer-reviewed paper in the scholarly journal <u>Conservation Biology</u> that their work does not support the agency's conclusions. They have repeatedly emphasized that the loss of genetic material poses a threat to the subspecies whether or not it engenders physical changes in appearance. In addition, they have cautioned that hybrids are <u>not</u> "express[ing] the behavioral, ecological, and life-history characteristics of WCT" but rather are rapidly colonizing new territory (hybridizing pure WCT as they go) unlike pure WCT populations, which tend to remain localized.

40.     Moreover, the absence of physically apparent hybridization does not guarantee "the limited presence in WCT of genetic material from other fish species." <u>Id.</u> at 47,006. Despite FWS' assertion that populations of hybrid look-alikes are likely to be no more than 20% hybridized, the agency itself acknowledges that hybridization cannot reliably be detected visually until a fish population is more than 50% hybridized. <u>See</u> <u>id.</u> at 46,993-94. Thus, while FWS purports to rely on the conservation value of "slightly introgressed WCT populations with low amounts of genetic introgression detectable only by molecular genetic methods," <u>id.</u>, in fact, FWS is counting fish stocks that may be up to 50% hybridized as viable WCT.

**FIRST CAUSE OF ACTION**

41.     American Wildlands hereby realleges and incorporates paragraphs 1 through 40 above.

42.     FWS' finding that listing the WCT as a threatened species is "not warranted" is subject to the standard of review set forth by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  The finding therefore must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id. § 706(2)(A).

43.     FWS based its "not warranted" finding for WCT on the arbitrary presumption that hybridized fish do not represent a threat to the subspecies so long as they look the same as WCT.  Because this presumption is directly at odds with the best available scientific data, FWS' finding is arbitrary, capricious, an abuse of discretion and not in accordance with law in violation of the ESA, 16 U.S.C. § 1533(b)(1)(A).

**SECOND CAUSE OF ACTION**

41.     American Wildlands hereby realleges and incorporates paragraphs 1 through 40 above.

42.     In failing to undertake a principled assessment of the WCT's current distribution in light of hybridization, FWS failed to make a reasoned determination whether any of the ESA's statutory factors requires listing the WCT as a threatened species.  For this reason too, FWS' "not warranted" finding for WCT is arbitrary, capricious, an abuse of discretion and not in accordance with law in violation of the ESA, 16 U.S.C. § 1533.

**REQUEST FOR RELIEF**

THEREFORE, Plaintiffs request that this Court:

1.   Enter a declaratory judgment that FWS' finding that listing the WCT as a threatened species is not warranted violates the ESA as set forth in this complaint.

2.   Set aside FWS' finding and remand to the agency for further consideration whether to list the WCT as a threatened species in light of this Court's disposition of Plaintiffs' claims.

3.   Award Plaintiffs their costs, expenses, and attorney fees pursuant to the citizen-suit provision of the Endangered Species Act, 16 U.S.C. § 1540(g)(4).

4.   Grant Plaintiffs such further relief as may be appropriate.

Respectfully submitted this 20th day of May, 2005,

/s/ Douglas Honnold
Douglas L. Honnold (D.C. Bar # 468323)
Abigail M. Dillen
Earthjustice
209 South Willson Avenue
Bozeman, MT 59715
(406) 586-9699
*Attorneys for Plaintiffs*
*American Wildlands, et al.*