UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AMERICAN WILDLANDS, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil No.: 05-cv-1043 |
| ) | |
| ) | PLAINTIFFS' MOTION FOR LEAVE |
| vs. ) | TO SUPPLEMENT THE |
| ) | ADMINISTRATIVE RECORD |
| GALE NORTON, in her official capacity ) | |
| as Secretary, U.S. Department of the Interior, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

Plaintiffs American Wildlands, et al. hereby move to supplement the administrative
record with three documents highlighting relevant factors that federal defendants failed to
consider in declining to afford the westslope cutthroat trout ("WCT") protection as a threatened
species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. The U.S. Fish and
Wildlife Service's ("FWS") determination that listing is "not warranted" for the WCT despite
widespread hybridization — interbreeding between WCT and rainbow trout that have been
introduced as sport fish into the WCT's native waters — has elicited strong criticism from
scientists that FWS itself regards as leading experts on WCT conservation. These scientists have
written repeatedly to FWS to protest the agency's misuse of their work. Yet while the agency
purports to rely on their research, it has failed to justify its decision in light of their concerns. In
order to ensure meaningful review of the challenged listing determination, the administrative
record should reflect the understanding of scientists upon whom the agency itself is purporting to
rely.

Accordingly, American Wildlands seeks to supplement the administrative record with:

- Letter from Fred W. Allendorf and Paul Spruell to Lynn Kaeding (November 30, 2003) ("Allendorf Letter") (attached as Exhibit 1) (in which leading experts itemize FWS' failure to support its conclusions on the basis of the best available science);

- Letter from Nathaniel P. Hitt, Fred W. Allendorf, and Christopher A. Frissell to Lynn Kaeding (July 10, 2004) ("Hitt Letter") (attached as Exhibit 2) (in which leading experts set forth their disagreement with FWS' interpretation of their data and discuss agency's failure to base its decision on the best available scientific information);

- National Park Service, <u>Yellowstone Fisheries & Aquatic Sciences</u>, <u>Annual Report 2003</u> (2003) ("2003 Annual Report") (excerpt attached as Exhibit 3) (disclosing that the last WCT population in Yellowstone National Park is hybridized).

.

## FACTUAL BACKGROUND

On August 7, 2003, the U.S Fish and Wildlife Service ("FWS") determined that listing the WCT as a threatened species under the ESA is "not warranted" even in the face of widespread hybridization. <u>See</u> Reconsidered Finding for an Amended Petition to List the Westslope Cutthroat Trout as Threatened Throughout its Range, 68 Fed. Reg. 46,989 (August 7, 2003). This determination followed a similar "not warranted" determination, which this Court struck down in 2002. <u>See</u> <u>American Wildlands v. Norton</u>, 193 F. Supp. 2d. 244, 257-58 (D.D.C. 2002). In <u>American Wildlands</u>, this Court held that FWS' "decision to include hybrid stock in the WCT population considered for listing was not supported by the best available science" and was "arbitrary and capricious" in light of the acknowledged threat posed by hybrid fish. <u>Id.</u> at 256. More specifically, this Court rejected FWS' attempt to defend its "decision to include hybrid stock in the population as resting on a determination that visual professional judgments were the best indication of the WCT population." <u>Id.</u> at 257. Accordingly, this Court ordered FWS to issue a new listing determination addressing: "(1) the current distribution of the species, taking into account the prevalence of hybridization, 16 U.S.C. § 1533(a)(1)(A); (2) whether the WCT population is an endangered or threatened species because of hybridization, 16 U.S.C. §

1533(a)(1)(E); and (3) if existing regulatory mechanisms are adequate to address threats posed by hybridizing non-native fish. 16 U.S.C. § 1533(a)(1)(D)." Id. at 258.

In response to this Court's order, FWS issued a second "not warranted" finding that turned once again on the inclusion of hybrids in the WCT population considered for listing. See 68 Fed. Reg. at 46,990. As FWS concedes, hybridization with rainbow trout and their hybrid "descendants" "remains the greatest threat to WCT." Id. at 47,006. Nevertheless, FWS continued to treat hybrids as WCT based on a newly created presumption that hybrids are equivalent to WCT unless their genetic differences manifest themselves in visually detectable ways. So long as hybrids conform physically to the "scientific taxonomic description of WCT," they are "presumed [by FWS] to express the behavioral, ecological, and life-history characteristics of WCT native to the geographic areas where those populations occur." Id. at 46,995. In short, FWS decided that superficial appearance is the best indication of the WCT population — that a fish that looks like a WCT should be treated as a WCT, even if it is a hybrid. Thus, notwithstanding the fact that hybrid populations may continue to be visually indistinguishable from WCT until they are more than 50 percent hybridized, see id. at 46,995, FWS relied once again on visual judgments rather than genetic data, counting all fish that look like WCT, including known and suspected hybrids, as viable members of the subspecies. See id. at 46, 995-96; see also id. at 47,006 (ultimately concluding that hybridization does not warrant listing because "the criteria that we provided for inclusion of individual fishes in the WCT subspecies, in response to the Court's order, allow for the limited presence in WCT of genetic material from other fish species").

By treating hybrid and suspected hybrid fish stocks as part of the WCT population, FWS managed not only to avoid confronting the threat posed by hybridization but also to report an

"even greater abundance of WCT" than previously estimated.  Id. at 47,006.  Thus, FWS

determined that the threat posed by hybridization does not warrant listing because "the WCT

subspecies is widely distributed and there are numerous, robust populations and aggregates of

populations throughout the subspecies' historic range."  Id.

In reaching this conclusion, FWS purported to rely on research by the leading experts on

WCT and fisheries genetics including Fred Allendorf, Rob Leary, Paul Spruell,[1] and Nathaniel

Hitt.  See id. at 46,993-94, 47,004; see also American Wildlands, 193 F. Supp. 2d at 256

(identifying research by "Allendorf and Leary" as a starting point for "reasoned" analysis of

hybridization issue).  Yet after FWS published its August 7, 2003 finding, these same scientists

wrote to the agency regarding "serious flaws" in the agency's analysis of the hybridization issue,

including its "interpretation of our data on several counts."  Ex. 1 at 1; Ex. 2 at 1.

When FWS failed to respond to the serious concerns expressed by these acknowledged

experts on WCT, American Wildlands sent FWS a 60-day notice letter alleging that the agency

had violated the ESA in failing to make a reasoned listing determination based on the best

available science.  American Wildlands reiterated the concerns previously directly to the agency

in the Allendorf and Hitt Letters, and also attached copies of their correspondence with the

agency as Exhibits to the 60-day notice letter.  American Wildlands further provided an excerpt

from a 2003 National Park Service annual report, see Ex. 3, which disclosed that the last

remaining WCT population in Yellowstone National Park is hybridized notwithstanding FWS'

speculation that "essentially undisturbed, natural habitats" insulate WCT from the threat of

hybridization.  68 Fed. Reg. at 47,005.  Because FWS refused to take any action to remedy the

---

[1] Paul Spruell co-authored several of the papers cited by FWS in its August 7, 2003 finding.  See
68 Fed. Reg. at 47,007.

legal violations identified in the 60-day notice, American Wildlands filed this action on May 25, 2005.

## ARGUMENT

American Wildlands now seeks to supplement the administrative record filed by federal defendants with these documents that were submitted with its 60-day notice letter, specifically: (1) the Allendorf Letter (Ex. 1); (2) the Hitt Letter (Ex. 2); and (3) the excerpt from the National Park Service's 2003 Annual Report regarding hybridization in Yellowstone National Park (Ex. 3).

Supplementation of the record with these three documents is proper under well-established case law providing that "courts may consider extra-record evidence in [their] review of agency actions under certain circumstances." American Rivers v. U.S. Army Corps of Engineers, 271 F. Supp. 2d 230, 247 (D.D.C. 2003). "Although as a general rule a court reviewing agency action is confined to information before the agency at the time it made its decision, the D.C. Circuit has acknowledged that a court may consider additional evidence 'when the agency failed to consider factors which are relevant to its final decision;' to allow the court to 'understand the issues more clearly' in a complex case; and 'where evidence arising after the agency action shows whether the decision was correct or not.'" Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 217-18 n.17 (D.D.C. 2005) (quoting Esch v. Yeutter, 876 F.2d 976, 991 (D.C.Cir.1989)).

These exceptions to the general record rule apply with special force in this case. Supplementation of the record is necessary to document relevant factors that FWS failed to consider in declining to list WCT, and to enable a clear understanding of the complex scientific issues before this Court. See id. As the Ninth Circuit has explained, "it is both unrealistic and

unwise to 'straightjacket' the reviewing court with the administrative record. It will often be

impossible, especially when highly technical matters are involved, for the court to determine

whether the agency took into consideration all relevant factors unless it looks outside the record

to determine what matters the agency should have considered but did not. The court cannot

adequately discharge its duty to engage in a "substantial inquiry" if it is required to take the

agency's word that it considered all relevant matters." Asarco, Inc. v. EPA, 616 F.2d 1153, 1160

(9th Cir. 1980)); see also Environmental Defense Fund v. Costle, 657 F.2d 275, 285 (D.C. Cir.

1981) (quoting Asarco, Inc.).

## I.     THIS COURT SHOULD SUPPLEMENT THE RECORD WITH CRITICAL LETTERS FROM THE EXPERTS CITED BY FWS

This Court should supplement the record with the Allendorf and Hitt Letters in order to

ensure meaningful review of FWS' determination that widespread hybridization does not warrant

listing of WCT.  In deciding to treat hybrid look-alikes as viable members of the WCT

subspecies, FWS purported to rely on research by Mr. Allendorf, Mr. Spruell, and Mr. Hitt.  See

68 Fed. Reg. at 46,993-95, 47,004.  However, these same scientists objected in writing to

FWS' conclusions, stressing that the agency had misused and, in some instances, flatly ignored

their findings in order to reach conclusions that, in their view, cannot be squared with the best

available science.  The record should reflect these scientists' "disagree[ment] with the USFWS'

interpretation of  [their] data on several counts."  Ex. 2 at 1.

For instance, FWS cited Allendorf, et al. (2003) for the proposition that "natural

populations of WCT may have a genetic ancestry derived by as much as 20 percent from

rainbow trout or YCT [Yellowstone Cutthroat Trout] when fish in those populations …

conform[] to the scientific taxonomic description of WCT."  68 Fed. Reg. at 46, 994 (emphasis

added); see also id. at 46,995 (explaining that on the basis of the Allendorf "data described

previously in this section, our general conclusion is that natural populations conforming morphologically to the scientific taxonomic description of WCT may have up to 20 percent of their genes derived from rainbow trout or YCT") (emphasis added). Assuming, on this basis, that hybrid look-alikes will have, at most, "genes from another taxon at low frequency," id. at 46,994, FWS decided to rely on visual judgments rather than genetic data to identify WCT populations. Id. at 46,994-95 (permitting the use of genetic data to identify WCT only when there is no data available on the physical traits or "morphology" of a population).

The Allendorf letter, however, expressly cautions that this policy would allow populations that "contain substantially less than 50% WCT genes" to be classified as WCT on the basis of looks alone. See Ex. 1 at 2; see also Ex. 2 at 2 (describing FWS' proposed "morphological threshold associated with 20% non-native genes" as "an unlikely scenario"). Indeed, Mr. Allendorf stresses that FWS' "primary reliance on morphology to determine what should be considered a WCT ignores scientific progress in understanding hybridization and detecting hybrids over the last 30 years" and "ensures that the best available scientific data will not be used to make these decisions." Ex. 1 at 2.

Similarly, FWS cited Hitt (2002) for the proposition that "the upstream introgression of rainbow trout genes would eventually be halted by diminished stream size, as evidenced by the observation that rainbow trout usually inhabit larger streams than cutthroat trout."[2] 68 Fed. Reg. 47,004; see also id. at 47,005 (suggesting "limits" to "upstream dispersal" of hybrids "set by low stream temperatures or other factors"). According to FWS, the prospect that "there may be limits to that upstream dispersal" set by environmental factors was a reason not to list WCT. Id. at 47,006; see also id. at 47,004-5.

---

[2] The term "introgression" is used interchangeably with the term "hybridization."

However, the Hitt Letter makes clear that "the data in this thesis and the corresponding Canadian Journal of Fisheries and Aquatic Sciences paper do not support this interpretation. In fact, the interpretation in the Federal Register is antithetical to the reported data in Hitt (2002) and Hitt et al. (2003)." Ex. 2 at 2. Far from supporting FWS' speculation that environmental factors such as stream size, temperature, or elevation may limit the spread of hybridization among WCT, the Hitt (2002) thesis cited by FWS "concluded that upstream introgression will not be limited by environmental gradients in our study area." Id. at 3.

Where, as here, the agency cites scientific research in support of conclusions that the scientists themselves regard as "antithetical" to their work, supplementation of the record is proper to reflect the scientists' actual views. See Carlton v. Babbitt, 26 F. Supp. 2d. 102, 107 (D.D.C. 1998); Oceana Inc. v. Evans, 384 F. Supp. 2d. at 217-18 n. 17. Both Carlton and Oceana, Inc. are directly on point. In Carlton, this Court supplemented the record with a declaration from a scientist "explicitly disclaim[ing] the FWS's optimistic reading of his article." Carlton v. Babbitt, 26 F. Supp. 2d at 108. This Court found that "his understanding of his own article is particularly relevant and should have been considered in connection with this matter." Id. Similarly, in Oceana, Inc., this Court supplemented the record with a letter from a scientist that objected to the agency's use of a model she had helped to develop. Oceana, Inc. v. Evans, 384 F. Supp. 2d at 218 n. 17. This Court held that her "understanding of the model is particularly relevant and allows the Court to better understand the model's complexities" and that "her letter bears directly on whether the agency considered factors which are relevant to its final decision, and purports to undermine key evidence supporting [the agency's] decision." Id. (internal quotations and citations omitted); see also Southwest Center for Biological Diversity v. Norton, 2002 WL 1733618 at *7 (D.D.C. 2002) (supplementing the record where a scientist

disputed FWS' application of ESA listing criteria that he had helped to develop).  Here too, supplementation of the record is necessary to ensure that FWS' decision is not sustained based upon a misrepresentation of the underlying science that has been explicitly rejected by the very scientists whose work is at issue.

More broadly, this Court should supplement the record with the Hitt and Allendorf letters because they "bear[] directly on whether the agency considered factors which are relevant to its final decision." Oceana, Inc. v. Evans, 384 F. Supp. 2d at 218 n. 17.  Both of these letters identify major considerations that FWS entirely ignored in dismissing hybridization as a threat. As the Hitt letter explains, FWS failed to mention, much less grapple with the practical danger posed by hybridization — that the loss of genetic diversity in WCT may compromise the long-term fitness (as opposed to the appearance) of the subspecies.  See Ex. 2 at 1-2.  Crucially, genetic changes that are not visibly apparent may nevertheless result in the loss of important "local adaptations" that have enabled WCT to persist over thousands of years in the face of fires, floods, disease and other periodic events.  See id.  Yet, as the Hitt letter explains, FWS never considered this risk, or indeed, any other consequence of hybridization and the attendant loss of genetic diversity among WCT.   See id.

Instead, FWS simply assumed that hybrid look-alikes will express the same "behavioral, ecological, and life-history characteristics of WCT."  68 Fed. Reg. at 46,994.  Here again, however, the Allendorf and Hitt letters identify significant factors that the agency neglected to consider.  As the Allendorf letter states, "[t]here are no scientific data presented in the Finding to support this assumption."  Ex. 1 at 2.  To the contrary, the Hitt (2002) thesis provides "clear evidence that this assumption is incorrect."  Id. (explaining that "[t]he continued spread of hybridization in the range of WCT is strong evidence that hybridized populations do not function

as WCT," which typically exhibit "very little natural gene flow among native populations"). Thus, while FWS relied upon the Hitt (2002) thesis, it never addressed a key implication of Hitt et al.'s research, which is that hybrids do not behave like WCT.

Moreover, the same Hitt (2002) data undermines FWS' contention that "the frequency of genes from the other taxa" such as rainbow trout will "remain low in the [WCT] population." Id. at 3 (quoting 68 Fed. Reg. at 46,994); see also Ex. 2 at 2. As both the Allendorf and Hitt Letters point out, "the recent empirical data of Hitt, et al. (in press) cited in the Finding show exactly the opposite." Ex.1 at 3; see also Ex. 2 at 2-3. Hitt et al. found that: (1) hybrids have moved increasingly into non-hybridized WCT populations over the last 20 years; and (2) "the best predictor of whether or not a WCT became hybridized was its proximity to a hybridized population." Ex. 1 at 3; see also Ex. 2 at 2-3. Based on these findings, the Allendorf Letter warned that "hybridized populations that would be considered as WCT under the Finding are a major threat of hybridization of WCT," contrary to FWS' pronouncement that "we do not consider such populations as contributing to the threat of hybridization." Ex. 1 at 3; 68 Fed. Reg. at 46,994; see also Ex. 2 at 2-3. Nevertheless, FWS never addressed this significant implication of the Hitt (2002) research, i.e. that hybridization cannot be expected to remain at low levels.

Because the Hitt and Allendorf Letters serve to illuminate key factors that FWS failed to consider, and further "purport[] to undermine key evidence supporting FWS' decision," they should be included in the record for review regardless of the fact that they are post-decisional. Oceana, Inc. v. Evans, 384 F. Supp. 2d at 218 n. 17 (internal quotations omitted). Oceana, Inc. is illustrative. While the Oceana, Inc. court noted that "Dr. Heppell submitted her comments only after the agency had issued the [challenged decision]," it nevertheless found that "the delay is understandable, since there was no public comment period for the [decision], and she only

recently became aware of the [agency's] use of the model." Id.  Similarly, in <u>Southwest Center for Biological Diversity</u>, this Court allowed the scientist's declaration into the record on grounds that "there [was] nothing to suggest that plaintiffs were acting in bad faith by delaying [the] declaration until after the close of the administrative record, for the first hint of the use of the 20% standard is found in FWS' final action, the not warranted decision itself." <u>Southwest Center for Biological Diversity v. Norton</u>, 2002 WL 1733618 at *7.

The circumstances warranting supplementation of the record are equally compelling in this case.  Mr. Allendorf, Mr. Hitt, Mr. Spruell and others provided comments and original data to FWS throughout the status review process, but they could not have anticipated FWS' adoption of a wholly novel approach to classifying hybrid look-alikes as WCT.  Thus, their letters, of necessity, were written <u>in response</u> to the challenged listing determination, for which there was no public comment period.  As a matter of course, they could not have drafted the letters at issue before the agency issued its "not warranted" decision, for the "first hint" of FWS' new hybrid policy is found in its Federal Register notice.  <u>Southwest Center for Biological Diversity</u>, 2002 WL 1733618 at *7.

As the Allendorf and Hitt letters were sent directly to the agency, and then subsequently attached to American Wildlands' 60-day notice, FWS has had ample notice of their contents and ample opportunity to revisit its conclusions in light of their criticisms.  FWS has elected not to avail itself of that opportunity.  FWS now should be required to justify its decision in light of the relevant factors identified by the very scientists that the agency itself is citing

## II. THIS COURT SHOULD SUPPLEMENT THE RECORD WITH THE 2003 ANNUAL REPORT REGARDING WCT HYBRIDIZATION IN YELLOWSTONE

Finally, this Court should supplement the record with an excerpt from the National Park Service's 2003 Annual Report, which discloses that the last WCT population in Yellowstone

National Park is hybridized based on the results of genetic testing from May 2003. <u>See</u> Ex. 3. This is a relevant factor that the agency should have considered in assessing the threat posed by hybridization. <u>See</u> <u>American Rivers v. Army Corps of Engineers</u>, 271 F. Supp. 2d at 230. In its "not warranted" finding, FWS highlighted the fact that "70 percent of the habitat occupied by extant WCT populations lies on lands managed by Federal agencies, including lands designated as national parks," 68 Fed. Reg. at 46,998. The agency then relied on these "essentially undisturbed, natural habitats" as a check on further hybridization. <u>See</u> <u>id.</u> at 47,005, the 2003. However, the 2003 Annual Report reveals that even the most protective land management in the "essentially undisturbed, natural habitats" of Yellowstone National Park did not prevent the spread of hybridization. <u>See</u> Ex. 3.

Because this 2003 Annual Report demonstrates that "FWS failed to consider factors which are relevant to its final decision," it should be admitted into the record in this case. Indeed, given that the genetic testing referenced in the report was completed in May 2003, it is unclear why this information was not part of the administrative record before the agency. <u>See</u> <u>Kent County, Delaware Levy Court v. EPA</u>, 963 F.2d 391, 396 (D.C. Cir. 1992) (permitting consideration of extra-record documents where "it appears that the [agency] was at least negligent in failing to discover them when it searched for documents to support its position").

## CONCLUSION

For all the reasons set forth above, Plaintiffs American Wildlands respectfully request that this Court grant their motion to supplement the administrative record in this case.

Respectfully submitted this 9th day of January, 2006,

/s Abigail M. Dillen
Douglas L. Honnold (D.C. Bar # 468323)
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699

*Counsel for Plaintiffs*