UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILDLANDS, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> GALE NORTON, in her official capacity as Secretary, U.S. Department of the Interior, et al., <br><br> Defendants. | Civil No.: 05-cv-1043 <br><br> REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD |

    Several prominent scientists involved with the Westslope cutthroat trout ("WCT") status review have expressed concerns that the U.S. Fish and Wildlife Service ("FWS") misused their work to make findings that their research does not support. Yet federal defendants suggest that this Court should simply ignore these scientists' concerns. When FWS seeks to trade on the credibility of respected experts, the administrative record rule does not permit the agency to conceal the genuine views of those experts from the Court.

    In declining to afford the WCT protection under the Endangered Species Act ("ESA"), FWS set forth a scientific rationale that purports to rely on the work of Dr. Fred Allendorf and his colleagues, Dr. Paul Spruell, and Mr. Nathanial Hitt. FWS commissioned Dr. Allendorf's laboratory to undertake a comprehensive study of hybridization for purposes of the status review, and FWS relies on this study, which was co-authored by Dr. Spruell and Mr. Hitt, as the basis for its linchpin conclusion that fish populations meeting the taxonomic, or physical, description of WCT will be no more than 20 percent hybridized with genes from other fish species. Based on

this "20 percent" threshold, FWS went on to presume that hybrid look-alikes will share the same ecological and behavioral characteristics as WCT.  Accordingly, FWS counted hybridized fish populations as viable WCT and ultimately concluded that ESA listing is not warranted for WCT based on the widespread distribution of the species.  However, Dr. Allendorf, Dr. Spruell, and Mr. Hitt have informed FWS that their work does not support either this "20 percent" threshold or the related presumption that hybrid look-alikes are the same as WCT from a behavioral and ecological standpoint.  This raises the fundamental concern that there is not a "rational connection" between the challenged listing determination and the best available scientific data.  Bowen v. American Hosp. Ass'n, 476 U.S. 610, 626-27 (1986).  Under these circumstances, meaningful review of the agency's rationale for declining to list the WCT requires consideration of the objections leveled by the very experts relied upon by FWS

## ARGUMENT

**I.   MEANINGFUL REVIEW REQUIRES SUPPLEMENTATION OF THE RECORD WITH THE ALLENDORF AND HITT LETTERS**

Contrary to federal defendants' arguments, the general rules governing record review in Administrative Procedure Act ("APA") cases do not preclude this Court from considering letters sent jointly to FWS by Dr. Allendorf, Dr. Spruell, and Mr. Hitt.  See Letter from Fred W. Allendorf and Paul Spruell to Lynn Kaeding (November 30, 2003) ("Allendorf Letter") (attached as Exhibit 1 to Plaintiffs' Motion For Leave To Supplement The Administrative Record ("Supp. Mot.");  Letter from Nathaniel P. Hitt, Fred W. Allendorf, and Christopher A. Frissell to Lynn Kaeding (July 10, 2004) ("Hitt Letter") (attached as Exhibit 2 to Supp. Mot.).   Federal defendants cite several cases standing for the well-settled proposition that litigation affidavits are generally inadmissible when none of the recognized exceptions to the administrative record rule apply.  See Federal Defendants' Opposition To Plaintiffs' Motion For Leave To Supplement The

Administrative Record ("Fed. Opp.") at 8-9 (citing Walter O. Boswell Memorial Hosp. v. Heckler, 749 F.2d 788, 794 (D.C. Cir. 1984) (declining to consider amicus litigation affidavits); Corel Corp. v. United States, 165 F. Supp. 2d 12, 31-32 (D.D.C. 2001) (declining to consider litigation affidavit where plaintiffs' expert was concededly hired "to assess the technical and financial merits of the decision" and "d[id] not add factors that [the agency] failed to consider") (emphasis in original); Cone v. Caldera, 223 F.3d 789, 795 (D.C. Cir. 2000) (declining to consider litigation affidavits that were written "after the district court complaint was filed and long after the close of the administrative proceedings" and which were in any case "neither sufficiently specific, nor sufficiently authoritative, to affect the result"); IMS, P.C. v. Alvarez, 129 F.3d 618, 624 (D.C. Cir. 1997) (declining to consider litigation affidavits that did "not appear to fall within any of the accepted exceptions" to the administrative record rule); North Texas Media, Inc. v. FCC, 778 F.2d 28, 32 n.16 (D.C. Cir. 1985) (same).

      These unremarkable holdings are not applicable here. Plaintiffs have not hired experts that were uninvolved in the decision-making process to assess the merits of the agency's conclusions, nor are plaintiffs seeking to supplement the record with affidavits prepared for purposes of litigation. Rather, plaintiffs are asking this Court to consider letters sent directly to FWS (well in advance of this litigation) by scientists who object to the agency's interpretation of their research. See Allendorf Letter; Hitt Letter. These are scientists that FWS solicited to assist in the status review process and that FWS cites in support of its listing determination. See AR II-240 at 6692-93; AR II-247 at 6765-68 (FWS purchase orders for reports from Dr. Allendorf's laboratory); AR II-260 at 6922-45 (final report authored by Dr. Allendorf et al.); Reconsidered Finding for an Amended Petition To List the Westslope Cutthroat Trout as Threatened Throughout Its Range, 68 Fed. Reg. 46,989, 46,994 (Aug. 7, 2003) (citing the Allendorf, et al.

2003 report to support agency's central conclusion regarding "20 percent" hybridization threshold); see also id. at 47,004 (citing Hitt (2002) for the proposition that "upstream introgression of rainbow trout genes would eventually be halted by diminished stream size").[1] These scientists' understanding of their own work, as set forth in the Allendorf and Hitt letters, is therefore "particularly relevant" and should be considered in these proceedings. Carlton v. Babbitt, 26 F. Supp. 2d 102, 108 (D.D.C. 1998).

As this Court has affirmed repeatedly, the administrative record should be supplemented to reflect the views actually held by experts that the agency invokes in support of its decisions. See id. at 108; Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 217-18 n.17 (D.D.C. 2005); Southwest Center for Biological Diversity v. Norton, 2002 WL 1733618 at *7 (D.D.C. 2002). For instance, in Carlton v. Babbitt, this Court admitted "a declaration by Dr. Schaffer that explicitly disclaim[ed] the FWS's optimistic reading of his article" in the agency's challenged listing determination, because his "article was the only support provided by the FWS to demonstrate that scientific authority exists for a small minimum viable population." Id. at 108. Similarly here, FWS relied on data presented by Dr. Allendorf and his colleagues to conclude that "natural populations of WCT may have a genetic ancestry derived by as much as 20 percent" from other species and still express all of the same physical, ecological, and behavioral characteristics as WCT. See 68 Fed. Reg. at 46,994.[2] Because Dr. Allendorf and his colleagues maintain that their research does not support this conclusion, see Allendorf Letter at 2-3; Hitt

---

[1] For ease of reference, plaintiffs adopt federal defendants' form of citation to the administrative record. For example, AR II-240 at 6692-93 references Part II of the record, document number 240, and bates stamp page numbers 6692-93.

[2] Dr. Allendorf and his colleague surveyed data from their own laboratory and data previously collected by Leary, et al. (1984), Marnell, et al. (1987), and Leary, et al. (1996) in order to discuss the relationship between hybridization and WCT appearance. See AR 11-260 at 6928-29. FWS cites the resulting synthesis in the 2003 Allendorf et al. report as the source for its "20 percent" threshold. See 68 Fed. Reg. at 46,994.

4

Letter at 1-2, their communications to FWS should be part of the record for review under Carlton.  See 26 F. Supp 2d at 108.

Nevertheless, federal defendants seek to distinguish Carlton on grounds that the Allendorf and Hitt Letters were sent to the agency after publication of the listing determination, whereas Dr. Schaffer's declaration "was in fact before the agency at the time it made its decision."  Fed. Opp. at 11.  However, this was not a factor mentioned by the Carlton court in deciding to supplement the record.  See Carlton, 26 F. Supp. 2d at 108.  Rather, the court's reasoning was that Dr. Schaffer's "understanding of his own article is particularly relevant."  Id.  The same is true here with respect to the Allendorf and Hitt letters.

Further, subsequent cases applying Carlton confirm that supplementation of the record is appropriate even when scientists express their concerns after the defendant agency has reached its decision.  In Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, this Court admitted an extra-record letter from a scientist who was worried that the National Marine Fisheries Service ("NMFS") had misused her model to conclude that the New England scallop fishery would not jeopardize the survival of threatened loggerhead sea turtles.  See id. at 217-21 & n. 17.  While "Dr. Heppell submitted her comments only after the agency had issued" its no-jeopardy finding, the Oceana court held that "the delay is understandable, since there was no public comment period" and "she only recently became aware of the [agency's] use of the model."  Id. at 218 n.17.  Similarly in Southwest Center for Biological Diversity v. Norton, 2002 WL 1733618 at *7, this Court supplemented the record with a declaration from Dr. Lande, a scientist who was concerned that FWS had misapplied his methodology for calculating extinction risk in declining to list the Queen Charlotte goshawk.  As in Oceana, the court was untroubled by the fact that the declaration was written after FWS had made its listing determination:

5

> [t]here is nothing to suggest that plaintiffs were acting in bad faith by delaying Lande's declaration until after the close of the administrative record, for the first hint of the use of the 20% standard [challenged by Lande] is found in FWS' final action, the not warranted decision itself. The administrative record closed upon the issuance of this final action.

Center for Biological Diversity v. Norton, 2002 WL 1733618 at *7. In this case as well, any delay in writing to the agency was similarly understandable and, indeed, unavoidable, as there was no comment period, and Dr. Allendorf and his colleagues had no reason to suspect that FWS was contemplating the entirely novel "20 percent" threshold based on their research.

Federal defendants unsuccessfully attempt to distinguish Oceana and Southwest Center by arguing that the Oceana "court carefully limited its use" of Dr. Heppell's letter "to understanding the model's complexities and determining whether the agency considered all factors," and that the Southwest Center court "carefully restricted review of the declaration to determine whether the agency considered all relevant factors." Fed. Opp. at 11 (internal quotations omitted). However, neither case refers to any such "careful" limitations and restrictions for purposes of supplementing the record.[3] In Oceana, the court simply denied the government's motion to strike the Heppell letter and then went on to consider the merits of arguments that plaintiffs advanced on the basis of Dr. Heppell's letter. See Oceana, 384 F. Supp. 2d at 217-221. In Southwest Center, the court permitted supplementation of the record and then decided on the merits that Dr. Lande's declaration "cannot be said to taint FWS' final decision." 2002 WL 1733618 at *8. Here, too, the proper course is to supplement the record with the

---

[3] On the contrary, the Oceana and Southwest Center courts considered the Heppell Letter and the Lande Declaration respectively because they "purport[ed] to undermine key evidence supporting [the agency's] decision." Southwest Center, 2002 WL 1733618 at *7; see also Oceana, 384 F. Supp. 2d at 218 n.17 (reasoning that the Heppell "letter bears directly on whether the agency considered factors which are relevant to its final decision, and purports to undermine key evidence supporting NMFS' decision") (internal quotations and citations omitted).

6

Allendorf and Hitt letters and then decide on the merits whether these letters fatally "taint FWS' final decision." Id.

In any case, plaintiffs in this case are seeking to supplement the record precisely for the purposes of understanding scientific "complexities" and "determining whether the agency considered all factors." Fed. Opp. at 11; see Supp. Mot. at 5 ("Supplementation of the record is necessary to document relevant factors that FWS failed to consider in declining to list WCT, and to enable a clear understanding of the complex scientific issues before this Court.").[4]  In this regard, federal defendants insist that the existing "record clearly discloses that FWS considered all relevant factors in its reconsidered finding." Fed. Opp. at 13. Defendants argue that supplementation of the record is unnecessary because: (a) the record includes scientific data on the effects of hybridization and the progressive spread of hybridization; and (b) FWS discussed these issues in its determination that hybridization does not warrant listing of WCT. See Fed. Opp. at 13-16. However, FWS was required to do more than compile relevant data and make pronouncements regarding the recognized threats associated with hybridization. FWS was required to articulate a rational connection between the scientific data in the record and the

---

[4] Plaintiffs do not seek to rely on the extra-record exception for "evidence arising after the agency action [that] shows whether the decision was correct or not." Fed. Opp. at 9 (quoting Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989). It is therefore unclear why defendants devote so much argument to the proposition that the Esch "new evidence" exception "does not justify consideration of extra-record material in the D.C. Circuit." Fed. Opp. at 9-10. However, it is worth noting that federal defendants cite a single case from the Federal Court of Claims for this sweeping proposition. See id. at 10 (citing Murakami v. United States, 46 Fed. Cl. 731, 735 n.4 (Fed. Cl. 2000) which merely observes that the Esch "new evidence" exception gives rise to concerns based on its potentially overbroad application). Moreover, while federal defendants state that "Esch's fifth factor has never been adopted or applied by the D.C. Circuit," Fed. Opp. at 10, Esch is itself a D.C. Circuit opinion that is routinely cited, and as federal defendants concede, lower court cases including Oceana have applied its "new evidence" exception. See id. at 11. Nevertheless, this Court need not address the validity of this exception, as plaintiffs do not directly rely upon it.

scientific conclusions announced in the final listing determination.  See Bowen v. American Hosp. Ass'n, 476 U.S. at 626-27.

In order to determine whether the scientific rationale put forward by FWS passes muster in light of all the relevant factors, it may be necessary to look outside the record just to understand what the "relevant factors" are.  See Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not."); see also Carlton, 26 F. Supp. 2d at 108 (supplementing the record with Dr. Schaeffer's declaration because "his understanding of his own article" was a "particularly relevant" factor in determining whether FWS' conclusion regarding small population viability was justified on the basis of the scientific data in the record).  Here, for example, FWS states that "we are not aware of any information to suggest that such [hybrid] individuals express behavioral, ecological, or life-history characteristics differently than do WCT." 68 Fed. Reg. at 46,994.  However, the Allendorf and Hitt Letters highlight data indicating that hybrids behave differently than WCT, and that morphology, or physical appearance, is not correlated with the sort of genetic structure that is responsible for local adaptations and differentiation in behavior among fish species.  See Allendorf Letter at 3; Hitt Letter at 1-2.  These are highly relevant factors that FWS apparently failed to consider, but which might never surface if this Court's review were restricted to the record filed by FWS.  Unless the record is supplemented to include the Allendorf and Hitt Letters, this Court will be "required to take the agency's word that it considered all relevant matters" in determining that listing is not warranted.  Asarco, Inc. v. EPA, 616 F.2d at 1160.  In

order to ensure meaningful review of FWS' listing determination, this Court should supplement the record with the Allendorf and Hitt Letters.[5]

## II.   THIS COURT SHOULD SUPPLEMENT THE RECORD WITH EVIDENCE OF HYBRIDIZATION IN YELLOWSTONE NATIONAL PARK

This Court should further supplement the record with the National Park Service's Yellowstone Fisheries and Aquatic Sciences, Annual Report 2003 ("2003 Report") (attached as Ex. 3 to Supp. Mot. and as Ex. 1 to Fed. Opp.).[6]  Federal defendants fail to offer any valid reason why encroaching hybridization of WCT in Yellowstone National Park is not a relevant factor that should have been considered by the agency.  FWS based its "not warranted" finding, at least in part, on the protection afforded by federal management and the presumed fitness advantage of

---

[5] Federal defendants finally contend in a footnote that consideration of the Allendorf and Hitt letters would be improper because the "letters are premised on mis-characterizations and unsupported interpretations of the final listing determination." Fed. Opp. at 8 n.3.  This is an attack on the weight of the Allendorf and Hitt letters, not an argument for declining to include them in the record.  Moreover, as the sole example of alleged "mischaracterizations and unsupported interpretations," federal defendants reference the "Allendorf Letter, stating that FWS would consider WCT with less than 50 percent WCT genes as a member of the subspecies considered for listing." Id.  According to defendants, "when molecular genetic data are available, WCT with less than 80 percent WCT genes will not generally be considered part of the WCT subspecies." Id.  However, defendants omit to mention that FWS is using molecular genetic data exclusively in cases where it is the "only data available." 68 Fed. Reg. at 46,995 (emphasis added).  As molecular genetic data is rarely the only data available for studied fish populations, FWS allows substantially hybridized populations to be classified as WCT so long as there is morphological data indicating that they meet the physical description of WCT.  Because hybrids may continue to look indistinguishable from WCT until they are more than 50 percent hybridized, the Allendorf letter correctly states the concern that FWS may be counting populations that are more than 50 percent hybridized as WCT.

[6] Federal defendants complain that "Plaintiffs' reference to the Annual Report as the "2003 Annual Report'" is deliberately "misleading." Fed. Opp. at 1 n.1.  However, the report is in fact titled "2003 Annual Report."  Federal defendants further complain that "Plaintiffs seek to introduce NPS's post-decisional commentary, not the laboratory results which form the basis of the report." Id. at 17.  However, these laboratory results are not available to the general public.  Federal defendants do not dispute that the results are fairly represented in the 2003 Annual Report, nor do they contest the fact that the results were available at the time FWS made its listing decision.

9

native WCT in essentially undisturbed habitats.  See 68 Fed. Reg. at 46,998 (relying on the fact that "70 percent of the habitat occupied by extant WCT populations lies on lands managed by Federal agencies, including lands designated as national parks"); id. at 47,005 (reasoning that "phenotypically true, native cutthroat trout of several subspecies persist in many essentially undisturbed, natural habitats because they have fitness superior to that of nonnative fishes including potentially hybridizing species and their hybrid descendants").  Thus, it is relevant that highly protective federal management in the essentially undisturbed, natural habitat of Yellowstone has not been effective in preventing the spread of hybridization among WCT.

Federal Defendants do not argue that FWS considered this relevant factor in reaching its listing determination.  Rather, defendants argue that hybridization in Yellowstone is somehow irrelevant because "[i]t is well known that the waters of Yellowstone National Park … were extensively stocked with nonnative trout beginning more than a century ago" and "[i]t is also well documented that this established stocking practice in Yellowstone did not and has not occurred in other wilderness, roadless, and national park areas inhabited by WCT today."  Fed. Opp. at 20.  This is simply wrong.  Yellowstone is not an anomaly.  The WCT's native lakes and streams have been heavily stocked throughout its range, including in wilderness areas, roadless areas, and national parks.  See e.g., A.R. II-306 at 7671 (chronicling history of extensive stocking in Glacier National Park); A.R. II-97 at 2328 (explaining that "stocking occurs in lakes within designated wilderness areas, national parks, and other conservation areas"); AR II-20 at 241-243 (studying WCT hybridization in stocked streams within Idaho wilderness area).

Because the 2003 Annual Report discloses a relevant factor that FWS failed to consider in declining to list the WCT, it should properly be part of the record before this Court.

## CONCLUSION

For all the reasons set forth above and in Plaintiffs' Motion For Leave To Supplement The Administrative Record, American Wildlands, et al. respectfully request that this Court supplement the record with the Allendorf Letter, the Hitt Letter, and the National Park Service's 2003 Annual Report.

Respectfully submitted this 30th day of January, 2006,

/s Abigail M. Dillen
Douglas L. Honnold (D.C. Bar # 468323)
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699

*Counsel for Plaintiffs*