## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILDLANDS, <u>et al</u>., ) | |
| ) | Civ. No. 05-1043 (EGS) |
| Plaintiffs, ) | |
| ) | |
| v. ) | **FEDERAL DEFENDANTS' MOTION FOR** |
| ) | **SUMMARY JUDGMENT** |
| P. LYNN SCARLETT, Acting Secretary of ) | |
| the Department of the Interior, <u>et al</u>., ) | |
| ) | |
| Defendants. ) | |
| ) | |

Defendants, P. Lynn Scarlett, Acting Secretary of the Department of the Interior, and H. Dale

Hall, Director of the United States Fish and Wildlife Service ("FWS" or "Service"),[1] hereby file their

Motion for Summary Judgment in the above-titled action.

The reasons why this Motion should be granted are set forth in the Memorandum in Support

and the Statement of Material Facts filed herewith. The supporting documents make clear that there

are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.

Accordingly, the Court should enter summary judgment Defendants' favor. <u>See</u> Fed. R. Civ. P. 56(c).

Dated: April 3, 2006                    Respectfully Submitted,

                                        SUE ELLEN WOOLDRIDGE, Asst. Attorney General
                                        JEAN E. WILLIAMS, Section Chief
                                        LISA L. RUSSELL, Asst. Section Chief

                                        _____*/s/ Michael R. Eitel*_____
                                        MICHAEL R. EITEL, Trial Attorney (SBN 22889 (Neb.))
                                        U.S. Department of Justice
                                        Wildlife & Marine Resources Section
                                        Ben Franklin Station, P.O. Box 7369
                                        Washington, DC 20044-7369
                                        Phone: (202) 305-0339/ Fax: (202) 305-0275
                                        Email: Michael.Eitel@usdoj.gov

                                        Attorneys for Federal Defendants

---

[1] P. Lynn Scarlett, Acting Secretary of Department of Interior, and FWS Director H. Dale
Hall are automatically substituted for their predecessors pursuant to Fed. R. Civ. P. 25(d)(1).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILDLANDS, et al.,      ) <br><br>      Plaintiffs,     ) <br> v.      ) <br><br> P. LYNN SCARLETT, Acting Secretary of ) <br> the Department of the Interior, et al.,   ) <br><br>      Defendants.    ) | Civ. No. 05-1043 (EGS) <br><br> **FEDERAL DEFENDANTS** <br> **STATEMENT OF MATERIAL FACTS** |

Pursuant to Local Rules 7(h) and 56.1, Defendants, P. Lynn Scarlett, Acting Secretary of the Department of the Interior, and H. Dale Hall, Director of the United States Fish and Wildlife Service ("FWS" or "Service"),[1] hereby set forth their statement of material facts.

The parties in this case are currently briefing cross-motions for summary judgment under Fed. R. Civ. P. 56 and LCvR 7 and 56.1. The Service is filing herewith papers in support of their motion for summary judgment. LCvR 7(h) and 56.1 require the submission of a statement of material facts. For the reasons explained below, however, there are no material facts in this case.

It is well-established that, in cases such as this one -- where Plaintiffs seek judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, of the Service's listing determination – the scope of that judicial review is properly limited to the administrative record that was before the agency at the time the decision was made. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Camp v. Pitts, 411 U.S. 138 (1973); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971); Louisiana Ass'n of Independent Producers v. FERC, 958 F.2d 1101, 1117 (D.C. Cir. 1992). "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to

---

[1] P. Lynn Scarlett, Acting Secretary of the Department of the Interior, and FWS Director H. Dale Hall are automatically substituted for their predecessors pursuant to Fed. R. Civ. P. 25(d)(1).

the reviewing court." <u>Florida Power & Light Co.</u>, 470 U.S. at 743-44.

Accordingly, judicial review of agency action is a unique procedure, different in both nature and scope from the procedures used to resolve civil actions within the original jurisdiction of the federal district courts. As the D.C. Circuit has aptly explained:

> [W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The "entire case" on review is a question of law. <u>See, e.g.</u>, <u>Marshall County Health Care Auth. v. Shalala</u>, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (holding that in agency review context there was no real distinction between questions presented in Rule 12(b)(6) motion to dismiss and motion for summary judgment); <u>University Medical Ctr. of S. Nevada v. Shalala</u>, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999) (explaining that when reviewing agency action the question of whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment); <u>James Madison Ltd. v. Ludwig</u>, 82 F.3d 1085, 1096 (D.C. Cir. 1996), <u>cert. denied</u>, 519 U.S. 1077 (1997) (holding that issues that appellant argued were issues of fact precluding summary judgment were issues of law in the context of agency review); <u>County of Los Angeles v. Shalala</u>, 192 F.3d 1005, 1011 (D.C. Cir. 1999), <u>cert. denied</u>, 530 U.S. 1204 (2000) (holding that rule of finality does not apply to bar appellate review of the district court's finding that the agency was arbitrary and capricious even though that court had not yet resolved the issue of remedy). Absent very unusual circumstances the district court does not take testimony. <u>See, e.g.</u>, <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402 (1971); <u>James Madison</u>, 82 F.3d at 1096.

<u>American Bioscience v. Thompson</u>, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001) (footnote omitted). Consequently, there are no material facts for the Court to resolve in the first instance. Rather, the Court's role is limited to determining whether the facts as found by FWS are reasonable and supported by the record. In turn, a statement of material facts as contemplated by Local Rule 7(h) is inapposite here. Nonetheless, to assure technical compliance with the local rules, FWS states as follows:

1. On June 6, 1997, FWS received a petition to list the Westslope cutthroat trout ("WCT") as threatened throughout its range and designate critical habitat for this subspecies pursuant to the Endangered Species Act ("ESA"). 65 Fed. Reg. 20,120. On June 10, 1998, FWS published notice in the Federal Register pursuant to ESA Section 4(b)(3)(A), 16 U.S.C. § 1533(b)(3)(A), that the amended WCT petition provided substantial information indicating that the requested action may be warranted. 63 Fed. Reg. 31,691 (June 10, 1998). The Service immediately began a comprehensive status review

of WCT.  65 Fed. Reg. 20,121 (April 14, 2000).

2.  On April 14, 2000, FWS determined that listing the WCT as either a threatened or endangered species under the ESA was not warranted.  See 65 Fed. Reg. 20,120.  Plaintiffs filed suit seeking remand of this determination on October 13, 2000.  See American Wildlands v. Norton, 193 F. Supp. 2d 244 (D.D.C. 2002).  On March 31, 2002, this Court vacated and remanded FWS' initial finding, holding that "FWS [did] not offer a scientifically based explanation for its decision to include known hybridized fish in its assessment of the WCT's current distribution" and that FWS "fail[ed] to reconcile its recognition of hybridization as a threat to WCT's viability with its inclusion of hybrid stock in the population assessed for listing."  Id. at 254-255.

3.  On September 3, 2002, FWS announced initiation of a new status review for the WCT and solicited comments from all interested parties regarding the present-day status of this fish, including information relevant to addressing issues raised by the Court. 68 Fed. Reg. at 46,991; see also 67 Fed. Reg. 56,257 (Sept. 3, 2002).  FWS stated it was "particularly interested in receiving data, information, technical critiques, and relevant comments that will help us address" the questions posed by the Court, including "the extent to which it is appropriate to include hybrid WCT stocks and stocks of unknown genetic characteristics in the WCT population considered for listing."  67 Fed. Reg. at 56,258-59.

4.  During the initial comment period, several entities indicated that they were assembling or awaiting important information relevant to the status of the WCT and asked that FWS extend the comment period.  See AR II-4 at 48-50; AR II-5 at 51; AR II-6 at 52-53; AR II-7 at 54.[2]  On December 18, 2002, FWS announced that the comment period was reopened until February 15, 2003. 67 Fed. Reg. 77,466 (Dec. 18, 2002); 68 Fed. Reg. at 46,991.

5.  In response to the Federal Register notices, FWS received over 200 documents and comments from State game and fish departments, the United States Forest Service, the National Park

---

[2] For ease of reference, the citations to the administrative record herein will identify the relevant "Part" of the record, which corresponds to the relevant CD-ROM (i.e., Part I (disk 1) or Part II (disk 2 and 3)), the document number, and the bates stamp number.  For example, "AR I-112 at 1112" references Part I (disk 1) of the record, document number 112, and bates stamp number 1112.

Service, Tribal governments, and private corporations, as well as private citizens, organizations, and other entities regarding the WCT.   68 Fed. Reg. at 46,996.

6.   During the administrative process, FWS received a comprehensive status report, AR II-119 ("Status Report") for WCT, prepared by the fish and wildlife agencies of Idaho, Montana, Oregon, and Washington and the U.S. Forest Service, which FWS determined constituted the best available scientific information describing the present-day rangewide status of WCT in the United States.   68 Fed. Reg. at 46,996.   To compile the information in the Status Report, 112 professional fishery biologists from 12 State, Federal, and Tribal agencies and private firms met at 9 workshops held across the range of WCT in fall 2002.   AR II-119 at 2683.   Those fishery biologists had a combined 1,818 years of professional experience, 63 percent of which involved work with WCT or other subspecies of cutthroat trout.   Id.   At the workshops, the biologists submitted essential information on the WCT in their particular geographic areas of professional responsibility or expertise, according to standardized protocols.   Id.

7.   After a review and consideration of all available information, FWS determined that listing the WCT as either an endangered or threatened species under the ESA is not warranted at this time. See 68 Fed. Reg. at 46,989.   Plaintiffs' filed suit relating to this determination on May 23, 2005.

8.   In its final determination, FWS provided a "scientifically-based conclusion about the extent to which it is appropriate to include 'hybrid' WCT populations and populations of unknown genetic characteristics in the taxonomic group that we considered for listing."   68 Fed. Reg. 46,989, 46,994 (Aug. 7, 2003).   FWS stated that "(1) The population under consideration must first exist within the recognized, native geographic range of WCT . . . .   The population must then satisfy one of the following two additional criteria to be considered WCT under the [ESA];   (2) If all measured individuals in the population have morphological characters that are all within the scientific, taxonomically-recognized ranges of those characters for the WCT subspecies, then the population shall be considered WCT; or (3) If [number 2, above, is not met], then additional evidence of reproductive discreteness between individuals that conform morphologically to the WCT subspecies

4

and individuals that do not conform morphologically to the subspecies will be examined. If the two forms are considered reproductively discrete (e.g., naturally sympatric [naturally co-occurring] populations of native redband trout and WCT that may only occasionally interbreed), then we shall consider the population under consideration to be WCT under the [ESA]."[3] Id. at 46,994.

9.  In addition to its "principle criteria," FWS recognized that "other potentially important characteristics of the populations" must be considered, including genetic molecular data, "ecological setting, geographic extent of the introgression across the population's range, and whether rainbow (or redband) trout are naturally sympatric [co-occur] with WCT in the particular region under consideration." Id. at 46,995. For instance, FWS determined, based on the best scientific information available, that introgressed WCT with less than 20% of their genes derived from another taxon would still conform morphologically to the scientific taxonomic description of WCT. Thus, particularly where only genetic data are available, FWS will consider individuals or populations with less than 20% of their genes derived from another taxon to be members of the WCT subspecies. Id. at 46,995.

10.  FWS also examined the threats facing the WCT, finding that none rose to the level warranting listing of the WCT under the ESA: "Although the WCT subspecies has been reduced from historic levels and its extant populations face threats in several areas of the historic range, we find that the magnitude and imminence of those threats do not jeopardize the continued existence of the subspecies within the foreseeable future. Many former threats to WCT, such as those posed by excessive harvest by anglers or the widespread stocking of nonnative fishes, are no longer factors that threaten the continued existence of the WCT subspecies. The effects of other extant threats are being effectively countered by the management actions of State and Federal agencies, in conjunction with existing regulatory mechanisms." 68 Fed. Reg. at 47,006.

---

[3] FWS also developed criteria to aid in the determination of whether the two forms are "reproductively discrete": "(a) Whether rainbow (redband) trout are native to the geographic area under consideration; (b) the percent of measured individuals that do not conform morphologically . . ., including their range of morphological variation . . .; (c) the results of genetic tests that would indicate reproductive discreteness . . .; and (d) any other additional information that would assist with these determinations. . . ." 68 Fed. Reg. at 46,994.

11.  With respect to the threat of hybridization, FWS recognized that "hybridization with nonnative rainbow trout or their hybrid progeny and descendants, both of which have established self-sustaining populations in many areas in the range of WCT, remains the greatest threat to WCT."  <u>Id</u>. at 47,006.  However, FWS reasonably determined that this threat does not warrant listing the WCT under the ESA: "The WCT subspecies is widely distributed and there are numerous, robust WCT populations and aggregates of populations throughout the subspecies' historic range.  Moreover, numerous nonintrogressed WCT populations are distributed in secure habitats throughout the subspecies' historic range.  In addition, despite the frequent occurrence of introgressive hybridization, we find that numerous WCT populations are nonintrogressed or nearly so, and thus retain substantial portions of their genetic ancestry.  We consider slightly introgressed WCT populations, with low amounts of genetic introgression detectable only by molecular genetic methods, to be a potentially important and valued component of the overall WCT subspecies."  <u>Id</u>.

12.  After identifying the WCT subspecies and considering threats facing the WCT subspecies, FWS determined that "the WCT is not likely to become either a threatened or endangered species within the foreseeable future.  Therefore, listing of the WCT as a threatened or endangered species under the [ESA] is not warranted at this time."  68 Fed. Reg. at 47,007.

Dated: April 3, 2006                              Respectfully Submitted,

                                                  SUE ELLEN WOOLDRIDGE, Asst. Attorney General
                                                  JEAN E. WILLIAMS, Section Chief
                                                  LISA L. RUSSELL, Asst. Section Chief


                                                  _____*/s/ Michael R. Eitel*_____
                                                  MICHAEL R. EITEL,
                                                  Trial Attorney (SBN 22889 (Neb.))
                                                  U.S. Department of Justice
                                                  Environment & Natural Resources Division
                                                  Wildlife & Marine Resources Section
                                                  Ben Franklin Station, P.O. Box 7369
                                                  Washington, DC 20044-7369
                                                  Phone: (202) 305-0339/ Fax: (202) 305-0275
                                                  Email: Michael.Eitel@usdoj.gov

                                                  Attorneys for Federal Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILDLANDS, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civ. No. 05-1043 (EGS) |
| ) | |
| P. LYNN SCARLETT, Acting Secretary of ) | |
| the Department of the Interior, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**FEDERAL DEFENDANTS' MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.     THE WESTSLOPE CUTTHROAT TROUT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.    WCT LISTING HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.     FWS' Initial Listing Determination For The WCT . . . . . . . . . . . . . . . . . . . . . . 7

       B.     FWS' Reconsidered Listing Determination For The WCT . . . . . . . . . . . . . . . . . . 8

STANDARD AND SCOPE OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.     FWS PROPERLY IDENTIFIED MEMBERS OF THE WCT SUBSPECIES FOR
       PURPOSES OF REVIEWING WHETHER TO LIST THE WCT AS A THREATENED OR
       ENDANGERED SPECIES UNDER THE ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       A.     Taxonomic Classification Of Species And Subspecies . . . . . . . . . . . . . . . . . . . . 13

       B.     The Effects Of Genetic Introgression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       C.     FWS Reasonably Identified And Developed Criteria For Determining
              Which Introgressed Fish Or Populations Are Members Of The WCT
              Subspecies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

              1.     FWS' Primary Criteria For Determining Whether Fish Or Populations Are
                     Members Of The WCT Subspecies Taxon . . . . . . . . . . . . . . . . . . . . . . . . . . 21

              2.     FWS Properly Considered Genetics In Determining Whether Fish Or
                     Populations Are Members Of The WCT Subspecies Taxon . . . . . . . . . . . 23

II.    FWS PROPERLY CONSIDERED THE THREAT OF HYBRIDIZATION TO THE
       WCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

       A.     FWS Correctly Analyzed The ESA's Five Statutory Factors With Respect To The
              Entire WCT Subspecies, Distinguishing Between Levels Of Genetic Introgression
              As Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

       B.     FWS Reasonably Determined That A WCT Is Not A "Threat" To The WCT

Subspecies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.    FWS Reasonably Determined That Listing Was Not Warranted Due To The Threats Posed By The Stocking Of Potentially Hybridizing, Non Native Fishes . . . . . . . . 30

D.    FWS Reasonably Determined That The Threat Of Hybridization With Non Native Fishes Did Not Warrant Listing The WCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III.    FWS ARTICULATED A REASONED, RATIONAL BASIS FOR ITS "NOT WARRANTED" LISTING DETERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Alsea Valley Alliance v. Evans, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001), appeal dismissed, 358
 F.3d 1181 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

American Bioscience v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . 10

*American Wildlands v. Norton, 193 F. Supp. 2d 244 (D.D.C. 2002) . . . . . . . . . 7, 9, 11-13, 34, 35

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1983) . . . . . . . . . . . 10

Bennett v. Spear, 520 U.S. 154, 174 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C & W Fish Co., Inc. v. Fox, 931 F.2d 1556, 1565 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . 13

Camp v. Pitts, 411 U.S. 138, 142 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Carlton v. Babbitt, 900 F. Supp. 526, 530 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 26, 27

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971) . . . . . . . . . . . . . . 9

Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health and Human Servs., 844 F. Supp. 770, 783
(D.D.C. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir.1981) . . . . . . . . . . . . . . . . . . . . . . . 9

*Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fairhurst v. Hagener, 422 F.3d 1146, 1147 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Lujan v. National Wildlife Federation, 497 U.S. 871, 883 (1990) . . . . . . . . . . . . . . . . . . . . . . . . 10

Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377 (1989) . . . . . . . . . . . . . . . . . . . . . . . 10

*Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 211-12 (D.D.C. 2005) . . . . . . . . . . . . . . . . 13, 25, 34

Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1505 (D.C. Cir. 1986) . . . . . 10, 35

San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Commission, 789 F.2d 26, 37
 (D.C. Cir. 1986) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Southwest Ctr. for Biological Diversity v. Babbitt, 980 F. Supp. 1080, 1085 (D. Ariz. 1997) . . . . 29

State of New York v. Reilly, 969 F.2d 1147, 1150-51 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 10

<u>STATUTES</u>

5 U.S.C. § 706(2)(A) ......................................................... 2, 9

16 U.S.C. § 1531 ............................................................ 2
16 U.S.C. § 1531(b) .......................................................... 2
16 U.S.C. § 1532(6) .......................................................... 3
16 U.S.C. § 1532(15) ......................................................... 3
16 U.S.C. § 1532(16) ...................................................... 11, 13
16 U.S.C. § 1533 ......................................................... 1, 11
16 U.S.C. § 1533(a)(1) ............................................. 3, 13, 15, 30-32
16 U.S.C. § 1533(b)(1)(A) ................................................ 3, 15
16 U.S.C. § 1533(b)(3)(A) ............................................... 3, 4, 7
16 U.S.C. § 1533(b)(3)(B) .................................................... 4
16 U.S.C. § 1533(b)(6)(A) ................................................. 4-6
16 U.S.C. § 1536 ............................................................ 2

<u>REGULATIONS</u>

50 C.F.R. § 424.11(a) ................................................... 11, 13-16

<u>LEGISLATIVE HISTORY</u>

H.R. Rep. No. 93-412 ....................................................... 21

S. Rep. No. 93-307 ......................................................... 21

S. Rep. No. 96-151 ......................................................... 30

TABLE OF ACRONYMS AND TERMS

APA          Administrative Procedure Act

ESA          Endangered Species Act

ESU          Evolutionary Significant Units

FWS          United States Fish and Wildlife Service

RBT          Rainbow Trout

WCT          Westslope cutthroat trout (*Oncorphynchus clarki lewisi*)

YCT          Yellowstone cutthroat trout

**Admixture -** Refers to the levels of genetic introgression present in fish or populations.  68 Fed. Reg. at 46,991.

**Conservation Population -** A population that "reflect[s] the respective cutthroat trout phenotype, with slight genetic introgression and ha[s] unique genetic, ecological, or behavior[al] attributes."  AR II-19 at 231.

**Core conservation population -** A population "that is [greater than] 99% pure [and] represents the historic genome of the native cutthroat trout."  AR II-19 at 236.

**Electrophoresis** - "A means of separating proteins for identification."  AR II-267 at 7040.

**Hybrid swarm -** A population consisting entirely of individual fish that each contain genetic material from two different species or subspecies.  68 Fed. Reg. at 47,004.

**Hybridization** - "[T]he direct interbreeding between two individuals that conform morphologically to different species or subspecies, including the interbreeding between individuals conforming morphologically to WCT and individuals not conforming morphologically to WCT." 68 Fed. Reg. at 46,994.

**Introgressed population** (or **hybrid stock**) - "[A] group of potentially interbreeding individuals with a genetic ancestry derived from two or more extant species or subspecies." 68 Fed. Reg. at 46,994

**Introgression** (or **genetic introgression**) - The transfer of genetic material from one species (or population) to another species (or population).  68 Fed. Reg. at 46,991.

**Isolated Population (Isolet)** – "[P]opulations [which] occupy isolated habitat fragments (isolates) and . . . exist independently from connected groups of subpopulations."  AR II-119 at 2734.

**Meristics** - "Meristic traits include anything on a fish that can be counted, such as vertebrae, fin rays

and spines, scale rows, pyloric ceca and lateral-line pores." AR II-309 at 7717; AR II-35 at 992; AR II-267 at 7039.

**Metapopulation** – A subpopulation which interbreeds with another subpopulation. "Also referred to as a connected or networked population." AR II-119 at 2734.

**Morphological characteristics** - The physical characteristics of a plant or animal, such as meristic traits (defined herein) and morphometric traits (defined herein). See AR II-248 at 6678.

**Morphology** - A branch of biology that deals with the form and structure of animals and plants, the science of relating and interpreting observed structures. See generally 68 Fed. Reg. at 46,990.

**Morphometric traits** - "[A]ny standard measurement that can be made on a fish, such as standard length, snout length, length of longest ray on the dorsal fin, or depth of caudal peduncle." AR II-309 at 7717.

**Naturalized population** - A self-sustaining, naturally reproducing population outside the native geographic range of the species. See AR II-14 at 123, 132; AR II-45 at 1035.

**Phenotypes** - The physical expression (outward appearance) of a trait of an organism. See AR II-125 at 2879.

**Physiology** - A branch of biology that deals with the functions and activities of life or living matter, i.e., the "functions that allow [an organism] to live, grow, and reproduce." AR II-167 at 3597.

**Sportfish population** – A population that, "at a minimum, meet[s] the species phenotypic expression defined by morphological and meristic characters of the cutthroat trout." AR II-19 at 232.

**Sympatric** - Means "co-occur", i.e., a species is sympatric with another species where the ranges of the two species overlap. 68 Fed. Reg. at 47,001.

**Taxon** - A group of organisms recognized as a unit in classification. See AR II-267 at 7034-42.

**Taxonomy** - "[T]he application of general classification principles to naming organisms in accordance with international rules of zoological nomenclature." AR II-267 at 7034.

# INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56, Federal Defendants, P. Lynn Scarlett, Acting Secretary of the United States Department of the Interior, and H. Dale Hall, Director of the United States Fish and Wildlife Service,[1] hereby move the Court to enter summary judgment in their favor on the counts presented in Plaintiffs' Complaint. (Dkt. #1).

On August 7, 2003, the United States Fish and Wildlife Service ("Service" or "FWS") published its reconsidered determination that the listing of the Westslope Cutthroat Trout (*Oncorphynchus clarki lewisi*) ("WCT") as threatened or endangered under Section 4 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1533, is not warranted. See 68 Fed. Reg. 46,989 (Aug. 7, 2003), reproduced at AR II-17 at 198-218 ("Finding").[2]  This final listing determination represents the culmination of five years of intensive study and consideration of the WCT.  The administrative process included an exhaustive review and analysis of the best available scientific and commercial information, including: taxonomic and genetic studies on the WCT; the initial status review for the WCT; draft genetics reports prepared by the Wild Trout and Salmon Genetics Laboratory, University of Montana, and the corresponding peer reviews of the draft reports; a comprehensive status report prepared by four State fish and wildlife agencies and the United States Forest Service and involving the participation of 112 professional fishery biologists from 12 State, Federal, and Tribal agencies and firms; a position paper developed by the fish and wildlife agencies of seven intermountain western States; peer reviews of FWS' finding and genetic information; over 200 documents received during two notice and comment periods; and over 72 scientific, peer reviewed journal articles.

In its Finding, FWS utilized its biological expertise and that of outside experts to assess the

---

[1] P. Lynn Scarlett, Acting Secretary of the Department of the Interior, and FWS Director H. Dale Hall are automatically substituted for their predecessors pursuant to Fed. R. Civ. P. 25(d)(1).

[2] For ease of reference, the citations to the administrative record herein will identify the relevant "Part" of the record, which corresponds to the relevant CD-ROM (i.e., Part I (disk 1) or Part II (disk 2 and 3)), the document number, and the bates stamp number.  For example, "AR I-112 at 1112" references Part I of the record, document number 112, and bates stamp number 1112.

present status of the WCT and, in so doing, relied upon the best available scientific information. Ultimately, the Service rendered its expert determination that, although there are various threats facing the WCT, none rose to the level which would warrant listing of the WCT.   As one expert commented:

> I'm very impressed with the careful wording of the report, and [FWS'] quite extensive citation of the scientific literature evaluating hybridization and introgression especially in the WCT complex.  Few taxonomic groups (in fishes or elsewhere) will have been subjected to comparable or greater magnitudes of effort to document the extent of introgression via molecular markers, and to interpret such results also in the context of morphological differences.  Thus, as you correctly indicate, the WCT is in these regards a rather model system, despite the fact (as you mention) that only a small fraction of all populations have been genetically characterized.

AR II-236 at 6675 (peer review by Dr. John C. Avise, Distinguished Research Professor, Emeritus, Department of Genetics, University of Georgia, and member of the National Academy of Sciences). Nonetheless, Plaintiffs now challenge this final listing decision.

As this memorandum demonstrates, none of Plaintiffs' arguments have merit.  Here, Plaintiffs merely disagree with the agency's expert scientific judgments and would have this Court substitute its judgment for that of the agency charged by Congress with making listing determinations.  This position runs afoul of Supreme Court and D.C. Circuit precedent and must be rejected.  Rather, the sole question for the Court is whether the Service's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The best available scientific data did not support a listing, and FWS acted consistently with the dictates of that science.  The administrative record in this matter fully supports the agency's determination, and the Court should uphold the agency's expert conclusions.

## STATUTORY BACKGROUND

The Endangered Species Act, 16 U.S.C. §§ 1531 et seq., was enacted in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . ." 16 U.S.C. § 1531(b). Once a species is listed as endangered or threatened, statutory prohibitions help ensure the survival and recovery of the species. See, e.g., 16 U.S.C. § 1536 (federal

2

agencies' duty to avoid jeopardizing listed species); § 1538 (prohibitions against take of listed species). According to the ESA, an endangered species is "in danger of extinction throughout all or a significant portion of its range" while a threatened species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(6), (20).

The ESA delegates the authority to determine whether to list species as endangered or threatened to the Secretaries of Commerce and Interior.[3]  Pursuant to Section 4(a)(1) of the ESA, the Secretary lists a species that is determined to be threatened or endangered because of one or more of five factors: (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1).  The Secretary must make the decision whether to list a species

> solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

16 U.S.C. § 1533(b)(1)(A).

The procedures for listing a species are set forth in Section 4 of the ESA, 16 U.S.C. § 1533. Section 4(b) establishes certain time frames during which the Secretary must perform the duties regarding the listing of species. Within 90 days after receiving a petition to list a species, the Secretary is required, "to the maximum extent practicable," to make a finding as to whether the petition presents substantial scientific or commercial information indicating that the listing may be warranted ("90-day finding"). 16 U.S.C. § 1533(b)(3)(A). The Secretary is required to publish this finding in the Federal

---

[3]  Depending on the species in question, the "Secretary" referred to in the language of the Act may be the Secretary of the Interior or the Secretary of Commerce. 16 U.S.C. § 1532(15). The Secretary of the Interior has jurisdiction over the WCT. The U.S. Fish and Wildlife Service is the agency within the Department of the Interior with delegated responsibility for administering the ESA with respect to those species within Interior's jurisdiction.

Register. Id.  If a positive finding is made, the Secretary has one year from the receipt of the petition to undertake a status review to determine if a listing action is warranted ("12-month finding"). 16 U.S.C. § 1533(b)(3)(B).

If the Secretary determines that the listing is warranted, the Secretary must publish a notice in the Federal Register that includes the complete text of a proposed rule to implement the action. 16 U.S.C. § 1533(b)(3)(B)(ii). The Secretary must act on a proposed rule within one year of the date of its publication. 16 U.S.C. § 1533(b)(6)(A). At that point, the Secretary may promulgate a final rule, withdraw the proposed rule if there is not sufficient evidence to justify the proposed rule, or extend the one-year period for consideration by not more than six months if there is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned." 16 U.S.C. § 1533(b)(6)(B)(i).

## **FACTUAL BACKGROUND**

## I.    **THE WESTSLOPE CUTTHROAT TROUT**

The WCT is one of 14 recognized subspecies of cutthroat trout native to the interior regions of Western North America.  68 Fed. Reg. at 46,990.  The WCT is distinguished from other trout and salmon species by: 1) the distinctive red or orange slash mark that occurs just below both sides of the lower jaw (hence the name, cutthroat); 2) the "pattern of irregularly shaped spots on the body, with few spots below the lateral line except near the tail; [3] a unique number of chromosomes; and [4] other genetic and morphological traits[4] that appear to reflect a distinct evolutionary lineage." Id. at 46,990; AR II-267 at 7092-7102 (providing an overview of the WCT subspecies).

The WCT's native or historic range is generally thought to be the most geographically

---

[4] "*Morphological characteristics*" are generally defined as the physical characteristics of a plant or animal, such as meristic traits and morphometric traits.  See AR II-248 at 6678.  "*Meristic traits*" include "anything on a fish that can be counted, such as vertebrae, fin rays and spines, scale rows, pyloric ceca and lateral-line pores." AR II-309 at 7717; AR II-35 at 992; AR II-267 at 7039. "*Morphometric traits*" include "any standard measurement that can be made on a fish, such as standard length, snout length, length of longest ray on the dorsal fin, or depth of caudal peduncle."  AR II-309 at 7717.

widespread of the 14 subspecies of inland cutthroat trout:

> West of the continental Divide, the subspecies is believed to be native to several major drainages of the Columbia River basin, including the upper Kootenai River drainage from its headwaters in British Columbia, through northwest Montana, and into northern Idaho; the Clarke Fork River drainage of Montana and Idaho downstream to the falls on the Pend Oreille River near the Washington-British Columbia border; the Spokane River above Spokane Falls and into Idaho's Coeur d'Alene and St. Joe River drainages; and the Salmon and Clearwater River drainages of Idaho's Snake River basin. The historic distribution of WCT also includes disjunct areas draining the east slope of the Cascade Mountains in Washington (Methow River and Lake Chelan drainages, and perhaps the Wenatchee and Entiat River drainages), the John Day River drainage in northeastern Oregon, and the headwaters of the Kootenai River and several other disjunct regions in British Columbia. East of the Continental Divide, the historic distribution of WCT is believed to include the headwaters of the South Saskatchewan River drainage (United States and Canada); the entire Missouri River drainage upstream of Fort Benton, Montana, and extending into northwest Wyoming; and the headwaters of the Judith Milk, and Marias Rivers, which join the Missouri River downstream from Fort Benton.

68 Fed. Reg. at 46,990. The best available scientific information indicates that WCT historically occupied about 56,500 miles of stream in the United States. Id. at 46,998; AR II-119 at 2675.

Today, the best available scientific information indicates that WCT are more abundant throughout their range than FWS estimated in 1999 and reveals that WCT occupy about 33,500 miles of stream, or 59% of their historic range. 68 Fed. Reg. at 47,006; AR II-119 at 2675. Specifically,

> WCT occupy over 28,968 km (18,000 mi) of stream in Idaho (95 percent of historic range in Idaho), about 20,922 km (13,000 mi) in Montana (39 percent of historic range in Montana), about 402 km (250 mi) in Oregon (21 percent of historic range in Oregon), and about 3,219 km (2,000 mi) of stream in Washington (66 percent of historic range in Washington).

68 Fed. Reg. at 46,998. Approximately 70% of the habitat occupied by extant WCT populations lies on lands managed by Federal agencies, including lands designated as national parks, wilderness areas, or United States Forest Service lands. Id. at 46,998; AR 1-119 at 2675, 2704, 2722.

Laboratory-based genetic testing has also been performed on samples of WCT collected from locations representative of about 6,100 of WCT occupied stream miles. The genetic testing results show that nonintrogressed WCT (i.e., WCT showing no evidence of introgressive hybridization)[5] are known

---

[5] "*Hybridization*" is defined as "the direct interbreeding between two individuals that conform morphologically to different species or subspecies, including the interbreeding between individuals conforming morphologically to WCT and individuals not conforming morphologically to WCT." 68 Fed. Reg. at 46,994. Hybridization generally results in "*genetic introgression*," which is the transfer

to inhabit about 3,500 of those stream miles (57% of tested stream miles; 10% of occupied miles).

WCT inhabiting an additional 9,100 miles of stream are most likely not introgressed, due to the absence

of potentially hybridizing nonnative species and their hybrid descendants.  68 Fed. Reg. at 46,998; AR

II-119 at 2696-97.  In sum, nonintrogressed WCT are known to inhabit 3,500 miles of stream and

probably inhabit as many as 12,600 miles of stream in which no potentially hybridizing fishes occur.

Id.  By comparison, FWS' initial status review, 65 Fed. Reg. 20,120 (Apr. 14, 2000), "reported that:

(1) WCT occupied about [] 23,000 mi[les] of stream; (2) data on the genetic characteristics of WCT

were limited and available mainly for Montana; and (3) nonintrogressed WCT were known to occupy

[] 2,633 mi[les] of stream."  68 Fed. Reg. at 46,998.

WCT have also been grouped into 563 separate "conservation" populations.[6]  68 Fed. Reg. at

46,998; AR II-119 at 2706-09.  The best available scientific information reveals that the 563

conservation populations collectively occupied 24,450 miles of stream, and individual conservation

populations ranged in geographic extent from isolets (e.g., small, nonintrogressed, isolated populations)

to large metapopulations (e.g., connected or networked subpopulations or populations).[7]  Id. at 2706-

09.  The populations inhabiting isolets accounted for the majority of the conservation populations (457

---

of genetic material from one species (or population) to another species (or population).  68 Fed. Reg.
46,991.  Hybridization also results in an "*introgressed*" fish or population (synonymous with "hybrid
stock"), which is defined as "a group of potentially interbreeding individuals with a genetic ancestry
derived from two or more extant species or subspecies."  68 Fed. Reg. at 46,994.

[6]  In a position paper developed by seven state fish and wildlife agencies, the agencies established
three categories of cutthroat trout populations for the purpose of implementing "a more unified
management approach associated with genetic considerations of cutthroat trout management."  AR II-
19 at 229.  A "*core conservation population*" is one "that is [greater than] 99% pure [and] represents
the historic genome of the native cutthroat trout."  Id. at 236.  A "*conservation population*" consists
of a population that "reflect[s] the respective cutthroat trout phenotype, with slight genetic introgression
and ha[s] unique genetic, ecological, or behavior[al] attributes."  Id. at 231.  A "*sportfish population*"
is one that, "at a minimum, meet[s] the species phenotypic expression defined by morphological and
meristic characters of the cutthroat trout."  Id. at 232.

[7]  "*Isolets*" describe "populations [which] occupy isolated habitat fragments (isolates) and . . . exist
independently from connected groups of subpopulations."  AR II-119 at 2734.  A "*metapopulation*"
describes a subpopulation which interbreeds with another subpopulation.  "Also referred to as a
connected or networked population."  AR II-119 at 2734.

of the 563 conservation populations), whereas the metapopulations accounted for the majority of stream miles occupied by the WCT (88.5% of the WCT's occupied stream miles).  68 Fed. Reg. at 46,998.

## II.    WCT LISTING HISTORY

### A.    FWS' Initial Listing Determination For The WCT.

On June 6, 1997, FWS received a petition to list the WCT as threatened throughout its range and designate critical habitat for this subspecies pursuant to the ESA. 65 Fed. Reg. 20,120.  On June 10, 1998, FWS published notice in the Federal Register pursuant to ESA Section 4(b)(3)(A), 16 U.S.C. § 1533(b)(3)(A), that the amended WCT petition provided substantial information indicating that the requested action may be warranted.  63 Fed. Reg. 31,691 (June 10, 1998).  The Service immediately began a comprehensive status review of WCT.  65 Fed. Reg. 20,121.

After an extensive review of all available information, FWS determined on April 14, 2000, that listing the WCT as either a threatened or endangered species under the ESA was not warranted.  See 65 Fed. Reg. 20,120.  Plaintiffs filed suit seeking remand of this determination on October 13, 2000.  See American Wildlands v. Norton, 193 F. Supp. 2d 244 (D.D.C. 2002).  On March 31, 2002, this Court vacated and remanded FWS' initial finding, holding that "FWS [did] not offer a scientifically based explanation for its decision to include known hybridized fish in its assessment of the WCT's current distribution" and that FWS "fail[ed] to reconcile its recognition of hybridization as a threat to WCT's viability with its inclusion of hybrid stock in the population assessed for listing." Id. at 254-255.  This Court remanded the finding to FWS, stating:

> FWS must evaluate the threat of hybridization as it bears on the ESA's statutory listing factors. Specifically, FWS must determine: (1) the current distribution of the species, taking into account the prevalence of hybridization, . . .; (2) whether the WCT population is an endangered or threatened species because of hybridization, . . .; and (3) if existing regulatory mechanisms are adequate to address threats posed by hybridizing non-native fish.

Id. at 258.[9]

---

[9]  For a more comprehensive history of the events leading to FWS' initial listing determination and this Court's opinion relating to that listing determination, see American Wildlands v. Norton, 193 F. Supp. 2d 244 (D.D.C. 2002).

### B.    FWS' Reconsidered Listing Determination For The WCT.

On September 3, 2002, FWS announced initiation of a new status review for the WCT and solicited comments from all interested parties regarding the present-day status of this fish, including information relevant to addressing issues raised by the Court. 68 Fed. Reg. at 46,991; see also 67 Fed. Reg. 56,257 (Sept. 3, 2002). FWS stated it was "particularly interested in receiving data, information, technical critiques, and relevant comments that will help us address" the questions posed by the Court, including information pertaining to "the extent to which it is appropriate to include hybrid WCT stocks and stocks of unknown genetic characteristics in the WCT population considered for listing." 67 Fed. Reg. at 56,258-59. FWS immediately began a comprehensive status review of WCT. 68 Fed. Reg. at 46,991. During the initial comment period, several entities indicated that they were assembling or awaiting important information relevant to the status of the WCT and asked that FWS extend the comment period. See AR II-4 at 48-50; AR II-5 at 51; AR II-6 at 52-53; AR II-7 at 54. On December 18, 2002, FWS announced that the comment period was reopened until February 15, 2003. 67 Fed. Reg. 77,466 (Dec. 18, 2002); 68 Fed. Reg. at 46,991.

In response to the Federal Register notices, FWS received over 200 documents and comments from State game and fish departments, the United States Forest Service, the National Park Service, Tribal governments, and private corporations, as well as private citizens, organizations, and other entities regarding the WCT. Most notably, FWS received a comprehensive status report, AR II-119 ("Status Report") for WCT, prepared by the fish and wildlife agencies of Idaho, Montana, Oregon, and Washington and the U.S. Forest Service, which FWS determined constituted the best available scientific information describing the present-day rangewide status of WCT in the United States. 68 Fed. Reg. at 46,996. The Status Report was the product of considerable work and expertise. To compile that important information, 112 professional fishery biologists from 12 State, Federal, and Tribal agencies and private firms met at 9 workshops held across the range of WCT in the fall of 2002.

AR II-119 at 2683.[9]  Those fishery biologists had a combined 1,818 years of professional experience, 63% of which involved work with WCT or other subspecies of cutthroat trout.  Id.  At the workshops, the biologists submitted essential information on the WCT in their particular geographic areas of professional responsibility or expertise, according to standardized protocols.  The protocols were developed to facilitate presentation of information directly applicable to the issues raised by the Court and other concerns that FWS considers when making listing determinations.  Id.

In sum, the initial status review, 65 Fed. Reg. 20,120 (April 14, 2000), constituted the foundational compendium of information on the present-day status of WCT.  In turn, the more-recent WCT Status Report, as well as the other materials that FWS received or otherwise obtained while conducting the new review, clarified and improved FWS' understanding of the present-day status of WCT and helped FWS address the issues raised by this Court.  68 Fed. Reg. at 46,997.  After this extensive review and consideration of all available information, FWS determined that listing the WCT as either an endangered or threatened species under the ESA is not warranted at this time.  See 68 Fed. Reg. at 46,989.  Plaintiffs filed suit seeking remand of this determination on May 23, 2005.

## STANDARD AND SCOPE OF REVIEW

Plaintiffs' challenges to FWS' actions pursuant to the ESA are reviewed using the standard set forth in the Administrative Procedure Act ("APA"), which authorizes a court to set aside agency action that is held to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  See Bennett v. Spear, 520 U.S. 154, 174 (1997); 5 U.S.C. § 706(2)(A).  This standard of review is narrow, and "[t]he court is not empowered to substitute its judgment for that of the agency."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971).  "[T]he standard mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree."  Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir.1981) (citations omitted).  The burden of proof is on the person challenging the agency's decision.  Cleary,

---

[9] In addition, 21 geographic information systems and data management specialists participated in the workshops to assist with data entry and display of status information for on-site editing of data.  AR II-119 at 2683.

<u>Gottlieb, Steen & Hamilton v. Dep't of Health and Human Servs.</u>, 844 F. Supp. 770, 783 (D.D.C. 1993).

When reviewing determinations by an agency, especially with respect to judgments within the agency's expertise, a reviewing court "must generally be at its most deferential." <u>Baltimore Gas & Elec. Co. v. Natural Res. Def. Council</u>, 462 U.S. 87, 103 (1983). <u>See also Marsh v. Oregon Natural Res. Council</u>, 490 U.S. 360, 377 (1989) (where analysis "'requires a high level of technical expertise,'" court must defer to informed discretion of agency, even if, as an original matter, court might find contrary views more persuasive). "Given the expertise of the FWS in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding decisions of the FWS." <u>Carlton v. Babbitt</u>, 900 F. Supp. 526, 530 (D.D.C. 1995). Furthermore, the deference owed to an administrative agency is heightened when the action in question involves uncertain technical information. <u>State of New York v. Reilly</u>, 969 F.2d 1147, 1150-51 (D.C. Cir. 1992). The D.C. Circuit has explained, "as long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence." <u>Public Citizen Health Research Group v. Tyson</u>, 796 F.2d 1479, 1505 (D.C. Cir. 1986).

Review in this case is based on the administrative record before the Court. <u>See Camp v. Pitts</u>, 411 U.S. 138, 142 (1973). Because there are generally no facts in dispute in administrative record cases, and the Court need not – and, indeed, may not – "find" underlying facts, there are no material facts essential to the Court's resolution of this action, and a motion for summary judgment is appropriate. <u>See</u>, <u>e.g.</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 883 (1990); <u>San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Commission</u>, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc). <u>See also American Bioscience v. Thompson</u>, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law") (footnote omitted).

## ARGUMENT

As demonstrated below, FWS' identification and determination of which fish or populations belong to the WCT subspecies, and FWS' consideration of the threats facing the WCT subspecies, is fully supported by the record, based on a thorough and comprehensive review of all relevant factors and the best available scientific data, is reasoned, and thus is entitled to substantial deference by this Court.

## I.  FWS PROPERLY IDENTIFIED MEMBERS OF THE WCT SUBSPECIES FOR PURPOSES OF REVIEWING WHETHER TO LIST THE WCT AS A THREATENED OR ENDANGERED SPECIES UNDER THE ESA.

Under § 4 of the ESA, 16 U.S.C. § 1533, FWS is to "determine whether any species is an endangered species or a threatened species because of any of the following factors" identified in § 4(a)(1)(A)-(E). "The term 'species' includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). FWS' implementing regulations further clarify that "[a]ny species or taxonomic group of species (e.g., genus, subsgenus) . . . is eligible for listing under the [ESA]." 50 C.F.R. § 424.11(a). Thus, the first step in any status review or listing determination is to identify the "species" under consideration.

One of the principle issues in this case is whether, and to what extent, introgressed WCT should be included within the WCT subspecies under review. American Wildlands v. Norton, 193 F. Supp. 2d 244, 255-56 (D.D.C. 2002). FWS extensively considered and addressed this issue in its Finding by providing a "scientifically-based conclusion about the extent to which it is appropriate to include 'hybrid' WCT populations and populations of unknown genetic characteristics in the taxonomic group that we considered for listing," as follows:

> (1) The population under consideration must first exist within the recognized, native geographic range of WCT . . . . The population then must satisfy one of the following two additional criteria to be considered WCT under the [ESA]; (2) If all measured individuals in the population have morphological characters that are all within the scientific, taxonomically-recognized ranges of those characters for the WCT subspecies, then the population shall be considered WCT; or (3) If [number 2, above, is not met], then additional evidence of reproductive discreteness between individuals that conform morphologically to the subspecies

and individuals that do not conform morphologically to the subspecies will be examined. If the two forms are considered reproductively discrete (e.g., naturally sympatric [naturally co-occurring] populations of native redband trout and WCT that may only occasionally interbreed), then we shall consider the population under consideration to be WCT under the [ESA].[10]

68 Fed. Reg. 46,989, 46,994. FWS' "principal criterion for including potentially introgressed populations, and populations of unknown genetic characteristics, with the WCT under the [ESA] is whether fish in those populations conform morphologically to the scientific taxonomic description of the WCT subspecies." Id. at 46,994-95.

In addition to its "principle criteria," FWS recognized that "other potentially important characteristics of the populations" must be considered, including genetic molecular data, "ecological setting, geographic extent of the introgression across the population's range, and whether rainbow (or redband) trout are naturally sympatric [co-occur] with WCT in the particular region under consideration." Id. at 46,995. For instance, FWS determined, based on the best scientific information available, that introgressed WCT with less than 20% of their genes derived from another taxon would still conform morphologically to the scientific taxonomic description of WCT. Thus, particularly where only genetic data are available, FWS will consider individuals or populations with less than 20% of their genes derived from another taxon to be members of the WCT subspecies. Id. at 46,995.

As demonstrated below, FWS' decision was the product of extensive and reasoned analysis and was based on a consideration of, and supported by, the best available scientific and commercial data. FWS considered the science of taxonomy, recognizing it must determine which fish and populations are members of the WCT subspecies taxon. See Section I.A., *supra*. FWS considered the effects of hybridization on individuals and populations, in order to determine whether genetically introgressed WCT should be included in the WCT subspecies taxon. See Section I.B., *supra*. Finally, FWS

---

[10]     FWS also developed criteria to aid in the determination of whether the two forms are "reproductively discrete": "(a) Whether rainbow (redband) trout are native to the geographic area under consideration; (b) the percent of measured individuals that do not conform morphologically . . ., including their range of morphological variation . . .; (c) the results of genetic tests that would indicate reproductive discreteness . . .; and (d) any other additional information that would assist with these determinations. . . ." 68 Fed. Reg. at 46,994.

identified criteria, based on the best available scientific information, to be used to determine the extent to which genetically introgressed WCT should be classified as WCT. See Section I.C., *supra*. FWS' scientific determinations are fully supported by the administrative record and thus entitled to deference by this Court. See Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 211-12 (D.D.C. 2005) ("Administrative actions are presumed valid and are accorded great deference; thus, the inquiry is only whether the Secretary's decisions were unreasonable, and 'this court will not second guess an agency decision or question whether the decision made was the best one.'" (citing C & W Fish Co., Inc. v. Fox, 931 F.2d 1556, 1565 (D.C. Cir. 1991)).

A.    **Taxonomic Classification Of Species And Subspecies.**

The ESA specifically authorizes listing, and consideration of threats to, the "species" taxonomic unit. 16 U.S.C. § 1533(a)(1); 16 U.S.C. § 1532(16); 50 C.F.R. § 424.11(a). FWS has spoken to the issue of how the agency will categorize fish or populations as "species" under the ESA:

> In determining whether a particular taxon or population is a species for the purposes of the Act, the Secretary shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community concerning the relevant taxonomic group.

50 C.F.R. § 424.11(a). FWS' identification of a species or subspecies thus entails an evaluation of the "scientific criteria used by professional zoologists and field biologists to taxonomically classify individuals, and populations of interbreeding individuals, as members of a particular species or subspecies," 68 Fed. Reg. at 46,992. In determining whether introgressed WCT are members of the WCT subspecies, FWS had to consider the question from a taxonomy standpoint.

Taxonomy is the science of naming species. "Biological classification is the science and art of arranging the results of evolution in a hierarchal scheme," a scheme that should "reflect[] degrees of relatedness." AR II-267 at 7034; see also 68 Fed. Reg. at 46,992. To make these taxonomic determinations, scientists consider a wide range of factors: "taxonomists evaluate evidence from different disciplines, including anatomical characters, genetic and chromosome data (including DNA variation), distribution patterns, and life history and behavioral traits." AR II-267 at 7038. With fish species, "[t]he scientific criteria for describing and formally recognizing taxonomic species of fish are

13

based almost entirely on morphological characters." 68 Fed. Reg. at 46,992. Morphological characters are typically used to identify and distinguish one species or subspecies from another, and are used to identify and distinguish one subspecies of cutthroat trout from another. Id.; AR II-267 at 7042 (rejecting criticisms relating to the use of morphological characters to identify members of a taxon).

Modern molecular genetics represents another tool that has recently emerged which can aid in the identification and classification of taxonomic groups of fish and other species. 68 Fed. Reg. at 46,992. Molecular genetic techniques enable scientists to identify the genetic ancestry of individual fish and populations:

> molecular genetic markers (e.g., microsatellite DNA alleles, DNA fingerprint patterns) provide very sensitive methods for evaluating ancestral or pedigree relationships among populations, species, or individuals independent of the genes affecting morphology and other species-specific characters.

68 Fed. Reg. at 46,996. Scientists can now determine, at very precise levels, which genes were derived from members of the WCT taxon and which genes, if any, were derived from closely-related subspecies of fish, such as rainbow trout: "molecular genetic methods are capable of detecting extremely small amounts of genetic introgression . . . undetectable by other methods." Id. at 46,992.

Notably, FWS reasonably determined that it is not appropriate to rely exclusively on molecular genetic techniques to taxonomically classify species or subspecies. First, exclusive reliance on one "tool," such as genetics, is contrary to the science of taxonomy: "For characterization of taxa, it is best to take an eclectic approach: use available evidence from all methods." AR II-267 at 7042; 68 Fed. Reg. at 46,993-95; AR II-272 at 7259. Second, molecular genetics is not always capable of confirming the evolutionary distinctness of species and subspecies. 68 Fed. Reg. at 46,992 (citing AR II-304 at 7650); AR II-267 at 7040-41. Third, molecular genetics does not always lead to an understanding of how specific genes influence the key characteristics of individuals or populations. Individual genes can influence the physical appearance of fish, behavioral or ecological characteristics, life history traits, or they can have no measurable effect on the key characteristics of the species or subspecies. AR II-290 at 7488; AR II-272 at 7257-7259; AR II-246 at 6763. As FWS noted, there is a "wide range of possible outcomes resulting from exchanges of genetic material between taxonomically distinct species,

14

and between entities within taxonomic species that also can be listed under the [ESA]." 68 Fed. Reg. 46,992; AR II-251 at 6803 (noting a distinction must be made "between 'evolutionary legacy' – which is the foundation for future 'evolutionary potential'" and "genotypic monophyly (i.e., genetic purity) which <u>only</u> reflects past ancestry" (emphasis added)).

FWS recognized this fundamental distinction – between identifying genetic introgression and understanding the consequences of that genetic introgression – in finding that genetic data alone are not dispositive. <u>See id</u>. at 46,992-93.  Rather, FWS must consider all relevant information (e.g., the best available scientific information), such as morphological characteristics, geographic distribution, genetic composition, ecology, and life history characteristics, to define WCT under the ESA and to  identify members of the WCT subspecies for the purpose of implementing the ESA.  FWS' approach is based upon fundamental principles of taxonomy, is thus consistent with the plain text of the ESA and FWS' implementing regulations, and is entitled to deference by this Court.  16 U.S.C. § 1533(a)(1) (FWS is to "determine whether any species is an endangered [] or a threatened species . . ."); 16 U.S.C. § 1533(b)(1)(A) (Secretary must make listing determinations "solely on the basis of the best scientific and commercial data available"); 50 C.F.R. § 424.11(a) (only "species", "subspecies", or distinct population segments can be listed under the ESA).

### B.    The Effects Of Genetic Introgression.

Understanding that it must consider all relevant information, FWS next determined whether, and to what extent, genetically introgressed WCT deviate biologically from nonintrogressed WCT for traits related to morphology and viability (e.g., physiology, behavior, etc.).  Only by determining how genetic introgression affects individuals or populations could FWS determine whether those individuals or populations should still be classified as members of the WCT subspecies, based on the principles of taxonomy and the best scientific information available. <u>See</u> AR II-244 at 6724 ("In this case, the problem is understanding the biological effects (positive or negative) of introgressive hybridization, not verifying that hybridization is 'problematic' or a 'threat' to natural populations.").  In short, FWS determined that there was no scientific support for concluding that genetic introgression at levels below

those which alter the WCT's morphological characteristics alter or affect the WCT's defining characteristics, such that exclusion from the WCT taxon was warranted. 68 Fed. Reg. at 46,994.

FWS noted that the consequences, or effects, of genetic introgression vary depending on the particular circumstances and species involved; thus, determinations on whether and to what extent introgressed individuals are members of the parental taxon must be assessed on a case-by-case basis. 68 Fed. Reg. at 46,991-93; see also AR II-311 at 7728-30 (illustrating the need for flexibility in identifying whether introgressed individuals should be included within the species or subspecies taxon). To aid in identifying the effects of genetic introgression on WCT, FWS contracted directly with the Wild Trout and Salmon Genetics Laboratory at the University of Montana, seeking a thorough review of the scientific literature to determine the lowest level of genetic introgression at which morphological, behavioral, ecological, or other traits related to the taxonomic distinctiveness and fitness of WCT are affected by hybridization. AR II-240 at 6692; AR II-247 at 6765. The data provided by the genetics laboratory revealed that genetic introgression, at certain levels, affects the standard morphological characteristics of WCT subspecies. 68 Fed. Reg. at 46,994. FWS' own review of the scientific literature yielded similar studies which revealed a correlation between the extent of genetic introgression and the morphological traits of fish and populations. Id. at 46,993-94.

The genetics laboratory did not provide evidence that genetic introgression at levels below those which alter the morphological characteristics of WCT affects or influences the fitness of introgressed WCT. Id.; AR II-251 at 6799 ("A major uncertainty not addressed by the authors is the extent that introgressed populations – indistinguishable morphologically from non-introgressed populations . . . – are distinguishable from WCT on the basis of other biological characteristics related to fitness. . . . The authors present no data or discussion on these later topics, . . . ."). Moreover, FWS' independent review of the scientific literature revealed no evidence supporting the assumption that low levels of genetic introgression alter the fitness of WCT. 68 Fed. Reg. at 46,993-96. Thus, FWS reasonably concluded that it was "not aware of any information to suggest that [populations or individual fish conforming morphologically to the scientific taxonomic description of WCT] express behavioral,

ecological, or life-history characteristics differently than do WCT native to the particular geographic area." 68 Fed. Reg. at 46,994.

Plaintiffs now appear to argue that there is, in fact, "evidence" demonstrating that introgressed WCT do not behave the same as nonintrogressed WCT, relying principally on a master's thesis by Nathaniel Hitt, AR II-92. See Pls' Motion for Leave to Supplement the Administrative Record ("Pls' Motion for Leave") at 2, 9-10 (Dkt. # 15); Pls' Reply in Support of Motion for Leave to Supplement the Administrative Record ("Pls' Reply") at 8 (Dkt. # 17); Pls' Complaint at ¶¶ 38, 39. First, Plaintiffs argue that the master's thesis implies that introgressed WCT do not behave like a nonintrogressed WCT. Pls' Motion for Leave at 8-10. However, the master's thesis expressly recognizes that there is no evidence, and the author did not test experimentally, whether introgressed WCT behaved or acted differently than non-introgressed WCT:

> Fundamental questions about the effects of [rainbow trout ("RBT")] introgression remain unanswered. First, the fitness consequences of RBT introgression should be investigated. . . . [N]o studies have compared vital rates among WCT and [hybridized] populations. Understanding the effects of natural selection on WCT x RBT hybrids would provide new insight on the long-term impacts of RBT introgression.

AR II-92 at 2271 (emphasis added). These statements are fully consistent with FWS' findings – that there is no evidence indicating that slightly introgressed WCT are biologically or ecologically distinguishable from nonintrogressed WCT. 68 Fed. Reg. at 46,994.

Plaintiffs also argue that the master's thesis provides "evidence" that introgressed WCT stray or move further upstream than nonintrogressed WCT. Pls' Motion for Leave at 9-10. Once again, the master's thesis expressly recognized that the author did not test this assumption and thus the thesis does not provide "evidence" to support this "implication": "[T]he effects of RBT introgression on straying rates should be assessed. . . . To test this hypothesis, one would first have to determine the extent of fine-scale population genetic structure within the study area." AR II-92 at 2271. In other words, the author stated that, to understand whether introgressed WCT in a population act differently than nonintrogressed WCT in that population, one must first determine how the nonintrogressed WCT in that population behave.

17

FWS considered these very issues during the administrative process. Examining the content of the genetics laboratory report, Dr. Campton, a geneticist with the FWS, noted that "the implicit assumption [of the report] is that the 'spreading' [of introgression into certain areas] represents some sort of natural diffusion process via gene flow." AR II-251 at 6801; see also AR 248-6672-74 (genetics laboratory report where the authors' reference the Hitt thesis to state that hybridization is spreading). However, Dr. Campton noted that the authors "do not explain the causes of that spreading" and noted that other studies have attributed the "'spreading' to continued, and ongoing, stocking of hatchery rainbow trout into [similar areas]." AR II-251 at 6801. FWS and others noted that the increased spread of hybridization in various areas, such as the areas examined in the Hitt thesis, is likely due to the increased stocking of rainbow trout in those areas. 68 Fed. Reg. at 47,004; AR II-251 at 6801; AR II-252 at 6807 ("[T]he reported continued spread of [rainbow trout] introgression within the Flathead River system is likely due to the establishment of self-reproducing populations of introduced rainbow trout and the dispersal of hybrids into areas containing pure cutthroat populations (Hitt et al. submitted)."); AR II-246 at 6764 ("The spread and increase of rainbow trout genes in [the North Fork of the Flathead River] over time seems to be directly attributed to stocking and / or a lack of barriers to keep stocked fish from entering it.").

At bottom, Plaintiffs' arguments do little more than rehash sentiments expressed in the reports submitted by the Wild Trout and Salmon Laboratory, i.e., that any level of genetic introgression alters the biological and behavioral characteristics unique to the WCT subspecies. AR II-241 at 6994-6715; AR II-248 at 6769-6791 (draft reports from the lab).[1] However, FWS subjected these reports to the

_____

[1] Some scientists, such as Dr. Allendorf, have speculated that introgression at low levels alters or reduces the fitness of a subspecies by eliminating ecologically relevant adaptations that have been obtained over many years – for instance the adaptions that supposedly enable fish to withstand periodic and extreme events, such as floods and fires. See, e.g., Pls' Complaint at ¶ 26; AR II-23 at 330 (Dr. Allendorf positing that "local adaptations might be lost," such as those that "might only be essential during periodic episodes of extreme environmental conditions"). Other scientists have recognized that the opposite proposition is equally persuasive – that introgression can increase the fitness or ecological adaptations of a subspecies and better enable species to withstand extreme periodic events. AR II-244 at 6724 ("an equal, but opposite, argument could be made that hybridization under 'normal' conditions may be slightly deleterious . . . but confers a strong selective advantage under periods of environmental

peer review process where numerous experts, like FWS, noted that these statements constitute the authors' personal views and are not supported by scientific evidence.  AR II-244 at 6726-27 (noting that portions of the manuscript are "not supported by their literature review nor by the results from their laboratory" and that "they draw many conclusions that do not appear to be totally consistent with the literature they review, and some of their conclusions appear to be inconsistent with each other"); AR II-245 at 6749 (noting that the manuscript "is pretty thin and superficial"); AR II-245 at 6754 (noting inconsistencies in the report – "How is it possible for hybrids to be less fit than native taxa and yet introgression is rampant and relentless?"); AR II-246 at 6761; AR II-250 at 6793, 6796 (noting the report is "overly one-sided" and "does not present a balanced discussion"); AR II-251 at 6798 (report "is not 'scientifically-defensible' nor is it suitable for publication in the scientific literature").  Indeed, Dr. Allendorf, the lead biologist responsible for producing the reports, acknowledged that "all we have is circumstantial evidence of fitness effects.  That is, we are not aware of any studies that have estimated the short- or long-term fitness of rainbow x westslope hybrids in nature." AR II-253 at 6811.

In addition to noting the lack of scientific evidence to support the assumption that slightly introgressed WCT are biologically and ecologically distinguishable from nonintrogressed WCT, FWS considered whether it was appropriate to "assume" such decreased fitness. FWS rejected this proposition, finding that "a significant proportion of the genetic resources associated with WCT throughout its native range may be represented by populations with low-frequency genes derived from other taxa (e.g., rainbow trout) detectable only by molecular genetic methods." 68 Fed. Reg. at 46,995. Because slightly introgressed WCT still contain valuable genetic resources common to the WCT taxon,

---

stress when environmental conditions change drastically and individual survival decreases significantly . . . (e.g. droughts, floods, temperature extremes, etc.)"); AR II-290 at 7488 ("Therefore, maintenance of reproductive plasticity and introgressive hybridization may be important for the evolution of Gila and other organisms, enabling them to adapt to extreme fluctuating environments"); AR II-311 at 7728 (recognizing that hybridized subspecies may contain or develop "ecologically relevant adaptations" and that "[o]ccasional introgression or interbreeding should not be viewed as inconsistent with subspecies status."). Contrary to Plaintiffs' approach, which flatly dismisses one side of the debate, FWS correctly acknowledged that there is a "wide range of possible outcomes resulting from exchanges of genetic material" and that it is not scientifically supportable to assume decreased fitness without evidence to support that assumption. 68 Fed. Reg. at 46,992.

those individuals and populations are still viable, valuable members of the WCT subspecies:

> In many cases, introgressed populations may contain unique or appreciable portions of the genetic resources of an imperiled or listed species. For example, populations with genes from another taxon at very low frequencies may still express important behavioral, life-history, or ecological adaptations of the indigenous population or species within a particular geographic area. . . .
>
> A natural population of a particular species that possesses genes from another taxon at low frequency, yet retains the distinguishing morphological, behavioral, and ecological characters of the native species, may remain very valuable to the overall conservation and survival of the species.

68 Fed. Reg. at 46,992. Experts agreed – "By excluding populations with low levels of [rainbow trout] hybridization, [only protecting non-introgressed WCT] will 'write-off' large components of the evolutionary legacy of WCT." AR II-250 at 6794 (peer review by Dr. Steven Kalinowski, Conservation Genetics Laboratory, Department of Ecology, Montana State University); AR II-251 at 6803 (Dr. Campton noting that, without evidence supporting the assumption that slightly hybridized WCT do not represent the "evolutionary legacy" of the WCT subspecies, "the authors [of the genetics laboratory report] are getting into dangerous territory [] by trying to place a 'value' on populations with no detectable introgression versus those with some detectable introgression based on molecular genetic markers.").

Furthermore, FWS correctly recognized that the ESA is inclusionary, rather than exclusionary, in that Congress intended to protect and conserve "species," including the species' genetic resources. 68 Fed. Reg. at 46,995. As relevant here, if listing were warranted, and if slightly introgressed WCT were not considered WCT, then fish containing the valuable genetic resources of the WCT subspecies would not be protected under the ESA. For instance, a fish containing 99% WCT genes and only 1% genes from another taxon, possibly the result of a hybridization event which occurred hundreds of years ago, would not be protected, even though it contains the overwhelming majority of WCT genes and even though no evidence indicates that the 1% foreign genes alters the defining characteristics of the

WCT subspecies.[12]  FWS reasonably found this latter, exclusionary position contrary to the purpose and intent of the ESA.  68 Fed. Reg. at 46,995.  See, e.g., Report of the House Committee on Merchant Marine and Fisheries, H.R. Rep. No. 93-412, at 143-44 (1973) ("From the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations.  The reason is simple: they are potential resources.  They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask."); Report of the Senate Committee on Commerce, S. Rep. No. 93-307, at 357 (1973) ("Diversity of genetic types is necessary for thorough scientific knowledge").

In sum, FWS thoroughly analyzed the available scientific literature and determined that there was no scientifically-defensible rationale for concluding that slightly introgressed WCT, which in all other respects conform to the scientific, taxonomic description of the WCT subspecies, are sufficiently distinguishable from a nonintrogressed WCT such that it would be appropriate to exclude those fish from the WCT subspecies taxon.  Rather, FWS relied on its expertise, the expertise of the scientific community, and the best available science to conclude that the mere detection of hybridization in populations, without more, does not justify excluding those populations from the WCT subspecies.

### C.    FWS Reasonably Identified And Developed Criteria For Determining Which Introgressed Fish Or Populations Are Members Of The WCT Subspecies.

#### 1.    FWS' Primary Criteria For Determining Whether Fish Or Populations Are Members Of The WCT Subspecies Taxon.

After determining that slightly introgressed WCT constitute members of the WCT subspecies for purposes of listing under the ESA, FWS proceeded to identify the criteria which would be used to

---

[12] See, e.g., AR II-251 at 6802 (Dr. Campton highlighted the fundamental questions that were examined and addressed in the Finding:  "Should populations with only '1% admixture' (i.e., 99% native WCT genes) be treated as a different 'species' than WCT with respect to how 'species' is defined under the ESA?  Of particular importance is the question, 'How has that 1% introgression affected the fitness or morphology of WCT?  The authors [of the genetics laboratory report] believe that such populations do not warrant protection.  Why?  Similar levels of introgression have undoubtedly occurred between Evolutionary Significant Units (ESU's) of Pacific salmon (e.g., between 'native' wild fish and 'introduced' hatchery fish), and nobody has proposed excluding those introgressed ESU's from consideration under the ESA.").

identify when introgressed fish and populations will be included, or excluded, from the WCT taxon. As noted above, the available scientific information on the effects of genetic introgression revealed that a fish's morphological characteristics would eventually be altered as a fish became more genetically introgressed. Thus, FWS centered its criteria for identifying members of the WCT around an individual's or population's morphological characteristics: the "principal criterion for including potentially introgressed populations, and populations of unknown genetic characteristics, with the WCT under the [ESA] is whether fish in those populations conform morphologically to the scientific taxonomic description of the WCT subspecies." 68 Fed. Reg. at 46,994-95.

Plaintiffs have alleged that FWS' primary reliance on morphology is a "novel presumption" that apparently cannot be supported. Pls' Complaint at ¶¶ 2, 36. Plaintiffs' allegations lack merit. For instance, FWS noted that the scientific community considers slightly introgressed individuals and populations as members of the parental or native taxon:

> [A] large number of situations exist in the scientific literature where the mitochondrial DNA (mtDNA) from one species appears to have introgressed via hybridization into the nuclear genetic background of a closely related species (e.g., Ferris et al. 1983; Bernatchez et al. 1995; Glemet et al. 1998; Wilson and Bernatchez 1998; Redenbach and Taylor 2002). This ability to detect very low levels of hybridization raises fundamental questions regarding the criteria by which introgressed populations, and individuals in those populations, should be included with, or excluded from, their parental or morphological species. In the mtDNA situations cited above, the scientific community considers the "introgressed" individuals to be legitimate members of their morphological species despite the presence of mtDNA from another species.

68 Fed. Reg. at 46,992.

Moreover, FWS' hybrid policy for WCT was subjected to peer review, where recognized experts concurred in FWS' approach. AR II-236 at 6675-76; AR II-237 at 6677-79; AR II-238 at 6680-85; AR II-239 at 6686-91. For example, Dr. Brian Bowen, Hawaii Institute of Marine Biology, University of Hawaii, noted that FWS' determinations regarding whether and to what extent to include introgressed individuals and populations in the WCT subspecies taxon "is lucid and scientifically sound to the best of my expertise. . . . The emphasis on morphological identity to define populations of this subspecies is anchored to the most venerable pillars of modern biology, and is unassailable." AR 6678 (emphasis added); AR II-236 at 6675-76 (Dr. John Avise, noting, among other things, that FWS' hybrid

policy for WCT is "scientifically sound").

FWS' criteria is also consistent with a recent position paper developed by the fish and wildlife agencies of the intermountain western States, signed by Colorado Division of Wildlife, Idaho Department of Fish and Game, Montana Department of Fish, Wildlife and Parks, Nevada Division of Wildlife, New Mexico Game and Fish Department, Utah Division of Wildlife Resources, and the Wyoming Game and Fish Department.

> That document identifies, for all subspecies of inland cutthroat trout, three tiers of natural populations for prioritizing conservation and management options under the States' fish and wildlife management authorities: (1) Core conservation populations composed of [greater than] 99 percent cutthroat trout genes; (2) conservation populations that generally 'have less than 10 percent introgression, but [in which] introgression may extend to a greater amount depending on the circumstances . . .; and (3) cutthroat trout sport fish populations that, 'at a minimum, meet the species (e.g., WCT) phenotypic expression defined by morphological and meristic characters of cutthroat trout.' . . . Consequently, the Service's criteria for including potentially introgressed populations of WCT with the WCT subspecies considered for listing under the Act include the first two tiers, . . ., as well as those sport fish population in the third tier for which morphological or genetic data are available.

68 Fed. Reg. at 46,995-96.  Like FWS' principal criteria, the Position Paper requires that a population "must conform, 'at a minimum,' to the morphological and meristic characters of a particular cutthroat trout subspecies in order for those populations to be included in a State's conservation and management plan for that subspecies."  68 Fed. Reg. at 46,996; AR II-19 at 232.

At bottom, the record clearly demonstrates that FWS considered the science of taxonomy, considered the relevant factors imposed by the ESA and FWS' implementing regulations, and considered the available scientific data on the effects of introgression on WCT to make a reasoned, sound determination as to which fish or populations are members of the WCT subspecies.  Plaintiffs' arguments that FWS' approach is "novel" is belied by the record and ultimately fails.

### 2.    FWS Properly Considered Genetics In Determining Whether Fish Or Populations Are Members Of The WCT Subspecies Taxon.

FWS did not rely solely on morphology, but considered all relevant factors, including the importance of molecular genetic data as a tool in classifying individuals or populations.  As noted above, because the science indicated that, at some level, genetic introgression alters the morphological

characteristics of a fish or population, FWS also identified that level of genetic introgression in a manner that was scientifically supported and defensible. Thus, contrary to Plaintiffs' unfounded assertions, FWS did not "ignore" genetics in its analysis. Pls' Complaint at ¶ 35; Pls' Motion for Leave at 3.

Based on a thorough review of the best available science, FWS noted that a strong correlation exists between levels of genetic introgression and the morphological characteristics of individuals and populations. 68 Fed. Reg. at 46,993-94. Several independent studies revealed that individuals from populations with up to 20% genetic introgression were morphologically indistinguishable from individuals in populations with 0% genetic introgression. 68 Fed. Reg. at 46,993-94 (citing AR II-324 at 8174-8189; AR II-260 at 6922; AR II-300 at 7598-7607). Other scientific data and studies revealed that a population clearly would not conform to the scientific, taxonomic description of WCT when 50% or more WCT genes were derived from another taxon. 68 Fed. Reg. at 46,993-94. Scientific uncertainties exist regarding the relationship between morphology and genetic introgression in the range of 20-50% because FWS' review of the scientific literature revealed no scientific data that directly compared or quantified the relationship between the two characteristics within that intermediate range (i.e., 20-50%) of genetic introgression. Id.; AR II-251 at 6799.

Hence, FWS established the 20% genetic introgression threshold as a conservative, scientifically-defensible upper limit for the maximum amount of introgression that FWS would accept for including populations of WCT within the WCT subspecies considered for listing under the ESA, especially when genetic data are the only data available. As FWS explained:

> natural populations of WCT may have a genetic ancestry derived by as much as 20 percent from rainbow trout or [Yellowstone cutthroat trout ("YCT")] when fish in those populations express a range of morphological variation that conforms to the scientific taxonomic description of WCT. In other words, a natural population of WCT with less than 20 percent of its genes derived from rainbow trout or YCT is, most likely, morphologically indistinguishable from nonintrogressed populations of WCT with no hybrid ancestry.

68 Red. Reg. at 46,994. Moreover, FWS noted that it must consider all available scientific and commercial data when making these species determinations:

> [S]uch decisions involving possible inclusion or exclusion [of fish within the WCT subspecies under the ESA] will need to consider other potentially important characteristics of the populations, including the ecological setting, geographic extent of the introgression across the population's range, and whether rainbow (or redband) trout are naturally sympatric with WCT in the particular region under consideration.

Id. at 46,995.

In their Complaint and subsequent briefing, Plaintiffs focus on the argument that FWS' criteria will classify fish and populations containing up to 50% genes derived from another taxon as WCT. Pls' Reply at 1; Pls' Motion for Leave at 7; Pls' Complaint at ¶¶ 38, 40. This belief represents a misinterpretation of the available scientific information and FWS' administrative record. First, where molecular genetic data and estimates are available, FWS' criteria will not classify populations with over 20% genes derived from another taxon as WCT – FWS will consider individuals or populations with less than 20% of their genes derived from another taxon to be members of the WCT subspecies. Id. at 46,995. In the vast majority of cases, FWS expects molecular genetic data derived from laboratory tests to be the only data available because of the rapidity and accuracy with which molecular genetic tests can be conducted in a noninvasive manner, relative to morphological or other methods. 68 Fed. Reg. at 46,994-96.

Second, as explained above, where molecular genetic data are not available, FWS determined that there was not a scientifically supported basis for excluding introgressed populations which conform to the scientific, taxonomic description of WCT subspecies. See Section I.B., infra. Consequently, Plaintiffs fail to demonstrate that FWS' ultimate decision, based on the science, is arbitrary and capricious. Oceana, Inc., v. Evans, 384 F. Supp. 2d 203, 214 (D.D.C. 2005) (noting the court "must give special deference where the agency has relied on its scientific expertise").

In sum, Plaintiffs' insinuations that whole populations of WCT will be classified as WCT when the population is 50% introgressed ignores the scientific literature and ignores FWS' criteria based on that literature. AR II-237 at 6678-79 (peer review, noting the existence of "several independent studies indicate [that the boundary line when WCT populations still retain morphological identity is near 20% foreign alleles" and that [t]he 20% rule is a reasonable interpretation of the best information available."

(emphasis added)); AR II-239 at 6686 (peer review, Dr. Robert Behnke, Colorado State University (retired), concurred that WCT "can have up to 20% hybrid influence from [rainbow trout] and/or Yellowstone [cutthroat trout] and be classified as [a WCT]").  Furthermore, Plaintiffs attempt to have this Court substitute its judgment and interpretation of the scientific data for that of FWS, an approach which should be rejected.  See Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976) (*en banc*) ("We must look at the decision not as a chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimum standards of rationality.").

## II.    FWS PROPERLY CONSIDERED THE THREAT OF HYBRIDIZATION TO THE WCT.

In determining whether the WCT should be listed under the ESA, FWS properly considered the hybridization threats to the WCT subspecies, distinguishing between levels of genetic introgression as appropriate.  FWS reasonably determined that listing of the entire subspecies is not warranted based on one or more of these threats.  Because FWS "considered the relevant factors and articulated a rational connection between the facts found and the choice made," its determination must be upheld. Carlton, 900 F. Supp. at 530.

### A.    FWS Correctly Analyzed The ESA's Five Statutory Factors With Respect To The Entire WCT Subspecies, Distinguishing Between Levels Of Genetic Introgression As Appropriate.

In examining the five statutory listing factors, FWS utilized the extensive Status Report "database . . . to [] closely examine the effects of several specific threats (i.e., whirling disease, nonnative predators, competition from nonnative brook trout [*Salvelinus fontinalis*], and hybridization) to WCT."  68 Fed. Reg. at 46,999.  In undertaking this examination, FWS reviewed the threats to two primary categories of extant WCT populations: "(1) Nonintrogressed and suspected nonintrogressed WCT populations and (2) introgressed and suspected introgressed WCT classified as "conservation" populations."  Id. (citing AR II-321 at 8140-8151 (multi-state position paper)).  FWS determined that these two categories of fish met FWS' criteria for classifying individuals or populations as WCT.  68

Fed. Reg. at 46,995-96.

FWS, however, did not apply the five statutory listing factors to the "sportfish" populations, citing two primary rationales: (1) to be more conservative regarding the status and viability of extant WCT populations; and (2) to avoid classification uncertainties associated with possible marginal populations managed as sportfish, populations that may not meet FWS' criteria for inclusion in the WCT taxon. 68 Fed. Reg. at 46,999. Thus, FWS reasonably determined that it was not appropriate to include sportfish populations in the WCT subspecies reviewed for listing because the populations may not be properly classified as WCT pursuant to FWS' criteria and because consideration of these populations could lead to an inaccurate assessment of the WCT subspecies. Id.

### B.    FWS Reasonably Determined That A WCT Is Not A "Threat" To The WCT Subspecies.

FWS' criteria for determining whether individuals or populations belong to the WCT subspecies recognizes that there is no evidence or scientific rationale for concluding that slightly introgressed WCT are any less valuable or viable than nonintrogressed WCT. Thus, FWS determined that WCT with genes at low frequency from another taxon, detectable only by a laboratory molecular genetic test, are not a threat to themselves or the WCT subspecies. Rather, FWS found that "hybridization" constitutes a threat to the WCT, which it defined as:

> the direct interbreeding between two individuals that conform morphologically to different species or subspecies, including the interbreeding between individuals conforming morphologically to WCT and individuals not conforming morphologically to WCT.

68 Fed. Reg. at 46,994. Thus, WCT interbreeding "with introduced, nonnative fishes, particularly rainbow trout and their hybrid descendants that have established self-sustaining populations, is recognized as an appreciable threat to the WCT subspecies." Id. at 47,004.

For example, in the Flathead River drainage in Montana, a naturalized population[13] of rainbow trout in the lower mainstem river appears to be a constant source of rainbow trout genes to WCT

---

[13] A "*naturalized population*" is generally defined as a self-sustaining, naturally reproducing population outside the native geographic range of the species. See AR II-14 at 123, 132; AR II-45 at 1035.

populations upstream, as there does not appear to be any barriers preventing the rainbow trout and WCT populations from interbreeding.  See 68 Fed. Reg. at 47,004; AR II-251 at 6801; AR II-251 at 6801; AR II-252 at 6807; AR II-246 at 6764.  In this situation, FWS considers the naturalized rainbow trout population in the lower river to constitute the hybridization threat to the WCT in the upper river because continued gene flow between the populations will result in increased levels of genetic introgression upstream – at some point in time, the upstream WCT population will surpass the 20% genetic threshold and will no longer morphologically conform to the scientific, taxonomic description of WCT.  See 68 Fed. Reg. at 47,004-05.  Plaintiffs have similarly recognized this proposition.  See Pls' Compl. at ¶ 36 (recognizing the "threat" to the WCT constitutes interbreeding with "sportfish, especially rainbow trout that were introduced into the WCT's native waters."); AR II-92 at 2220 (Nathaniel Hitt's master's thesis, indicating that "[t]he greatest threat to [WCT] is hybridization with introduced trout").

On the other hand, FWS found, based on the best available scientific data, that slightly introgressed WCT do not threaten the WCT subspecies, because such fish constitute viable members of the WCT subspecies, contain valuable genetic resources of the WCT subspecies, and exhibit the defining characteristics, both biological and ecological, of the WCT subspecies.  68 Fed. Reg. at 46,994.  Moreover, slightly introgressed WCT are not a threat to the WCT subspecies because, absent the additional introduction of genes from another taxon (for instance, due to the interbreeding between rainbow trout and WCT or the propagation of genes from highly introgressed populations or naturalized populations of rainbow trout), FWS noted that it "expect[ed] the frequency of genes from the other taxon to remain low in the population."  68 Fed. Reg. at 46,994.

For example, FWS' Finding recognizes that a WCT population containing 10% rainbow trout ("RBT") genes, which can interbreed with a nonintrogressed WCT population, does not pose a threat to the nonintrogressed WCT population or the WCT subspecies.  The introgressed WCT population is not considered a threat because it is indistinguishable from the nonintrogressed population by the criteria FWS established to define WCT taxonomically.  See 68 Fed. Reg. at 46,994-95.  Moreover,

under these circumstances, the frequency of foreign genes (i.e., rainbow trout genes) in the WCT populations cannot increase in frequency (i.e., cannot increase above 10% level) unless there is a ready source of those genes, for example, through active stocking of RBT or from self-sustaining, naturalized or hybridized populations of RBT. See 68 Fed. Reg. at 46,994; AR II-243 at 6720 ("The increase or decrease of rainbow trout introgression (the % of RBT alleles within a population) depends on whether new rainbow trout alleles are continually introduced into the population and the relative fitness of the hybrid genotypes"); AR II-250 at 6795 (noting that, without additional introduction of foreign genes in a slightly introgressed population, "[n]o matter[] what happens, I don't see how the small amount of [rainbow trout] genes could 'take over' the WCT population"). Accordingly, an introgressed WCT population is not distinguishable from an nonintrogressed WCT population and cannot further increase the amount of foreign genes in the WCT subspecies complex; thus, the introgressed WCT is not a threat to the WCT subspecies.

Plaintiffs' argument to the contrary, that slightly introgressed WCT are a "threat" to the WCT subspecies, amounts to little more than advocating that FWS should find that a fish is a WCT only if it is nonintrogressed. As stated above, this position runs counter to accepted methods of taxonomically classifying species and subspecies, the best available science, other expert's opinions expressed in the peer reviews of FWS' finding, and FWS' own judgments and expertise. 68 Fed. Reg. at 46,992-96.

Plaintiffs further appear to advocate that FWS should only consider the existence of, and threats to, nonintrogressed WCT. This position is directly contrary to the plain language of the ESA, which mandates that FWS consider whether a "species" is endangered or threatened because of one or more of the five statutorily enumerated factors, not whether a taxonomic group below the species level is threatened or endangered. Alsea Valley Alliance v. Evans, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001), appeal dismissed, 358 F.3d 1181 (9th Cir. 2004) ("Listing distinctions below that of subspecies or a [distinct population segment] of a species are not allowed under the ESA." (citing Southwest Ctr. for Biological Diversity v. Babbitt, 980 F. Supp. 1080, 1085 (D. Ariz. 1997)). Just as FWS cannot list "squirrels in a specific city park, even though there is an abundance of squirrels in other parks in the

29

same city, or elsewhere in the country," FWS cannot consider the threats to the "squirrels in a specific city park" to justify listing the entire squirrel species.  Report of the Senate Committee on Environment and Public Works, S. Rep. No. 96-151, at 1397 (1979).

### C.    FWS Reasonably Determined That Listing Was Not Warranted Due To The Threats Posed By The Stocking Of Potentially Hybridizing, Non Native Fishes.

FWS reasonably determined that the WCT subspecies is not an endangered or threatened species due to the inadequacy of existing regulatory mechanisms relating to stocking of potentially hybridizing, nonnative fishes.  68 Fed. Reg. at 47,002.  FWS noted that many states have various laws and regulatory mechanisms that address threats posed by the unlawful stocking of potentially hybridizing, nonnative fishes. Notably, Montana, Idaho, Washington, and Oregon have ceased the practice of stocking nonnative, potentially hybridizing species into waters inhabited by WCT.  Id.  If fish are stocked with nonnatives, only sterile fish are introduced into such waters, preventing interbreeding with WCT.  Moreover, many of the states closely regulate the possession and transportation of live fish and the stocking of ponds, and many of these states manage primarily for wild fish production.  Id.; see also AR II-154 at 3137 (discussing laws and regulations in Montana); AR II-18 at 219 (Idaho); AR II-114-2576 (Idaho); AR II-104 at 2452 (Washington); AR II-67 at 1232 (Oregon).

Accordingly, the WCT is not "an endangered species or threatened species because of" the inadequacy of existing regulatory mechanisms, as the regulatory mechanisms in place adequately address the threats posed by the introduction of potentially hybridizing, nonnative fishes.  See 16 U.S.C. § 1533(a)(1).

### D.    FWS Reasonably Determined That The Threat Of Hybridization With Non Native Fishes Did Not Warrant Listing The WCT.

FWS further determined that the best scientific and commercial information available indicates that the WCT subspecies is not "an endangered species or a threatened species because of" introgressive hybridization.  16 U.S.C. § 1533(a)(1); 68 Fed. Reg. at 47-004-05.  FWS based its determination on several factors, such as the nature of the threat posed by hybridization, the risk of

hybridization to WCT populations, and human and natural factors that influence the risk posed by hybridization.  Id.

Generally, hybridization requires that the nonnative species, particularly rainbow trout and their hybrid descendants, invade the WCT habitat, the two species interbreed, and the resulting hybrids themselves survive and reproduce.  68 Fed. Reg. at 47,004.  If the hybrids interbreed with one or both of the parental species, genetic introgression can occur.  Hybridization has "long been recognized as an important evolutionary mechanism for the origin of new species of plants" and has recently been "recognized as an important evolutionary mechanism for the origin of new species of animals."  Id. at 46,991.  Natural hybridization "(a) [c]reates new genotypic diversity, (b) can lead to new, adaptive phenotypes,[14] and (c) can yield new species."  Id. at 46,991; AR II-311 at 7730.  However, in some cases, "hybridization may be threatening the continued existence of a taxon due to anthropogenic [human-caused] factors or natural environmental events."  68 Fed. Reg. at 46,992.  Here, FWS determined that hybridization constitutes an appreciable threat to the WCT subspecies because continual introgression can eventually lead to the loss of genetic identity of one or both parental species and thus result in a "hybrid swarm."  Id. at 47,004; id. at 46,991 (noting that where rainbow trout have been extensively stocked in WCT habitat, the resulting hybridization with WCT threatens to eliminate the distinctiveness of the WCT populations).[15]

In its Finding, FWS recognized the importance of responsibly assessing the risk hybridization poses to the WCT subspecies.  FWS noted that limits exist on the ability for humans to eliminate self-sustaining populations of potentially hybridizing, nonnative fishes from entire drainages or even individual streams.  Id.  For instance, barriers can be installed to prevent upstream movement of potentially hybridizing fish.  Once the barriers are in place, fish toxins can be applied to completely remove all fishes from the upstream reaches, which can then be restocked with nonintrogressed WCT.

---

[14] "*Phenotypes*" are defined as the physical expression (outward appearance) of a trait of an organism. See AR II-125 at 2879.

[15] A "*hybrid swarm*" generally consists of individual fish that each contain genetic material from both of the parental species. Id.

However, this method is not regularly used because of technological, budgetary, and other limitations. Id.; see also Fairhurst v. Hagener, 422 F.3d 1146, 1147 (9th Cir. 2005) (illustrating some concerns with this management tool).  As FWS explained:

> Because self-sustaining populations of nonnative fishes pose the greatest hybridization threat to WCT and few of those populations can be eliminated or appreciably reduced, a key concern is for the extent that introgressive hybridization may eventually pervade extant, nonintrogressed or suspected nonintrogressed WCT populations, particularly those that inhabit headwater streams in high-elevation areas.

68 Fed. Reg. at 47,004.

FWS found that the primary hybridization threat to WCT constitutes rainbow trout, YCT, hybrid offspring, and descendants that have established self-sustaining populations within the WCT's range and thus can potentially interbreed with WCT.  Id.; see, e.g., AR II-316 at 7819-7831 (attributing increased levels of introgression in a population to the ongoing stocking of rainbow trout).  Many of the WCT populations are protected from hybridization by barriers which entirely prevent the upstream movements of nonnative fishes, including those that may potentially hybridize with WCT.  Id.  FWS found that 48% of the stream miles occupied by nonintrogressed and suspected nonintrogressed WCT populations occupying isolets were completely protected by such barriers and that 6% of nonintrogressed or suspected nonintrogressed WCT populations occupying the larger, more diverse habitats where completely protected by such barriers.  Id.

FWS also recognized that hybridization poses a greater risk to the WCT metapopulations, inhabiting larger, diverse areas:

> the vulnerability to hybridization of WCT in metapopulations stems from the key characteristic of the metapopulation itself, i.e., the ability of its member fish to move (and interbreed) among the various WCT populations that constitute the metapopulation.  It is assumed that potentially hybridizing fishes are similarly unencumbered in their movements throughout the geographic area occupied by the metapopulation and, accordingly, WCT metapopulations can inevitably become completely introgressed as a hybrid swarm.

68 Fed. Reg. at 47,004.  However, the mere co-occurrence of WCT and potentially hybridizing species "does not portend their imminent hybridization with WCT."  Id.  For the past 100 years, rainbow trout and YCT have been stocked into WCT habitat, yet evidence reveals numerous populations of

32

nonintrogressed and suspected nonintrogressed WCT:

> Clearly, not all nonintrogressed WCT populations have been equally vulnerable to introgressive hybridization. In Idaho, WCT in many populations are sympatric with potentially hybridizing, native redband trout but remain nonintrogressed (Moore 2002).

Id. FWS acknowledged that there exists no clear consensus as to why some populations are more vulnerable than others to hybridization. See 68 Fed. Reg. at 47,005 ("[T]he eventual extent that rainbow trout, or YCT, genes move upstream may be stream-specific and unpredictable."). Some scientists speculate that there may be natural barriers to the upstream progression or movement of hybridization, for instance diminished stream size, AR II-92 at 2211, stream elevation, stream temperature, hydrologic regimes, and the physiological or habitat requirements of rainbow trout, their hybrids, and WCT, AR II-325 at 8190. Moreover, some experts have speculated that "that phenotypically true, native cutthroat trout of several subspecies persist in many essentially undisturbed, natural habitats because they have fitness superior to that of nonnative fishes, including potentially hybridizing species and their hybrid descendants." 68 Fed. Reg. at 47,005 (citing AR II-325 at 8190). Other experts, however, have speculated that rainbow trout genes are expected to continue moving upstream into many stream reaches presently inhabited by nonintrogressed WCT and that environmental barriers are may not be stop the spread of hybridization. Id.

At bottom, FWS was tasked with reconciling this information and making a reasoned, rational determination on the imminence and magnitude of the hybridization threat to WCT. FWS did not base its conclusion solely on the assumed effectiveness of environmental barriers, as Plaintiffs complain, see Pls' Complaint at ¶ 27; Pls' Motion for Leave at 9-10, but rather considered all relevant factors and the best available scientific information, noting that (1) numerous WCT populations throughout the natural geographic range of the subspecies are completely protected from potentially hybridizing species; (2) numerous WCT populations may be protected from potentially hybridizing species by various environmental conditions; and (3) numerous WCT populations have co-existed with potentially hybridizing species for decades without becoming hybridized. 68 Fed. Reg. at 47,004-05. That FWS did not have perfect information and thus had to utilize its professional judgment does not support a

finding that the listing determination is arbitrary and capricious.  Oceana, Inc. v. Evans, 384 F. Supp.

2d 203, 223-24 (D.D.C. 2005) ("Evaluation of the equivocal evidence pointed to by the parties is

exactly the type of scientific debate that the Court is not meant to wade into."); American Wildlands

v. Norton, 193 F. Supp. 2d at 253 ("This Court defers to the policy judgments of FWS in weighing

hybridization as one of the many factors . . .").  Accordingly, FWS' reasoned, rational determinations

are entitled to deference and must be upheld.

## III.    FWS ARTICULATED A REASONED, RATIONAL BASIS FOR ITS "NOT WARRANTED" LISTING DETERMINATION.

In sum, FWS explained that the current threats facing the WCT subspecies do not warrant

listing under the ESA:

> Although the WCT subspecies has been reduced from historic levels and its extant populations
> face threats in several areas of the historic range, we find that the magnitude and imminence
> of those threats do not jeopardize the continued existence of the subspecies within the
> foreseeable future.  Many former threats to WCT, such as those posed by excessive harvest by
> anglers or the widespread stocking of nonnative fishes, are no longer factors that threaten the
> continued existence of the WCT subspecies.  The effects of other extant threats are being
> effectively countered by the management actions of State and Federal agencies, in conjunction
> with existing regulatory mechanisms.

68 Fed. Reg. at 47,006.[19]  With respect to the threat of hybridization, FWS recognized that

"hybridization with nonnative rainbow trout or their hybrid progeny and descendants, both of which

have established self-sustaining populations in many areas in the range of WCT, remains the greatest

threat to WCT."   Id. at 47,006.   However, FWS reasonably determined that this threat does not

warrant listing the WCT under the ESA:

> The WCT subspecies is widely distributed and there are numerous, robust WCT populations
> and aggregates of populations throughout the subspecies' historic range.  Moreover, numerous
> nonintrogressed WCT populations are distributed in secure habitats throughout the subspecies'

---

[19] Plaintiffs' Complaint challenges FWS' findings and conclusions with respect to hybridization.  See
Pls' Compl. at 13.  Plaintiffs do not allege that FWS' consideration of various other threats is "arbitrary
or capricious" under the APA.  Accordingly, Defendants will not address those aspects of FWS'
finding, besides noting that FWS considered the full range of threats facing WCT, the best scientific
and commercial data available, and made reasoned, supported determinations supported by the record
and in accordance with the ESA.  See 68 Fed. Reg. at 46,999-47,007.

> historic range. In addition, despite the frequent occurrence of introgressive hybridization, we find that numerous WCT populations are nonintrogressed or nearly so, and thus retain substantial portions of their genetic ancestry. We consider slightly introgressed WCT populations, with low amounts of genetic introgression detectable only by molecular genetic methods, to be a potentially important and valued component of the overall WCT subspecies.

Id. See also id. at 47,006 (also considering and identifying the numerous, ongoing conservation efforts which benefit WCT and their habitats: "These ongoing conservation efforts are commendable and they contribute to the certainty that WCT can be conserved and protected.").

After a complete and extensive evaluation of both the status of the WCT subspecies and the threats facing the WCT, FWS made a reasoned determination, consistent with the mandates of the ESA and the dictates of the best available science, that "the WCT is not likely to become either a threatened or endangered species within the foreseeable future. Therefore, listing of the WCT as a threatened or endangered species under the [ESA] is not warranted at this time." 68 Fed. Reg. at 47,007. This determination is entitled to deference by the Court and must be upheld. Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1505 (D.C. Cir. 1986) ("[A]s long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence.").

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court grant Defendants motion for summary judgment.

Dated: April 3, 2006                 Respectfully Submitted,

SUE ELLEN WOOLDRIDGE, Asst. Attorney General
JEAN E. WILLIAMS, Section Chief
LISA L. RUSSELL, Asst. Section Chief

_____/s/ Michael R. Eitel_____
MICHAEL R. EITEL,
Trial Attorney (SBN 22889 (Neb.))
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369

Washington, DC 20044-7369
Phone: (202) 305-0339/ Fax: (202) 305-0275
Email: Michael.Eitel@usdoj.gov

Attorneys for Federal Defendants