UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
AMERICAN WILDLANDS, et al.,               )
                                          )
                                          ) Civil No.: 05-cv-1043 (EGS)
            Plaintiffs,                    )
                                          ) PLAINTIFFS' MEMORANDUM IN
      vs.                                 ) SUPPORT OF MOTION FOR
                                          ) SUMMARY  JUDGMENT
                                          )
GALE NORTON, in her official capacity     )
as Secretary, U.S. Department of the Interior, )
et al.,                                   )
                                          )
            Defendants.                    )
                                          )
_____   )

**TABLE OF CONTENTS**

FACTUAL BACKGROUND ............................................................................................... 2

    A.  The ESA's Statutory Framework ................................................................. 2

    B.  The Westslope Cutthroat Trout ................................................................... 3

    C.  The Threat Posed By Hybridization ............................................................ 5

    D.  FWS' Refusal To Confront The Threat Hybridization Poses to WCT ............................ 7

        1.  FWS' Arbitrary Treatment of Hybrids in 2000 .................................... 8

        2.  The Second Status Review and The Allendorf Report ........................ 10

        3.  FWS' Second Listing Decision To Treat Hybrids As Viable WCT .................... 13

        4.  FWS' Risk Assessment For Hybridizing Rio Grande Cutthroat Trout ............... 16

ARGUMENT ............................................................................................................. 18

    I.  STANDARD OF REVIEW ................................................................... 19

    II.  FWS ARBITRARILY INCLUDED HYBRID FISH IN THE WCT POPULATION FOR LISTING CONTRARY TO THE BEST AVAILABLE SCIENCE ...................... 19

        A.  FWS Arbitrarily Assumed That Hybrid Look-Alikes Will Be No More Than 20% Hybridized ........................................... 20

        B.  FWS Arbitrarily Assumed That Hybrid Look-Alikes Are Ecologically Equivalent To WCT ......................................... 22

    III.  FWS ARBITRARILY RELIED ON VISUAL JUDGMENTS RATHER THAN GENETIC TESTING ................................................................. 25

CONCLUSION ........................................................................................................ 27

## TABLE OF AUTHORITIES

### CASES

ALLTEL Corp. v. FCC,
 838 F.2d 551 (D.C. Cir. 1988) ........................................................................19

American Wildlands v. Norton,
 193 F. Supp. 2d 244 (D.D.C. 2002) ........................................................... passim

Baltimore Gas & Elec.Co. v. NRDC,
 462 U.S. 87 (1983) ........................................................................................19

Carlton v. Babbitt,
 900 F. Supp. 526 (D.D.C. 1995) .....................................................................19

Center for Biological Diversity v. Lohn,
 296 F. Supp. 2d 1223 (W.D. Wash. 2003) ...........................................25, 26, 27

City of Las Vegas v. Lujan,
 891 F.2d 927 (D.C. Cir 1989) ........................................................................19

Defenders of Wildlife v. Babbitt,
 958 F. Supp. 670 (D.D.C 1997) ................................................................. passim

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,
 463 U.S. 29 (1983) ........................................................................................19

Public Citizen, Inc. v. FAA,
 988 F.2d 186 (D.C. Cir.1993) ........................................................................24

Southwest Center for Biological Diversity v. Babbitt,
 215 F.3d 58 (D.C. Cir.2000) ..........................................................................26

### STATUTES

Administrative Procedure Act,
5 U.S.C. § 706(A) ...........................................................................................19

Endangered Species Act,
16 U.S.C. § 1521 et seq.......................................................................................1

16 U.S.C. § 1531(a)(1)(A) ................................................................................10

16 U.S.C. § 1531(b) ...................................................................................................2

16 U.S.C. § 1532(6) ...................................................................................................2

16 U.S.C. § 1532(20) .................................................................................................2

16 U.S.C. § 1533(a)(1) ...........................................................................................2, 3

16 U.S.C. § 1533(a)(1)(D) .......................................................................................10

16 U.S.C. § 1533(a)(1)(E) .......................................................................................10

16 U.S.C. § 1533(b)(1)(A) .....................................................................................3, 25

16 U.S.C. § 1533(b)(2) ...............................................................................................2

16 U.S.C. § 1533(b)(3)(A) ..........................................................................................8

16 U.S.C. § 1533(b)(3)(B) ..........................................................................................8

16 U.S.C. § 1536(a)(2) ...............................................................................................2

16 U.S.C. § 1538(a)(1)(B) ..........................................................................................2

## RULES AND REGULATIONS

50 C.F.R. § 17.21 ........................................................................................................2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| ) | |
| AMERICAN WILDLANDS, et al., ) | |
| ) | Civil No.: 05-cv-1043 (EGS) |
| Plaintiffs, ) | |
| ) | PLAINTIFFS' MEMORANDUM IN |
| vs. ) | SUPPORT OF MOTION FOR |
| ) | SUMMARY  JUDGMENT |
| ) | |
| GALE NORTON, in her official capacity ) | |
| as Secretary, U.S. Department of the Interior, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

Plaintiffs American Wildlands, <u>et al.</u>, ("American Widlands") bring this action to compel the U.S. Fish and Wildlife Service ("FWS") to undertake a scientifically based assessment of the Westslope cutthroat trout's status under the Endangered Species Act ("ESA"), 16 U.S.C. § 1521 <u>et seq.</u>, as this Court ordered in 2002. <u>See</u> <u>American Wildlands v. Norton</u>, 193 F. Supp. 2d 244, 258 (D.D.C. 2002). While FWS recognizes that interbreeding, or hybridization, of Westslope curttroat trout ("WCT") with introduced sport fish is the principal threat to WCT survival, FWS refuses to consider the true genetic status of WCT populations in order to determine whether listing is warranted. Instead, FWS assumes that hybrids are viable members of the subspecies if they look the same as WCT.

This assumption has no scientific basis. The best available scientific data indicates that hybrid fish may look exactly like pure WCT until they are more than 50% hybridized — at which point, key evolutionary advantages that have enabled WCT to survive for thousands of years have been lost. As this Court found previously, FWS cannot rely on superficial

appearances to evaluate the current extent of hybridization.  Accordingly, American Wildlands once again asks this Court to direct FWS to evaluate the threat posed by hybridization in light of the most reliable genetic data.

<strong>FACTUAL BACKGROUND</strong>

**A.    The ESA's Statutory Framework**

Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  To this end, the ESA requires the Secretary of Interior, acting through FWS, to identify endangered or threatened species for listing and to respond to listing petitions submitted by the public.  Id. § 1533(a)(1), (b)(3).  Once listed, imperiled species benefit from strong federal protections.  The ESA makes it illegal for any person to "take" – kill, harm, collect, or otherwise harass – any member of an endangered species.  Id. §§ 1532(19), 1538(a)(1)(B); see also 50 C.F.R. § 17.21 (extending take prohibition to threatened species).  FWS is generally required to designate critical habitat for listed species, 16 U.S.C. § 1533(b)(2), and federal agencies must ensure that their actions will not jeopardize the continued existence of listed species or adversely modify their critical habitat.  Id. § 1536(a)(2).

The ESA defines 'endangered species' to "mean[] any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  The Act further defines "threatened species" to "mean[] any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  Thus, in requiring FWS to list "threatened species," the ESA seeks to ensure timely recovery efforts "before a species is conclusively headed for extinction."

2

Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 680 (D.D.C 1997) (internal quotations omitted).

In determining whether a species is threatened, FWS must consider five factors, any one of which may justify listing: "A) the present or threatened destruction, modification, or curtailment of its habitat or range; B) overutilization for commercial, recreational, scientific, or educational purposes; C) disease or predation; D) the inadequacy of existing regulatory mechanisms; or E) other natural and manmade factors affecting its continued existence." 16 U.S.C. § 1533(a)(1). Importantly, FWS must make its listing determination "solely on the basis of the best scientific and commercial data available." Id. § 1533(b)(1)(A).

**B.    The Westslope Cutthroat Trout**

The Westslope cutthroat trout is an iconic species in the Northern Rockies. It is the state fish of both Montana and Idaho, and it takes its scientific name, Oncorhynchus clarki lewisi, from Lewis and Clark. The earliest written record of the westslope cutthroat trout comes from Merriwether Lewis. Lewis had just arrived at the foot of the spectacular Great Falls of the Missouri River in Montana, and it was a novelty on an otherwise remarkable day to hook a river trout. The Westslope cutthroat trout's appearance in Lewis' journals is unmistakeable, with the "small dash of red on each side of the first ventral fins" and the hallmark "flesh … of a rose red." Moulton, Gary ed., Journals of the Lewis and Clark Expedition (1987).[1] The westslope cutthroat trout was then the most abundant cutthroat trout in the inland Northwest.

Today, the Great Falls are dammed, and it would take extraordinary luck to fish a Westslope cutthroat trout out of the Missouri River. In the two hundred years since Lewis and

---

[1] For photographs of westslope cutthroat trout and their distinctive coloration and spotting patterns, see AR II-128 (Trotter, et al., Genetic And Phenotypic Catalog Of Native Resident Trout Of The Interior Columbia River Basin at Appendix A) (PDF document labeled "Heritage Trout2001").

Clark arrived in the American West, damming, irrigating, grazing, logging, mining, road-building, and widespread sport-fish stocking have made WCT scarce.  See AR I-1728 at 6257, 6260-61; AR II-321 at 8117. [2]  Based on the most current available data, WCT occupy only 6.2% of their historic range. [3]  See Reconsidered Finding for an Amended Petition To List the Westslope Cutthroat Trout as Threatened Throughout Its Range, 68 Fed. Reg. 46,989, 46,998 (Aug. 7, 2003) (reporting that genetically true WCT are known to occupy 3,500 stream miles of the estimated 56,500 stream miles in their historic range).  And this figure does not account for major declines in the abundance of WCT in the portions of their range that are still occupied.  Whereas rivers and large tributary streams historically supported the most robust WCT populations, WCT are now primarily "restricted to small, headwater streams in mountainous areas, where the adverse effects of human activities on WCT has been negligible."  AR II-321 at 8115;  see also AR I-1728 at 6257 (explaining that "whole river basins have been blocked" by "construction of dams, irrigation diversions, or other migration barriers such as culverts" thereby "eliminat[ing] habitat that w[as] once available to migratory populations" and leaving "[r]esident forms" of WCT "in isolated segments of streams").

According to a comprehensive survey recently completed by the state Game and Fish Departments of Montana, Idaho, Washington and Oregon, small isolated populations or "'isolets' accounted for 168 (98%) of the[] 172 conservation populations" that are considered genetically

---

[2] "AR" as used herein refers to the administrative record filed by federal defendants.  Citations are to volume number, document number, and page number.  For example, AR II-321 at 8115 refers to Part 2 of the AR, document number 321 at bate-stamped page number 8115.

[3] The WCT's historic range stretched from the headwaters of the Columbia River Basin in British Columbia, east to the South Saskatchewan River Basin in Alberta, south to the Missouri River Basin in central and western Montana and northern Wyoming; and west to the tributaries of the Columbia River in northern and central Idaho.  Disjunct populations of WCT were also carried to eastern Washington state and the John Day River in central Oregon, presumably by glacial lakes flooding during the ice ages.  See 68 Fed. Reg. at 46,990.

intact.  AR II-119 at 2720; see also 68 Fed. Reg. at 46,998  (reporting that 81.2 percent of all WCT populations are "isolets" that are "restricted to headwater areas").  These remnant WCT populations are imperiled simply by their small size and isolation from other WCT.  See  AR II-119 at 2710-11, 2719-20 (explaining that for most "core" populations of genetically pure WCT, "risks due to isolation, small population size, and temporal variability are high"); AR II-38 at 980-986 (quantifying high extinction risk for small isolated populations); see also AR II-299 at 7588-7597 (same); AR I-1752 (same).

Across their current range, WCT are also threatened with encroaching human development such as new roads, logging projects, mines, livestock operations, irrigation ditches, and dams, see AR-1 at 6260; AR II-321 at 8053, 8055, 8059-62, 8067, 8073-8077, 8082-8085, 8089-90, 8097-98, 8101-3, 8105-6 (detailing adverse impacts of land-use activities in WCT watersheds); warming water temperatures associated with habitat degradation and climate change, see AR I-1728 at 6257, 6261; and competition with introduced species such as brook trout and brown trout, see AR I-1728 at 6257-58, 6260; AR II-321 at 8065-66.  Finally, WCT are experiencing major declines as a result of widespread interbreeding, also known as "hybridization" or "introgression," with introduced rainbow trout and Yellowstone Cutthroat Trout ("YCT").  See AR I-1728 at 6260; 68 Fed. Reg. at 47,004, 47,006.

### C.    The Threat Posed By Hybridization

FWS and leading fisheries biologists all acknowledge that hybridization is currently "the greatest threat" to the long-term survival of WCT.  68 Fed. Reg. at 47,006; see also AR I-1728 at 6260; AR I-1719 at 5977; AR II-258 at 6896, 6907-8.  As this Court found previously, and as the record amply reflects, there are "several significant harms stemming from hybridization, including impairment of growth, survival, fertility, developmental rate, and the ability of

individuals to develop properly." See American Wildlands, 193 F. Supp. 2d at 253 (internal quotations and record citations omitted); see also AR II-258 at 6896, 6907; AR II-259 at 6912, 6915; AR II-260 at 6923.

The emergence of hybrids in place of pure-strain cutthroat populations represents an irreversible genetic loss that undermines the overall fitness of WCT as well as the larger western trout fishery. See id. at 6923, 6926, 6936; AR II-258 at 6907-9. The disappearance of distinct trout lineages undoes the work of millions of years of evolution, risking the loss of important adaptations to local environmental conditions . See AR II-260 at 6923, 6926, 6936; AR II-258 at 6896, 6907-9. "Loss of these adaptations is difficult to detect because some local adaptations of native populations might only be essential during periodic episodes of extreme environmental conditions" such as winter storms, floods, droughts, disease epidemics, and especially wildfires, which are increasing in both frequency and intensity across the West. AR II-260 at 6933; see also id. at 6923, 6926, 6935-36; AR II-258 at 6896, 6907-8-9. Thus, while hybrid populations may appear to be robust, they are not equipped with the same genetic makeup that allowed their parental subspecies to survive over time. See id.; see also Letter from Nathaniel Hitt, Fred Allendorf, and Chris Frissell to Lynn Kaeding at 2 (July 10, 2004) (attached as Exhibit 2 to Plaintiffs' Motion To Supplement The Administrative Record).

Eventually, unchecked hybridization could eradicate WCT as a subspecies. See AR II-260 at 6923, 6926; AR II-258 at 6896, 6907-9. Hybridization with introduced rainbow trout has already caused the near-extinction of Paiute cutthroat trout, which is native to California. See Notice of document availability, 69 Fed. Reg. 54,797 (Aug. 10, 2004) (providing public notice of recovery plan standards that "focus on removing non-native salmonids" and "identify[ing] the need to protect pure populations which exist outside of the historic range"). The same is true of

Gila trout, which is native to Arizona and Colorado.  FWS is aware of only four surviving

"original" populations of Gila trout that were not lost to hybridization with rainbow trout.  See

Proposed Rule, 70 Fed. Reg. 24,750, 24,752, 24,759 (May 11, 2005).  Accordingly, FWS is now

seeking to "replicate" these remnant genetic strains by way of elaborate reintroduction efforts

that include "eliminating non-native salmonids from the species' historic habitat through

piscicide (fish-killing), mechanical removal, and construction of waterfall barriers to prevent

their reinvasion" and also "rescuing fish from streams that are in danger of flash floods" and

wildlfires.  Id. at 24,759; see also id. at 24,757.  Absent timely efforts to protect pure populations

of WCT, FWS will be obliged to undertake similarly drastic measures to prevent the WCT's

extinction.  Indeed, during the last major wildfire season in Montana, state wildlife officials

transplanted WCT from a scorched stream to a private pond in an effort to save one of three

remaining pure populations in southwest Montana's Gallatin River drainage.  See AR II-61 at

1141.

    D.    **FWS' Refusal To Confront The Threat Hybridization Poses To WCT**

    FWS readily concedes that hybridization is a major threat to WCT.  See 68 Fed. Reg. at

47,004, 47,006.  Yet in the nine years since American Wildlands submitted its petition to list

theWCT as a threatened species, FWS has never undertaken an honest assessment of the

problem.[4]  Even though FWS has established scientifically-based criteria for evaluating

extinction risk among hybridizing subspecies of cutthroat trout, the agency is apparently

unwilling to use these criteria to complete a meaningful status review for WCT.

### 1.    FWS' Arbitrary Treatment of Hybrids in 2000

In 1999, FWS completed its first status review for WCT.  FWS duly noted that leading

experts "considered genetic introgression (interbreeding), particularly with rainbow trout or

Yellowstone cutthroat trout, to be the primary threat to the continued existence of WCT where

the species coexist."  AR II-321 at 7979 (emphasis added), see also id. at 8117.  FWS further

stated that introduced fish populations "probably constitute the greatest contemporary threat to

the maintenance and restoration of WCT" in Montana watersheds where extensive genetic

testing had been completed.  Id. at 8050, 8052, 8055, 8057, 8059.  Yet in the face of this

acknowledged threat, FWS made no attempt to evaluate how many WCT populations were then

hybridized and to what degree, much less how widespread hybridization would affect the WCT's

prospects for long-term persistence.  Instead, FWS "assumed that the fish stocks that state, tribal,

---

[4] At every step of the WCT listing process, American Wildlands has been obliged to bring a
lawsuit to compel FWS to take required action under the ESA.  On March 17, 1998, American
Wildlands filed suit in this Court to obtain a 90-day finding on its WCT listing petition.  See 16
U.S.C. § 1533(b)(3)(A).  FWS settled the case and published a positive 90-day finding that
listing "may be warranted" for WCT.  See Notice, 63 Fed. Reg. 31,691 (June 10, 1998).  FWS
was then required to complete a status review and issue a final 12-month listing determination.
See 16 U.S.C § 1533(b)(3)(B).  However, FWS missed the statutory deadline and let a second
year go by without issuing a decision.  American Wildlands filed a second lawsuit on August 4,
1999 to obtain the required 12-month finding.  FWS settled the case and eventually issued a
determination that listing was "not warranted" for the WCT.  See Notice of 12-month petition
finding, 65 Fed. Reg. 20,120 (Apr. 14, 2000).  On November 2, 2001, American Wildlands filed
suit for a third time to obtain a principled listing determination based on the best available
science.  On March 31, 2002, this Court granted summary judgment to American Wildlands and
ordered FWS to undertake a reasoned, scientifically-based assessment of the threat posed by
hybridization.  See American Wildlands, 193 F. Supp. 2d at 253-58.  Because FWS has yet to
produce the principled listing decision that this Court ordered four years ago, American
Wildlands is once again seeking judicial relief.

and National Park Service fisheries managers classified as WCT represented the subspecies." Id. at 7970.

This assumption was directly at odds with the results of genetic testing in Montana, which revealed that 40 percent of classified "pure" WCT populations were in fact hybridized. See AR II-258 at 6903; see also AR II-321 at 8112 (recognizing Montana data as most comprehensive data available on WCT genetics). Nevertheless, FWS elected to rely on the visual judgments of fisheries managers, and as a result, FWS counted many confirmed and likely hybridized fish populations as viable WCT. See AR II-321 at 8111, 8116, 8144-45. Thus, at the same time FWS recognized hybridization as a threat, it relied on hybrid fish stocks to determine that listing was "not warranted" based on the "widespread distribution" of WCT. 65 Fed. Reg. at 20123; see also AR II-321 at 8111, 8116, 8144-45.

On November 2, 2001, American Wildlands filed suit challenging this "not warranted" finding, arguing, inter alia, that FWS had arbitrarily counted known and likely hybridized fish as healthy WCT for purposes of its status review. This Court granted summary judgment in American Wildlands' favor, holding that "the agency wholly fail[ed] to reconcile its recognition of hybridization as a threat to WCT's viability with its inclusion of hybrid stock in the population assessed for listing." American Wildlands, 193 F. Supp. 2d at 255. "Without a scientifically based explanation of the decision," this Court explained that it could "not but find that the decision to include hybrid stock in the WCT population for listing was not supported by the best available science, and was a failure to consider an important part of the problem facing FWS and was arbitrary and capricious." Id. at 256 (internal citations, quotations, and alterations omitted).

While FWS argued that it could shore up the problems in its 12-month finding with "further explanation" of its position regarding hybridized fish, this Court declined government counsel's

request to remand the record, emphasizing that "[t]here is an extensive administrative record that describes FWS' decision to include hybrid stock in the population as resting on a determination that visual professional judgments were the best indication of the WCT population" and that "[n]othing in the record convinces this Court that this defect may be cured by a simple explanatory declaration." Id. at 257.  Accordingly, the Court ordered FWS to issue a new 12-month finding addressing: "(1) the current distribution of the species, taking into account the prevalence of hybridization, 16 U.S.C. § 1533(a)(1)(A); (2) whether the WCT population is an endangered or threatened species because of hybridization, 16 U.S.C. § 1533(a)(1)(E); and (3) if existing regulatory mechanisms are adequate to address threats posed by hybridizing non-native fish.  16 U.S.C. § 1533(a)(1)(D)." Id. at 258.

### 2.    The Second Status Review And The Allendorf Report

In response to this Court's order, FWS initiated a second status review for WCT. During the review process, FWS relied on state agencies to compile updated information on the current status of WCT populations.  See AR II-4; AR II-7; AR II-10; see also AR II-317 ("WCT Multi-state Assessment" of all known populations, summarizing their current distribution, genetic status, conservation value, and relative vulnerability to risks including isolation, small population size, nonnative species invasion, and disease).

FWS concentrated its own resources on formulating a position regarding "The Value of Hybrid Westslope Cutthroat Trout in Listing Determinations."  68 Fed. Reg. at 46,991; see also AR II-235-239.  In this regard, FWS sought the expertise of Dr. Fred Allendorf, a leading expert on WCT genetics and a co-author of the "Allendorf and Leary report" featured in this Court's 2002 opinion.  American Wildlands, 193 F. Supp. 2d at 256; see also id. at 253.  FWS hired Dr. Allendorf's laboratory, the Wild Trout and Salmon Genetics Laboratory at the University of

Montana, to review all of the scientific literature pertaining to hybridization and its effect on species viability, especially cutthroat trout viability, and to prepare a report "assert[ing] a scientifically based conclusion about the extent to which it is appropriate to include introgressed WCT stocks and stocks of unknown genetic characteristics in the WCT population considered for listing."  AR II-247 at 6767; see also AR II-240.

Ultimately, Dr. Allendorf and his colleagues at the Wild Trout and Salmon Genetics Laboratory concluded that it is not appropriate to include any hybridized populations in the WCT population considered for listing.  Their report, which was subsequently published in the scientific journal Conservation Biology with Dr. Robb Leary as a co-author, explained that "non-hybridized populations … are the only populations that represent the evolutionary legacy of WCT and are likely to possess the local adaptations that are important for long-term persistence."  AR II-260 at 6936.  Because any genetic alteration "may disrupt important long-term adaptations," the report clarified that "there is no scientific basis to justify" a level of genetic introgression, such as 10%, 15%, or 25%, that is "acceptable."  Id. at 6933, 6936.

The Allendorf report further documented the inherent unreliability of visual or "morphological/phenotypic" methods for detecting hybridization.  The report surveyed the available peer-reviewed scientific literature regarding efforts "to identify hybridized and non-hybridized populations using a variety of [physical] traits" and disclosed the following results of relevant research:

- Leary (1984): Using physical traits to detect hybridization, the author was able to identify only one population with 85% rainbow trout genes as being hybridized.

- Marnell et al. (1987): The authors found that their index of physical traits was "not useful for identifying hybrid populations."  Hybridized populations that had at least 50% Yellowstone cutthroat trout genes met the physical description of

Yellowstone cutthroat trout while a population with 80% WCT genes met the physical description of WCT.

- Leary, et al. (1996): "The authors concluded that the presence of basibranchial teeth" — a key morphological trait — "was not a reliable indicator of hybridization between WCT" and rainbow trout.

- Weigel et al. (2002): The authors concluded that a hybridized population had to contain at least 50% rainbow trout genes "to be identified reliably in the field."

Id. at 6928. Based on these findings, Dr. Allendorf and his colleagues concluded that "identification of hybridized populations of WCT on the basis of morphological analysis is not reliable." Id. at 6929.

As explained by Dr. Don Campton, co-author of FWS' analysis regarding the value of hybridized populations, the conclusions to be drawn from the existing data are that "[i]ntrogressed populations of WCT will be morphologically indistinguishable from non-introgressed populations if the amount of admixture … is less than 20-25%" and that "levels of admixture greater than 50% will be detected morphologically (i.e. in the field) because fish in those populations will not conform physically (phenotypically) to the scientific description of WCT." AR II-251 at 6799. However, "it is unclear … the extent to which 25-50% genetic admixture … will be detectable in natural populations of WCT based on morphological criteria, field observations, and the scientific description of WCT." Id. In sum, based on the available data, it is reasonable to assume that fish populations with 20% or less of their genes deriving from rainbow trout or Yellowstone cutthroat trout will continue to look like WCT. Based on the available data, it can also be assumed that fish populations with predominantly foreign genes — i.e. populations with 50% or more genes from rainbow trout or Yellowstone cutthroat trout — will no longer meet the physical description of WCT. However, for populations with more than

20% foreign genes and less than 50% foreign genes, it is unclear at what point, if ever, hybridization becomes detectable.

Indeed, there is no data in the record suggesting that there is <u>any</u> threshold at which hybridization becomes visually detectable short of 50% genetic admixture — <u>i.e.</u> until the population is more rainbow trout or YCT than WCT.  <u>See</u>, <u>e.g.</u> 68 Fed. Reg. at 46,993-944.  As the Allendorf report made clear, the best available data indicates that significantly hybridized populations are likely to look the same as pure WCT until foreign genes predominate over WCT genes, at which point key genetic adaptations that have enabled the species' survival will be lost.

For precisely this reason, Dr. Allendorf and his colleagues recommended <u>against</u> the use of visual classification methods to identify WCT populations.  While the Allendorf report considered the merits of including all fish retaining the "phenotypic attributes" or physical characteristics of WCT, it roundly rejected this approach, explaining that:

> <u>The WCT evolutionary lineage will be poorly preserved since many introgressed populations could be protected.  Many populations will be misidentified if molecular [genetic] examination is not used for analysis. … Some populations that contain very little genetic influence from WCT may be protected. Populations may look like WCT, but may not function as WCT.  Local adaptations that are crucial to long term survival (disease resistance, behavior, physiology, etc.) will be lost.</u>

AR II-260 at 6935 (emphasis added).  In short, the Allendorf report stated in very strong terms that it would be inconsistent with the best available science and the overarching goal of conserving WCT as a subspecies to define the WCT population on the basis of looks alone.

### 3.    FWS' Second Listing Decision To Treat Hybrids As Viable WCT

On August 7, 2003, FWS published the results of its second status review and its final determination regarding "The Value of Hybrid Westslope Cutthroat Trout in Listing

Determinations." 68 Fed. Reg. at 46,991. Once again, FWS announced that listing is "not

warranted" based on the widespread distribution of fish that look like WCT, including known

and likely hybridized populations. See id. at 46,990. While FWS purported to rely on the

Allendorf report, see id. at 46,993-94, the agency's decision runs directly contrary to every one

of the recommendations presented by Dr. Allendorf and his colleagues: FWS decided to rely

primarily on morphological methods to identify WCT; it swept hybridized populations into the

population considered for listing; and it created a "20% standard" for tolerating hybridization

among WCT populations.

FWS was aware of "the dichotomy between hybridization as a threat and the potential

inclusion of 'hybrid stock' with WCT under the [ESA]." 68 Fed. Reg. at 46,994; see also id. at

47,006 (reiterating that "hybridization with nonnative rainbow trout or their hybrid progeny or

descendants remains the greatest threat to WCT"). But FWS was intent upon "reconciling the

dichotomy" and including hybridized populations in the WCT population for listing. Id. at

46,994. To this end, FWS created a new presumption that hybrids conforming physically to the

"scientific taxonomic description of WCT," will "express the behavioral, ecological, and life-

history characteristics of WCT native to the geographic areas where those populations occur."

Id. at 46,995. In defense of this presumption, FWS asserted that fish meeting the physical

description of WCT are likely to be no more than 20% hybridized, and that this "limited

presence in WCT of genetic material from other fish species" does not represent a threat. 68

Fed. Reg. at 46,994, 47,006.

FWS offered no support for the proposition that populations with up to 20% foreign

genes share all of the same "behavioral, ecological, and life-history characteristics of WCT." Id.

at 46,995. FWS merely stated that "we are not aware of any information to suggest that such

individuals express behavioral, ecological, and life-history characteristics differently than do WCT." 68 Fed. Reg. 46,994.  However, in its bibliography of sources, FWS listed several papers suggesting that <u>any</u> genetic loss may interfere with important long-term local adaptations and therefore emphasizing the importance of conserving pure populations.  <u>See</u> 68 Fed. Reg. at 47,007 (citing AR II-258 at 6907, AR II-260 at 6933-35, AR II-301 at 7608, AR II-325 at 8182).  Also, the agency was in possession of a paper demonstrating that hybrid fish behave very differently than WCT in northwest Montana's Flathead River drainage: while WCT populations remain localized, second and third-generation hybrids are rapidly dispersing and colonizing new habitat.  <u>See</u> AR II-260 at 6932, AR II-92 at 2250-51, 2267, 2270.  Thus, not only are hybrids behaving differently than pure WCT, their dispersion is rapidly eroding the genetic security of surviving pure WCT populations.  <u>See</u> <u>id.</u>  At least in the Flathead, which was regarded as a WCT stronghold until very recently, it is wrong to presume that hybrids, which represent an affirmative threat to the subspecies, are no different from WCT.

FWS' assumption that hybrid look-alikes will be no more than 20% hybridized is further at odds with the best available data.  In its published finding, FWS disclosed the results of studies indicating that current morphological methods do not reliably detect hybridization until fish populations are more than <u>50%</u> hybridized.  <u>See</u> <u>id.</u> at 46,993-94.  Nevertheless, FWS took the position that superficial appearance is the best indication of the WCT population.

Indeed, FWS established a methodology that would classify hybrid populations as WCT even if genetic testing has confirmed that they are <u>more</u> than 20% hybridized.  Thus, FWS specified that genetic data may be used to classify WCT populations only in circumstances where no other morphological data is available.  <u>See</u> <u>id.</u> at 46,995 (specifying that "for populations for which molecular genetic data may be the <u>only</u> data available, populations with

less than 20 percent introgression will be considered WCT under the Act, whereas populations with less than 20 percent introgression will generally be excluded from the WCT subspecies") (emphasis added). However, in the usual case, where genetic data is not the only data available for a sampled fish population, less reliable morphological data would trump the genetic data, and FWS would classify hybrid look-alike populations as WCT even if genetic testing had confirmed them to be more than 20% hybridized. Thus FWS established a preference for WCT classification on the basis of morphological data even when more reliable genetic data is available.

While FWS asserts that "the criteria that we provided for inclusion of individual fishes in the WCT subspecies, in response to the Court's order, allow for the limited presence in WCT of genetic material from other fish species," FWS has never provided a scientifically-based justification for these "criteria." In essence, FWS' listing determination relies once again on visual judgments rather than genetic data, counting all fish that look like WCT, including known and suspected hybrids, as viable members of the subspecies. See id. at 46, 995-96; see also id. at 47,006. Conveniently, this allowed FWS to conclude that listing of WCT is not warranted because the subspecies is abundant and well-distributed. See id. at 47,006.

### 4.  FWS' Risk Assessment For Hybridizing Rio Grande Cutthroat Trout

FWS' stance on WCT hybridization is especially puzzling in light of the agency's evaluation of analogous hybridization threats to Rio Grande cutthroat trout, which are native to Colorado and New Mexico. See Notice of candidate status review, 67 Fed. Reg. 39,936 (June 11, 2002). In assessing the status of Rio Grande cutthroat trout, FWS relied solely on the most reliable genetic data, and counted only pure fish as viable members of the subspecies.

Roughly a year before FWS issued the challenged listing determination for WCT (and shortly after this Court ruled in 2002), FWS issued a listing determination, in which it "categorize[d] populations" of Rio Grande cutthroat trout based on "criteria … established for purity, population stability, and security from invasion by nonnative salmonids." Id. at 39,937. Specifically, FWS classified "core" Rio Grande cutthroat trout populations based on: (1) genetic purity — i.e. "less than 1 percent introgression" as suggested by "Allendorf, et al. (2001)";[5] (2) sufficient population size for long-term persistence — 2,500 fish or more; (3) sufficient stream length for long-term persistence— at least 8 kilometers or 4.9 miles; (4) absence of competing and hybridizing nonnative fish; and (5) the presence of a barrier to prevent future invasion by nonnative fish. See id. at 39,938-39.  After identifying 13 such "core" populations, the agency went on to assess their status in relation to the ESA's statutory listing factors and concluded that none of these populations was "threatened by any of the identified threats alone or in combination." Id. at 39,939-45 (considering threats posed by degraded habitat, over-fishing, whirling disease, inadequate existing regulatory protections, wildfires, electrofishing, and hatcheries).[6]

It is unclear why FWS has avoided undertaking a similar analysis for WCT, especially since Montana, Idaho, Washington, and Oregon have already laid the groundwork for such analysis by itemizing foreseeable risks, including genetic risks, to WCT populations across all four states.  See AR II-317 (Shepard, B.B., B.E. May, and W. Urie, Status of westslope cutthroat

---

[5] Allendorf et al. (2001) is the same "Allendorf and Leary report" that this Court recognized as a starting point for "reasoned" analysis of the hybridization issue.  See American Wildlands, 193 F. Supp. 2d at 256.

[6] American Wildlands disputes FWS' conclusion that the Rio Grande cutthroat trout "is not likely to become endangered within the foreseeable future throughout all or any portion of its range" based on the existence of 13 small populations.  68 Fed. Reg. at 39,947.  However, FWS' criteria for identifying genetically secure populations of Rio Grande Cutthroat Trout are scientifically defensible and could easily be applied in the WCT context.

trout (*Oncorhynchus clarki lewisi*) in the United States: 2002 (2003)).  Based on the states' data,

FWS could readily identify healthy WCT populations that are genetically intact and then

evaluate whether these populations are sufficiently numerous, well-distributed, and secure from

other threats to guarantee the WCT's future.

## ARGUMENT

This Court should set aside FWS' finding that listing is "not warranted" for WCT.

Fundamentally, FWS has failed to account for hybridization as a threat to the subspecies.

Despite pronouncements that hybridization is "an appreciable threat to the WCT subspecies" and

indeed, "the greatest threat to WCT," 68 Fed. Reg. at 47,004, 47,006, FWS continues to ignore

genetics in assessing the status of WCT populations.  FWS has never tried to distinguish between

hybridized WCT populations that undermine the subspecies' prospects for long-term persistence

and genetically secure WCT populations that contribute to the overall viability of the subspecies.

Instead, FWS continues to rely on outdated and unreliable visual classifications, assuming that

hybrids are viable members of the WCT subspecies as long as they look like WCT.  See 68 Fed.

Reg. at 46,994-95; AR II-321 at 7970.  On this basis, FWS has twice determined that

hybridization and other threats do not warrant ESA listing because fish that look like WCT are

relatively abundant.  See 68 Fed. Reg. at 47,006; AR II-321 at 8111.

FWS cannot point to any scientific data supporting the proposition that hybridization is

harmless so long as its effects are invisible.  On the contrary, the best available science indicates

that physical appearance does not correlate with genetic integrity, and that hybrid look-alikes are

not ecologically equivalent to pure WCT.  Reliance on hybrids to secure the future of WCT is

arbitrary, capricious and counter to the best available scientific data in violation of the ESA.

# I.    STANDARD OF REVIEW

Judicial review of an ESA listing determination is pursuant to the Administrative

Procedure Act, ("APA") 5 U.S.C. § 706(A).  City of Las Vegas v. Lujan, 891 F.2d 927, 932

(D.C. Cir 1989)).  Under the APA, FWS' listing decision must be set aside if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §

706(A).  An agency's decision is arbitrary and capricious if it:

> has relied on factors which Congress had not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in view or the product of
> agency expertise.

Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Although the APA standard of review is deferential to the agency, "the presumption of

agency expertise may be rebutted if its decisions … are not reasoned."  Defenders of Wildlife v.

Babbitt, 958 F.Supp. at 679 (citing ALLTEL Corp. v. FCC, 838 F.2d 551, 562 (D.C. Cir. 1988)).

In cases where the agency has failed to articulate "a rational connection between the facts found

and the choice made," the court may remand the decision to the agency for reasoned decision-

making.  Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 105 (1983); Carlton v. Babbitt, 900

F. Supp. 526, 533 (D.D.C. 1995).

# II.    FWS ARBITRARILY INCLUDED HYBRID FISH IN THE WCT POPULATION FOR LISTING CONTRARY TO THE BEST AVAILABLE SCIENCE

FWS has failed to remedy the legal violations this Court found in 2002 because it has

failed to offer any "scientifically based" justification for including hybrid stocks in the

population considered for listing.  American Wildlands, 193 F. Supp. 2d at 256.  In asserting

that hybrid populations can be considered viable WCT so long as they meet the taxonomic

definition, or physical description, of WCT, FWS made two critical assumptions:  (1) hybrids

that look like WCT will be no more than 20% hybridized; and (2) hybrids that look like WCT

can be expected to function like WCT.  Because the best available scientific data contradicts both

assumptions, FWS' reconsidered finding is fatally flawed.

    A.    **FWS Arbitrarily Assumed That Hybrid Look-Alikes Will Be No More Than 20% Hybridized**

None of the relevant data cited by FWS supports the agency's conclusion that "natural

populations conforming morphologically to the scientific taxonomic description of WCT may

have <u>up to</u> 20 percent of their genes derived from rainbow trout or YCT."  68 Fed. Reg. at

46,995 (emphasis added).  The relevant research surveyed in the Allendorf report and cited by

FWS supports the proposition that fish populations with 20% foreign genes are physically

"indistinguishable" from pure WCT populations.  <u>See id.</u> at 46,993-94; AR II-260 at 6928.  At

the same time, fish populations with <u>more</u> than 20% foreign genes are also likely to look the

same as pure populations.  As FWS acknowledged in its listing determination for Rio Grande

cutthroat trout, "individuals can look pure and still have a <u>significant</u> level of introgression."  67

Fed. Reg. at 39,398 (emphasis added).

Contrary to FWS' finding, the best available data on WCT indicates that current visual,

or "morphological," methods do not detect hybridization until fish populations are at least 50%

hybridized.  <u>See</u> AR II-260 at 6928.  While "many attempts have been made to identify

hybridized and non-hybridized populations of WCT using a variety" of physical traits, these

methods have succeeded only in identifying populations deriving most, or over 50% of their

genes, from Rainbow trout or Yellowstone cutthroat trout.  <u>See id</u>.  Thus, the <u>only</u> documented

morphological threshold for detecting hybridization is a 50% threshhold.  <u>See id.</u>

Based on the results of these studies, it is reasonable to assume that populations will look

like WCT if no more than 20% of their genes are foreign.  However, there is nothing in the data

20

to suggest that populations with 30% or 45% admixture will not also look the same as pure WCT. Indeed, Dr. Don Campton, who co-authored FWS' finding on the "value" of hybrids, made precisely this point when he reviewed the Allendorf report, stating that "it is unclear … the extent to which 25-50% genetic admixture … will be detectable in natural populations of WCT based on morphological criteria, field observations, and the scientific description of WCT." AR II-251 at 6799

Despite the concerns raised by Dr. Campton, FWS blindly asserted the existence of a 20% threshold. Thus, notwithstanding the fact that hybrid populations may be mistaken for pure WCT until they are more than 50% hybridized, FWS arbitrarily decided to classify hybrid look-alikes as WCT on the assumption that they "have genes from another taxon at <u>low</u> frequency." 68 Fed. Reg. at 46,994 (emphasis added); <u>see also</u> <u>id.</u> at 47,006 (stating that "the criteria that we provided for inclusion of individual fishes in the WCT subspecies, in response to the Court's order, allow for the <u>limited presence</u> in WCT of genetic material from other fish species") (emphasis added).

Because this assumption has no scientific basis, it violates the ESA. "The ESA mandates that the decision on listing a species be made 'solely on the basis of the best scientific and commercial data available at the time the decision is made.'" <u>Defenders of Wildlife v. Babbitt</u>, 958 F. Supp. at 679 (quoting 16 U.S.C. § 1533(b)). Here, as Dr. Campton recognized, the best available data belies the linchpin assumption that hybrid look-alikes are only slightly hybridized. FWS "bas[ed] its decision on unsupported conclusory statements as well as facts which are directly contradicted by undisputed evidence in the Administrative Record." <u>Id.</u> at 685. Its listing determination is therefore "arbitrary and capricious" and cannot pass muster under the ESA. <u>Id.</u>; <u>see also</u> <u>American Wildlands</u>, 193 F. Supp. 2d at 256 (requiring FWS to come forward

with a "scientifically based" rationale for including hybrids in the WCT population considered for listing).

### B. FWS Arbitrarily Assumed That Hybrid Look-Alikes Are Ecologically Equivalent To WCT

FWS further violated the ESA in presuming that hybrid look-alikes are virtually the same as WCT. Even if it were reasonable to assume that fish meeting the taxonomic description of WCT will be no more than 20% hybridized — which it is not — there is no scientific basis to assume that fish populations with 20% foreign genes will "express the behavioral, ecological, and life-history characteristics of WCT native to the geographic areas where those populations occur." 68 Fed. Reg. at 46,995. Indeed, FWS failed to offer a single citation in support of this entirely novel "presumption." See id. at 46,994-95.

While FWS claimed that it was "not aware of any information to suggest that such [hybrid] individuals express behavioral, ecological, or life-history characteristics differently than do WCT," this is demonstrably false. The Allendorf report, which FWS itself commissioned, emphasized that the loss of any WCT genome "may disrupt important long-term adaptations," i.e. the behavioral, ecological, and life-history characteristics that distinguish individual WCT populations. AR II- 260 at 6936. Precisely because "non-hybridized populations … are the only populations that … are likely to possess the local adaptations that are important for long-term persistence," the Allendorf report recommended against including any hybrids in the population considered for listing. See id.; see also AR II-258 at 6907; AR II-6935. Indeed, the Allendorf report considered the relative merits of treating hybrid look-alikes as WCT and recommended against such an approach on grounds that "[p]opulations may look like WCT, but may not function as WCT" and "[l]ocal adaptations that are crucial to long term survival (disease, resistance, behavior, physiology, etc.) will likely be lost." AR II-260 at 6935.

Consequently, when FWS published its new presumption that hybrid look-alikes can be expected to function just as WCT do, Dr. Allendorf and his colleagues voiced serious concern. In a letter to the agency, Dr. Allendorf and Dr. Spruell unequivocally stated that "[t]here are no scientific data in the Finding to support this assumption. In contrast, <u>there is clear evidence that this assumption is incorrect</u>." Letter from Fred Allendorf and Paul Spruell to Lynn Kaeding at 2 (November 30, 2003) ("Allendorf Letter") (attached as Exhibit 1 to Plaintiffs' Motion For Leave To Supplement The Administrative Record) (emphasis added).[7] As their letter stressed, rainbow trout, Yellowstone cutthroat trout, and WCT "have major differences in behavior, ecolog[y], and life history. Thus, there is no reason whatsoever to assume that a hybridized population of WCT and either of these two taxa would express the behavioral, ecological, and life-history characteristics of WCT." Allendorf Letter at 3.

Offering a concrete example of the difference between pure WCT and hybridized populations, Dr. Allendorf and Dr. Spruell cited the rapid dispersal of hybrid fish thoughout northwest Montana's Flathead River drainage, as reported by their student Nathaniel Hitt in his Master's Thesis (AR II-92):[8]

> The continued spread of hybridization in the range of WCT (Hitt, <u>et al</u>. <u>in press</u>) is strong evidence that hybridized populations do not function as WCT. Native WCT populations demonstrate strong genetic differentiation over even short geographical distances; this indicates very little natural gene flow among native populations of WCT … (Allendorf & Leary 1988; Taylor <u>et al.</u> 2003). The rapid spread of introgression, however, indicates that there is a high rate of gene flow and dispersal from hybridized populations.

Allendorf Letter at 2-3. In short, the Hitt Thesis revealed a crucial difference between pure WCT and hybrids: WCT tend to stay within localized areas, evolving adaptations to specific

---

[7] Plaintiffs have filed a motion to supplement the administrative record with Dr. Allendorf and Dr. Spruell's letter.

[8] This research was subsequently published in the <u>Canadian Journal of Fisheries and Aquatic Sciences</u>, Vol. 60 at 1440-51 (2004).

environmental conditions, whereas hybrids are quickly colonizing unfamiliar habitat.  See id.;

see also AR II-92 at 2250-51, 2267, 2270.  Thus, hybrids are not only exhibiting different

behavioral, ecological, and life-history characteristics than WCT, the very nature of their

difference — their invasiveness — poses a major threat to the last remaining pure WCT

populations in the Flathead River drainage.

   This information was indisputably before FWS when it made its listing determination.

FWS cited the Hitt thesis in its listing decision.  See 68 Fed. Reg. at 47,004, 47,008.  Yet FWS

never mentioned the Hitt findings demonstrating that hybrids can behave very differently from

WCT.  Moreover, FWS dismissed the strongly stated concerns of Dr. Allendorf and his

colleagues.  Given that FWS cited no scientific data in support of its position, the agency could

not ignore the findings and professional judgments of the very experts that it had hired to "assert

a scientifically based conclusion about the extent to which it is appropriate to include

introgressed WCT stocks and stocks of unknown genetic characteristics in the WCT population

considered for listing."  AR II-247 at 6767; see Defenders of Wildlife v. Babbitt, 958 F.Supp. at

685.  "Although the Court must defer to an agency's expertise, it must do so only to the extent

that the agency utilizes, rather than ignores, the analysis of its experts."  Id.

   Once again, FWS has failed to produce a scientifically based rationale for its decision to

treat hybrids as viable WCT.  "The failure of the agency, despite the views of its own experts, to

articulate a rational reason for its decision… establishes the arbitrary and capricious nature of the

agency's decision-making" with regard to hybrids.  Id. at 684 (citing Public Citizen, Inc. v. FAA,

988 F.2d 186, 197 (D.C. Cir. 1993).  As in Defenders of Wildlife, the key assumptions

underlying FWS' "not warranted" finding, as it pertains to hybridization, are "supported by no

citation to scientific evidence, study, or data of any kind, and fly in the face" of the best available scientific data in the record.  Id. at 681.

## III.     FWS ARBITRARILY RELIED ON VISUAL JUDGMENTS RATHER THAN GENETIC TESTING

Finally, FWS' reliance on visual judgments (morphological data) to determine the genetic status of WCT populations — even in cases where molecular genetic data is available — violates the ESA's requirement that listing decisions be based "solely on the best available scientific and commercial data."  16 U.S.C. § 1533(b).  As FWS concedes, "molecular genetic markers are very sensitive tools" for detecting hybridization in native trout populations.  68 Fed. Reg. at 46,992.  In contrast, current morphological methods do not detect hybridization until fish populations are more than 50% hybridized.  See AR II-260 at 6929.  As the Allendorf report correctly concluded, "identification of hybridized populations of WCT on the basis of morphological analysis is not reliable."  Id. at 6929.  Thus, in cases where molecular genetic data is available, far less accurate morphological data cannot qualify as the best available data for purposes of the ESA.  See Center for Biological Diversity v. Lohn, 296 F. Supp. 2d 1223, 1237 (W.D. Wash. 2003) (holding that "[t]he record before the Court is replete with compelling evidence that the [scientific data cited by the agency] is inaccurate and therefore does not constitute the best available scientific information").  In allowing morphological data, or visual judgments, to trump existing genetic data, its listing determination plainly violated the ESA.

More broadly, FWS failed make its decision "solely on the basis of the best available scientific data" in deciding to rely primarily on visual judgments rather than genetic data to define the WCT population.  16 U.S.C. § 1533(b)(1)(A).  As Dr. Allendorf stressed to the agency, "[t]he primary reliance on morphology to determine what should be considered a WCT ignores scientific progress in understanding hybridization and detecting hybrids over the last 30

years." Allendorf Letter at 2 (explaining that "[g]enetic techniques using protein electophoresis and direct examination of DNA have become the accepted scientific taxonomic standard"). Accordingly, FWS' reliance on morphological data "ensures that the best scientific data will not be used to make these difficult decisions" regarding the proper classification of WCT populations. Id.

As the court in Center for Biological Diversity made clear, "[w]hen the best available science indicates that [old] taxonomic distinctions are wrong, pursuant to ESA mandate [the agency] must apply that best available science." 296 F. Supp. 2d at 1239 (internal quotations omitted). Given that fisheries managers have routinely misclassified hybridized populations as pure WCT populations based on morphology, see AR II-258, it is incumbent upon FWS to curtail its reliance on visual judgments and to assess the genetic status of WCT populations based on the results of genetic testing. FWS "is not obliged to conduct independent studies to improve upon the best available science or to resolve inconclusive aspects of the scientific information." Southwest Center for Biological Diversity v. Babbitt, 215 F.3d 58, 61 (D.C. Cir. 2000). However, the ESA does not permit FWS to continue using inaccurate data simply because it is more convenient to do so — particularly when the agency has at its disposal the principled genetic criteria developed for the Rio Grande cutthroat trout listing. See 67 Fed. Reg. at 39,938.

Center for Biological Diversity is directly on point. In that case, plaintiffs challenged the National Marine Fisheries Service's ("NMFS") "not warranted" finding for Southern Resident killer whales on grounds that the agency had relied on a taxonomic classification that was inaccurate. See 296 F. Supp. 2d at 1236. NMFS sought to defend its decision on grounds that it needed to rely on the old classification because "changes in taxonomic classification are

time consuming, slow, and may be controversial." <u>Id.</u> at 1238. Rejecting this argument, the Court held that the agency's reliance on outdated scientific information "does not give the benefit of the doubt to the species and fails to meet the best available science requirement." <u>Id.</u> at 1239. Here, too, FWS' reliance on outdated visual methods of taxonomic classification fails to meet the ESA's best available science requirement, and in discounting the threat posed by hybridization, it fails to give WCT the benefit of the doubt.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs American Wildlands <u>et al.</u> request that this Court grant their motion for summary judgment.

Respectfully submitted this 3rd day of April, 2006,

> /s/ Abigail M. Dillen
> Douglas L. Honnold (D.C. Bar # 468323)
> Earthjustice
> 209 South Willson Avenue
> Bozeman, MT  59715
> (406) 586-9699
>
> *Counsel for Plaintiffs*