UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILDLANDS, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) Civ. No. 05-1043 (EGS) |
| | ) |
| v. | ) |
| | ) |
| P. LYNN SCARLETT, Acting Secretary of | ) **FEDERAL DEFENDANTS' POINTS** |
| the Department of the Interior, et al., | ) **AND AUTHORITIES IN OPPOSITION** |
| | ) **TO PLAINTIFFS' MOTION FOR** |
| Defendants. | ) **SUMMARY JUDGMENT** |
| | ) |
| | ) |

TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    PLAINTIFFS' ENTIRE MOTION IS PREMISED ON A FAULTY INTERPRETATION OF THE ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PLAINTIFFS' ARGUMENTS THAT FWS ARBITRARILY IDENTIFIED THE WCT SUBSPECIES UNDER REVIEW LACK MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.    Plaintiffs Fail To Demonstrate That FWS' Decision To Rely On All Available Science, Rather Than Solely Molecular Genetic Data, To Taxonomically Classify WCT Is Arbitrary Or Capricious . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      B.    Plaintiffs' Arguments That FWS Arbitrarily Failed To Exclude All Genetically Introgressed WCT From The WCT Subspecies Taxon Fail . . . . . . . . . . . . 12

            1.    FWS Fully Considered And Reasonably Rejected The Opinions And Conclusions Of Some Scientists Recommending Against Including Introgressed WCT In The WCT Subspecies Taxon . . . . . . . . . . . . 12

            2.    Plaintiffs' Post-Hoc Rationalizations Lack Merit And Fail To Demonstrate That FWS' Determination, Fully Supported By The Administrative Record, Is Arbitrary Or Capricious . . . . . . . . . . . . 15

      C.    Plaintiffs' Reliance On The Rio Grande Cutthroat Trout Listing Determination Is Unavailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.  PLAINTIFFS' REMAINING ARGUMENTS ARE PREMISED ON FUNDAMENTALLY FLAWED ANALYSIS AND INTERPRETATION OF FWS' LISTING DETERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.    Plaintiffs Misrepresent The Science Of Determining Whether Populations Conform Morphologically To The Scientific Taxonomic Description Of The WCT Subspecies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.    Plaintiffs Misrepresent FWS' Molecular Genetic Criteria For Classifying WCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.   PLAINTIFFS' ARGUMENTS RELYING ON EXTRA-RECORD MATERIALS MUST BE STRICKEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

CASES                                                                                    PAGE

*Alsea Valley Alliance v. Evans, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001), appeal dismissed,
   358 F.3d 1181 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 24

American Wildlands v. Norton, 193 F. Supp. 2d 244, 252 (D.D.C. 2002) . . . . . . . . . . . . . . . 24, 25

Brower v. Daley, 93 F. Supp. 2d 1071, 1082-93 (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . 15, 16, 17

California v. Watt, 712 F.2d 584, 606 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) . . . . . . . 2, 7, 17, 18, 25

*Ctr. for Biological Diversity v. Lohn, 296 F. Supp. 2d 1223 (W.D. Wash. 2003) . . . . . . . . . . . . 11

Ctr. for Biological Diversity v. Norton, 411 F. Supp. 2d 1271 (D.N.M. 2005) . . . . . . . . . . . . . . 18

Fed. Prop. Mgmt. Corp. v. Harris, 603 F.2d 1226, 1230 (6th Cir. 1979) . . . . . . . . . . . . . . . . . 23, 24

Huls Am., Inc. v. Browner, 83 F.3d 445, 452 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Maine v. Norton, 257 F. Supp. 2d 357, 389 (D. Maine 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Natural Res. Def. Council v. EPA, 683 F.2d 752, 753-54 n. 2 (3rd Cir. 1982) . . . . . . . . . . . . . . . 22

Oceana v. Evans, 384 F. Supp. 2d 203, 224 (D.D.C. 2005), clarified, 389 F. Supp. 2d 4
   (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Rybachek v. EPA, 904 F.2d 1276, 1296 n. 25 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n, 751 F.2d 1287, 1325
   (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

U.S. Telecom Ass'n v. Federal Communications Comm'n, 359 F.3d 554, 555-56
   (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

West Virginia v. EPA, 362 F.3d 861, 871 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15


STATUTES

5 U.S.C. § 706(A)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

16 U.S.C. § 1532(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1532(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-6

16 U.S.C. § 1533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1533(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

16 U.S.C. § 1533(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19, 21

REGULATIONS

50 C.F.R. § 424.11(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

## INTRODUCTION

The entirety of Plaintiffs' summary judgment motion hinges on one fundamentally flawed proposition – that only genetically "pure," or non-introgressed, westslope cutthroat trout ("WCT") are taxonomically classified as WCT and thus capable of being listed as a threatened or endangered species under the Endangered Species Act ("ESA"). According to Plaintiffs, WCT are taxonomically classified and identified based solely on the results of a genetics test. Plaintiffs also argue that the genetic test must reveal that the fish contains 100% WCT genes for the fish to properly be classified as a WCT – that the mere existence of a foreign gene *per se* excludes the fish from inclusion in the WCT subspecies taxon. Plaintiffs accept these propositions without pause and proceed to argue that FWS' listing determination is "arbitrary and capricious." 5 U.S.C. § 706(A)(2); Plaintiffs' Motion for Summary Judgment ("Pls' MSJ") at 19-27 (Dkt. # 20) (filed April 3, 2006).

However, as the key documents in the administrative record reveal – such as FWS' Finding and the peer reviews by leading scientists from across the country – it is beyond question that FWS considered all relevant factors and issued a final listing determination that is both scientifically supported and eminently rational. FWS determined that it must consider the science of taxonomy and the best available scientific information – including morphological data, genetics data, distribution, ecology, and biology – to identify members of the WCT subspecies taxon. See Reconsidered Finding for an Amended Petition to List the Westslope Cutthroat Trout As Threatened Throughout Its Range ("Finding"), 68 Fed. Reg. 46,989, 46,994-95 (Aug. 7, 2003). FWS thoroughly considered and rejected arguments made during the administrative process that the mere existence of genetic introgression *per se* disqualifies a fish from inclusion in the WCT subspecies taxon. See 68 Fed. Reg. at 46,991-46,996; AR II-243-246, 250-252; AR II-236-239. FWS reasonably and rationally developed criteria to identify members of the WCT subspecies taxon, 68 Fed. Reg. at 46,994-95, and FWS thoroughly considered threats to the WCT subspecies in concluding that listing the WCT under the ESA was not warranted,

1

id. at 46,999-47,007.

At bottom, Plaintiffs clearly are asking this Court to adopt the views of non-FWS scientists, such as Dr. Allendorf, and substitute its judgment regarding taxonomy, genetics, and the status of the WCT for that of FWS.   However, "[t]he court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  Accordingly, Federal Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment.

## ARGUMENT

### I.     PLAINTIFFS' ENTIRE MOTION IS PREMISED ON A FAULTY INTERPRETATION OF THE ESA.

The only question before the Court is whether FWS properly identified which fish are part of the WCT subspecies taxon.  Under the ESA, Congress clearly identified the duties and obligations of FWS in making listing determinations under the ESA.  FWS must first identify the taxonomic unit under consideration, which is limited to species, subspecies, or distinct population segments. 16 U.S.C. § 1533(a)(1) (inquiry is whether any "species" is endangered or threatened); id. at § 1532(16) (definition of "species").  FWS must then consider whether the taxonomic unit under consideration "is an endangered species or threatened species because of any of the" five statutory factors identified in 16 U.S.C. § 1533(a)(1).  Finally, FWS must issue its ultimate determination, based on the best scientific and commercial data available, 16 U.S.C. § 1533(b)(1)(A), of whether the taxonomic unit under consideration "is in danger of extinction [or is likely to become an endangered species in the foreseeable future] throughout all or a significant portion of its range . . ." 16 U.S.C. § 1532(6), (20).

As demonstrated in Defendants' motion for summary judgment, FWS' Finding and the administrative record demonstrate that FWS reasonably and rationally identified the WCT subspecies. See Defs' MSJ at 11-26.  FWS examined the science of taxonomy, reasonably determining that it must rely on all available scientific information to make classification determinations.  Id. at 13-15.  FWS

2

examined the effects of genetic introgression in WCT and reasonably determined that genetic introgression would alter the morphological characteristics of WCT at certain levels, but that no evidence indicated that WCT conforming to the scientific taxonomic description of WCT "express behavioral, ecological, or life-history characteristics differently than do WCT native to the particular geographic area." 68 Fed. Reg. at 46,994; Defs' MSJ at 15-21. Thus, FWS reasonably developed criteria to identify WCT in accordance with the principles of taxonomy and the best available science. See Defs' MSJ at 21-26.

In their motion for summary judgment, Plaintiffs try to blur the lines between these two steps of the listing process. Plaintiffs argue that the threat of hybridization must be considered during the first step of the analysis – identification of the taxon. See Pls' MSJ at 18 (arguing that hybridization is a threat, yet proceeding to argue that FWS arbitrarily identified the WCT subspecies taxon). For instance, Plaintiffs argue that, since the act or process of hybridization (interbreeding between WCT and fish not classified as WCT) may constitute a threat warranting listing, then genetically introgressed WCT (the result of an ancestral hybridization event) cannot be taxonomically classified as WCT. See Pls' MSJ at 19-27.

Plaintiffs, however, misunderstand the ESA's requirements. At the first stage in the listing process, FWS is required to identify the taxon under consideration, which includes determining whether and to what extent genetically introgressed, or hybrid, fish are part of that taxon. See 16 U.S.C. § 1532(16) (definition of "species"); 50 C.F.R. § 424.11(a). Once this taxonomic unit is classified and identified, then FWS engages in the separate process of analyzing the five statutory factors to that taxonomic unit to determine whether listing the entire taxonomic unit is warranted. See 16 U.S.C. § 1533(a)(1) (FWS must determine whether to list any "species."). While different members of that taxonomic unit may necessitate different management actions or conservation priorities, or may be at a higher risk from various threats such as hybridization, these concerns are not implicated at the first

stage in the listing process.  Rather, it is only at the second stage where FWS considers the threat of hybridization to the taxon, which FWS appropriately defined as "the direct interbreeding between two individuals that conform morphologically to different species or subspecies, including the interbreeding between individuals conforming morphologically to WCT and individuals not conforming morphologically to WCT."  68 Fed. Reg. at 46,994.[1]

This case is about FWS' taxonomic classification and identification of WCT.  This case is not about how hybridization might threaten the taxon.  That inquiry would fall under the analysis in the second step, which Plaintiffs do not challenge. See Pls' MSJ at 19-27. By failing to make the fundamental distinction between these two distinct issues, Plaintiffs have merely faulted FWS for failing to take action that would violate the plain and clear language of the ESA.  For instance, Plaintiffs identify a genetic difference between some portions of the WCT subspecies conforming to the scientific taxonomic description of the WCT subspecies, i.e., populations containing genes from another taxon and those that do not. See Pls' MSJ at 22-25.  Plaintiffs proceed to assign a higher value to the genetically nonintrogressed WCT based on the speculations of a few scientists, i.e., Dr. Allendorf and his colleagues.  Id. (relying on three documents, AR II-258, 259, 260, authored principally by Dr. Allendorf and providing "recommendations" to FWS on how to treat hybrid WCT under the ESA). Plaintiffs then argue that, since nonintrogressed populations are more valuable, FWS should consider listing only those populations and should analyze threats only to those populations.[2]  These exact

---

[1] On the other hand, "hybrid stock," or genetically introgressed WCT, are defined as "a group of potentially interbreeding individuals with a genetic ancestry derived from two or more extant species or subspecies." 68 Fed. Reg. at 46,994. As FWS correctly noted, "one must make a clear distinction between the action (hybridization) and the outcome of that action (hybrid stock)." Id.

[2] Plaintiffs have made clear why they desire a consideration of only nonintrogressed WCT.  In their brief, Plaintiffs understate the WCT's status and distribution by arguing that only known, nonintrogressed WCT actually constitute WCT.  Compare Pls' MSJ at 4 (arguing that WCT only occupy 3,500 miles of stream, or 6.2% of their historic range) with 68 Fed. Reg. at 46,998 (finding, based on a comprehensive status update report, that WCT currently occupy about 33,500 miles of

4

arguments, however, have been found to violate Congress' clear command that "[l]isting distinctions below that of subspecies or a DPS of a subspecies are not allowed under the ESA." <u>Alsea Valley Alliance v. Evans</u>, 161 F. Supp. 2d 1154, 1162 (D. Or. 2001), appeal dismissed, 358 F.3d 1181 (9th Cir. 2004) (citing <u>Sw. Ctr. for Biological Diversity v. Babbitt</u>, 980 F. Supp. 1080, 1085 (D. Ariz. 1997)).

In <u>Alsea Valley Alliance</u>, the National Marine Fisheries Service ("NMFS") listed the Oregon Coast coho salmon ("OC coho salmon") evolutionary significant unit ("ESU"), or distinct population segment ("DPS"), as a threatened species under the ESA. <u>Id.</u> at 1159. In making that determination, NMFS excluded hatchery populations from the OC coho salmon ESU listed under the ESA because, due to their genetic composition, the populations were not considered essential to the recovery of the OC coho salmon. <u>Id.</u> at 1159-63. Similar to Plaintiffs' arguments in this case, NMFS made distinctions for the purposes of listing based solely on the genetic composition of a subset of the OC coho ESU. <u>Id.</u> In reviewing NMFS' determinations, the court correctly noted that "Congress expressly limited the Secretary's ability to make listing distinctions among species below that of subspecies or a DPS of a species." <u>Id.</u> at 1163. In other words, NMFS "may consider listing only an *entire* species, subspecies, or distinct population segment ("DPS") of any species" under the ESA. <u>Id.</u> at 1162 (citing 16 U.S.C. § 1532(16)). Accordingly, the court held that NMFS' "listing decision should have been made without further distinctions between members of the same DPS/ESU." <u>Id.</u>

In contrast to NMFS' determination in <u>Alsea Valley Alliance</u>, FWS here properly identified the

---

stream, or 59% of their historic range). Plaintiffs then proceed to identify all threats to all WCT, whether introgressed or nonintrogressed. Pls' MSJ at 4-5 (arguing, for instance, that genetically nonintrogressed WCT are threatened by hybridization). Plaintiffs' arguments make little sense – if WCT are only genetically nonintrogressed populations isolated in headwater regions, those populations could not be threatened by interbreeding with RBT and YCT <u>which do not occur</u> in those areas. <u>See</u> 68 Fed. Reg. at 47,004 (nonintrogressed WCT inhabiting the 3,500 miles of stream identified by Plaintiffs occur in areas "in which no potentially hybridizing fishes occur"). Rather than find support in the administrative record, Plaintiffs' arguments constitute a failed attempt to simultaneously understate the overall status and distribution of the WCT and overstate the threats facing the WCT.

WCT subspecies and determined whether to list or not list that entire subspecies of cutthroat trout. 68 Fed. Reg. at 46,991-46,996. FWS thus reasonably rejected the arguments of a small minority of scientists advocating that certain populations of the WCT subspecies should be excluded from analysis and consideration, and hence listing under the ESA if warranted, simply because those scientists place a higher "value" on nonintrogressed populations. Id.; see Alsea Valley Alliance, 161 F. Supp. 2d at 1163 ("[G]enetics cannot, by itself, justify a listing distinction that runs counter to the definition of [the taxonomic unit under consideration].").

Not only do Plaintiffs' arguments advocate a position contrary to the plain language of the ESA, but Plaintiffs' arguments would lead to absurd results. For example, "[s]ome populations of westslope cutthroat trout have spots much larger than those of typical Westslope populations." AR II-268 at 7159. If someone placed a lower value on the population with large spots, because for instance those populations are more vulnerable to predation, Plaintiffs' logic would contend that FWS should exclude those populations from the WCT subspecies taxon and thus not list and protect those populations under the ESA, were listing the WCT subspecies warranted. In other words, identifying the "species" under consideration would no longer involve the science of taxonomy, but would involve assigning value to certain portions of the species to determine which portions of the species to list under the ESA. This is clearly not what Congress intended in enacting the ESA, see 16 U.S.C. § 1533 (only "species" may be listed under the ESA), nor what FWS contemplated in interpreting the ESA, see 50 C.F.R. § 424.11(a) ("Any species or taxonomic group of species (e.g., genus, subgenus) . . . is eligible for listing under the [ESA].").

## II.    PLAINTIFFS' ARGUMENTS THAT FWS ARBITRARILY IDENTIFIED THE WCT SUBSPECIES UNDER REVIEW LACK MERIT.

Attempting to ground their arguments on a proper interpretation of the ESA, Plaintiffs argue that all introgressed WCT are not taxonomically classified as WCT, but presumably some other

6

subspecies of cutthroat trout.  See Pls' MSJ at 25-26.   According to Plaintiffs, FWS' decision, which

supposedly considers the status of this other, undefined subspecies of cutthroat trout, is arbitrary and

capricious.  As demonstrated below, Plaintiffs' arguments are contrary to the administrative record and

fail to demonstrate that FWS has made "a clear error of judgment."  Citizens to Preserve Overton Park,

Inc. v. Volpe, 401 U.S. at 416.  Accordingly, this Court should uphold FWS' listing determination.

> **A.    Plaintiffs Fail To Demonstrate That FWS' Decision To Rely On All Available Science, Rather Than Solely Molecular Genetic Data, To Taxonomically Classify WCT Is Arbitrary Or Capricious.**

Plaintiffs assert that only molecular genetic techniques may be used to identify the populations

classified as WCT.  Pls' MSJ at 26. The administrative record, however, clearly demonstrates

otherwise.  See Defs' MSJ at 13-15 (thoroughly discussing the science of taxonomic classification).

First, Plaintiffs repeatedly assert that, since molecular genetic techniques more accurately

identify genetic introgression in populations, FWS' reliance primarily on morphological characteristics

to identify WCT is arbitrary and capricious.  Pls' MSJ at 26.  Plaintiffs confuse two distinct concepts

– (1) the issue of identifying genetic introgression, and (2) the issue of how to taxonomically classify

WCT.  In its Finding, FWS recognized that identifying genetic introgression does not answer the

completely separate question of whether and to what extent those genetically introgressed WCT are

taxonomically classified as members of the WCT subspecies taxon.  See 68 Fed. Reg. at 46,993-46,996.

For instance, genetic data do not indicate how specific genes influence key characteristics of

individuals or populations, such as physical appearance and attributes, behavioral or ecological

characteristics, life-history traits, or other important characteristics of the individuals or populations

that define a species or other taxon.  See 68 Fed. Reg. at 46,992 (there is a "wide range of possible

outcomes resulting from exchanges of genetic material between taxonomically distinct species and

between entities within taxonomic species that can be listed under the [ESA].").[3] Nor do genetic data alone address how to taxonomically classify WCT. See Defs' MSJ at 13-15. Thus, by asserting that molecular genetic techniques constitute the best available science, Plaintiffs have failed to address the very decision they challenge in this case – i.e., FWS' determination that genetically introgressed populations conforming to the scientific taxonomic description of WCT are members of the WCT subspecies taxon.

Second, Plaintiffs argue that, scientifically, only molecular genetic techniques can be used to taxonomically classify WCT – that a scientist cannot identify a WCT without first performing a genetics test. Pls' MSJ at 26; id. at 4 (only considering those populations that have been genetically tested and identified as genetically nonintrogressed to constitute WCT). To support this claim, Plaintiffs cite one sentence from a post-decisional letter from Dr. Allendorf and Dr. Spruell, Pls' MSJ at 26, which states: "Genetic techniques using protein electrophoresis and direct examination of DNA have become the accepted scientific taxonomic standard (Tautz et al. 2003)," Exhibit 1 to Pls' Motion for Leave To Supplement the Administrative Record ("Pls' Motion Supp. AR"), at 2 (Dkt. #15).

FWS' Finding and the administrative record, however, provide clear support for FWS' determinations that WCT are defined scientifically and taxonomically classified based primarily on morphological characteristics, but that the best available science and all available information must be utilized in classifying WCT. The following record excerpts support FWS' conclusion:

- **FWS' Finding**. "The scientific criteria for describing and formally recognizing taxonomic species of fish are based almost entirely on morphological characters." 68 Fed. Reg. at 46,992. FWS' criteria for determining which populations are taxonomically classified as WCT examines and considers geographic distribution, morphological characteristics, reproductive discreteness, existence of nonnative fishes, such as RBT, genetic tests, location and timing of spawning, ecological setting, and geographic extent of introgression across the population's range. Id. at 46,994-95.

---

[3] See also AR II-290 at 7488; AR II-246 at 6763; AR II-272 at 7257-7259; AR II-251 at 6803.

- **FWS' Finding**. "[T]he scientific community considers the 'introgressed' individuals to be legitimate members of their morphological species despite the presence of mtDNA from another species." 68 Fed. Reg. at 46,992 (citing Ferris et al. 1983, AR II-287; Bernatchez et al. 1995, AR II-269; Glemet et al. 1998, AR II-291; Wilson and Bernatchez 1998, AR II-327; Redenbach and Taylor 2002, AR II-312).

- **Shepard et al. (2003)**. Recognizing that WCT populations may be genetically introgressed and still classified as members of the WCT subspecies taxon. The comprehensive status update report made the pivotal distinction between identifying members of the WCT subspecies and the separate question of assessing the genetic status of those WCT populations. AR II-119 at 2684 ("All waters that supported WCT . . ., regardless of level of introgression, were included; however, the genetic status of each stream segment was classified."); id. at 2687-88, 2696-2709 (noting that WCT populations may be genetically introgressed, but that distinctions between populations of WCT are made based on genetic status and management classifications).

- **Position Paper of Seven Intermountain States**. The position paper requires that a population "must conform, 'at a minimum,' to the morphological and meristic characters of a particular cutthroat trout subspecies in order for those populations to be included in the State's conservation and management plan for that subspecies." 68 Fed. Reg. at 46,996; AR II-19 at 232.

- **Dr. Bowen Peer Review**. "The emphasis on morphological identity to define populations of this subspecies is anchored to the most venerable pillars of modern biology, and is unassailable." AR II-237 at 6678.

- **Dr. Avise Peer Review**. FWS' criteria to classify WCT is "a rather model system, despite the fact (as you mention) that only a small fraction of all populations has been genetically characterized." AR II-236 at 6675. FWS' "stance strikes me as being not only highly professional and scientifically based, but also practical and in direct response to the court's mandate." Id.

- **Dr. Dowling Peer Review**: Agreeing that "natural populations in which all measured individuals conform morphologically to the scientific, taxonomic description of WCT, shall be considered WCT if a genetic test has not been conducted." AR II-238 at 6683. Further stating that he "agree[s] with [FWS'] discussion of morphological and molecular data." Id. at 6684.

- **Behnke (1992)**. In making taxonomic determinations, "taxonomists evaluate evidence from different disciplines, including anatomical characters, genetic and chromosome data (including DNA variation), distribution patterns, and life history and behavioral traits." AR II-267 at 7038. Further, it can be assumed that morphological differences having a hereditary basis should be used in making taxonomic determinations. Id. at 7042. The WCT is described on the basis of both morphological and genetic data, but characterized "mainly by its distinctive spotting, . . . which is corroborated by a distinctive karyotype (66 chromosomes) and electrophoretic data." Id. at 7092-94.

9

- **Behnke (2002)**.  Describing WCT subspecies taxon on the basis of morphological characteristics, rather than purely the results of genetics tests.  AR II-268 at 7159-7160.

- **Bond (1996)**.  Taxonomic classifications result from identifying groups of organisms that "posses[] several unique characters drawn from several lines of evidence – morphological, behavioral, chromosomal, biochemical, molecular, or ecological."  AR II-271 at 7195, 7196-7205.

- **Moyle and Cech (1996)**.  "The basic methods used in taxonomic studies fall into six categories:  (1) morphometric measurements, (2) meristic traits, (3) anatomical characteristics, (4) color patterns, (5) karyotypes, and (6) biochemical characteristics."  AR II-309 at 7717.

- **Busack and Gall (1981)**.  Cautioning that "[t]he conclusion should not be made, however, that eletrophoreisis [molecular genetic data] is superior to meristics [morphological data] in studying introgression in trout. Both techniques yield useful, often complementary information; we learned significantly more about introgression in the Paiute cutthroat trout by using both electrophoresis and meristics than we could have by using either method alone."  AR II-272 at 7259.

Furthermore, FWS responded to the post-hoc assertion that only molecular genetics are used to taxonomically classify WCT, explaining why relying solely on molecular genetic techniques to taxonomically classify WCT is not appropriate:

> [FWS] is unaware that certain genetic techniques have become the recognized standard for assigning organisms to their appropriate taxon, or that such genetic techniques have been embraced by the community of taxonomists.  Although you cited Tautz et al. (2003) to support your perspective about DNA becoming 'the accepted scientific taxonomic standard", you did not cite three other papers (i.e., Mallet and Willmont 2003; Seberg et al. 2003; Lipsomb et al. 2003) from the same issue of [the journal] that contradicted and disagreed with the perspective of Tautz et al. (2003).

FWS' Feb. 27, 2004 Response Letter to Dr. Allendorf and Dr. Spruell ("FWS Response Letter") at 5 (attached hereto as Ex. A).[4]

_____

[4] Plaintiffs rely upon post-decisional, post-hoc rationalizations in their summary judgment brief.  Pls' MSJ at 26.  As stated in Defendants' Opposition to Plaintiffs' motion to supplement the administrative record ("Defs' Opp Supp. AR") (Dkt. # 16), such extra-record materials should not be considered in this record-review case.   However, if this Court nonetheless considers Plaintiffs' extra-record documents, the Court should also consider various post-decisional materials submitted by FWS, which provide necessary context to Plaintiffs' post-hoc rationalizations.  See Section IV, *supra*.

As these materials demonstrate, FWS fully considered the science of taxonomically classifying species and had ample support for its determination that reliance on the best available scientific information, rather than solely molecular genetic techniques, is appropriate to classify and identify WCT populations. Accordingly, rather than support their strained arguments, the only case cited by Plaintiffs – <u>Ctr. for Biological Diversity v. Lohn ("CBD v. Lohn")</u>, 296 F. Supp. 2d 1223 (W.D. Wash. 2003) – fully supports FWS' determinations in this case. <u>See</u> Pls' MSJ at 25-26.

In <u>CBD v. Lohn</u>, NMFS' scientists "unanimously agreed that the global *Orcinus orca* taxon is inaccurate" and that the "transient and resident killer whales in the North Pacific belong to two different taxa." 296 F. Supp. 2d at 1236. Those conclusions stemmed from identified differences "in morphology, ecology, behavior, and genetic characteristics." <u>Id</u>. at 1228, 1233. Indeed, the NMFS scientists recognized that differences in diet and "*different external morphology*" were perhaps the more important data indicating that the old taxonomic distinction was inaccurate. <u>Id</u>. at 1237 (emphasis in original). Nonetheless, "NMFS based its listing decision on the global *Ocinus orca* taxon," the taxon which the scientists "unanimously agreed" was inaccurate. <u>Id</u>. at 1236-37. Not surprisingly, the court found that NMFS arbitrarily relied on this "inaccurate" classification. <u>Id</u>.

Here, by contrast, FWS' scientists, peer reviewers, and the scientific studies in the administrative record all indicate that the taxonomic classification of WCT is scientifically sound. <u>See</u> Defs' MSJ at 21-26. The WCT administrative record indicates that taxonomic determinations are made using the best available information, similar to the findings and conclusions of the NMFS' scientists in <u>CBD v. Lohn</u>. <u>See</u> 68 Fed. Reg. at 46,994-96; AR II-267 at 7042, 7092-94; AR II-268 at 7159-7160; AR II-271 at 7195, 7196-7205; AR II-209 at 7717; AR II-272 at 7259. The materials in the WCT administrative record indicate that classification determinations for WCT are based primarily on morphological data, similar to the finding of the NMFS' scientists in <u>CBD v. Lohn</u>. <u>See</u> 68 Fed. Reg. at 46,992; AR II-237 at 6678; AR II-236 at 6675; AR II-238 at 6683-84; AR II-267 at 7092-94.

11

Moreover, unlike the situation in CBD v. Lohn, FWS here fully relied on the expertise of its scientists in classifying WCT. See, e.g., AR II-244 at 6723-6748 (comprehensive evaluation by Dr. Campton, senior scientist and geneticist with the FWS); AR II-251 at 6797-6803 (same).

In sum, Plaintiffs' reliance on one sentence from a post-decisional document fails to demonstrate that FWS' classification of WCT, amply supported by the record, is arbitrary or capricious. See Oceana v. Evans, 384 F. Supp. 2d 203, 224 (D.D.C. 2005), clarified, 389 F. Supp. 2d 4 (D.D.C. 2005) ("A conclusion based on [equivocal] evidence should be left to the agency's discretion unless the record is devoid of support for the agency's position, which is not the case here.").

**B.    Plaintiffs' Arguments That FWS Arbitrarily Failed To Exclude All Genetically Introgressed WCT From The WCT Subspecies Taxon Fail.**

**1.    FWS Fully Considered And Reasonably Rejected The Opinions And Conclusions Of Some Scientists Recommending Against Including Introgressed WCT In The WCT Subspecies Taxon.**

Plaintiffs further argue that FWS' decision to include genetically introgressed WCT in the WCT subspecies taxon is arbitrary simply because a group of scientists, i.e., Dr. Allendorf and some of his former students and immediate colleagues at the University of Montana ("colleagues"), advocate the exclusion of all genetically introgressed WCT from that taxon. See Pls' MSJ at 22-25. Plaintiffs' arguments lack merit, as FWS fully and expressly considered these exact sentiments during the administrative process and issued a final determination fully supported by the administrative record.

First, the record clearly demonstrates that FWS fully and extensively considered the opinions and conclusions of Dr. Allendorf and his colleagues, the only scientists Plaintiffs rely upon in their summary judgment brief. Pls' MSJ at 22-25 (relying almost exclusively on three articles authored principally by Dr. Allendorf, AR II-258, AR II-259, AR II-260). These opinions and conclusions were conveyed to FWS during the administrative process, notably in the draft reports submitted by the Wild Trout and Salmon Laboratory, see AR II-241 and AR II-248, which were produced at the request of

FWS, AR II-240 at 6692 (requesting that the laboratory provide a "comprehensive review of the literature on the effects of hybridization and genetic introgression on salmonid fishes, particularly as relevant to cutthroat trout."). See also Defs' MSJ at 16, 18-19 (discussing the draft reports from the genetics laboratory). FWS subjected the laboratory's draft reports to the peer review process, where respected and recognized experts, including FWS scientists, objectively analyzed and critiqued the study. See Defs' MSJ at 18-19; AR II-243-246, 250-252 (peer reviews). FWS considered the draft reports and corresponding peer reviews in developing the criteria to identify populations of WCT. See Defs' MSJ at 15-21; 68 Fed. Reg. at 46,994-95 (FWS' criteria). This portion of FWS' finding was also subjected to the peer review process, where numerous experts critiqued and commented on FWS' determinations. See AR II-236-239 (peer reviews). Accordingly, the record fully demonstrates that FWS fully considered these scientists' opinions and conclusions during the administrative process.

Second, FWS reasonably determined that the opinions and recommendations of Dr. Allendorf and his colleagues were not scientifically defensible and thus reasonably determined not to follow those opinions and recommendations. During the administrative process, Dr. Allendorf and his colleagues speculated, among other things, that genetic introgression "'may disrupt important long-term adaptations;'" that only genetically nonintrogressed WCT are "'likely to possess the local adaptions that are important for long-term persistence;'" and that introgressed WCT "'may not function as WCT.'" Pls' MSJ at 22 (emphasis added). Based on these assumptions, those scientists "recommended" that FWS exclude from consideration, and thus protection under the ESA were listing warranted, all WCT populations with any amount of genetic introgression. Id.

FWS, however, reasonably found that there was no evidence indicating that genetically introgressed WCT conforming morphologically to the scientific taxonomic description of the WCT subspecies expressed different "behavioral, ecological, [or] life-history characteristics" than non-introgressed WCT. 68 Fed. Reg. at 46,995. FWS' findings are amply supported by numerous peer

reviews and FWS' own experts.  See AR II-236; AR II-237; AR II-238; AR II-239; AR II-243; AR II-244; AR II-245; AR II-246; AR II-250; AR II-251; AR II-252 (peer reviews for FWS' identification and classification of WCT populations).  For instance, various scientists concurred with FWS' determinations that Dr. Allendorf and his colleagues opinions and recommendations were "not supported by their literature review," AR II-244 at 6726-27; were "thin and superficial," AR II-245 at 6749; were "overly one-sided" and failed to "present a balanced discussion," AR II-250 at 6793, 6796; and were "not 'scientifically-defensible,'" AR II-251 at 6798.  See also Defs' MSJ at 15-21.  This wealth of support for FWS' determinations belies Plaintiffs' claims that FWS did not have support for its determinations.  See Pls' MSJ at 24-25.

Moreover, FWS found that genetically introgressed WCT conforming to the scientific taxonomic description of WCT likely contain "a significant proportion of the genetic resources associated with WCT throughout its native geographic range," id. at 46,995, and thus likely "retains the distinguishing morphological, behavioral, and ecological characters of the native species [and] may remain very valuable to the overall conservation and survival of the species," id. at 46,992. Accordingly, FWS reasonably concluded that excluding such populations from the WCT subspecies and denying the protections of the ESA were listing warranted – based on no evidence indicating any deleterious effects of genetic introgression in WCT – would be both scientifically unsupportable and contrary to the dictates of the ESA.  Id. at 46,995; Defs' MSJ at 19-21.

Rather than recognizing that FWS fully considered the opinions and conclusions of Dr. Allendorf and his colleagues and issued a reasoned determination, Plaintiffs instead argue that Dr. Allendorf and his colleagues are FWS' experts and that FWS was somehow obligated to adopt their conclusions.  Pls' MSJ at 24-25.  FWS, however, merely proactively requested and funded the draft reports by Dr. Allendorf and his colleagues.  AR II-240; AR II-247.  Clearly, FWS could not delegate its decision-making authority by funding a study.  See U.S. Telecom Ass'n v. Federal Communications

Comm'n, 359 F.3d 554, 555-56 (D.C. Cir. 2004) ("Subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization," for instance because "delegation to outside entities increases the risk that these parties . . . may pursue goals inconsistent with those of the agency and the underlying statutory scheme.").  Nor did FWS delegate its decision-making authority here, but rather fully relied on the expertise of its own experts, see AR II-244; AR II-251 (peer reviews of Dr. Campton), outside peer reviewers,  AR II-243; AR II-245; AR II-246; AR II-250; AR II-251; AR II-252, and other scientific support in the administrative record.

While it is clear that FWS and Dr. Allendorf and his colleagues disagree on the appropriate outcome in this case, it is also equally clear that FWS' determinations are amply supported by the administrative record, are a product of reasoned, informed decision-making, and are entitled to deference by this Court.  See  West Virginia v. EPA, 362 F.3d 861, 871 (D.C. Cir. 2004) (the Court must "'give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise'"(quoting Huls Am., Inc. v. Browner, 83 F.3d 445, 452 (D.C. Cir. 1996)).  By asking this Court to adopt the views of Dr. Allendorf, Plaintiffs have misstated the function of judicial review – it is not the function of this Court "to resolve disagreements among the experts or to judge the merits of competing expert views." California v. Watt, 712 F.2d 584, 606 (D.C. Cir. 1983); Maine v. Norton, 257 F. Supp. 2d 357, 389 (D. Maine 2003) ("Even where there are competing expert opinions, or where the scientific data are equivocal, it is the agency's prerogative 'to weigh those opinions and make a policy judgment based on the scientific data.'" (quoting Brower v. Daley, 93 F. Supp. 2d 1071, 1082-93 (N.D. Cal. 2000)).

**2.    Plaintiffs' Post-Hoc Rationalizations Lack Merit And Fail To Demonstrate That FWS' Determination, Fully Supported By The Administrative Record, Is Arbitrary Or Capricious.**

Although contradicted by clear statements in the administrative record, Plaintiffs now contend that there is "clear evidence" indicating that introgressed WCT conforming morphologically to the

scientific taxonomic description of WCT do not "express the behavioral, ecological, and life-history characteristics of" nonintrogressed WCT. 68 Fed. Reg. at 46,995, Pls' MSJ at 23. Plaintiffs' contentions are based on post-hoc rationalizations of Dr. Allendorf and Dr. Spruell, rationalizations that are directly contrary to their own statements made during the administrative process. For instance, although Dr. Allendorf later contends that there is "clear evidence," during the administrative process he stated otherwise, admitting that "all we have is circumstantial evidence of fitness effects. That is, we are not aware of any studies that have estimated the short- or long-term fitness of rainbow x westslope hybrids in nature." AR II-253 at 6811.

Moreover, the post-decisional letter references, as a "concrete example" of this "clear evidence," the master's thesis by Nathaniel Hitt. See Pls' MSJ at 23. The Allendorf Letter contends that the thesis demonstrates that introgressed WCT disperse more rapidly than nonintrogressed WCT in Montana's Flathead River drainage. Pls' MSJ at 23 (referencing the Hitt thesis, AR II-92, yet quoting only from the Allendorf post-decisional letter). Yet again, Dr. Allendorf contradicted himself during the administrative process, stating that "we are not aware of any studies that have estimated" the fitness of introgressed WCT, such as whether they disperse more rapidly than nonintrogressed WCT. AR II-253 at 6811. Moreover, the plain and clear language of the Hitt thesis demonstrates that it did not provide "clear evidence" on the effects of introgression on WCT, acknowledging that "the effects of RBT introgression on straying rates should be [but were not] assessed." AR II-92 at 2271. In short, the Hitt thesis was a genetics study, not a behavioral one, and no measurements of behavior or fitness were obtained. Id.

Nonetheless, FWS considered this exact contention during the administrative process, finding that materials in the record simply did not support the conclusion that the introgressed WCT in the Flathead River drainage disperse more rapidly than nonintrogressed WCT. AR II-251 at 6801 (peer review of the laboratory draft reports by Dr. Campton with the FWS). Rather, FWS found that

16

numerous studies have attributed the flow of genetic introgression in the Flathead River drainage to the "continued, and ongoing, stocking of hatchery rainbow trout into [similar areas]" and to the establishment of naturalized populations of rainbow trout resulting from those stockings. AR II-251 at 6801. In other words, the flow of genetic introgression results from continued interbreeding with rainbow trout and their introgressed hybrid descendants, rather than introgressed WCT dispersing upstream at a rate faster than non-introgressed WCT. Id. Other respected scientists agree. See 68 Fed. Reg. at 47,004; AR II-251 at 6801; AR II-252 at 6807 ("[T]he reported continued spread of [rainbow trout] introgression within the Flathead River system is likely due to the establishment of self-reproducing populations of introduced rainbow trout and the dispersal of hybrids into areas containing pure cutthroat populations (Hitt et al. submitted)."); AR II-246 at 6764 ("The spread and increase of rainbow trout genes in [the North Fork of the Flathead River] over time seems to be directly attributed to stocking and / or a lack of barriers to keep stocked fish from entering it.").

By relying on the post-hoc rationalizations of Dr. Allendorf and Dr. Spruell, Plaintiffs have merely demonstrated why post-hoc rationalizations are not considered in administrative record cases. FWS here engaged in an extensive administrative process in issuing the WCT listing determination, going so far as to fund additional studies that were not required. FWS sought comments, considered all the available scientific data, subjected its determinations to the peer-review process, and issued a final determination fully supported by the record. FWS' process exemplifies reasoned and careful decision-making and, rather than address the materials before the FWS, Plaintiffs instead cite post-hoc opinions challenging the wisdom of the agency's decisions. Plaintiffs' burden here, however, is not to find individuals who disagree with an agency decision, but to demonstrate that FWS failed to consider all relevant factors and made a clear error of judgment. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 416. This, Plaintiffs cannot do.

**C.    Plaintiffs' Reliance On The Rio Grande Cutthroat Trout Listing Determination Is Unavailing.**

Plaintiffs further attempt to divert attention away from the WCT listing determination by focusing on the listing determination for the Rio Grande Cutthroat Trout ("RGCT").  Pls' MSJ at 16-18; Candidate Status Review for the Rio Grande Cutthroat Trout, 67 Fed. Reg. 39,936 (June 11, 2002). Plaintiffs' reliance on the RGCT decision is misplaced for several reasons.

First, the reasons and rationales justifying and supporting the RGCT decision are not before this Court, but are the subject of an entirely different lawsuit.  See Ctr. for Biological Diversity v. Norton, 411 F. Supp. 2d 1271 (D.N.M. 2005), appeal pending.  This Court is not in a position to judge the propriety of the RGCT listing determination, which would be necessary to compare that determination with the WCT determination at issue here, as Plaintiffs request.  Rather, what is at issue in this case is FWS' determinations for the WCT, and whether FWS' "decision was based on a consideration of the relevant factors and [that] there has [not] been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. at 416.

Second, to the extent Plaintiffs rely on the RGCT to show that FWS failed to consider a relevant factor or made a clear error of judgment, Plaintiffs' arguments fail.  Plaintiffs rely on the RGCT listing determination to argue that FWS should have included only genetically nonintrogressed WCT in the WCT subspecies taxon.  Pls' MSJ at 16-18.  However, the WCT administrative record is replete with analysis and discussion on whether it is appropriate to consider genetically introgressed WCT in the WCT listing determination. See Defs' MSJ at 11-26.  Moreover, the record provides ample support for FWS' determinations with respect to the WCT subspecies. Id.  Thus, the record conclusively demonstrates that FWS fulfilled its obligations under the ESA with respect to the WCT.  Whether or not FWS was justified in making certain scientific determinations for the RGCT, or any other species of fish or wildlife or plant, is not relevant.  In other words, it is not incumbent upon this Court, nor

appropriate, to delve into the RGCT record, or every other listing determination issued by FWS, in order to assess FWS' listing determination for the WCT.

Finally, to the extent Plaintiffs argue that all scientific determinations for all species of wildlife and plants, or even all subspecies of cutthroat trout, must be the same under the ESA, these arguments also lack merit.  Every species and subspecies is unique, and the best available science standard governs each listing determination, not the scientific decisions made for other species in prior listing determinations.  16 U.S.C. § 1533(b)(1)(A).  With respect to the issue of how to identify, classify, and treat genetically introgressed individuals or populations, FWS recognized that a one-size-fits-all standard does not apply.  Rather, the consequences, or effects, of genetic introgression vary depending on the particular circumstances and species involved, necessitating consideration of this issue on a case-by-case basis.  68 Fed. Reg. at 46,991-93; see also AR II-331 at 7728-30 (illustrating the need for flexibility in identifying whether introgressed individuals should be included within a species or subspecies taxon).  Other experts have concurred, noting that "[i]t cannot be emphasized enough that each situation needs to be evaluated on a case-by-case basis" and that "the impact and significance of introgression must be evaluated independently for each situation, almost as a dichotomous key."  AR II-238 at 6680, 6685.  Even the scientists whom Plaintiffs extensively rely upon have similarly stated that "[a]ny policy that deals with hybrids must be flexible and must recognize that nearly every situation involving hybridization is different enough that general rules are not likely to be effective." AR II-259 at 6912; AR II-260 at 6935 (same).

At bottom, Plaintiffs ask this Court to assume that the WCT and RGCT are the same, and thus the same scientific concerns and decisions should apply with respect to both subspecies of cutthroat trout.  However, the issue of whether the RGCT and WCT are the "same" and thus require the "same" analysis and decisions is not before the Court, nor could a rational determination be made on this issue without the full benefit of the RGCT administrative record, which is likewise not before this Court.

Accordingly, Plaintiffs' attempts to distract and divert attention away from the actual issue in this case, i.e., the WCT listing determination, fail.

III.   **PLAINTIFFS' REMAINING ARGUMENTS ARE PREMISED ON FUNDAMENTALLY FLAWED ANALYSIS AND INTERPRETATION OF FWS' LISTING DETERMINATION.**

   A.   **Plaintiffs Misrepresent The Science Of Determining Whether Populations Conform Morphologically To The Scientific Taxonomic Description Of The WCT Subspecies.**

In addition to failing to make the fundamental distinction between hybridization and hybrid WCT, Plaintiffs completely misunderstand the nature of morphological data, repeatedly contending that FWS' criteria are based on how a WCT "looks" in the field. See Pls' MSJ at 1-27 (repeatedly referring to morphological data as how a WCT "looks" and arguing that FWS' criteria supposedly protect "look-alikes"). However, whether a fish "looks like" a WCT in the field is not a valid substitute for FWS' finding that populations must "conform morphologically to the scientific taxonomic description of the WCT subspecies." 68 Fed. Reg. at 46,995. In practice, individual specimens would need to be sacrificed to be fully examined morphologically in a manner consistent with the scientific taxonomic description of WCT or any taxon of fish. This procedure involves collecting specimens and analyzing the specimens in a laboratory setting, using a dichotomous key and reference books to properly classify the specimens. See, e.g., AR II-302 at 7621 (in obtaining morphological data for 188 WCT, the authors "preserved [the specimens] in a 10% formalin for several days, then measured for total length prior to dissecting the head to obtain the ventral portion containing the basibranchial and basihyal bones.").

By stating that FWS' criteria merely involve identifying how WCT "look" in the field, Plaintiffs misrepresent FWS' Finding, misrepresent and diminish the science of taxonomically classifying species, including the scientific discipline of ichthyology itself, and thus fail to grasp the complex scientific issues addressed and resolved by FWS in its listing determination for the WCT.

20

**B.    Plaintiffs Misrepresent FWS' Molecular Genetic Criteria For Classifying WCT.**

Plaintiffs also argue that FWS' classification and identification of WCT are arbitrary and capricious by inserting findings and conclusions into FWS' listing determination.  For instance, Plaintiffs contend that FWS determined that genetically introgressed WCT containing 21% or more WCT <u>will not</u> conform morphologically to the scientific taxonomic description of WCT.  Pls' MSJ at 20-21 (arguing that FWS determined that genetically introgressed WCT will have "no more than" 20% genes derived from another species).  FWS simply did not make this finding.

In its Finding, and to develop alternative genetic criteria which can be used to identify WCT, FWS determined that "a natural population of WCT with less than 20 percent of its genes derived from rainbow trout or Yellowstone cutthroat trout ("YCT") is, most likely, morphologically indistinguishable from nonintrogressed populations of WCT with no hybrid ancestry."  68 Fed. Reg. at 46,994.   This 20% criterion was used to provide a basis for identifying WCT that conform morphologically to the WCT subspecies taxon where molecular genetic data are available.  In other words, FWS developed genetic criteria that identify a range of genetic introgression (<u>i.e.</u>, 0-20%) at which all the available scientific information indicates that WCT can be expected to conform morphologically to the WCT subspecies.  <u>Id.</u>; <u>see</u> Defs' MSJ at 24;  AR II-251 at 6799.   FWS simply did not establish a threshold at which every population above that threshold would not conform morphologically to WCT.  <u>See</u> AR II-251 at 6799.

Plaintiffs also flatly misconstrue FWS' Finding by arguing that morphological data will always "trump" genetic data.  Pls' MSJ at 15-16.  In its Finding, FWS developed criteria that can be used to taxonomically classify and identify WCT.  68 Fed. Reg. at 46,994-46,995.   These criteria were developed to enable resolution of a single issue – which populations are classified as members of the WCT subspecies taxon.  <u>Id</u>.  In developing those criteria, FWS recognized that different types of data, such as morphological or genetic data, may be available.  Thus, FWS developed criteria to enable FWS

to identify WCT regardless of the type of data available.  See 68 Fed. Reg. at 46,994-95 (identifying

principal criteria to identify WCT and then proceeding to identify additional criteria and concerns that

will be used to taxonomically classify WCT).  Contrary to Plaintiffs' claims, FWS did not express a

preference for one type or category of data over another, nor did FWS find that one type or category

of data is preferable.  Defs' MSJ at 21-26 (explaining FWS' criteria to identify WCT populations).

FWS simply used the scientific, taxonomic definition of WCT to establish genetic criteria consistent

with that definition.

## IV.  PLAINTIFFS' ARGUMENTS RELYING ON EXTRA-RECORD MATERIALS MUST BE STRICKEN.

As stated above, Plaintiffs have submitted and relied upon the post-hoc rationalizations of Dr.

Allendorf and Dr. Spruell in their summary judgment motion.  See Pls' MSJ at 23 (citing Ex. 1

("Allendorf Letter") to Pls' Motion for Leave to Supplement the Administrative Record ("Pls' Motion

Supp. AR")).  These materials are not part of the administrative record and should not be considered

in this record-review case.  See Defs' Opposition to Pls' Motion Supp. AR at 7-17 (Dkt. #16).

Moreover, where extra-record materials are referenced in a brief, it is well established that the materials

and references in the brief, and arguments based upon them, should be stricken.  Rybachek v. EPA, 904

F.2d 1276, 1296 n. 25 (9th Cir. 1990); Natural Res. Def. Council v. EPA, 683 F.2d 752, 753-54 n. 2 (3rd

Cir. 1982).  Accordingly, the Court should strike the extra-record document and all arguments relying

on the document in Plaintiffs' motion for summary judgment.  See San Luis Obispo Mothers for Peace

v. Nuclear Regulatory Comm'n, 751 F.2d 1287, 1325 (D.C. Cir. 1984) ("Were courts cavalierly to

supplement the record, they would be tempted to second-guess agency decisions in the belief that they

were better informed than the administrators empowered by Congress and appointed by the

President."), aff'd, 789 F.2d 26 (D.C. Cir. 1985) (en banc).[5]

      If the Court nonetheless decides to consider the post-hoc rationalizations contained in the Allendorf Letter, Defendants respectfully request that the Court consider additional post-decisional documents which provide context to the Allendorf Letter. First, in a letter to Dr. Allendorf and Dr. Spruell ("FWS Response Letter"), FWS fully addressed the contentions of Dr. Allendorf and his colleagues, responding to each contention by explaining its listing determination and documenting materials relied upon by FWS to make that determination. See FWS Response Letter (attached hereto as Exhibit A). In issuing that response, FWS relied on its listing determination and the scientific support for that determination. Consequently, the FWS Response Letter illustrates that FWS' listing determination was fully supported by the record, even in the face of post-hoc rationalizations challenging the wisdom of that listing determination. See Section II.B., infra.

      Furthermore, Defendants include herein a series of articles published in the scientific journal, Conservation Biology. The first article, authored by Dr. Allendorf, et al., contains largely the same opinions, conclusions, and recommendations conveyed by Dr. Allendorf and his colleagues in the reports by the Wild Trout and Salmon Genetics Laboratory. See Allendorf Conservation Biology Article (attached hereto as Ex. B); AR II-241, 248, 260. The second article – authored by Donald E. Campton, senior scientist and geneticist with FWS, and Lynn R. Kaeding, Chief, Branch of Native Fishes Management at FWS' Montana Fish and Wildlife Management Assistance Office – provides a scientific response to the Allendorf Conservation Biology article. See FWS Conservation Biology

---

[5] Plaintiffs also moved to supplement the administrative record with two additional documents: a letter from Nathaniel P. Hitt, et al., to FWS and a Yellowstone Fisheries & Aquatic Sciences 2003 Annual Report. See Pls' Motion Supp. AR, Ex. 2, 3. Plaintiffs, however, have not relied on those documents in their motion for summary judgment and thus have apparently abandoned that part of their motion to supplement the administrative record. Accordingly, the documents must be stricken for that reason, in addition to the reasons set forth in Defendants' opposition to Plaintiffs' motion to supplement the administrative record.

Article (attached hereto as Ex. C). The third article, authored by Dr. Allendorf, et al., replies to some of the points made by FWS in its responsive Conservation Biology Article. See Allendorf Reply Conservation Biology Article (attached hereto as Ex. D).[9]

The Conservation Biology articles clearly evidence the ongoing debate occurring in the scientific community over how to treat genetically introgressed populations when making listing determinations under the ESA. This same debate occurred during the administrative process, evidenced by the draft reports by the genetics laboratory, the peer reviews, and FWS' listing determination. And it is this debate which Plaintiffs ask the Court to resolve, contending that Dr. Allendorf and his colleagues are correct and that FWS, its scientists, and numerous peer reviewers are wrong. The Court, however, need "not concern itself with the wisdom of the agency action." Fed. Prop. Mgmt. Corp. v. Harris, 603 F.2d 1226, 1230 (6th Cir. 1979) (citing U.S. v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749 (1972)); American Wildlands v. Norton, 193 F. Supp. 2d 244, 252 (D.D.C. 2002) ("This Court is not in a position to make policy judgments based on conflicting or uncertain scientific data.").

---

[9] Notably, in their last Conservation Biology article, Dr. Allendorf and his colleagues did not respond to, nor refute, several important points made by FWS in its Conservation Biology article, yet Plaintiffs continue to rely on these mistaken arguments in their summary judgment motion. For example, FWS' finding that the Allendorf article "misrepresented Weigel et al. (2002)" by stating that "'a hybridized population has to contain at least 50% admixture from RT to be identified reliably in the field'" went unaddressed and unrebuked. Defs' Ex. C at 1. Likewise, FWS' finding that the Allendorf article relied on unpublished work to assert that hybrid WCT had reduced survival under laboratory conditions – when published work from their own laboratory leads to a different conclusion – went unaddressed and unrebuked. See id. Furthermore, FWS' finding that there are no data on WCT to suggest that they are locally adapted to extreme periodic events (e.g., winter storms, drought, fire, etc.) to a greater or lesser extent than rainbow trout, YCT, or introgressed populations of WCT similarly went unrebuked. Id. at 2. At bottom, the Allendorf articles evidence a complete misunderstanding of the ESA, arguing that all genetically introgressed WCT should be excluded from the WCT subspecies taxon, while at the same time arguing that introgressed populations should not be eliminated and are important to the conservation of the WCT subspecies. Defs' Ex. D at 3 (internal quotations omitted). If introgressed WCT are members of the WCT subspecies, then FWS has no basis for excluding those populations from the WCT subspecies taxon considered for listing under the ESA. See Alsea Valley Alliance v. Evans, 161 F. Supp. 2d at 1162 ("Listing distinctions below that of subspecies or a DPS of a subspecies are not allowed under the ESA.").

Rather, "[W]here there are competing expert opinions, [i]t is the prerogative of [the Secretary] to weigh those opinions and make a policy judgment based on the scientific data." <u>American Wildlands</u>, 193 F. Supp. 2d at 252 (citations and internal quotations omitted).

As the record demonstrates, FWS fully considered the issue of how to treat genetically introgressed WCT in making the listing determinations under the ESA. <u>See</u> Defs' MSJ at 11-26. As the record demonstrates, FWS had ample support for its finding that not all genetically introgressed WCT should be excluded from the WCT subspecies taxon. <u>Id.</u> Based on the best available science, FWS developed reasoned criteria to identify the WCT subspecies taxon, and proceeded to analyze the status of and threats facing the WCT subspecies. <u>Id.</u> at 26-35. Accordingly, the record demonstrates that FWS' "decision was based on a consideration of the relevant factors and [that] there has [not] been a clear error of judgment." <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. at 416. FWS' determination is thus entitled to deference and must be upheld.

## <u>CONCLUSION</u>

For the foregoing reasons, Federal Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment and dismiss this action in its entirety.

Dated: May 3, 2006                     Respectfully Submitted,

                                       SUE ELLEN WOOLDRIDGE, Asst. Attorney General
                                       JEAN E. WILLIAMS, Section Chief
                                       LISA L. RUSSELL, Asst. Section Chief


                                       _____/s/ Michael R. Eitel_____
                                       MICHAEL R. EITEL, Trial Attorney (SBN 22889 (Neb.))
                                       United States Department of Justice
                                       Environment & Natural Resources Division
                                       Wildlife & Marine Resources Section
                                       Ben Franklin Station, P.O. Box 7369
                                       Washington, DC 20044-7369
                                       Phone: (202) 305-0339/ Fax: (202) 305-0275
                                       Email: Michael.Eitel@usdoj.gov

                                       Attorneys for Federal Defendants