UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN WILDLANDS, et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>P. LYNN SCARLETT, Acting Secretary of )<br>the Department of the Interior, et al., )<br>)<br>Defendants. )<br>) | Civ. No. 05-1043 (EGS)<br><br>**FEDERAL DEFENDANTS'<br>RESPONSE TO PLAINTIFFS'<br>STATEMENT OF MATERIAL FACTS** |

      Pursuant to Local Rules 7(h) and 56.1, Defendants, P. Lynn Scarlett, Acting Secretary of the Department of the Interior, and H. Dale Hall, Director of the United States Fish and Wildlife Service ("FWS" or "Service"),[1] hereby respond to Plaintiffs' Statement of Material Facts (Dkt. #20).

      The parties in this case are currently briefing cross-motions for summary judgment under Fed. R. Civ. P. 56 and LCvR 7 and 56.1. As stated in Defendants' Statement of Material Facts, although LCvR 7(h) and 56.1 require the submission of a statement of material facts, there are no material facts in this case. See Defs' Statement of Material Facts at 1, 2 (Dkt. #19). Rather, judicial review is limited to the administrative record that was before the agency at the time the decision was made. See, e.g., Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985). Thus, "[t]he 'entire case' on review is a question of law." American Bioscience v. Thompson, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001). Nonetheless, to assure technical compliance with the local rules, FWS responds to Plaintiffs' statement of material facts as follows:

      1.    Disputed, in that FWS' Reconsidered Finding for an Amended Petition to List the Westslope Cutthroat Trout as Threatened Throughout Its Range ("Finding"), 68 Fed. Reg. 46,989 (Aug. 7, 2003), evidences that the westslope cutthroat trout ("WCT") was historically and remains

---

[1] P. Lynn Scarlett, Acting Secretary of the Department of the Interior, and FWS Director H. Dale Hall are automatically substituted for their predecessors pursuant to Fed. R. Civ. P. 25(d)(1).

today the most geographically widespread of the cutthroat trout subspecies. See id. at 46,990, 47,006 (Aug. 7, 2003) (discussing historic and current distribution of WCT); AR II-119 (same).[2]  FWS' Finding further states that the WCT's actual historic range is not known, but that:

> West of the Continental Divide, the subspecies is believed to be native to several major drainages of the Columbia River basin, including the upper Kootenai River drainage from its headwaters in British Columbia, through northwest Montana, and into northern Idaho; the Clark Fork River drainage of Montana and Idaho downstream to the falls on the Pend Oreille River near the Washington-British Columbia border; the Spokane River above Spokane Falls and into Idaho's Coeur d'Alene and St. Joe River drainages; and the Salmon and Clearwater River drainages of Idaho's Snake River basin.  The historic distribution of WCT also includes disjunct areas draining the east slope of the Cascade Mountains in Washington (Methow River and Lake Chelan drainages, and perhaps the Wenatchee and Entiat River drainages), the John Day River drainage in northeastern Oregon, and the headwaters of the Kootenai River and several other disjunct regions in British Columbia.  East of the Continental Divide, the historic distribution of WCT is believed to include the headwaters of the South Saskatchewan River drainage (United States and Canada); the entire Missouri River drainage upstream from Fort Benton, Montana, and extending into northwest Wyoming; and the headwaters of the Judith Milk, and Marias Rivers, which join the Missouri River downstream from Fort Benton.

68 Fed. Reg. at 46,990.

2. Disputed, in that Plaintiffs rely on outdated data from 1995, AR I-1726, and Plaintiffs' citation to FWS' 1999 status review, AR II-321 at 8117, does not support their assertion that "WCT have suffered major declines."  Rather, appreciably more-detailed and current data on WCT are provided by FWS' Finding, 68 Fed. Reg. 46,989, and the comprehensive status update report, AR II-119, both of which reveal that current information "indicates even greater abundance of WCT across the subspecies' range than [FWS] had estimated during the initial status review."  68 Fed. Reg. at 47,006.  Moreover, Plaintiffs' argument identifying the current distribution of the WCT is false – FWS' Finding and the comprehensive status update report, AR II-119, both reveal that WCT occupy about 33,500 miles of stream, not 3,500 as Plaintiffs contend.  68 Fed. Reg. at 46,998.

3. Disputed, in that WCT are not "primarily" restricted to small headwater streams, as

---

[2] For ease of reference, the citations to the administrative record herein will identify the relevant "Part" of the record, which corresponds to the relevant CD-ROM (i.e., Part I (disk 1) or Part II (disk 2 and 3)), the document number, and the bates stamp number.  For example, "AR I-112 at 1112" references Part I of the record, document number 112, and bates stamp number 1112.

Plaintiffs' claim; rather, WCT inhabiting headwater areas account for only "11.5 percent of the total occupied stream miles." 68 Fed. Reg. at 46,998. As FWS' Finding states, "[a]ccording to Shepard et al. (2003) [AR II-119], 457 (81.2 percent) of the 563 WCT conservation populations were isolets that were often restricted to headwater areas and represented 11.5 percent of the total occupied stream miles. Most of the occupied stream miles (88.5 percent) were habitat for WCT in metapopulations." Id. at 46,998. Plaintiffs also rely on superficial and outdated information from 1995, AR I-1726.

    4.    Disputed, in that the comprehensive status update report cited by Plaintiffs does not support their claims. See AR II-119 at 2719-20. For instance, the comprehensive status update report noted that "Rieman and Dunham (2000) provided data that indicated small, isolated populations of WCT might not be as prone to extinction as other vertebrates, and even other salmonids, based on their evaluation of the persistence of isolated headwater populations of WCT in the Coeur d'Alene basin in Idaho." Id. Furthermore, materials in the record indicate that "evidence of inbreeding depression in extant WCT stocks has not been found" and that there is no evidence that the probable small effective population size of some WCT stocks is resulting in genetic changes that could have adverse effects on stock viability. AR II-321 at 8115; 68 Fed. Reg. at 47,002 ("[O]ur initial review revealed no evidence that the isolation of some WCT populations had resulted in either deleterious inbreeding . . . or stochastic extirpations that threatened the WCT subspecies."); AR II-277 at 7338 ("The effects of interbreeding and loss of genetic diversity on the persistence of populations in the real world are, however, increasingly questionable."). The additional materials cited by Plaintiffs do not support their assertions. See, e.g., AR II-299 (discussing Yellowstone cutthroat trout, not WCT).

    5.    Disputed, in that Plaintiffs again rely on superficial and outdated information from 1995 (e.g., AR I-1728) and fail to address the current and best available science, which indicates:

> Although the WCT subspecies has been reduced from historic levels and its extant populations face threats in several areas of the historic range, [FWS found] that the magnitude and imminence of those threats do not jeopardize the continued existence of the subspecies within the foreseeable future. Many former threats to WCT, such as those posed by excessive harvest by anglers or the widespread stocking of nonnative fishes, are no longer factors that threaten the continued existence of the WCT subspecies. The effects of other extant threats are being effectively countered by the management actions of State and Federal agencies, in conjunction

3

with existing regulatory mechanisms.

68 Fed. Reg. at 47006. Furthermore, contrary to Plaintiffs' claim that "WCT are experiencing major declines as a result of widespread interbreeding," FWS' Finding indicates that:

> [t]he WCT subspecies is widely distributed and there are numerous, robust WCT populations and aggregates of populations throughout the subspecies' historic range. Moreover, numerous nonintrogressed WCT populations are distributed in secure habitats throughout the subspecies' historic range. In addition, despite the frequent occurrence of introgressive hybridization, we find that numerous WCT populations are nonintrogressed or nearly so, and thus retain substantial portions of their genetic ancestry.

68 Fed. Reg. at 47006.

6. Disputed, in that Plaintiffs' statement is misleading. As FWS stated, "hybridization with nonnative rainbow trout or their hybrid progeny and descendants, both of which have established self-sustaining populations in many areas in the range of WCT, remains the greatest threat to WCT." 68 Fed. Reg. at 47,006.

7. Disputed, in that there is no empirical evidence of adverse effects of low levels of hybridization on WCT, and the documents relied upon by Plaintiffs merely contain various scientists' unsubstantiated opinions. See AR II-243; AR II-244; AR II-245; AR II-246; AR II-250; AR II-251; AR II-252; AR II-236; AR II-237; AR II-238; AR II-239. As FWS stated: "Although [genetically introgressed individuals conforming to the scientific taxonomic description of WCT] may have genes from another taxon at low frequency, we are not aware of any information to suggest that such individuals express behavioral, ecological, or life-history characteristics differently than do WCT native to the particular geographic area." 68 Fed. Reg. at 46,994. Moreover, even the sources Plaintiffs rely on do not support their statements; for instance, one of their sources notes that hybrids do not exhibit impaired fertility or outbreeding depression. See AR II-258 at 6908 ("The available evidence indicates that hybrids between chromosomally differentiated rainbow and cutthroat trout subspecies. . . do not have meiotic problems. The common existence in nature of hybrid swarms demonstrates that these hybrids do not have severely reduced fertility."); id. at 6909 ("the widespread success of hybrid trout populations suggests that outbreeding depression is not a serious problem.").

8. Disputed, see Response No. 7, supra.

9. Disputed, see Response No. 7, supra.

10. Disputed, in that FWS determined, based on the best available science, that "the best scientific and commercial information available to us indicates that the WCT subspecies is not threatened by introgressive hybridization." 68 Fed. Reg. at 47,005. Moreover, Plaintiffs' reliance on other fish species is immaterial to the status, distribution, or threats posed by hybridization to the WCT subspecies, issues which were thoroughly examined and discussed in FWS' Finding. Id. at 47,004-05.

11. Disputed as irrelevant. As stated above, Plaintiffs' reliance on other species is immaterial to the status, distribution, or threats posed by hybridization to the WCT subspecies, information which FWS thoroughly examined and discussed in its Finding. 68 Fed. Reg. at 47,004-05.

12. Admit.

13. Disputed, in that FWS did not identify the authors of the quoted text as "leading experts." See AR II-321 at 7979.

14. Disputed, in that FWS did not find that hybrid fish represent a threat to the WCT in 1999, but rather found that hybridization constitutes a threat to the WCT subspecies. See AR 321 at 7979. As FWS noted in 2003, "one must make a clear distinction between the action (hybridization) and the outcome of that action (hybrid stock)." 68 Fed. Reg. at 46,994. "Hybridization" is defined as "the direct interbreeding between two individuals that conform morphologically to different species or subspecies, including the interbreeding between individuals conforming morphologically to WCT and individuals not conforming morphologically to WCT." Id. "Hybrid stock," or genetically introgressed WCT, are defined as "a group of potentially interbreeding individuals with a genetic ancestry derived from two or more extant species or subspecies." Id. Plaintiffs' attempts to equate the two concepts are not supported by the administrative record.

15. Disputed, in that FWS' classification of WCT was not at odds with genetic information obtained in 1988, AR II-258, as Plaintiffs state. Rather, Plaintiffs wrongly presume that only genetically nonintrogressed WCT constitute members of the WCT subspecies taxon. This assumption

is not supported by the administrative record. See 68 Fed. Reg. at 46,991-46,996 (discussing the classification and identification of WCT).

16. Admit.

17. Admit.

18. Admit.

19. Disputed, in that the report merely contained the scientists unsubstantiated opinions – no empirical evidence was submitted which indicated adverse effects of low levels of hybridization on WCT. See AR II-243; AR II-244; AR II-245; AR II-246; AR II-250; AR II-251; AR II-252; AR II-236; AR II-237; AR II-238; AR II-239. As FWS stated: "Although [genetically introgressed individuals conforming to the scientific taxonomic description of WCT] may have genes from another taxon at low frequency, we are not aware of any information to suggest that such individuals express behavioral, ecological, or life-history characteristics differently than do WCT native to the particular geographic area." 68 Fed. Reg. at 46,994.

20. Admitted, to the extent that FWS treated genetically introgressed WCT, or hybrid WCT, as members of the WCT subspecies if those populations "meet[] the taxonomic definition of WCT." FWS' full criteria for identifying and classifying WCT are found at 68 Fed. Reg. at 46,994-95. Disputed, to the extent that Plaintiffs assert that FWS' criteria hinge on how a fish "looks" in the field. Whether a fish "looks like" a WCT in the field is not a valid substitute for FWS' finding that populations must "conform morphologically to the scientific taxonomic description of the WCT subspecies." 68 Fed. Reg. at 46,995.

21. Disputed, in that FWS did not create a new presumption, but rather adhered to the fundamental and accepted scientific method of taxonomically classifying WCT. "The scientific criteria for describing and formally recognizing taxonomic species of fish are based almost entirely on morphological characters." 68 Fed. Reg. at 46,992. Scientifically, members of a common subspecies taxon are presumed to express similar "behavioral, ecological, and life-history characteristics" in the absence of data suggesting otherwise. Id. at 46,992-96. Disputed, in that FWS

6

did not use the 20% criterion as a defense for its criteria, but rather the 20% criterion constitutes part of the criteria developed to identify WCT. See id. at 46,994-95.

22.  Disputed, in that the administrative record unequivocally supports for FWS' identification and classification of WCT and its determinations regarding the extent to which it is appropriate to include genetically introgressed WCT within the WCT subspecies being considered for listing under the ESA. See 68 Fed. Reg. at 46,992-96; AR II-267 at 7042, 7092-94; AR II-268 at 7159-7160; AR II-271 at 7195, 7196-7205; AR II-209 at 7717; AR II-272 at 7259; AR II-237 at 6678; AR II-236 at 6675; AR II-238 at 6683-84; AR II-267 at 7092-94.

22.a.  Disputed, in that FWS did not assert that identification of hybridization based on an examination of morphological characteristics is more reliable than molecular genetic techniques, and Plaintiffs do not explain where FWS supposedly made this determination. Rather, Plaintiffs' arguments are based on a clear misrepresentation of FWS' Finding.

22.b.  Admit, while noting that Dr. Campton's statements fully support FWS' determination that the best available science indicates that WCT populations containing less than 20% genetic introgression will conform morphologically to the WCT subspecies. See 68 Fed. Reg. at 46,994-95.

22.c.  Disputed, in that FWS reasonably determined, as Plaintiffs noted in No. 22.b., *supra*, that the best available science indicated that WCT with less than 20% genetic introgression will conform morphologically to the scientific taxonomic description of the WCT subspecies. 68 Fed. Reg. at 46,994-95. FWS did not find that WCT will not conform morphologically when genetic introgression reached levels exceeding 20%, and Plaintiffs' statements otherwise cannot be supported.

22.d.  Disputed, in that FWS' determination is amply supported by numerous peer reviewers and other documents in the administrative record. See, e.g., 68 Fed. Reg. at 46,992-96; AR II-267 at 7042, 7092-94; AR II-268 at 7159-7160; AR II-271 at 7195, 7196-7205; AR II-209 at 7717; AR II-272 at 7259; AR II-237 at 6678; AR II-236 at 6675; AR II-238 at 6683-84; AR II-267 at 7092-94.

22.e.  Disputed, in that Plaintiffs' arguments are based on post-hoc rationalizations and are contradicted by clear evidence in the administrative record. Specifically, the plain and clear language

of the Hitt thesis demonstrates that it did not provide evidence on the effects of introgression on WCT, acknowledging that "the effects of RBT introgression on straying rates should be [but were not] assessed." AR II-92 at 2271. The Hitt thesis was a genetics study, not a behavioral one, and no measurements of behavior or fitness were obtained. Id. Moreover, FWS noted that the Hitt thesis did not support the conclusion that the introgressed WCT in the Flathead River drainage disperse more rapidly than nonintrogressed WCT, AR II-251 at 6801, but found that numerous studies have attributed the flow of genetic introgression in the Flathead River drainage to the "continued, and ongoing, stocking of hatchery rainbow trout into [similar areas]" and to the establishment of naturalized populations of rainbow trout resulting from those stockings. AR II-251 at 6801. See also 68 Fed. Reg. at 47,004; AR II-251 at 6801; AR II-252 at 6807; AR II-246 at 6764.

23.    Disputed, in that Plaintiffs' arguments are not based on FWS' actual Finding or the administrative record. FWS never stated that morphological data will always "trump" genetic data, and Plaintiffs' attempts to claim otherwise are not supportable. Rather, FWS' criteria for identifying and defining WCT speaks for themselves, which state as follows:

> (1) The population under consideration must first exist within the recognized, native geographic range of WCT . . . . The population must then satisfy one of the following two additional criteria to be considered WCT under the [ESA]; (2) If all measured individuals in the population have morphological characters that are all within the scientific, taxonomically-recognized ranges of those characters for the WCT subspecies, then the population shall be considered WCT; or (3) If [number 2, above, is not met], then additional evidence of reproductive discreteness between individuals that conform morphologically to the WCT subspecies and individuals that do not conform morphologically to the subspecies will be examined. If the two forms are considered reproductively discrete (e.g., naturally sympatric [naturally co-occurring] populations of native redband trout and WCT that may only occasionally interbreed), then we shall consider the population under consideration to be WCT under the [ESA].[3]

Id. at 46,994. Moreover, FWS determined, based on the best scientific information available, that

---

[3] FWS also developed criteria to aid in the determination of whether the two forms are "reproductively discrete": "(a) Whether rainbow (redband) trout are native to the geographic area under consideration; (b) the percent of measured individuals that do not conform morphologically . . ., including their range of morphological variation . . .; (c) the results of genetic tests that would indicate reproductive discreteness . . .; and (d) any other additional information that would assist with these determinations. . . ." 68 Fed. Reg. at 46,994.

introgressed WCT with less than 20% of their genes derived from another taxon would still conform morphologically to the scientific taxonomic description of WCT. Thus, particularly where only genetic data are available, FWS will consider individuals or populations with less than 20% of their genes derived from another taxon to be members of the WCT subspecies. Id. at 46,995. However, FWS expressly recognized that "other potentially important characteristics of the populations" must be considered, including "ecological setting, geographic extent of the introgression across the population's range, and whether rainbow (or redband) trout are naturally sympatric [co-occur] with WCT in the particular region under consideration." Id. at 46,995. Thus, contrary to Plaintiffs' claim, even when molecular genetic data are available, FWS expressly stated that it would consider the best available science and all information when identifying and classifying WCT populations.

Dated: May 3, 2006                    Respectfully Submitted,

                                      SUE ELLEN WOOLDRIDGE, Asst. Attorney General
                                      JEAN E. WILLIAMS, Section Chief
                                      LISA L. RUSSELL, Asst. Section Chief

                                              /s/ Michael R. Eitel
                                      MICHAEL R. EITEL,
                                      Trial Attorney (SBN 22889 (Neb.))
                                      U.S. Department of Justice
                                      Environment & Natural Resources Division
                                      Wildlife & Marine Resources Section
                                      Ben Franklin Station, P.O. Box 7369
                                      Washington, DC 20044-7369
                                      Phone: (202) 305-0339/ Fax: (202) 305-0275
                                      Email: Michael.Eitel@usdoj.gov

                                      Attorneys for Federal Defendants