

# United States Department of the Interior

### FISH AND WILDLIFE SERVICE

Montana Fish and Wildlife Management Assistance Office
Branch of Native Fishes Management
4052 Bridger Canyon Road
Bozeman, MT 59715  (406) 582-0717

February 27, 2004

Drs. Fred Allendorf and Paul Spruell
Division of Biological Sciences
University of Montana
Missoula, Montana 59812

Dear Drs. Allendorf and Spruell,

In your letter of November 30, 2003, you provided your views on the U.S. Fish and Wildlife Service's recent finding for an amended petition to list the westslope cutthroat trout (WCT) as threatened under the Endangered Species Act (Act).  That finding was published in the August 7, 2003 *Federal Register* (68 FR 46989).  Before I address each of the three principal concerns that you raised, it is important that the key background information central to the WCT legal case be presented and clearly understood.

On April 14, 2000, we, the Fish and Wildlife Service (Service), published a notice (65 FR 20120) of our initial finding that the WCT was not likely to become either a threatened or an endangered species within the foreseeable future and that listing the WCT as either threatened or endangered under the Act was not warranted at that time.

On October 23, 2000, plaintiffs filed, in the U.S. District Court for the District of Columbia, a suit alleging four claims.  They alleged that our consideration of existing regulatory mechanisms was arbitrary.  Plaintiffs further claimed that our consideration of hybridization as a threat to WCT was arbitrary because, while identifying hybridization as a threat to WCT, we relied on a draft Intercross policy (61 FR 4710; February 7, 1996) to include hybridized WCT in the WCT subspecies that we considered for listing under the Act.  Their third claim averred that we arbitrarily considered the threats to WCT posed by the geographic isolation of some WCT populations and the loss of some WCT life-history forms.  Finally, plaintiffs claimed that we failed to account for the threat of whirling disease and other important factors, and that our decision to not list the WCT as threatened was arbitrary and capricious.  In the subsequent oral argument before the Court, plaintiffs conceded that their strongest argument, and the one from which their other concerns stemmed, was that we included hybridized fish in the WCT subspecies considered for listing under the Act, while also recognizing hybridization as a threat to the subspecies.

2

On March 31, 2002, the Court found that our listing determination for WCT did not reflect a reasoned assessment of the Act's statutory listing factors on the basis of the best available science. The Court remanded the listing decision to us with the order that we reconsider whether to list the WCT as a threatened species, and that in so doing we evaluate the threat of hybridization as it bears on the Act's statutory listing factors. Specifically, the Court ordered us to determine: (1) the current distribution of WCT, taking into account the prevalence of hybridization; (2) whether the WCT population (i.e. subspecies) is an endangered or a threatened species because of hybridization; and (3) whether existing regulatory mechanisms are adequate to address the threats posed by hybridizing, nonnative fishes.

The Court also pointed out that the draft Intercross policy (61 FR 4710) in no way indicates what degree of hybridization would threaten WCT, or that the existing levels of hybridization do not presently threaten WCT. Furthermore, the Court directed the Service to present a scientifically based conclusion about the extent to which it is appropriate to include hybrid WCT populations and populations of unknown genetic characteristics in the WCT subspecies that we considered for listing.

During the Court proceedings, as stated in the Court's ruling, we noted that the Act does not require "100 percent genetic purity" and the plaintiffs agreed with this point, noting that they were not insisting on genetic purity. The Court, in effect, concurred. "Genetic purity" is not a condition for including populations or individual fish with the WCT subspecies under the Act, but the conditions for including potential "hybrid stock" with WCT may not be arbitrary and capricious. Thus, we had been directed by the Court to provide our scientifically based conclusion about the characteristics that define the fish we call WCT, as well as our conclusion about the characteristics of those fishes that constituted a hybridization threat to WCT.

Accordingly, we used the best scientific data available, as described in our finding, to establish three principal criteria for identifying WCT: (1) The population under consideration must first exist within the recognized, native geographic range of WCT (as described by Behnke 1992 and Shepard et al. 2003). The population must then satisfy one of the following two additional criteria to be considered WCT under the Act: (2) If all measured individuals in the population have morphological characters that are all within the scientific, taxonomically-recognized ranges of those characters for the WCT subspecies, then the population shall be considered WCT, or (3) if not all of the measured individuals have morphological characters that are within the scientific, taxonomically-recognized ranges of those characters for the WCT subspecies, then additional evidence of reproductive discreteness between individuals that conform morphologically to the WCT subspecies and individuals that do not conform morphologically to the subspecies will be examined. If the two forms are considered reproductively discrete (e.g., naturally sympatric populations of native redband trout and WCT that may only occasionally interbreed), then we shall consider the population under consideration to be WCT under the Act. Furthermore, based on the best scientific and commercial data available and described in the finding, we concluded that natural populations of WCT may have a genetic ancestry derived by as much as 20% from rainbow trout or Yellowstone cutthroat trout when fish in those populations express a range of morphological variation that conforms to the scientific taxonomic description of WCT. In other words, a natural population of WCT with < 20% of its genes derived from rainbow trout or Yellowstone cutthroat trout is, most likely, morphologically indistinguishable from nonintrogressed

populations of WCT with no hybrid ancestry.

In our opinion, the Court had ordered us to derive a specific threshold level of genetic introgression within which fish or their populations would be considered WCT on the basis of the phenotypic characteristics that *define* WCT taxonomically. Under the language of the Act, introgressed populations excluded from the WCT subspecies on the basis of those criteria would be considered a potential hybridization threat to the subspecies. We thus faced the following question: At what level of introgression should the Service distinguish between populations that meet the phenotypic characteristics that define the WCT subspecies and populations that do not meet those characteristics? Under the Act, these latter populations would be considered a potential "hybridization threat." We also believed that molecular genetic data would, in the vast majority of cases, be the principal data used to *detect* genetic introgression in natural populations. Therefore, we needed to use whatever data were available to correlate levels of genetic introgression, as detected by molecular genetic markers, with measurable changes in phenotypic characteristics that define WCT taxonomically. That is, to answer the question: At what level of introgression do natural populations no longer conform to the phenotypic characters that define WCT? Obtaining these data was one of the objectives of the contract between the Service and your lab. However, "detecting" the mere presence of "rainbow trout alleles" in a population of WCT does not, under the Act, provide sufficient conditions for excluding such a population from the WCT subspecies. Furthermore, although contemporary molecular genetic techniques allow for the detection of those alleles at frequencies < 1%, we found no scientific support for application of such a threshold criterion for identifying WCT. Indeed, as noted previously, both the Court and the plaintiffs concurred that "genetic purity" was not a condition for inclusion in the WCT subspecies.

We should also point out the distinction between the characters that *define* WCT taxonomically (i.e. external spotting patterns, meristic characters, geographic distribution) and the characters that scientists might use to *detect* introgression. As you have pointed out, molecular genetic methods are much more accurate at "detecting" introgression; however, those characters are not the ones by which WCT are recognized taxonomically as a distinct subspecies. Indeed, very few species or subspecies of animals were originally described taxonomically on the basis of molecular genetic data. In your correspondences with the Service, you appear to have consistently confounded the characteristics that define WCT taxonomically (i.e. morphological characters) with those that have a high sensitivity for detecting genetic introgression (i.e. molecular genetic characters).

Our approach, as outlined in our finding, acknowledges that a significant proportion of the genetic resources associated with WCT throughout its native geographic range may be represented by populations with low-frequency genes from other taxa (e.g., rainbow trout) detectable only by molecular genetic methods. Such populations, if they conform morphologically to the scientific taxonomic description of WCT, are considered part of the WCT subspecies under the Act and shall not be considered a threat to the continued existence of the WCT subspecies. Conversely, we will consider genetically introgressed populations not classified as WCT, including those with > 20% of their genes derived from another taxon as detected by molecular genetic methods, as potential hybridization threats to the WCT subspecies. Thus, our finding fully complied with the Court's order, including that we distinguish between the WCT that we considered for listing under the Act and those fishes that

4

may pose a hybridization threat to WCT. Our finding simply laid out the scientific foundation for the 20% genetic threshold based on the characteristics that define WCT taxonomically (i.e. morphological characteristics coupled with geographic distribution). The finding did not say that morphological characters had to be used to detect introgression or that populations exceeding the 20% threshold would be included with the WCT subspecies, even if morphological data were available. In such evaluations, the Service must defer to the scientific method: failure to reject the null hypothesis of < 20% introgression based on morphology would not preclude rejection of that null hypothesis on the basis of molecular genetic data.

Having provided this critical background information, I will now address each of your concerns, as excerpted from your letter.

(1) **You state:** According to the finding: Our principal criterion for including potentially introgressed populations, and populations of unknown genetic characteristics, with the WCT subspecies under the Act is whether fish in those populations conform morphologically to the scientific taxonomic description of the WCT subspecies. The scientific source for those morphological characteristics that distinguish WCT is Behnke (1992). However, there are no original data presented in Behnke (1992) to apply this criterion.

**Our response:** Behnke (1992) is intended as only a general reference. Morphological characteristics that we recognize as indicative of fish that conform morphologically to the scientific, taxonomic description of WCT are described by Roscoe (MS thesis, 1974), Behnke (1992, 2002), Leary et al. (1994, 1996), and probably other sources. Furthermore, there are probably opportunities for labs such as yours to add to these descriptions by quantifying the morphological characters of WCT in non-introgressed, natural populations as determined by molecular genetic analyses.

**You state:** A comparison of the range of values for WCT, Yellowstone cutthroat trout, and rainbow trout presented by Behnke (1992) indicates that there are no morphological characters that distinguish WCT. That is, the range of all of the morphological characters presented by Behnke (1992) overlap in WCT and Yellowstone cutthroat trout. Because of this overlap of ranges, some populations of pure Yellowstone cutthroat trout or pure rainbow trout may be within the "ranges of those characters for the WCT subspecies". Thus, this is not a scientifically valid criterion to identify WCT.

**Our response:** We agree that there may be overlap in the characteristics of some individual fishes from among these species or subspecies. However, real differences between and among the species' or subspecies' populations exist and have an underlying statistical basis dependent upon adequate sample sizes. It is that statistical difference between populations that is important to discriminating between species or subspecies, not the characteristics of a single fish.

**You state:** As stated in the finding, genetic data can only be used if there are no morphological data available for a particular population: Consequently, for populations for which molecular genetic data may be the only data available, populations with less than 20 percent introgression will be considered WCT under the Act, whereas populations with more than 20 percent introgression will generally be excluded from the WCT subspecies. According

to this policy, populations that meet the morphological criterion of being WCT would be included as part of the listing unit even if there are molecular data available that indicate that they contain substantially less than 50% WCT genes on the basis of molecular analysis!

**Our response:** We do not give primacy to morphological data over genetic data. Instead, we state that – when only genetic data are available – the < 20% criterion should be applied to those data. Finally, according to the data that we describe in the finding and our assessment thereof, populations that contain < 50% WCT will not have the morphological characteristics of WCT and would therefore not be classified as WCT.

**You state:** The primary reliance on morphology to determine what should be considered a WCT ignores scientific progress in understanding hybridization and detecting hybrids over the last 30 years (Allendorf et al. 2001). Genetic techniques using protein electrophoresis and direct examination of DNA have become the accepted scientific taxonomic standard (Tautz et al. 2003). This finding ensures that the best scientific data will not be used to make these difficult decisions.

**Our response:** The finding does not say that morphology shall be used for detecting hybridization. Rather, it says that recognition of WCT as a distinct subspecies is based on its unique morphological characters and non-overlapping geographic distribution with other subspecies of cutthroat trout. We are unaware that certain genetic techniques have become the recognized standard for assigning organisms to their appropriate taxon, or that such genetic techniques have been embraced by the community of taxonomists. Although you cited Tautz et al. (2003) to support your perspective about DNA becoming "the accepted scientific taxonomic standard", you did not cite three other papers (i.e. Mallet and Willmott 2003; Seberg et al. 2003; Lipscomb et al. 2003) from that same issue of TREE that contradicted and disagreed with the perspective of Tautz et al. (2003). Finally, the most advanced molecular genetic techniques currently available do not necessarily provide the best available scientific information useful to addressing the questions posed by the Court, as we have described.

(2) **You state:** The explicit assumption of the use of morphological criteria to distinguish WCT is that "natural populations conforming morphologically to the scientific taxonomic description of WCT are presumed to express the behavioral, ecological, and life-history characteristics of WCT." There are no scientific data presented in the Finding to support this assumption.

In contrast, there is clear evidence that this assumption is incorrect. The continued spread of hybridization in the range of WCT (Hitt et al. in press) is strong evidence that hybridized populations do not function as WCT. Native WCT populations demonstrate strong genetic differentiation over even short geographical distances; this indicates very little natural gene-flow among native populations of WCT populations (Allendorf & Leary 1988; Taylor et al. 2003). The rapid spread of introgression, however, indicates that there is a high rate of dispersal and gene flow from hybridized populations.

**Our response:** We find no evidence in Hitt et al. (In press) to indicate that nonnative genes spread more rapidly though a population of interbreeding fishes than do native genes. Instead, the key factor here is that the nonnative genes are recognizable as unique using contemporary

molecular genetic techniques, whereas the native genes are not. Specifically, the spread of nonnative genes can be detected qualitatively (presence or absence), whereas the spread of native genes can only be detected quantitatively by assumption-laden estimates of gene-flow parameters. Both nonnative and native genes may move equally rapidly through the population, but the detection method is substantially more sensitive toward revealing the movement of nonnative genes.

**You state:** Rainbow trout, Yellowstone cutthroat trout, and WCT show little morphological divergence, but have major differences in behavior, ecological, and life-history. Thus, there is no reason whatsoever to assume that a hybridized population of WCT and either of these two taxa would express the behavioral, ecological, and life-history characteristics of WCT.

**Our response:** We are not aware of any scientific studies that have demonstrated altered behavior, ecology, or life-history patterns in populations of WCT with 1% to 20% genetic introgression from either rainbow trout or Yellowstone cutthroat trout in either a laboratory or field setting. The null hypothesis in this situation is that behavioral, life-history, and ecological traits for WCT with 1% to 20% introgression would be indistinguishable from those for non-introgressed populations.

(3) **You state:** The finding states that "we expect the frequency of genes from the other taxa to remain low in the population. Therefore, we do not consider such populations contributing to the threat of hybridization to the WCT subspecies." There is no basis for this assumption that the proportion of admixture will remain low. In contrast, the recent empirical data of Hitt et al. (in press) cited in the Finding show exactly the opposite. That is, the frequency of admixture in hybridized WCT populations in the North Fork of the Flathead River has increased over the last 20 years. In addition, Hitt et al. (in press) found that the best predictor of whether or not a WCT became hybridized was its proximity to a hybridized population. Thus, these hybridized populations that would be considered as WCT under the Finding are a major threat of hybridization of WCT.

**Our response:** As indicated in the finding, we anticipate that rainbow trout genes will continue moving upstream into many stream reaches presently inhabited by nonintrogressed WCT, but there may be limits to that upstream dispersal set by low stream temperatures or other factors. However, the observation that numerous nonintrogressed WCT populations persist today despite both the longstanding occurrence (i.e. > 100 years) of potentially hybridizing fishes in regions downstream and the absence of obvious intervening barriers to the upstream movement of those fish suggests that not all nonintrogressed WCT populations have been or are equally vulnerable to introgression. The eventual extent that rainbow trout, or Yellowstone cutthroat trout, genes move upstream may be stream-specific and unpredictable. Nonetheless, as we determine in our finding, small amounts of genetic introgression do not disqualify individual WCT or their populations from species membership under the Act. Likewise, small amounts (i.e. < 20%) genetic introgression is not considered a threat to the WCT subspecies.

I hope this response addresses your concerns.

Sincerely,

/s/ LRK

Lynn R. Kaeding
Chief, Branch of Native Fishes Management