UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN WILDLANDS, et al.,

        Plaintiffs,

    vs.

GALE NORTON, in her official capacity
as Secretary, U.S. Department of the Interior,
et al.,

        Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil No.: 05-cv-1043 (EGS)

PLAINTIFFS' OPPOSITION TO FEDERAL
DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT

Federal defendants improperly ask this Court to defer to the U.S. Fish and Wildlife Service ("FWS") in determining that listing is not warranted for the Westslope cutthroat trout ("WCT") under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq.  FWS is not entitled to deference when it risks the future of a species on ill-founded assumptions that defy the best available scientific data.  Here, FWS elected to count many hybridized fish populations as viable WCT, notwithstanding the agency's recognition that hybridization poses the single "greatest threat" to the subspecies.  Reconsidered Finding for an Amended Petition To List the Westslope Cutthroat Trout as Threatened Throughout Its Range, 68 Fed. Reg. 46,989, 46,7006 (Aug. 7, 2003).  That arbitrary decision enabled FWS to determine that there are "numerous robust WCT populations and aggregates of populations" throughout the WCT's range.  Because FWS failed to identify hybridized populations of WCT and assess the risk they pose to WCT, this Court should remand the challenged "not warranted" finding and compel FWS to undertake the principled status review that the WCT deserves.

I.     **FWS ARBITRARILY DEFINED THE WCT POPULATION BASED ON LOOKS ALONE**

FWS recognizes that "interbreeding 'with introduced, nonnative fishes, particularly rainbow trout and their hybrid descendants that have established self-sustaining populations" is "an appreciable threat to the WCT subspecies.'"  Federal Defendants' Memorandum Of Points And Authorities In Support Of Their Motion For Summary Judgment ("Fed. Mem.") at 27 (quoting 68 Fed. Reg. at 47,004).  Yet FWS has settled on a visual method for classifying WCT that allows substantially hybridized fish populations to be counted as viable WCT.  In short, FWS identifies "hybrid descendants" as a threat to the subspecies but nevertheless employs a "look-alike" approach to identify many of these same "hybrid descendants" as viable WCT in order to conclude that ESA protections are not warranted.

In an effort to justify this apparent contradiction, federal defendants argue that only "slightly" hybridized fish qualify as WCT under FWS' "look-alike" policy. Fed. Mem. at 19, 21, 22, 27, 28, 29, 35. Seeking to distinguish between such "slightly" hybridized fish and other hybridized populations that represent an acknowledged threat to WCT, the government maintains that "slightly introgressed WCT" are not "biologically and ecologically distinguishable from nonintrogressed WCT." Id. at 19. On this basis, the government insists that FWS properly "determined that slightly introgressed WCT constitute members of the WCT subspecies." See Fed. Mem. at 21.

As discussed below, there is no scientific support for the proposition that slightly hybridized fish are equivalent to WCT, that "slight" levels of hybridization are benign, or indeed, that there is any "safe" percentage of genes that WCT can afford to lose. However, it is unnecessary to reach this issue in order to conclude that FWS' reasoning is fatally flawed. The government's argument regarding "slightly" hybridized fish fails on its own terms because the central assumption that WCT look-alikes will be only "slightly" hybridized is unfounded. While FWS asserts that fish that look like WCT will be no more than 20% hybridized, see 68 Fed. Reg. at 46,994-95, the best available data indicate that hybridization may not become apparent until fish are over 50% hybridized. Given the agency's own emphasis on including only slightly hybridized fish in the WCT population considered for listing, the government cannot defend a listing decision that would allow substantially hybridized fish to be classified as viable WCT.

A.    **FWS' Assumption That WCT Hybrids Will Be No More Than 20% Hybridized Is Not Scientifically Defensible**

Based on the best available data compiled by FWS, the only known threshold at which hybridized fish become visually distinguishable from genetically pure WCT is at over 50% hybridization — in other words, when hybrid populations derive more than half of their genes

from another species.  See id. at 46,993-94; see also AR II-260 at 6928.  As explained by the government itself, "scientific data and studies revealed that a population clearly would not conform to the scientific, taxonomic description of WCT when 50% or more WCT genes were derived from another taxon."  Fed. Mem. at 24 (emphasis added).

While various studies indicate that fish with 20% foreign genes continue to look just the same as pure WCT, it is also the case that fish that are 21% to 50% hybridized may also look just the same as pure WCT.   There is no evidence to suggest that 20% genetic "admixture" marks any dividing line between hybridized fish populations that do and do not meet the physical description or "taxonomic" definition of WCT.  Compare 68 Fed. Reg. at 46,994 at 6928; AR II-260 (citing studies where fish populations with 20% foreign genes were visually indistinguishable from genetically intact WCT populations) with AR II-251 (noting absence of studies where hybridization was visually detectable in populations with over 20% but under 50% foreign genes).  As the government concedes, "FWS' review of the scientific literature revealed no scientific data that directly compared or quantified the relationship between the two characteristics [of genetic make-up and physical appearance] within that intermediate range (i.e., 20-50%) of genetic introgression."  Fed Mem. at 24 (quoting AR II-251 at 6799) (comments of Dr. Don Campton, who co-authored the discussion of hybrids in the challenged listing decision).  In other words, FWS acknowledged during the status review that there is no scientific data indicating that hybridization becomes detectable before foreign genes from rainbow or Yellowstone cutthroat trout predominate in a given fish population.  Rather, the best available scientific data supports only one genetic threshold that correlates with detectable changes in physical appearance, and that is over 50% hybridization.

In short, FWS' look-alike policy does not provide that only "slightly introgressed WCT" will be included as members of the WCT subspecies, despite the government's repeated assertions to the contrary.  See Fed. Mem. at 19, 21, 22, 27, 28, 29, 35 (government brief referencing "slightly introgressed WCT" no fewer than eleven times).  Because hybridized fish may look the same as WCT until more than half of their genes come from another species, substantially hybridized fish may qualify as WCT under the look-alike policy.  Thus, the government cannot reasonably argue that "FWS established the 20% genetic introgression threshold as a conservative scientifically-defensible upper limit for the maximum amount of introgression that FWS would accept."  Id. at 24.  Based on the available data, the look-alike policy effectively adopts a 50% upper limit for the maximum amount of introgression that FWS is willing to accept.

Federal defendants fail to offer any reason why the 20% threshold is nevertheless scientifically defensible.  Aside from quoting the agency's bare assertion that fish "may have a genetic ancestry derived by as much as 20 percent from rainbow trout or [Yellowstone cutthroat trout ("YCT")]' and still conform to the "scientific taxonomic definition of WCT," the government relies solely on comments from two scientists that FWS informally enlisted to review its draft policy on hybrids.  Fed. Mem. at 24 (quoting 68 Fed. Reg. at 46,994); see also id. at 25-26 (citing AR II-237 at 6678-79).  Neither of these two reviewers lend credible support to the government's position, nor do their "knee-jerk reactions" (AR II-237 at 6677) represent the "best available scientific data" that must serve as the basis for FWS' listing determination.  16 U.S.C. § 1533(b)(1).

First, FWS quotes Brian Bowen of the Hawaii Institute of Marine Biology.  In a brief electronic mail message, Dr. Bowen generally endorsed FWS' looks-based approach to

classifying WCT "to the best of [his] expertise." See AR II-237 at 6678.[1]  However, Dr.

Bowen's opinion was not based on his own reading of the available data on hybridization and its

relationship to "morphological" or physical characteristics.  See id. (asking questions regarding

the methods and results of cited studies that are readily answered by the studies themselves).

Instead, he accepted at face value FWS' characterization of the underlying data, including the

agency's assertion that 20% represents the "upper limit" of hybridization among fish that are

indistinguishable from WCT.  As a result, he noted inaccurately that "[s]everal independent

studies indicate this boundary is near 20% foreign alleles.  Most of these studies are in peer-

reviewed journals, and the one that isn't (Allendorf et al. in prep) is from a highly respected

authority in salmonid genetics."  Id.  As discussed above, this summation of the available data

misses the crucial point that there is no data indicating that hybridization becomes visually

detectable short of 50% hybridization.  See AR II-251 at 6799; AR II-260 at 6928.  This point

was raised by FWS' own geneticist Dr. Don Campton, who co-authored the discussion of

hybrids in the listing determination.  See AR II-251 at 6799.  Moreover, Dr. Allendorf, the very

same "highly respected authority in salmonid genetics" referenced by Dr. Bowen, has repeatedly

stated that his work does not support the 20% rule adopted by FWS.  See Letter from Nathaniel

P. Hitt, Fred W. Allendorf, and Christopher A. Frissell to Lynn Kaeding at 2 (July 10, 2004)

(attached as Exhibit 2 to Plaintiffs' Motion For Leave To Supplement The Administrative

Record) ("Hitt Letter") (referring to "a morphological threshold associated with 20% foreign

genes in an admixed population of WCT" as "an unlikely scenario"); see also Letter from Fred

Allendorf and Paul Spruell to Lynn Kaeding (November 30, 2003) (attached as Exhibit 1 to

---

[1] While Dr. Bowen approved of FWS' basic approach, he also highlighted confusing "ambiguity" in FWS' discussion of the 20% threshold and the available studies on visual detection of hybridization, stating that clarification was "crucial to tightly staple down the arbitrary and capricious claim."  AR II-237 at 6678.

Plaintiffs' Motion For Leave To Supplement The Administrative Record) ("Allendorf Letter").

Under these circumstances, Dr. Bowen's ill-informed opinion that "[t]he 20% rule is a

reasonable interpretation of the best information available" carries no weight.  Fed. Mem. at 25

(quoting AR II-237 at 6679).  See Natural Resources Defense Council v. Daley, 209 F.3d 742,

755-56 (D.C. Cir. 2000) (holding that the agency "cannot rely on reminders that its scientific

determinations are entitled to deference in the absence of reasoned analysis to cogently explain

its scientific judgments) (internal quotations omitted).

        Second, federal defendants cite notes from Dr. Robert Behnke, a retired Colorado State

University professor, for the proposition that WCT "can have up to 20% hybrid influence from

[rainbow trout] and/or Yellowstone [cutthroat trout] and be classified as [a WCT]."  Fed. Mem.

at 26 (alterations in original) (quoting AR II-239 at 6686).  However, Dr. Behnke did not agree

that 20% is the genetic threshold at which point hybridization become visually detectable.  While

he was prepared to accept the 20% rule on grounds that populations with 20% foreign genes

"should closely resemble the lewisi phenotype in spotting pattern and coloration," he also stated

(without any supporting citations) that "Allendorf is not correct in claiming that a hybrid

influence cannot be detected at 20% hybridization — but you should cite him for it anyway."  Id.

(emphasis added).  Thus, Dr. Behnke supported FWS' look-alike approach, apparently for

reasons of expediency, but he did not agree with FWS that 20% is a scientifically defensible

"upper limit" on hybridization that is visually undetectable.  See Fed. Mem. at 24.  Dr. Behnke's

comments therefore fail to bolster FWS' defense of the 20% rule and the "look-alike" approach

to WCT classification that rests on it.  Under the ESA, biological data rather than policy

preferences must provide the basis for listing decisions.  See 16 U.S.C. § 1533(b)(1)(A); see also

Biodiversity Legal Foundation v. Babbitt, 943 F. Supp. 23, 25-26 & n.4 (D.D.C.1996) (where

FWS expressed policy concerns about the controversial nature of listing, the court cited the agency's failure to make its decisions "solely on the basis of the best scientific and commercial data" in striking down its "not warranted" finding for the Alexander Archipelago wolf); <u>accord Southwest Ctr. for Biological Diversity v. Babbitt</u>, 939 F. Supp. 49, 52 (D.D.C.1996) (striking down "not warranted" finding for Queen Charlotte goshawk); <u>Defenders of Wildlife v. Babbitt</u>, 958 F. Supp. 670, 680 (D.D.C 1997) (striking down "not warranted" finding for Canada lynx).

**B.     In Allowing Substantially Hybridized Fish To Be Classified As WCT, FWS Discounted The Most Pressing Threat To The Subspecies**

Because FWS' "look-alike" approach does not effectively distinguish between "slightly introgressed populations" and substantially introgressed populations of WCT, the challenged listing determination failed to address risks posed by hybrid populations that even FWS recognizes as a threat.[2]  As the government concedes, FWS considers self-sustaining populations of "hybrid descendants" as "an appreciable threat to the WCT subspecies." Fed. Mem. at 27 (quoting 68 Fed. Reg. 47,004); <u>see also</u> 68 Fed. Reg. at 46,995 (stating that populations not classified as WCT, <u>i.e.</u> populations that are assumed to be more than 20% hybridized, are "considered as potential threats to the WCT subspecies").  Indeed, FWS's listing decision hinges on the proposition that hybridization can be tolerated <u>only</u> at "very low" levels.  68 Fed. Reg. at 46,992 (stating that "populations with genes from another taxon at <u>very low</u> frequencies may still express important behavioral, life-history, or ecological adaptations) (emphasis added); <u>see also</u>

---

[2] FWS' very definition of "hybridization," which flows from the "look-alike" approach, precludes a principled assessment of the hybridization issue.  In limiting its definition of "hybridization" to "the direct interbreeding between … individuals conforming <u>morphologically</u> to WCT and individuals not conforming <u>morphologically</u> to WCT," 68 Fed. Reg. at 46,994, FWS expressly ignored the threat posed by interbreeding between WCT and significantly hybridized fish that look the same as WCT.  <u>See</u> AR II-92 at 2249, 2266.

id. ("small amounts of genetic introgression do not disqualify individuals or populations from

'species membership'") (emphasis added); id. at 47,005 (same); id. at 46,995 ('a significant

proportion of the genetic resources associated with WCT throughout its native range may be

represented by populations with low-frequency genes derived from other taxa (e.g. rainbow

trout) detectable only by molecular genetic methods") (emphasis added); id. at 46,994 ("[W]e do

not consider populations or individuals conforming morphologically to the scientific taxonomic

definition of WCT to be a hybridization threat to the WCT subspecies.  Although such

individuals or populations may have genes from another taxon at low frequency, we are not

aware of any information to suggest that such individuals express behavioral, ecological, or life-

history characteristics differently than do WCT native to the geographic area.") (emphasis

added).

Yet despite the agency's emphatic distinction between hybridization that represents a

threat and "small amounts of genetic introgression" that are allegedly acceptable, 68 Fed. Reg. at

47,005, FWS failed to adopt an approach to classifying WCT that would ensure inclusion of only

"slightly" hybridized fish in the WCT population considered for listing.  Because FWS failed to

distinguish between hybrid populations that pose a recognized threat to WCT and populations

that can be deemed viable on scientifically defensible grounds, the agency's assessment of the

threat posed by hybridization is arbitrary and capricious in violation of the ESA.  See American

Wildlands v. Norton, 193 F. Supp. 2d 244, 258 (D.D.C. 2002) (invalidating FWS' previous "not

warranted" finding for WCT because "the agency wholly fail[ed] to reconcile its recognition of

hybridization as a threat to WCT's viability with its inclusion of hybrid stock in the population

assessed for listing"); Defenders of Wildlife v. Babbitt, 958 F. Supp. at 679 (affirming that "the

presumption of agency expertise may be rebutted if its decisions … are not reasoned").

**C.    FWS' Look-Alike Approach Failed To Identify Hybrids That Threaten WCT**

As a result of its failure to identify hybrids that threaten WCT, FWS never even considered the risk that many look-alike hybrid populations pose to neighboring pure WCT populations. For instance, Nathaniel Hitt, et al.'s recent study of spreading hybridization in the North and Middle Forks of the Flathead River System, in and around Montana's Glacier National Park, suggests that hybrid populations are responsible for colonizing streams that, until very recently, were regarded as pure WCT strongholds. AR II-92 at 2266[3]; see also AR II-77 at 1350; AR II-91 at 2210; Allendorf Letter at 2; Hitt Letter at 2. In keeping with these findings, FWS acknowledged that hybridization is a progressive problem driven in large part by hybrid fish. See 68 Fed. Reg. at 47,004. But FWS again distinguished slightly hybridized fish from hybrids that represent a threat. In populations with "genes from another taxon at low frequency," FWS reasoned that there would be no changes in "behavioral, ecological, or life-history characteristics … and [w]ithout such changes, we expect the frequency of genes from the other taxon to remain low in the population." Id. at 46,994 (emphasis added). However, this reasoning, even if it were sound,[4] does not apply to hybridized populations with higher frequencies of foreign genes that could be classified as viable WCT under the "look-alike" policy. In failing to identify these populations, FWS also failed to consider the risks they pose, not only to themselves, but also to surviving pure populations of WCT. Thus, the government cannot defend FWS' listing determination on grounds that slightly hybridized populations

---

[3] This research was first presented in Nathaniel Hitt's Masters thesis. The results of that thesis have since been summarized in a paper co-authored by Mr. Hitt, Dr. Allendorf, Dr. Christopher Frissell, and Dr. Clint Muhfield (Montana Department of Fish, Wildlife, & Parks) and published in the Canadian Journal of Fisheries and Aquatic Sciences.

[4] As discussed below, the results of the Hitt Thesis suggest that even slightly hybridized populations are facilitating the spread of hybridization in the Flathead River System. See pp. 10-11 infra.

"cannot further increase the amount of foreign genes in the WCT subspecies complex." Fed.

Mem. at 29-30. Once it becomes apparent that fish populations with up to 50% foreign genes

may be classified as WCT under the agency's new look-alike policy, the government's argument

for including hybrids in the WCT population, which hinges on the alleged value of "slightly"

hybridized WCT, falls apart.

### D.    FWS' Presumption That Hybrid Look-Alikes Are Equivalent To WCT Is Entirely Novel And Unsupported By The Best Available Science

Even if FWS could defensibly argue that hybrid fish conforming to the taxonomic

definition of WCT will be no more than 20% hybridized — which it cannot — there is no

scientific basis for the agency's further leap in presuming that WCT look-alikes will be

equivalent to pure WCT in terms of "behavioral, ecological, and life history characteristics." 68

Fed. Reg. at 46,994. In fact, the best available data indicate that such look-alikes will not be

equivalent to WCT and will instead exhibit behaviors that threaten the WCT's continued

existence.

According to the government, "FWS reasonably concluded that it was 'not aware of any

information to suggest that [populations or individual fish conforming morphologically to the

scientific taxonomic description of WCT] express behavioral, ecological, or life-history

characteristics differently than do WCT native to the particular geographic area." Fed. Mem. at

16-17 (alterations in original) (quoting 68 Fed. Reg. at 46,994). However, in the ensuing three

pages of its summary judgment brief, the government goes on to discuss information raising the

precise concern that hybrids cannot be presumed to function as WCT do or to persist over time

as WCT have done.

1.      **The Hitt Thesis Indicates That Hybrids Differ From WCT In Ways That Affirmatively Threaten Remaining Pure Populations**

First, the government seeks to dismiss relevant research presented in Nathaniel Hitt's Masters thesis that suggests hybrids function differently than WCT in Montana's Flathead River system.  Mr. Hitt sampled 18 "non-hybridized WCT sites" and 25 sites where genetic testing revealed hybridization.  AR II-92 at 2244.  Notably, only three of these 25 hybridized sites supported fish that were more than 20% hybridized, and the vast majority were less than 10% hybridized.  See id. at 2241-44.  Based on extensive data regarding the spatial distribution of these hybridized populations, the Hitt Thesis concluded that observed patterns in the spread of hybridization were "consistent with the hypothesis that WCT x RBT [rainbow trout] hybrids are straying among populations, thereby spreading RBT introgression."  AR II-92 at 2266; see also id. at 2249 (explaining that spatial analyses of the collected data "suggest that the spread of RBT [rainbow trout] introgression is facilitated by hybrid individuals straying among populations in the study area").  Such "straying" is uncommon among native WCT populations, as WCT tend to remain in localized areas where they develop highly specific adaptations to site-specific environmental conditions.  See Allendorf Letter at 2-3; AR II-258 at 6896, 6907; AR II-92 at 2251; AR II-92 at 2251.  Therefore, Mr. Hitt, Dr. Allendorf, and Dr. Frissell, who co-authored the paper publishing the Hitt thesis results, informed FWS that "the continued spread of introgression in the range of WCT (Hitt, et al. in press) is strong evidence that hybridized populations do not function as WCT."  Allendorf Letter at 2 (emphasis added); see also AR II-91 at 2209-10; AR II-77 at 1350.

Nevertheless, the government denies that the Hitt Thesis "implies that introgressed WCT do not behave like a nonintrogressed WCT [population]."  Fed. Mem. at 17.  This denial is unfounded.  While the government points out that Mr. Hitt identified further questions regarding

hybridization and its precise effects on straying rates, see id. at 17, the routine practice of

encouraging further research does not alter the finding presented in the thesis, i.e. that the data

"suggest that the spread of RBT [rainbow trout] introgression is facilitated by hybrid individuals

straying among populations in the study area."  AR II-92 at 2249; see also id. at 2266.  As the

government itself acknowledges, Dr. Matthew Campbell, a peer-reviewer hand-picked by FWS,

acknowledged that hybridization in the Flathead River system is spreading "likely due to the

establishment of self-reproducing populations of introduced rainbow trout and the dispersal of

hybrids into areas containing pure cutthroat populations."  Id. at 18 (quoting AR

II-252 at 6807) (emphasis added).[5]  Consistent with this understanding, FWS identified "hybrid

progeny and descendants" as one of the greatest threats to the WCT subspecies.  68 Fed. Reg. at

47,006.

    The fact that there is more to learn about hybrid dispersal patterns is not a license to

ignore evidence that hybrids seem to behave differently than WCT generally do, and indeed,

disperse at rates that affirmatively threaten the subspecies.  As this court has made clear, "by

requiring the listing of species based on the 'best available data,' Congress intended to give 'the

---

[5] The government also quotes comments from Dr. Campton in his review of the FWS-commissioned report by Dr. Allendorf and his colleagues at the Wild Trout and Salmon Genetics Laboratory ("Allendorf Report").  See Fed. Mem. at 18 (quoting AR II-251 at 6801).  Based on the Allendorf Report's brief discussion of the Hitt thesis, Dr. Campton questioned the causes of spreading hybridization in the Flathead River system, suggesting that it might be attributed to "continued, and ongoing, stocking of hatchery rainbow trout," as in British Columbia, where research has revealed that ongoing stocking is fueling the rapid spread of hybridization.  See AR II-251 at 6801.  However, the Hitt thesis expressly rejected this explanation, concluding that "the observed patterns of RBT introgression are not the result of multiple RBT stocking events."  AR II-92 at 2249.  Indeed, continued stocking cannot explain spreading hybridization in Montana because the State has "ceased the practice of stocking nonnative, potentially hybridizing species into waters inhabited by WCT."  Fed. Mem. at 30; see also 68 Fed. Reg. at 47,002 ("In 1976, Montana adopted a policy that prohibits the stocking of hatchery fish in rivers and streams").  Thus, Dr. Campton's comments provide no basis for second-guessing the Hitt thesis findings that hybrids are likely dispersing differently than WCT and thereby driving the spread of hybridization in the Flathead River system.

benefit of the doubt to the species.'"  Defenders of Wildlife v. Babbitt, 958 F. Supp. at 680

(quoting Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir.1988)); see also Sierra Club v. Marsh,

816 F.2d 1376, 1383 (9th Cir. 1987) (explaining that "Congress has spoken in the plainest of

words, making it abundantly clear that the balance has been struck in favor of affording

endangered species the highest of priorities, thereby adopting a policy which it described as

'institutionalized caution'") (citing TVA v. Hill, 437 U.S. 153, 194 (1978).  Under the ESA,

"conclusive evidence" was not required to prove that hybrids function differently than WCT.

Defenders of Wildlife v. Babbitt, 958 F. Supp. at 680.  In light of available data indicating that

hybrids — including hybridized populations with very low levels of foreign genes — are

dispersing at unexpected rates and colonizing the last remaining pure populations of WCT, FWS

could not reasonably presume that hybrid look-alikes are interchangeable with WCT for

purposes of perpetuating the WCT subspecies.

> **2.**     **The FWS Could Not Reasonably Ignore The Potential Loss of Local Adaptations Highlighted By The Preeminent Experts on WCT**

Second, the government attempts to discredit the Allendorf Report, which cautioned that

hybrids are not equivalent to WCT because hybridization, even at low levels, may result in the

loss of local adaptations that are needed to secure the WCT's prospects for long-term

persistence.  See AR II-260 at 6933, 6936.  To this end, the government cites several critical

comments submitted during the agency's "peer-review" process.  See Fed. Mem. at 19.  For

instance, the government quotes Dr. Campton, who developed FWS' new policy on hybrid look-

alikes, commenting that the report "is not scientifically-defensible nor is it suitable for

publication in the scientific literature."  Id. (quoting AR II-251 at 6798).  In fact, however, the

Allendorf Report was published in Conservation Biology, the preeminent scientific journal on

species conservation.

The government further overlooks the fact that the "sentiments expressed" in the Allendorf Report, Fed. Mem. at 18, reflect an understanding of WCT genetics and the importance of local adaptations that is well-accepted in the scientific literature.  See AR II-258 at 6896, 6907-9; AR II-35 at 921; AR II-64 at 1182-3, 1196-97; AR II-92 at 2251.  While the government seeks to marginalize Dr. Allendorf (notwithstanding the fact that FWS hired him to help develop a coherent policy on hybrids), see Fed. Mem. at 18-19 & n.11, prominent experts including Dr. Robb Leary, the author of many leading articles on WCT conservation, share Dr. Allendorf's view that "non-hybridized populations … are the only populations that represent the evolutionary legacy of WCT and are likely to possess the local adaptations that are important for long-term persistence." AR II-260 at 6922, 6936; see also American Wildlands v. Norton, 193 F. Supp. 2d at 256 (recognizing Allendorf and Leary as experts on the hybridization issue).  In the absence of any data demonstrating that the loss of genetic material does not threaten the loss of important local adaptations in WCT, FWS could not simply dismiss the Allendorf report and other published papers in order to gamble on the long-term persistence of hybrid look-alikes.  Rather, FWS was required to give WCT "the benefit of the doubt."  Defenders of Wildlife v. Babbitt, 958 F. Supp. at 680.

To be clear, Dr. Allendorf, Dr. Leary, and their colleagues are not on one side of an ongoing scientific debate regarding the long-term fitness of WCT hybrids.  American Wildlands is not aware of any scientific data suggesting that hybridization is boosting long-term WCT fitness.  Indeed, FWS was unable to cite any data is support of its presumption that slightly hybridized fish are no less fit than pure WCT.  See 68 Fed. Reg. at 46,994.  Thus, this is not a case where FWS had discretion to choose among conflicting scientific views.  Cf. Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989).

The government wrongly suggests that "[o]ther scientists have recognized that the opposite proposition is equally persuasive — that introgression can increase fitness or ecological adaptations of a subspecies and better enable species to withstand extreme periodic events." Fed. Mem. at 18 n.11. Indeed, this argument fails at the outset because FWS itself has never sought to justify its listing determination on grounds that hybridization is <u>good</u> for WCT. As the Supreme Court has made clear, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947). The Court therefore may not accept counsel's "post hoc rationalizations for agency action." <u>Burlington Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962).

Moreover, as the government's citations make clear, there is no credible authority for the presumption that hybrids and pure WCT will be equally fit over the long term. First, the government quotes part of a comment made by Dr. Campton, the co-author of FWS' new hybrid policy, in his review of the Allendorf report. <u>See</u> Fed. Mem. at 18-19 n.11 (quoting AR II-244 at 6724. In full, Dr. Campton's statement was "<u>[i]n the absence of me conducting my own literature review, I believe</u>, an equal but opposite argument could be made that hybridization under 'normal' conditions may be slightly deleterious ... but confers a strong selective advantage under periods of environmental stress when environmental conditions change drastically and individual survival decreases significantly." AR II-244 at 6724 (emphasis added). This speculative belief hardly justifies FWS' decision to ignore the published scientific literature on hybridization, loss of local adaptations, and the resulting threat to WCT persistence.

Second, the government quotes from a paper entitled "The Role Of Hybridization In The Evolution Of The *Gila Robusta* Complex," which addresses the positive effects of hybridization

among fishes that are wholly unrelated to cutthroat trout.  See Fed. Mem. at 19 n.11 (quoting AR
II-290 at 7488).  Again, this paper does not provide any basis for ignoring the relevant science on
WCT.  As the Allendorf Report made clear, hybridization has been found to increase fitness in
certain species and reduce fitness in others.  See AR II-260 at 6929; see also AR II-23
(Allendorf, et al.'s 2001 paper discussing different types of hybridization and their respective
outcomes).  Here, however, the best available data uniformly identifies hybridization as a threat
to the long-term survival of WCT.  See AR I-1728 at 6260; AR I-1719 at 5977; AR II-258 at
6896, 6907-8; see also AR II-91 at 2209 (stressing that "[w]e have to recognize the unique
genetic structure of WCT to develop practical conservation measures").

Finally, the government quotes a "perspective" piece published in Science magazine, in
which the authors correctly suggest that there are occasions when hybridized animals should be
protected under the ESA — for instance when there are very few animals left in the wild and all
of them contain some foreign genetic material, as in the case of the Florida panther or the red
wolf.  See Fed. Mem. at 19 n.11 (quoting AR II-311 at 7728).  Again, however, this provides no
authority to suggest that ongoing hybridization among WCT may be a good thing.  Where, as
here, there is still an opportunity to protect the full evolutionary legacy of the subspecies, it is
FWS' responsibility to take preventative action "before" the WCT "is conclusively headed for
extinction."  Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 680 (D.D.C 1997) (internal
quotations omitted).

In short, there is no evidence to suggest that it is ever safe to presume that hybrid fish are
equivalent to WCT.  For this reason, state fisheries managers prioritize conservation of "core"
genetically pure WCT populations, and they use only pure WCT for reintroduction efforts.  AR
II-19 at 231; AR II-317 at 7845; see also AR II-35 at 921; AR II-64 at 1182-3.  Indeed, prior to

the challenged listing determination for WCT, FWS itself focused on the status of "core" genetically pure populations of cutthroat trout to determine whether listing was warranted.  See Notice of candidate status review, 67 Fed. Reg. 39,936 (June 11, 2002).  Thus, while FWS asserts that its hybrid policy is "anchored to the most venerable pillars of modern biology," Fed. Mem. at 22, the presumption that hybrid look-alikes are essentially the same as pure WCT is wholly unmoored from the accepted science on WCT, and also from well-established management practices for cutthroat trout.

## II.    FWS FAILED TO BASE ITS DECISION ON THE BEST AVAILABLE SCIENCE

Finally, the government fails to justify FWS' primary reliance on visual judgments or "morphology" to classify the WCT population for listing, given that morphological methods have been proven unreliable in several published studies.  See AR II-260 at 6929.  The government argues that FWS "did not rely solely on morphology" because it "noted that a strong correlation exists between levels of genetic introgression and the morphological characteristics of individuals and populations."   Fed. Mem. at 23-24.  However, as discussed above, available scientific data does not establish any correlation between morphology and genetic introgression that can accurately distinguish WCT from significantly hybridized fish.  Thus, FWS' argument boils down to an assertion that "visual professional judgments [are] the best indication of the WCT population" notwithstanding the threat posed by hybridization.  American Wildlands v. Norton, 193 F. Supp. 2d at 257.   This Court has already rejected this argument once before.  See id.; see also Center for Biological Diversity v. Lohn, 296 F. Supp. 2d 1223, 1237 (W.D. Wash. 2003) (holding that "[w]hen the best available science indicates that [old] taxonomic distinctions are wrong, pursuant to ESA mandate [the agency] must apply that best available science" ).

The government further argues that in cases where superior molecular genetic data is available, "FWS' criteria will not classify populations with over 20% genes derived from another taxon as WCT." Fed. Mem. at 25. However, this is not what the listing determination actually provides. Under the new hybrid policy, FWS clearly retains discretion to classify populations with more than 20% introgressions as WCT if they meet the taxonomic definition of the subspecies. See 68 Fed. Reg. at 46,994-95 (stating that "populations with more than 20 percent introgression will generally be excluded from the WCT subspecies. However, such decisions involving possible inclusion or exclusion will need to consider other potentially important characteristics of the populations"). Thus, by its own terms, the hybrid policy contemplates the classification of populations with greater than 20% introgression as WCT.

More sweepingly, the hybrid policy dictates that morphological data will trump superior genetic data in virtually all cases. The listing determination states that:

The Service acknowledges that molecular genetic data also can be very helpful for guiding these decisions regarding inclusion and exclusion of particular populations from the WCT subspecies under the Act. For example on the basis of data described previously in this section, our general conclusion is that natural populations conforming morphologically to the scientific definition of WCT may have up to 20 percent of their genes derived from rainbow trout or YCT [Yellowstone cutthroat trout]. Consequently, for populations for which molecular genetic data may be the only data available, populations with less than 20 percent introgression will be considered WCT under the Act, whereas populations with less than 20 percent introgression will generally be excluded from the WCT subspecies.

68 Fed. Reg. at 46,995 (emphasis added). Thus, under the hybrid policy, any available morphological data trumps the most reliable genetic data, even when genetic testing has revealed that a population is more than 20% hybridized. See id. This defies the ESA's mandate to make listing determinations "solely on the basis of the best available scientific data" because it privileges unreliable morphological data over genetic data that is universally regarded as the best measure of genetic status. 16 U.S.C. § 1533(b)(1)(A).

In an effort to downplay this plain legal violation, the government offers the post-hoc rationalization that "[i]n the vast majority of cases, FWS expects molecular genetic data derived from laboratory tests to be the only data available because of the rapidity and accuracy with which molecular genetic tests can be conducted in a noninvasive manner, relative to morphological methods." Fed. Mem. at 25 (citing 68 Fed. Reg. at 46,994-96). However, FWS never stated any such expectation in the listing determination, nor could it reasonably do so. Genetic testing is not quick or non-invasive, and because it involves capture and handling of live fish, it necessarily yields morphological "data" regarding the physical appearance of sampled fish.[6] See, e.g., AR II-92 at 2234 (describing fish capture via electrofishing and angling, anesthetizing of fish, and excision of anal fin for laboratory analyses); see also AR II-325 at 8183 ("Genetic techniques … are often expensive and time-consuming"). Moreover, morphological data is already available for most WCT populations. Occupied WCT streams have been identified as such by field biologists using morphological methods, and few of them have subsequently been genetically tested. See, e.g. AR II-321 at 7969; AR II-119 at 2697 (out of 33,557.2 stream miles that are reportedly occupied by WCT, only 6,127.5 stream miles have been genetically tested). Thus, it is hard to imagine the situation where no morphological data of any kind would be available to trump genetic data under the hybrid policy. Indeed, this was the understanding of Dr. Allendorf and his colleagues, who specialize in genetic testing of wild trout including WCT. See Allendorf Letter at 2 (stating that "[t]his finding ensures that the best available scientific data will not be used"). When the most accurate genetic data is available, it

---

[6] While FWS "principal criterion" for classifying hybridized fish as WCT "is whether fish in those populations conform morphologically to the scientific description of the WCT subspecies," the agency remarkably failed to set forth any standards regarding data that is acceptable to demonstrate such morphological conformity. 68 Fed. Reg. at 46,994-95.

violates the ESA to rely on outdated, unreliable morphological methods to identify WCT.  <u>See</u>

16 U.S.C. § 1533(b)(1)(A); <u>Defenders of Wildlife v. Babbitt</u>, 958 F. Supp. at 680.

## CONCLUSION

For all of the foregoing reasons and the reasons stated in their Memorandum In Support

Of Summary Judgment, Plaintiffs American Wildlands <u>et al.</u> request that this Court grant their

motion for summary judgment.

Respectfully submitted this 3rd day of May, 2006,

/s/ Abigail M. Dillen
Douglas L. Honnold (D.C. Bar # 468323)
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699

*Counsel for Plaintiffs*