UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN WILDLANDS, et al., | ) ) ) |
| Plaintiffs, | ) Civ. No. 05-1043 (EGS) |
| v. | ) ) |
| DIRK KEMPTHORNE, Secretary of the Department of the Interior, et al., | ) **FEDERAL DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) ) ) |

## INTRODUCTION

Plaintiffs in this case have confused the relevant issues and have repeatedly misconstrued the United States Fish and Wildlife Service's ("FWS")[1] listing determination for the Westslope cutthroat trout ("WCT"). Plaintiffs' diversions and mischaracterizations fail to demonstrate that FWS ignored a relevant issue or made determinations unsupported by the science or the administrative record. Indeed, FWS' listing determination reveals that it fulfilled each and every obligation imposed by the ESA and ordered by this Court in American Wildlands v. Norton, 193 F. Supp. 2d 244 (D.D.C. 2002). Because an accurate understanding of FWS' decisions and determinations is critical to this Court's review, Defendants will briefly summarize the principal decisions and determinations made in the WCT listing determination. See Section I, *supra*. Defendants will then address Plaintiffs' unsupported arguments challenging that listing determination. See Section II, *supra*.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Dirk Kempthorne, Secretary of the Department of the Interior, is automatically substituted for his predecessor, P. Lynn Scarlett.

**ARGUMENT**

I.  **FWS' LISTING DETERMINATION FOR THE WESTSLOPE CUTTHROAT TROUT**

    A.  **FWS' Development Of Criteria To Classify And Identify The WCT Subspecies**

Because Congress permitted FWS to consider listing, and if warranted list, only certain taxonomic units, i.e., species, subspecies, or distinct population segments, 16 U.S.C. §§ 1532(16), FWS developed criteria to legally identify the WCT subspecies under the ESA and consistent with the biological definition of the subspecies. See 68 Fed. Reg. 46,989, 46,991-92 (Aug. 7, 2003) ("The issue here for this status review is . . . the scientific criteria used by professional zoologists and field biologists to taxonomically classify individuals, and populations of interbreeding individuals."). In doing so, FWS recognized that it must assess the "extent to which it is appropriate to include hybrid stock and stock of unknown characteristics in the population evaluated." American Wildlands, 193 F. Supp. 2d at 254; 68 Fed. Reg. at 46,994. In accordance with the ESA and FWS' implementing regulations, FWS utilized the principles of taxonomy, the best available science, and the expertise of its staff to develop criteria to identify WCT populations. Id.; 50 C.F.R. § 424.11(a) ("the Secretary shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community" in identifying the taxonomic unit under consideration).

In conducting its review, FWS determined that the WCT subspecies is taxonomically classified as distinct from other subspecies and species of trout based primarily on an examination and analysis of morphological characteristics and native geographic distributions, see 68 Fed. Reg. at 46,992, but that other factors must also be assessed, such as the genetics, ecology, and biology of WCT, see id. at 46,994-95. Indeed, WCT were recognized as a distinct form and subspecies long before genetic methods were available. See AR II-267 at 7096-97; 68 Fed. Reg. at 46,992. With respect to genetically introgressed fish, FWS found that the mere existence of introgression resulting from some ancestral or historical interbreeding between taxa does not *per se* exclude a population from a species or subspecies, see id. at 46,994; rather, accepted taxonomic distinctions and considerations govern

1

whether and to what extent introgressed populations should be classified as WCT. See id. at 46,992-95.

Applying these principles, FWS developed criteria to identify WCT populations, relying on the taxonomic definition of WCT, the analysis of morphological characteristics and geographic distributions of individuals and populations, and the correlation between those characteristics and potential genetic criteria. See 68 Fed. Reg. 46,994-95. FWS' criteria also consider other relevant factors, such as reproductive discreteness, existence of nonnative fishes, range of morphological variation, genetic tests, and location and timing of spawning. Id. Recognizing that an analysis of molecular genetic data can also identify populations which meet the taxonomic definition of the WCT subspecies, see id. at 46,992-93, FWS developed a genetic criterion, finding that populations with between 0% and 20% genetic introgression will conform to the scientific taxonomic description of the WCT subspecies and should be classified as WCT, id. at 46,993-95. Collectively, FWS' criteria enabled it to identify the current distribution of the WCT subspecies and prevalence of hybridization in the WCT complex. See id. at 46,998.

### B.    FWS' Application Of Its Criteria To Identify The Distribution Of WCT And The Prevalence of Hybridization

A crucial point overlooked by Plaintiffs is FWS' application of its criteria in the WCT status review. In assessing the distribution of WCT and the prevalence of hybridization, FWS determined that the WCT status update report and its comprehensive database, AR II-119 ("Status Report"), constituted the best available scientific information on the "rangewide status of WCT in the United States." 68 Fed. Reg. at 46,996 (describing the Status Report). The Status Report classified all WCT populations into three management categories: (1) core conservation populations; (2) conservation populations; and (3) sportfish populations. See id. at 46,998; AR II-119 at 7206.[2]

---

[2] A "core conservation population" is one "that is [greater than] 99% [genetically] pure [and] represents the historic genome of the native cutthroat trout." AR II-19 at 236. A "conservation population" is one that "reflect[s] the respective cutthroat trout phenotype, with slight genetic introgression [usually less than 10% genetic introgression] and ha[s] unique genetic, ecological, or behavor[al] attributes." Id. at 231. A "sportfish population" is one that, "at a minimum, meet[s] the species phenotypic expression

2

Reviewing the Status Report, FWS determined that only the first two categories, core conservation populations and conservation populations, unequivocally satisfied FWS' criteria for identifying WCT populations. See 68 Fed. Reg. at 46,999. Accordingly, only those populations that were nonintrogressed (e.g., core conservation populations) and those populations that expressed all the "phenotypic attributes associated with the subspecies," but contained usually less than 10% genetic introgression (e.g., conservation populations), were identified as WCT and examined in the analysis of threats to extant WCT populations. See AR II-19 at 230-232; see 68 Fed. Reg. at 46,999.

### C.   FWS' Analysis Of The Hybridization Threat To The WCT Subspecies Taxon

FWS identified the hybridization threat to the WCT subspecies, see 68 Fed. Reg. at 47,004, 46,994, recognizing that the continual introduction of foreign genes into a WCT population could, in certain circumstances, result in a population that no longer contains or represents the defining characteristics of the WCT subspecies. Under these circumstances, a population once classified as WCT would no longer be identified and classified as WCT. See 68 Fed. Reg. at 47,004; AR II-119 at 2760 (identifying the numerous factors that must occur for hybridization to become and remain a problem). Based on a review of the scientific information, FWS defined the specific circumstances that are necessary for the hybridization threat to occur, finding that there must exist "the direct interbreeding between two individuals that conform morphologically to different species or subspecies, including the interbreeding between individuals conforming morphologically to WCT and individuals not conforming morphologically to WCT." 68 Fed. Reg. at 46,994, 47,004-05.

FWS then expressly considered whether introgressed (or hybrid) WCT, classified as WCT pursuant to its criteria, constitute a hybridization threat to the WCT subspecies as a whole. See 68 Fed. Reg. at 46,994. FWS concluded that they did not because (1) no evidence reveals that the introgressed WCT populations – populations that are morphologically indistinguishable from nonintrogressed WCT populations – are behaviorally, physiologically, or ecologically distinguishable from the

---

defined by morphological and meristic characters of the cutthroat trout." Id. at 232.

3

nonintrogressed WCT populations; and (2) the frequency of foreign genes in introgressed or nonintrogressed populations cannot increase to levels where identifiable and measurable effects do occur unless a direct hybridization threat exists, such as the presence of and potential interbreeding between WCT and fish that do not conform to the WCT subspecies. Id.; see AR II-243 at 6720 ("increase or decrease of . . . the % of RBT alleles within a population[] depends on whether new rainbow trout alleles are continually introduced into the population and the relative fitness of the hybrid genotypes"); AR II-250 at 6795 (same); AR II-119 at 2761 (same); Defendants' Motion for Summary Judgment ("Defs' MSJ") at 27-30 (Dkt. # 19).

After establishing criteria for identifying WCT, hybridization, and the hybridization threat to the WCT subspecies, FWS proceeded to analyze and quantify the magnitude of this threat as it relates to the current status of WCT populations and the status of WCT populations in the foreseeable future. See 68 Fed. Reg. at 46,998 (analyzing the prevalence of hybridization among WCT populations); id. at 47,002 (analyzing the regulatory mechanisms that address threats from hybridizing, nonnative fishes); id. at 47,004-05 (analyzing hybridization with nonnative fishes); id. at 47,005-06 (analyzing ongoing conservation efforts). FWS ultimately determined that the threat of hybridization did not warrant listing the WCT under the ESA:

> The WCT subspecies is widely distributed and there are numerous robust WCT populations and aggregates of populations throughout the subspecies' historic range. Moreover, numerous nonintrogressed WCT populations are distributed in secure habitats throughout the subspecies' historic range. In addition, despite the frequent occurrence of introgressive hybridization, we find that numerous WCT populations are nonintrogressed or nearly so, and thus retain substantial portions of their genetic ancestry.

68 Fed. Reg. at 47,006.

Accordingly, as ordered by this Court, FWS reasonably and carefully determined "(1) the current distribution of the species, taking into account the prevalence of hybridization, . . . (2) whether the WCT population is an endangered or threatened species because of hybridization, . . . and (3) if existing regulatory mechanisms are adequate to address threats posed by hybridizing nonnative fish."

4

American Wildlands, 193 F. Supp. 2d at 258.

## II.   PLAINTIFFS' CHALLENGES TO FWS' LISTING DETERMINATION ARE FACTUALLY AND LEGALLY FLAWED.

Plaintiffs have challenged only one aspect of FWS' listing determination – i.e., FWS' identification of those populations that constitute members of the WCT subspecies and FWS' identification of those fish that constitute the hybridization threat to the WCT subspecies. Plaintiffs' challenges, however, are premised on erroneous interpretations of FWS' listing determination and their mistaken belief that FWS was required to adopt the views of certain third-party scientists found by FWS, its experts, and numerous peer reviewers to be scientifically unsupported and contrary to the ESA. Plaintiffs' arguments do not provide a basis to overturn FWS' listing determination.

### A.   Plaintiffs Misrepresent FWS' Criteria For Identifying WCT Populations And FWS' Analysis Of The Hybridization Threat To The WCT Subspecies.

First, the record reveals that FWS adopted a scientifically supported method to identify which fish fall within the WCT subspecies taxon and which fish constitute a hybridization threat to the WCT subspecies. Plaintiffs assert that FWS arbitrarily drew the line between those populations that constitute members of the WCT subspecies and those fish that constitute the hybridization threat by relying primarily on morphological characters to identify the WCT subspecies. Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Pls' Opp.") at 1-7 (Dkt. #23).[3] Plaintiffs' entire argument, however, is premised on a fundamental misunderstanding of FWS' listing determination and the biological definition of WCT.

Plaintiffs repeatedly assert that FWS' criteria for identifying WCT were developed in order to

---

[3] Plaintiffs continue to mischaracterize FWS' criteria by asserting that morphological data are equivalent to examining how a fish "looks" in the field. Pls' Opp. at 1, 17-20. Plaintiffs are wrong, as a scientific evaluation of morphological characteristics, as required by FWS in its criteria, is quite different from using a field guide to identify fish that "look like" a picture of a WCT (e.g., like a bird-watcher). See Defs' Opposition to Pls' Motion for Summary Judgment ("Defs' Opp.") at 20 (Dkt. #22); AR II-302 at 7621-22 (sacrificing live fish to obtain morphological data); AR II-304 at 7650-51 (same); AR II-306 at 7671 (same); AR II-307 at 7681-82 (same). Plaintiffs' attempts to diminish morphological data with glib characterizations thus fail.

5

identify populations with slight amounts of introgression or, alternatively, with less than 20% genetic introgression. See Pls' Opp. at 2, 7-8 (claiming FWS found that only "slightly hybridized" WCT should be classified as WCT); id. at 2-7 (asserting that FWS found that only WCT containing less than 20% introgression should be classified as WCT). FWS, however, determined that populations conforming to the scientific taxonomic definition and description of the WCT subspecies should be identified as WCT. See 68 Fed. Reg. at 46,994-95 (populations "conform[ing] morphologically to the scientific taxonomic description of the WCT subspecies" are classified as WCT). Thus, FWS analyzed how WCT are taxonomically classified, id. at 46,992, and developed criteria to identify populations conforming to the taxonomic definition of the WCT subspecies, id. at 46,994-95. FWS simply did not develop its criteria to identify populations with less than some numerical percentage of genetic introgression, such as 20%. See, e.g., 68 Fed. Reg. at 46,995 (explaining FWS' consideration of and determination that other approaches, such as identifying WCT based on a numerical percentage (e.g., 10%) of genetic introgression, were arbitrary and scientifically unsupported).

As a result of Plaintiffs' flawed understanding of the basis for FWS' criteria, Plaintiffs have raised several unsupported arguments challenging FWS' criteria. For instance, Plaintiffs argue that FWS failed to use only molecular genetic data in identifying the WCT subspecies. Pls' Opp. at 2-7, 17-19. If FWS' criteria were developed to identify WCT with some percentage of genetic introgression, then Plaintiffs may be correct that molecular genetic data should primarily be used. However, because FWS' criteria were developed to identify populations which conform to the *taxonomic definition* of the WCT subspecies, and because WCT are taxonomically recognized as a distinct subspecies based primarily on morphological characters and their native geographic range, FWS' determination to rely primarily on morphological characteristics and native geographic range to identify the WCT subspecies is entirely reasonable and rational.[4]

---

[4] Plaintiffs tersely argue that WCT are not taxonomically classified based primarily on morphological characteristics, Pls' Opp. at 17. The administrative record, however, clearly supports FWS'

6

Plaintiffs also contend that WCT with over 20% genetic introgression may conform to the WCT subspecies and may be classified as WCT. Pls' Opp. at 2-7, 18. Plaintiffs then argue that, because some populations may contain more genetic introgression than FWS supposedly deemed appropriate, FWS' criteria are arbitrary. Id. Again, these hypothetical arguments fail.[5] If a population contains more than 20% genetic introgression and still conforms taxonomically to the WCT subspecies, the Endangered Species Act ("ESA"), FWS' implementing regulations, and applicable law mandate that FWS consider that population in making listing determinations under the ESA. See Alsea Valley Alliance v. Evans, 161 F. Supp. 2d 1154, 1163 (D. Or. 2001) ("Congress expressly limited the Secretary's ability to make listing distinctions among species below that of subspecies . . . ."). FWS' criteria adhere to these principles. See Section I.A., *supra*. Plaintiffs, on the other hand, do not. See Pls' Opp. at 18 (arguing that FWS erred in classifying as WCT populations which "meet the taxonomic definition of the subspecies").

Plaintiffs lack of understanding of FWS' taxonomic criteria has also led them to mis-comprehend FWS' analysis of the hybridization threat to the WCT subspecies. For instance, Plaintiffs assert that FWS simultaneously classified introgressed WCT as members of the WCT subspecies and as a threat to the WCT subspecies, thereby discounting the hybridization threat facing the WCT subspecies. See Pls' Opp. at 1-2, 7-8. FWS' listing determination easily refutes this claim: FWS clearly distinguished between the fish that constitute the WCT subspecies and the fish that constitute a hybridization threat to the WCT subspecies. See 68 Fed. Reg. at 46,991-96. FWS identified the populations that constitute members of the WCT subspecies and explicitly determined that those populations <u>do not</u> constitute a hybridization threat to the WCT subspecies. Id. at 46,994 ("[W]e do

---

determination. See AR II-237 at 6678 ("The emphasis on morphological identity to define populations of this subspecies is anchored to the most venerable pillars of modern biology, and is unassailable.").

[5] Plaintiffs' argument that WCT with over 20% genetic introgression may be classified as WCT is conjectural, as FWS' conservative application of its criteria demonstrates that only WCT with usually less than 10% introgression were classified as WCT. See Section I.B., *supra*.

not consider populations or individual fish conforming morphologically to the scientific taxonomic description of WCT to be a hybridization threat to the WCT subspecies."). FWS also identified populations that do constitute the hybridization threat to the WCT subspecies, i.e., other "species or subspecies" or "individuals not conforming morphologically to WCT." Id. With the proper distinctions between WCT and fish that constitute a hybridization threat to the WCT subspecies, FWS identified the relevant threat and analyzed that threat to the entire WCT subspecies. See Section I.C., *supra*. Plaintiffs' diversionary arguments, based on faulty interpretations of FWS' listing determination, fail to show otherwise.

> **B.    Plaintiffs Misapply The Best Available Science Standard And Advance A Position Contrary To The ESA By Arguing That FWS Was Required To Adopt The Views Of A Select Group Of Scientists.**

In addition to misconstruing FWS' listing determination, Plaintiffs erroneously classify the opinions and conclusions of a select group of scientists, memorialized in several documents in the administrative record (e.g., AR II-241, 248, 258, 260 (collectively, the "Allendorf reports"), as the best available science and thus as viewpoints that FWS was legally required to adopt. See Pls' Opp. at 10-17. Plaintiffs, however, misapply the best available science standard and misunderstand FWS' obligations in making listing determinations under the ESA.

> **1.    FWS Relied On The Best Available Scientific Information In Issuing The WCT Listing Determination.**

The ESA directs FWS to make listing determinations "solely on the basis of the best scientific and commercial data available to [the Secretary]." 16 U.S.C. § 1533(b)(1)(A). The D.C. Circuit has made clear that the best available data requirement "merely prohibits the Secretary from disregarding available scientific evidence that is in some way better than the evidence he relies on. Even if the available scientific and commercial data were quite inconclusive, he may – indeed must – still rely on it at that stage." Sw. Ctr. for Biological Diversity v. Babbitt, 215 F.3d 58, 60 (D.C. Cir. 2000) (quoting City of Las Vegas v. Lujan, 891 F.2d 927, 933 (D.C. Cir. 1989)); Sw. Ctr. for Biological Diversity v.

8

Norton, Civ. No. 98-934, 2002 WL 1733618, at * 8 (D.D.C. July 29, 2002) ("best available science" standard merely "prevents FWS from manipulating its analysis by unreasonably relying on certain sources to the exclusion of others.").

Plaintiffs contend that FWS was required by the "best available science" standard to adopt the views contained in the Allendorf Reports because they are "better" than FWS' judgment and expertise. See Pls' Opp. at 13-16. Plaintiffs' argument fails at the outset, as the "best available science" standard requires FWS to consider available scientific information and exercise its judgment in a manner that is not arbitrary – the standard does not require or permit a court to make credibility determinations and itself judge the relative merit of competing views. See Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); S. Utah Wilderness Alliance v. Norton, 326 F. Supp. 2d 102, 113 (D.D.C. 2004) ("[T]he agency still has discretion to rely on its chosen experts or research.").

Moreover, FWS solicited external peer reviews of the Allendorf Reports and received evaluations consistent with, and supportive of, the evaluations conducted by FWS' own experts. Consequently, Plaintiffs' efforts to bolster the opinions contained in the Allendorf Reports are unavailing. For example, Plaintiffs argue that the numerous peer reviews, all by extremely respected scientists, are not credible and of no value. See Pls' Opp. at 4-7. The peer review process, however, is an accepted and fundamental tool in assessing the scientific validity of scientific work, employed to "ensure [that] the best biological and commercial information is being used in the decisionmaking process." Notice of Interagency Cooperative Policy for Peer Review In Endangered Species Act Activities, 59 Fed. Reg. 34,270 (July 1, 1994); see, e.g., Meister v. Med. Eng'g Corp., 267 F.3d 1123, 1127 (D.C. Cir. 2001) (peer review process is a key factor "in evaluating scientific validity" of expert testimony (citing Daubert v. Merrell Dow Pharm., 509 U.S. 579, 593-94 (1993)). This is not a case where only one peer review supports FWS' decision or criticized the Allendorf Reports. Rather, each

9

of the peer reviewers arrived at substantially the same conclusions – that the opinions and conclusions in the Allendorf Reports were not supported scientifically and that FWS' conclusions were scientifically supported. See Defs' MSJ at 19 (summarizing peer reviews on the Allendorf Reports); id. at 22-23 (summarizing peer reviews on FWS' determinations). FWS' decision to rely on these peer reviews to ensure that its conclusions were scientifically supported is thus eminently reasonable.[6]

Plaintiffs also argue that FWS violated the "best available science" standard by disregarding the speculation in the Allendorf Reports that introgression "may" result in the "potential loss of local adaptations." Pls' Opp. at 13-17. FWS, however, did not disregard this speculation, but rather thoroughly considered this viewpoint, reviewed and studied the available science, and found that this speculation was not supported scientifically with empirical or experimental evidence. See AR II-244; 68 Fed. Reg. at 46,996. In considering this issue during the administrative process, FWS' senior scientist and geneticist noted that the Allendorf Reports did not support their assertions with evidence and thus the opposite contention is equally likely – i.e., that introgression "confers a strong selective advantage under periods of environmental stress . . . (e.g. droughts, floods, temperature extremes, etc.)." AR II-244 at 6724 (Dr. Campton). FWS further conducted an analysis of the scientific literature and, as a result of that analysis, concluded that natural selection can work to retain local phenotypic adaptations in the face of low amounts of gene flow and introgression from other taxa, i.e., that introgressive hybridization insufficient to affect the morphology of fish does not reduce the fitness of

---

[6] Plaintiffs' additional attempts to bolster the opinions in the Allendorf Reports similarly fail. For example, Plaintiffs argue that the Allendorf Reports were published in a scientific journal, Pls' Opp. at 13, yet conveniently ignore that FWS' conclusions were also published in the same scientific journal, see Defs' Opp. at 23-24. Plaintiffs argue that other scientists support the conclusions contained in the Allendorf Reports, Pls' Opp. at 14, yet disregard as immaterial the numerous, independent scientists who found FWS' conclusions were scientifically supported, see Defs' MSJ at 22-23. Plaintiffs argue that materials refuting the speculation in the Allendorf Reports are irrelevant because they relate to other fish species, Pls' Opp. at 15-16, yet contradictorily argue that FWS should have adopted the scientific determinations made in an unrelated listing determination, see Pls' MSJ at 16-18. These and other similar arguments advanced by Plaintiffs merely illustrate that FWS fully considered these difficult issues and made reasoned determinations in the listing determination for the WCT.

those fish. See 68 Fed. Reg. at 46,996 (citing AR II-290); AR II-290 at 7488; AR II-311 at 7728.

Based on its expertise and an independent review of the scientific literature, FWS determined that it was not appropriate to presume decreased fitness in introgressed WCT that met the taxonomic criteria for the subspecies, especially since doing so would actually exclude valuable WCT genetic resources from protection as part of the WCT subspecies taxon. See 68 Fed. Reg. at 46,992 (introgressed WCT conforming to the taxonomic definition of the WCT subspecies "remain[s] very valuable to the overall conservation and survival of that species"); AR II-250 at 6794 (excluding introgressed WCT from the WCT subspecies taxon would "'write-off' large components of the evolutionary legacy of WCT"). Recognizing that FWS fully considered this issue, Plaintiffs argue that the Court should ignore FWS' comprehensive analysis made during the administrative process (i.e., AR II-244 at 6724) and its conclusions made in the challenged listing decision (i.e., 68 Fed. Reg. at 46,996). See Pls' Opp. at 15. Plaintiffs reason that such analysis constitutes "post-hoc rationalizations" and that the Court should limit review to FWS' stated rationales. Id. Needless to say, Plaintiffs' misguided classification of FWS' stated rationales does not support their claims and does not demonstrate that FWS violated the "best available science" standard by disregarding any science.[7]

At bottom, the record demonstrates that FWS fully and carefully considered these difficult issues, had ample support for its determinations, and thus fulfilled its obligations to base listing decisions solely on the best available scientific data. See Sw. Ctr. for Biological Diversity, 2002 WL 1733618, at *8. That Plaintiffs can identify opposing views fully considered by FWS does not warrant

---

[7] Plaintiffs also contend that FWS ignored "evidence" on the effects of introgression on WCT, i.e., the Hitt thesis. See Pls' Opp. at 11-12. Defendants have already thoroughly addressed and refuted this contention. See Defs' MSJ at 17-18; Defs' Opp. at 15-17. Moreover, Plaintiffs' arguments that FWS was required to conclusively prove every finding with "evidence" or "data," or otherwise dispel scientific uncertainty, likewise fail. See Pls' Opp. at 2, 10-12, 14, 16. The ESA and the "best available science" standard do not require FWS to conclusively prove each determination or dispel scientific uncertainty. See Sw. Ctr. for Biological Diversity, 215 F.3d at 60; Bldg. Indus. Ass'n v. Norton, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001); Sw. Ctr. for Biological Diversity, 2002 WL 1733618, at *8; Cook Inlet Beluga Whale v. Daley, 156 F. Supp. 2d 16, 21-22 (D.D.C. 2001).

a contrary finding. See Bldg. Indus. Ass'n v. Babbitt, 979 F. Supp. 893, 903 (D.D.C. 1997) (upholding listing determination where "plaintiffs have pointed to no data that was omitted from consideration."); Nat'l Fisheries Inst. v. Mosbacher, 732 F. Supp. 210, 227 (D.D.C. 1990) (that the administrative record reflects a certain amount of disagreement is "inevitable and indicates that the debate was as open and vigorous as Congress intended.").

> **2. FWS Was Obligated To Follow The Dictates Of The ESA, Rather Than The Views Of Outside Scientists, In Issuing Its Listing Determination For The WCT.**

Plaintiffs' arguments that FWS should have adopted the views in the Allendorf Reports also fail. In the Allendorf Reports, the authors conclude that all introgressed WCT should be excluded from the WCT subspecies. See AR II-248 at 6786, 6782-6783. In an attempt to support their perspectives, those authors identify a genetic difference based on a molecular genetics test (i.e., the existence of genes from another taxon), speculate that this genetic difference "may" adversely impact the biology and ecology of WCT, and then assert that this speculation is sufficient to exclude a whole segment of the WCT subspecies from consideration for listing under the ESA. Id. The authors, however, never once discussed the criteria by which WCT are defined taxonomically, nor did they attempt to reconcile their conclusion that large segments of the WCT subspecies should be excluded from consideration with the ESA's legal command to consider and list the "entire" WCT subspecies. See Alsea Valley Alliance, 161 F. Supp. 2d at 1162. By failing to undertake this analysis, the authors of the Allendorf Reports – and Plaintiffs by deferring to the Allendorf Reports – have merely advocated the adoption of a position contrary to the clear command of the ESA. Id. at 1163 (Genetics cannot justify a listing distinction that runs contrary to the definition of the taxonomic unit under consideration).

FWS, on the other hand, correctly recognized that it must identify the entire WCT subspecies, consistent with the taxonomic description of that subspecies, and consider whether to list the entire WCT subspecies. See 68 Fed. Reg. at 46,995 ("decisions regarding status of WCT under the [ESA] must be made for the entire subspecies and its component populations"). To complying with this

mandate, FWS reasonably considered and applied the principles of taxonomy to identify the WCT subspecies. See id. at 46,992; 50 C.F.R. § 424.11(a).[8]  FWS found that WCT are identified and classified "based almost entirely on morphological characters." 68 Fed. Reg. at 46,992.  FWS also found that the mere existence of genetic introgression in populations does not warrant the exclusion of those populations from the WCT subspecies taxon. See id.  FWS considered the information on the effects of introgression on WCT and found that there was no scientific basis to exclude from the WCT subspecies taxon introgressed populations conforming to the taxonomic definition of the WCT subspecies. Id. at 46,994-95.

Accordingly, FWS determined that those populations conforming to the scientific, taxonomic description of the WCT subspecies, whether or not the populations contain genes from another taxon, should be identified as WCT and should be considered part of the WCT subspecies for purposes of listing under the ESA. Id.  By properly adhering to the dictates of the ESA, rather than adopting views that run counter to the ESA, FWS has fully complied with and fulfilled its obligations under the ESA.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court grant their motion for summary judgment.

Dated: June 2, 2006                Respectfully Submitted,

                                      SUE ELLEN WOOLDRIDGE, Asst. Attorney General
                                      JEAN E. WILLIAMS, Section Chief
                                      LISA L. RUSSELL, Asst. Section Chief

                                      */s/ Michael R. Eitel*
                                      MICHAEL R. EITEL, Trial Attorney (SBN 22889 (Neb.))
                                      United States Department of Justice
                                      Environment & Natural Resources Division

---

[8] FWS' regulation regarding the proper methods of identifying and classifying "species" under the ESA, as an agency rule subject to notice and comment and as a rule consistent with the agency's interpretation of the ESA, is entitled to the highest levels of judicial deference. See Barnhart v. Walton, 535 U.S. 212, 217-18 (2002); Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984); United States v. Mead Corp., 533 U.S. 218, 227 (2001).

        Wildlife & Marine Resources Section
        Ben Franklin Station, P.O. Box 7369
        Washington, DC 20044-7369
        Phone: (202) 305-0339/ Fax: (202) 305-0275
        Email: Michael.Eitel@usdoj.gov

        Attorneys for Federal Defendants