**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
                                    )
AMERICAN WILDLANDS, et al.,         )
                                    )
              Plaintiffs,           )
                                    ) Civil Action No. 05-1043 (EGS)
         v.                         )
                                    )
DIRK KEMPTHORNE, Secretary of       )
the Department of the Interior,     )
et al.,                             )
                                    )
              Defendants.           )
                                    )
```

**<u>MEMORANDUM OPINION</u>**

In 2000, several environmental groups brought suit to challenge the finding of the Fish and Wildlife Service ("FWS" or "the Service") that listing of the westslope cutthroat trout ("WCT") as endangered or threatened under the Endangered Species Act ("ESA") was not warranted. The Court granted plaintiffs' motion for summary judgment, concluding that the Service's decision was arbitrary and capricious. The Court remanded the action to FWS so that it could reconsider its finding and ordered FWS to specifically determine the threat of hybridization to the WCT as it bears on the ESA's listing factors. FWS followed the Court's order, conducted further analysis, and concluded that, notwithstanding the threat of hybridization, listing of the WCT as endangered or threatened was not warranted. Plaintiffs have brought the instant suit, challenging this reconsidered decision

1

as arbitrary and capricious under the Administrative Procedure Act ("APA").[1]  Currently pending before the Court are the parties' cross-motions for summary judgment.  Upon consideration of the motions, the responses and replies thereto, the applicable law, and the entire record, the Court determines that the Service's reconsidered decision was not arbitrary and capricious. Therefore, for the reasons stated herein, defendants' motion for summary judgment is **GRANTED**, and plaintiffs' cross-motion for summary judgment is **DENIED**.

## BACKGROUND

## I. Factual and Statutory Background

The westslope cutthroat trout is one of fourteen subspecies of cutthroat trout native to interior streams in western North America.  The historic habitat of WCT includes of several major drainages of the upper Columbia River basin (Idaho and Montana), the Methow River and Lake Chelan drainages (Washington), the John Day River drainage (Oregon), the headwaters of the South Saskatchewan River (Montana), and the upper Missouri River basin (Montana and Wyoming).  The historic range of WCT is considered to be the largest of any of the cutthroat trout subspecies.

Plaintiffs in this case are four environmental organizations

---

[1] Dirk Kempthorne, Secretary of the Department of Interior, and FWS Director H. Dale. Hall have been automatically substituted for their predecessors pursuant to Federal Rule of Civil Procedure 25(d)(1).

– American Wildlands, Montana Environmental Information Center, the Clearwater Biodiversity Project, and the Western Watershed Project – and one individual, Bud Lilly, who fishes in WCT habitat and who is a board member of American Wildlands. American Wildlands formally petitioned FWS to list the WCT as threatened throughout its range and designate critical habitat for the subspecies pursuant to the ESA.

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).  The Act defines a species as "any subspecies of fish or wildlife . . . and any distinct population of any species of vertebrate fish or wildlife which interbreeds when mature."  § 1532(16).  A species is "endangered" when it is in "danger of extinction throughout all or a significant part of its range," and a species is "threatened" when it is "likely to become an endangered species within the foreseeable future."  §§ 1532(6), 1532(20), 1533(c).

The ESA directs the Secretary of the Interior to determine whether to list species of flora and fauna as endangered or threatened.  FWS is obligated to independently identify species for listing, and to respond to listing petitions from the public. § 1533(b)(3)(A).  Where there is a public petition for listing,

3

FWS has ninety days from the filing of the petition in which to determine whether the petition presents substantial scientific or commercial information indicating that a listing may be warranted. § 1533(b)(3)(A). If FWS issues a "may be warranted" finding, the Service then has twelve months to complete a "review of the status of the species concerned" to determine if listing is "warranted." §§ 1533(b)(3)(B), 1533(b)(5). If the agency concludes that listing is warranted, it must publish a proposed rule in the Federal Register and provide an opportunity for public comment. § 1533(b)(5). Twelve months after publication of the proposed rule, the agency must make a final decision whether to adopt a final rule listing the species under the ESA. *Id.*

When making its determination as to whether a species should be listed as endangered or threatened, the agency must consider the following five factors: (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting its continued existence. § 1533(a)(1). The ESA also instructs that the agency's determination as to whether to list a species under the Act is to be made "solely on the basis of the best scientific and

4

commercial data available."  § 1533(b)(1)(A).

## II. Procedural History

On May 21, 1997, American Wildlands submitted a petition to FWS requesting the listing of the WCT as a threatened species under the ESA.  *See generally American Wildlands v. Norton*, 193 F. Supp. 2d 244, 249-50 (D.D.C. 2002) (describing procedural history up to 2002).  The petition described reasons warranting the listing and provided information about threats to the trout's habitat, hybridization of the trout population, predation, and the trout's distribution patterns.  On January 23, 1998, American Wildlands supplemented its petition with information detailing increasing threats to the trout.

On March 17, 1998, American Wildlands brought suit to compel FWS to issue a 90-day finding on the WCT listing petition as required by the ESA.  FWS then agreed to prepare a 90-day finding, and, in June 1998, it published its determination that American Wildlands' petition provided sufficient information to conclude that a listing of the WCT as a threatened species "may be warranted."  90-day Finding and Commencement of Status Review for a Petition To List WCT as Threatened, 63 Fed. Reg. 31691 (June 10, 1998).

Following the "may be warranted" determination and publication, FWS failed to meet its twelve-month statutory deadline for making a final determination as to the trout's

listing. *See* 16 U.S.C. § 1533(b)(3)(B). In March 1999, almost eleven months after the twelve-month statutory period had run, American Wildlands provided notice to FWS that it was in violation of ESA and its implementing regulations. On August 4, 1999, American Wildlands filed suit to compel FWS to issue its twelve-month finding. In March 2000, FWS and American Wildlands reached a settlement that provided that FWS would publish its twelve-month finding on or before April 10, 2000. On April 14, 2000, FWS published its finding on American Wildlands' petition to list the WCT as a threatened species. 12-Month Finding for an Amended Petition To List WCT as Threatened Throughout Its Range, 65 Fed. Reg. 20120 (April 14, 2000). FWS determined that listing the WCT was not warranted at that time.

On October 23, 2000, plaintiffs filed suit in this Court, alleging that the Service's WCT listing determination violated the APA. *American Wildlands*, 193 F. Supp. 2d at 249. Plaintiffs' principle argument was that FWS included hybridized fish in the population considered for listing, while also recognizing hybridization as a threat to the species. *Id.* at 250. After finding that plaintiffs had standing to bring their claims, the Court concluded that the Service's decision to include hybridized fish in the WCT population considered for listing was not supported by the best available science and was arbitrary and capricious. *Id.* at 250-56. In particular, the

Court found that "FWS did not offer a scientifically based explanation for its decision to include known hybridized fish in its assessment of the WCT's current distribution" and that FWS "fail[ed] to reconcile its recognition of hybridization as a threat to WCT's viability with its inclusion of hybrid stock in the population assessed for listing."  *Id.* at 254-55.

The Court remanded the action to FWS with instructions that it reconsider its "not warranted" finding for WCT in light of the Court's decision.  *Id.* at 258.  Specifically, FWS was ordered to determine, within 12 months: "(1) the current distribution of the species, taking into account the prevalence of hybridization; (2) whether the WCT population is an endangered or threatened species because of hybridization; and (3) if existing regulatory mechanisms are adequate to address threats posed by hybridizing non-native fish."  *Id.* (citations omitted).

On September 3, 2002, FWS announced initiation of a new status review for the WCT and solicited comments from all interested parties regarding the present-day status of the fish, particularly seeking information relevant to addressing the issues raised by the Court.  Notice of Intent To Prepare a Status Review for WCT, 67 Fed. Reg. 56,257 (Sept. 3, 2002).  As reflected in the administrative record, FWS received numerous documents and comments from interested parties, including a comprehensive status report of the WCT population in the United

States that was prepared by the fish and wildlife agencies of Idaho, Montana, Oregon, and Washington (the "inter-mountain Western states") and the United States Forest Service. *See* Administrative Record ("A.R."), Vol. II, Doc. 119. After conducting its review of the available information, FWS determined that listing the WCT as either an endangered or threatened species under the ESA is not warranted at this time. Reconsidered Finding for an Amended Petition To List WCT as Threatened Throughout Its Range, 68 Fed. Reg. 46989 (Aug. 7, 2003). Plaintiffs filed suit in this Court seeking review of this determination on May 23, 2005. Both parties have filed motions for summary judgment.

## STANDARD OF REVIEW

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by

affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324.

Plaintiffs' challenge to the Service's determination as to whether to list a species as endangered or threatened is subject to review under the APA.  *See Las Vegas v. Lujan*, 891 F.2d 927, 932 (D.C. Cir. 1989).  Under Section 702 of the APA, an agency's decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In an APA case, the "entire case" on review is a question of law, which the Court resolves on the administrative record.  *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

Under the APA's standard of review, there is a presumption of validity of agency action.  *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (en banc).  When decision-making "requires a high level of technical expertise," courts must defer to "the informed discretion of the responsible federal agencies."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).  With regard to FWS decisions in particular, "[g]iven the expertise of the [Service] in the area of wildlife conservation and management and the deferential standard of review, the Court begins with a strong presumption in favor of upholding decisions of the [Service]."  *Carlton v. Babbitt*, 900 F. Supp. 526, 530 (D.D.C.

1995).  In addition, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378.  However, an agency's decision is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ANALYSIS

## I. The Service's Reconsidered Listing Determination for WCT

In its reconsidered determination, FWS responded to the Court's order on remand by providing a scientifically-based conclusion about the extent to which hybrid WCT fish should be considered within the WCT subspecies for the purpose of listing under the ESA.  WCT Reconsidered Finding, 68 Fed. Reg. at 46,991. The operative issue was determining the proper scientific criteria, of the type used by professional zoologists and biologists, to taxonomically classify fish populations.  *Id.* at 46,992.  Central to the Service's analysis was the conclusion

10

that the principle criterion for including fish populations within the WCT subspecies is whether "fish in those populations conform morphologically to the scientific taxonomic description of the WCT subspecies." *Id.* at 46994-95. This conclusion was based on analysis of fish populations in general and WCT populations in particular.

FWS started by observing that the "scientific criteria for describing and formally recognizing taxonomic species of fish are based almost entirely on morphological characters." *Id.* at 46,992. Thus, the scientific basis for distinguishing different species of trout and subspecies of cutthroat trout are morphological differences in characteristics such as spotting patterns and the number of scales. *Id.* Recently developed genetic techniques add to the understanding of these differences, and can particularly detect small amounts of genetic introgression, which is the transfer of genetic material from one species or population to another. *Id.* Using genetic analysis, scientists have observed that individuals of a particular "native" species may possess some genetic material of a foreign species and yet still conform in all meaningful ways – morphologically, behaviorally, and ecologically – to the scientific taxonomic description of the native species. *Id.* In other words, some amount of genetic transfer may not change a species or subspecies individuals in practical, substantive

11

respects.  In fact, such genetic transfers are a common historical process, *id.* at 46,991, and can be very valuable to the overall survival of a species, *id.* at 46,992.

With regard to WCT in particular, FWS relied on several studies that demonstrated that natural WCT populations "conforming morphologically to the scientific taxonomic description of WCT may contain genes derived from rainbow trout or YCT as the result of a past hybridization event." *Id.* at 46,993.  In addition, the comprehensive status report prepared by the conservation agencies of the inter-mountain Western states utilized a morphology-based definition of the WCT subspecies.  In classifying populations for conservation purposes, the report covered WCT populations that conform, "at a minimum," to the morphological and meristic characteristics of the WCT.  *Id.* at 46,996.

Utilizing a morphology-based definition of the WCT subspecies, FWS then defined the threat of hybridization. "Hybridization" was defined as the interbreeding of fish that conform morphologically to different species or subspecies.  *Id.* at 46,994.  Thus, hybridization may be a threat to continued existence of the WCT when there is a population of fish not morphologically conforming to the taxonomic description of WCT. *Id.*  On the other hand, populations of fish conforming to the WCT description are not considered a hybridization threat.  *Id.*

12

Although these populations may vary genetically from WCT, FWS did not consider any potential interbreeding to be a threat to WCT because all fish would be morphologically similar. *Id.* Given that similarity, there was no evidence that interbred fish would have any expressed differences, such as in behavior or life-history, and thus the foreign genes would not spread among the WCT. *Id.* Therefore, in order to account for the threat of hybridization, FWS made a distinction between genetically introgressed (hybrid) fish that match WCT morphologically, and those that do not. Because the former do not pose a threat of hybridization, FWS found it appropriate to include such populations within the WCT subspecies for the purpose of the listing decision. *Id.*

Accordingly, FWS established detailed criteria for determining whether particular fish populations should be considered to be within the WCT subspecies. The first requirement is that the "population under consideration must first exist within the recognized, native geographic range of WCT." *Id.* Second, the population must then satisfy one of two additional criteria: either (1) "all measured individuals in the population have morphological characters that are all within the scientific, taxonomically-recognized ranges of those characters for the WCT subspecies" or (2) there is "additional evidence of reproductive discreteness between individuals that conform

13

morphologically to the WCT subspecies and individuals that do not conform morphologically to the subspecies." *Id.*

In addition to its "principle criteria," FWS recognized that "other potentially important characteristics of the populations" must be considered, including genetic molecular data, "ecological setting, geographic extent of the introgression across the population's range, and whether rainbow (or redband) trout are naturally sympatric [co-occur] with WCT in the particular region under consideration." *Id.* at 46,995. For instance, FWS determined, based on the best scientific information available, that introgressed WCT with less than 20% of their genes derived from another taxon would still conform morphologically to the scientific taxonomic description of WCT. Thus, particularly where only genetic data are available, FWS considered individuals or populations with less than 20% of their genes derived from another taxon to be members of the WCT subspecies. *Id.*

Based on this criteria for including introgressed populations in the WCT subspecies, FWS conducted a new status review of the WCT. The most important new material in the Service's analysis was the comprehensive status report prepared by the inter-mountain Western states. *Id.* at 46,996. FWS described the present-day status of WCT in various areas, paying particular attention to the prevalence of hybridization. *Id.* at 46,996-99. FWS then reviewed the five factors of potential

14

threats as mandated by the ESA, including the threat of hybridization. *Id.* at 46,999-47,005; *see* 16 U.S.C. § 1533(a)(1).

After examining the threats facing the WCT, FWS concluded that none rose to the level warranting listing of the WCT under the ESA: "Although the WCT subspecies has been reduced from historic levels and its extant populations face threats in several areas of the historic range, we find that the magnitude and imminence of those threats do not jeopardize the continued existence of the subspecies within the foreseeable future." 68 Fed. Reg. at 47,006. With respect to the threat of hybridization, FWS recognized that "hybridization with nonnative rainbow trout or their hybrid progeny and descendants . . . remains the greatest threat to WCT." *Id.* FWS determined, however, that this threat does not warrant listing the WCT under the ESA because the WCT subspecies is widely distributed, numerous non-introgressed WCT populations are distributed in secure habitats throughout the subspecies' historic range, and numerous WCT populations are non-introgressed or nearly so. *Id.* Overall, FWS concluded that "the WCT is not likely to become either a threatened or endangered species within the foreseeable future," and that "listing of the WCT as a threatened or endangered species under the [ESA] is not warranted at this time." *Id.* at 47,007.

## II. Evaluation of the Service's Determination

In their motion for summary judgment, defendants argue that all steps of the Service's analysis in its reconsidered listing determination were proper and in compliance with the ESA and APA. In their opposition and cross-motion for summary judgment, plaintiffs' primary contention, upon which all their other arguments are based, is that the Service's decision to rely on a primarily morphological classification of WCT instead of a primarily genetic classification is not based on the best scientific evidence and is arbitrary and capricious.[2]

At the first stage in the listing process, FWS is required to identify the taxon under consideration, which includes determining whether and to what extent genetically introgressed, or hybrid, fish are part of that taxon. *See* 16 U.S.C. § 1532(16) (defining "species"); 50 C.F.R. § 424.02(k) (same); 50 C.F.R. § 424.11(a). "In determining whether a particular taxon or population is a species for the purposes of the [ESA], [FWS] shall rely on standard taxonomic distinctions and the biological expertise of the Department and the scientific community

---

[2]  The Court need not consider any objections to the reconsidered listing determination except those specifically raised by plaintiffs. *See* LCvR 7.1(b); *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded").

concerning the relevant taxonomic group." 50 C.F.R. § 424.11(a). Once this taxonomic unit is classified and identified, then FWS engages in the separate process of analyzing the five statutory factors as to that taxonomic unit to determine whether listing the entire taxonomic unit is warranted. *See* 16 U.S.C. § 1533(a)(1) (FWS must determine whether to list any "species."). FWS is to make such a determination "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). This requirement does not oblige FWS to conduct independent studies. *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000). It "merely prohibits [FWS] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Id.*

As described above, FWS classified fish populations as WCT if they conformed morphologically to the scientific taxonomic description of the WCT subspecies. Several pieces of scientific evidence in the record support this approach. First, several sources agree that taxonomy in general relies on morphological characteristics, and not just genetic data. *See* A.R., Vol. II, Doc. 271, at 7195-7205; Doc. 272 at 7259; Doc. 309, at 7717-19. Second, several sources considered introgressed individuals to be legitimate members of their morphological species despite the presence of foreign genetic material. *See, e.g.*, A.R., Vol. II, Doc. 269, at 7166; Doc. 287, at 7449; Doc. 291, at 7491. Third,

the WCT subspecies has been described taxonomically mainly on the basis of morphological features. *See* A.R., Vol. II, Doc. 267, at 7092-94. Fourth, the comprehensive multi-state status report utilized a morphological approach. *See* WCT Reconsidered Finding, 68 Fed. Reg. at 46,996 (citing A.R., Vol. II, Doc. 119). Finally, FWS submitted a draft of its analysis to several scientists for peer review, and these scientists agreed with the Service's approach. *See* A.R., Vol. II, Doc. 236, at 6675 (review of Dr. Avise stating that the FWS approach "is a rather model system," "scientifically based," and "practical"); Doc. 237, at 6678 (review of Dr. Bowen, stating that the "emphasis on morphological identity to define populations of this subspecies is anchored to the most venerable pillars of modern biology, and is unassailable"); Doc. 238, at 6683-84 (review of Dr. Dowling agreeing with morphological approach and stating that he agreed "with [the Service's] discussion of morphological and molecular data").

Plaintiffs rely on two scientific sources to challenge the Service's approach: (1) three articles by Dr. Fred Allendorf and his colleagues; and (2) the master's thesis of Nathaniel Hitt, a student of Dr. Allendorf. *See* Pls.' Mot. at 20-25 (citing A.R., Vol. II, Docs. 92, 258, 260).[3] The Allendorf report directly

_____

[3] Plaintiffs also attempt to rely on several documents outside the administrative record. *See, e.g.*, Pls.' Mot. at 23. The Court, however, has already denied plaintiffs' motion for

disagreed with the Service's morphological approach.  One report
claimed that any change in WCT genetic material would result in
changes to the affected individuals' behavioral and ecological
characteristics.  A.R., Vol. II, Doc. 260, at 6935.  Accordingly,
the report recommended that only non-hybridized (or non-
introgressed) populations should be included within the WCT
subspecies.  *Id.* at 6936.  The Hitt thesis described the
continued spread of hybridization in a particular population of
WCT, which plaintiffs argue is strong evidence that hybridized
populations behave differently.  Pls.' Mot. at 23 (citing A.R.,
Vol. II, Doc. 92).

    Contrary to plaintiffs' contention, FWS did have scientific
support for its position.  In addition to the evidence noted
already, FWS specifically considered the Allendorf materials.
Earlier drafts of the Allendorf reports on hybridized WCT
populations were submitted to FWS for consideration.  *See* A.R.,
Vol. II, Docs. 241, 248.  These reports were then circulated for
peer reviews.  Some scientists disagreed with the Allendorf
report's conclusions about the altered behavior or fitness of
hybrid WCT.  A.R., Vol. II, Doc. 244, at 6726 (stating that the
conclusion "is not supported by their literature review or their
results in the laboratory"); Doc. 245, at 6749 (describing

---

leave to expand the administrative record to include these
documents.  Order, Sept. 21, 2006.

research as "thin and superficial").  With regard to the
Allendorf report's discussion of WCT hybrid classification, one
outside scientist commented that the report was "overly
one-sided" and failed to "present a balanced discussion."  A.R.,
Vol. II, Doc. 250, at 6793, 6796.  The FWS geneticist who
reviewed the report found it "not scientifically-defensible" and
noted that the report presented no data on whether introgressed
WCT are distinguishable from other WCT in terms of physiological,
behavioral, or ecological traits.  A.R., Vol. II, Doc. 251, at
6798-99.  The review also commented on the Hitt thesis, noting
that the spread of hybridized fish documented in the thesis may
have been due to manmade causes as opposed to differing behaviors
of hybrid WCT.  *Id.* at 6801.

     Thus, this is not a case where FWS has failed to consider an
important aspect of its decision or offered an explanation that
runs counter to the evidence.  *See State Farm*, 463 U.S. at 43.
Nor is this a case where FWS has utilized a taxonomic
classification that all scientists consider to be flawed.  *See
Ctr. for Biological Diversity v. Lohn*, 296 F. Supp. 2d 1223,
1239-40 (W.D. Wash. 2003) (finding that agency erred because it
"ignored its experts' conclusions that the global taxon is
inaccurate and that the best available science demonstrates that
resident and transient killer whales do not belong to the same
taxon").  Rather, FWS considered the question of WCT taxonomy in

depth and had several sources of evidence supporting its
morphology-based approach to classifying WCT populations.  While
Dr. Allendorf and his colleagues may have disagreed with the
Service's approach, the Service has "discretion to rely on the
reasonable opinions of its own qualified experts even if, as an
original matter, a court might find contrary views more
persuasive."  *See Marsh*, 490 U.S. at 378.  Therefore, the
Service's primarily morphological classification of WCT was not
arbitrary and capricious.

All of plaintiffs' other arguments are derivative of its
primary argument.  Plaintiffs challenged the morphological
approach by arguing that WCT hybrids behaved differently.  Pls.'
Mot. at 22-25.  As already noted, this issue was a component of
the Service's decision to employ the morphological approach.
Plaintiffs also argue that because FWS improperly classified WCT
hybrids, it has discounted the threat of hybridization to the WCT
subspecies.  Pls.' Opp. at 7-10.  Plaintiffs, however, have not
challenged the Service's threat evaluation apart from arguing
that the original hybrid classification was incorrect.  Finally,
plaintiffs argue that FWS improperly assumed that morphologically
matching WCT will not contain more than 20% foreign genes.  Pls.'
Mot. at 20-22.  Plaintiffs point to evidence that morphologically
matching WCT may contain up to 50% foreign genes.  FWS explicitly
considered this evidence in its determination, *see* WCT

Reconsidered Finding, 68 Fed. Reg. at 46,994, and there was nothing improper about its conclusions because it was using a morphological rather than genetic approach. Because FWS classified WCT based on morphology, the relevant inquiry is whether particular populations match morphologically, not genetically. Plaintiffs' argument implicitly assumes that a genetic rather than morphological approach is correct. Because the Service's primarily morphological classification of WCT was not arbitrary and capricious, all of plaintiffs' other arguments lack merit.

CONCLUSION

As all of plaintiffs' arguments lack merit, the Court concludes that the Service's reconsidered listing determination was not arbitrary and capricious. Accordingly, defendants' motion for summary judgment is **GRANTED**, plaintiffs' cross-motion for summary judgment is **DENIED**, and plaintiffs' claims are **DISMISSED with prejudice**. An appropriate Order accompanies this Memorandum Opinion.

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**March 26, 2007**

22