# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 4, 2008                    Decided July 8, 2008

No. 07-5179

AMERICAN WILDLANDS, ET AL.,
APPELLANTS

v.

DIRK KEMPTHORNE, SECRETARY, U.S. DEPARTMENT OF THE
INTERIOR AND DALE HALL, DIRECTOR, U.S. FISH AND
WILDLIFE SERVICE,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv01043)

———

*Abigail M. Dillen* argued the cause for appellants. With her on the briefs was *Timothy J. Preso*. *Douglas L. Honnold* entered an appearance.

*Lane M. McFadden*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the briefs were *Andrew C. Mergen* and *Jennifer L. Scheller*, Attorneys.

Before: SENTELLE, *Chief Judge*, and GARLAND and GRIFFITH, *Circuit Judges*.

2

Opinion for the court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: The westslope cutthroat trout has historically inhabited rivers and streams across parts of Montana, Wyoming, Idaho, Oregon, and Washington. Its scientific name, *Oncorhynchus clarki lewisi*, pays homage to Lewis and Clark, the storied explorers who encountered the fish in 1805 at the Great Falls of the Missouri River. Plaintiffs maintain that interbreeding with other members of the trout family — a phenomenon called hybridization — has so imperiled the continued existence of the fish that the government should list it as threatened under the Endangered Species Act.

On appeal, plaintiffs argue that the government's decision not to do so was arbitrary and capricious because the agency included in its count of westslope cutthroat trout hybridized fish, which embodied the menace at issue. Plaintiffs also appeal the district court's denial of their motion to supplement the record with letters supporting their case. Although new data might require a future listing of the fish as threatened, we conclude the agency engaged in reasoned decisionmaking based on the best available science, and the district court did not abuse its discretion in refusing to supplement the record.

## I.

### A.

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, requires the Secretary of the Interior to determine whether any species is "threatened" or "endangered," *id.* § 1533(a)(1), a responsibility he has delegated to the Department of the Interior's Fish and Wildlife Service

3

("Service"), 50 C.F.R. § 402.01(b). In determining whether to list a species as threatened or endangered, the Service must first define the species so the agency can estimate its population. The ESA treats subspecies of fish as distinct species for listing purposes. 16 U.S.C. § 1532(16).

A species is endangered when it is "in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), and threatened when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20). The ESA requires the Secretary to determine whether any species is threatened or endangered as a result of one or more identified factors, including the catch-all, "other natural or manmade factors affecting [the species'] continued existence." *Id.* § 1533(a). The Secretary must make this decision "solely on the basis of the best scientific and commercial data available to him." *Id.* § 1533(b)(1)(A). Furthermore, the ESA recognizes the right of "interested person[s]" to petition the agency to add or remove a species from the list, *id.* § 1533(b)(3)(A), and sets forth a procedure for the agency to act on the petition and explain its decision, *id.* § 1533(b)(3)–(6).

**B.**

In 1997 a fisherman and several environmental groups (collectively, "American Wildlands") petitioned the Service to list the westslope cutthroat trout ("WCT") as a threatened species. *See Am. Wildlands v. Norton*, 193 F. Supp. 2d 244, 249 (D.D.C. 2002) (recounting procedural history). According to plaintiffs, the chief threat to the fish comes from hybridization: interbreeding between WCT and other members of the trout family, primarily the rainbow trout. Plaintiffs contend that hybridization puts at risk the genetic heritage that defines WCT as a subspecies and that equips it to survive harsh conditions.

4

After various delays, the Service determined not to list the species. 65 Fed. Reg. 20,120 (Apr. 14, 2000). American Wildlands subsequently filed suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), claiming this decision was arbitrary and capricious because the Service included hybridized fish in the WCT population considered for listing. This accounting, plaintiffs argue, not only inflated the number of WCT, but did so with the hybridized fish that represented the very threat the proposed listing was intended to address.

The district court granted summary judgment for the plaintiffs, concluding:

> [T]he agency wholly fails to reconcile its recognition of hybridization as a threat to WCT's viability with its inclusion of hybrid stock in the population assessed for listing. The administrative record clearly supports a finding that hybridization is a threat to the WCT population. . . . Therefore, when [the Service] included hybrid stock in the population assessed for listing, it needed to give some reasoned explanation. . . . Without a scientifically based explanation of the decision, the Court can not but find that the decision . . . was not supported by the best available science, 16 U.S.C. § 1553(b)(1)(A) . . . .

*Am. Wildlands*, 193 F. Supp. 2d at 255–56. The court noted that the Service "might have drawn a distinction between hybridization that is a threat to a population, and hybridization that is benign. However, [the Service] made no attempt to draw such a distinction." *Id.* at 256. The court remanded the listing decision to the agency with instructions to reconsider and issue a new decision within one year. *Id.* at 258.

5

Following the court's ruling, the Service announced its intent to conduct a new status review and requested comments from interested parties. Notice of Intent To Prepare a Status Review for the Westslope Cutthroat Trout, 67 Fed. Reg. 56,257 (Sept. 3, 2002). The Service received numerous submissions, including a comprehensive report on WCT populations prepared by the fish and wildlife agencies of Idaho, Montana, Oregon, Washington, and Wyoming, in conjunction with the U.S. Forest Service. BRADLEY B. SHEPARD ET AL., STATUS OF WESTSLOPE CUTTHROAT TROUT IN THE UNITED STATES: 2002 (2003) ("Multistate Assessment"), App. 943–1042.

In August 2003 the Service again denied threatened status to WCT. Reconsidered Finding for an Amended Petition to List the Westslope Cutthroat Trout as Threatened Throughout Its Range, 68 Fed. Reg. 46,989 (Aug. 7, 2003) ("Reconsidered Finding"). The Reconsidered Finding included a general policy statement, in which the Service provided the explanation lacking in its earlier decision for why it included some hybridized fish in its count of WCT, and the actual status review, in which the Service explained its decision not to list WCT. The policy statement began with the claim that the scientific criteria for classifying species of fish "are based almost entirely on morphological characters." *Id.* at 46,992. "Morphology" is "a branch of biology that deals with the form and structure of animals and plants." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1471 (1981). WCT have a number of morphological characteristics that scientists use to identify the fish, such as a distinctive spotting pattern, coloring, and a typical number of vertebrae, scales, and bony projections called "gill rakers." *See* ROBERT J. BEHNKE, NATIVE TROUT OF WESTERN NORTH AMERICA 77–79 (1992), App. 181–83. In determining what fish should count as WCT, the Service relied on morphology as the "principal criterion" and did not consider

6

fish that conformed morphologically to WCT to pose a threat of hybridization. 68 Fed. Reg. at 46,994.

The Service recognized, however, that genetic data allows biologists to detect "introgression" — the "entry or introduction of a gene from one gene complex into another," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1187 (1981) — in fish that otherwise conform morphologically to the subspecies. 68 Fed. Reg. at 46,992. As a result, when genetic data is available, scientists can now detect hybridization in some instances when they previously could not by relying on morphology alone. When using genetic data to classify fish, the Service adopted a rule: "[F]or populations for which molecular genetic data may be the only data available, populations with less than 20 percent introgression will be considered WCT under the [ESA], whereas populations with more than 20 percent introgression will generally be excluded from the WCT subspecies." Id. at 46,995. The Service settled on the 20% threshold after reviewing the scientific evidence and concluding that "a natural population of WCT with less than 20 percent of its genes derived from [foreign subspecies] is, most likely, morphologically indistinguishable from nonintrogressed populations of WCT with no hybrid ancestry." Id. at 46,994. The Service also concluded that low levels of introgression can occur as a result of the natural evolutionary process and that such fish may "remain very valuable to the overall conservation and survival of that species." Id. at 46,992.

In the status review the Service analyzed the threat of hybridization to WCT, relying on the 2002 Multistate Assessment as the best available science. Id. at 46,999. The Multistate Assessment identified populations of WCT within the subspecies' historic range and classified them according to their actual or suspected genetic status, Multistate Assessment at 5 (introduction), 1 (main report), App. 953–54, and then

7

according to the conservation strategy that state agencies employed to manage the fish, *id.* at 3–4 (main report), 80 (App. D), App. 956–57, 1033. The report had genetic data for approximately 21% of habitat occupied by WCT within its historic range. *Id.* at 13 (main report), App. 966.

Drawing on data from the Multistate Assessment, the Service included in the WCT population count fish that fell into three categories: (1) genetically tested populations with introgression levels below 1%; (2) nongenetically tested populations that morphologically conformed to WCT and that scientists concluded likely had introgression levels below 1% because no records indicated that hybridizing fish, such as rainbow trout, were at one time stocked in the area or were otherwise present; and (3) populations that the Multistate Assessment classified as "conservation populations." 68 Fed. Reg. at 46,999. This last category included fish that morphologically conformed to WCT and generally had less than 10% introgression. Multistate Assessment at 3–4 (main report), 80 (App. D), App. 956–57, 1033; *see also* UTAH DIVISION WILDLIFE RESOURCES, GENETIC CONSIDERATIONS ASSOCIATED WITH CUTTHROAT TROUT MANAGEMENT 4 (2000) ("[Conservation] populations retain all the phenotypic attributes associated with the subspecies, though they exist in a slightly introgressed condition."), App. 486. Conservation populations included some fish with slightly higher levels of introgression where the populations demonstrated a special attribute that biologists sought to preserve, such as an evolutionary adaptation to an extreme environmental condition. Multistate Assessment at 3–4 (main report), App. 956–57.

Looking to the Multistate Assessment, and considering the prospects for future genetic dilution, the Service acknowledged that hybridization "remains the greatest threat to WCT," 68 Fed. Reg. at 47,006, but decided the severity of the threat did not yet

8

require listing. Importantly, the agency identified significant populations of nonintrogressed WCT. *See id.* at 47,004.

> The information that we have summarized in this document, particularly that obtained from the status update report (Shepard *et al.* 2003), indicates even greater abundance of WCT across the subspecies' range than we had estimated during the initial status review (U.S. Fish and Wildlife Service 1999). Today, 563 extant WCT "conservation" populations collectively occupy 39,349 km (24,450 mi) of stream in Idaho, Montana, Oregon, Washington, and Wyoming. . . . In our initial status review . . . we reported that WCT occupied about 37,015 km (23,000 mi) of stream in the United States. In addition, nonintrogressed WCT are now known to inhabit 5,633 km (3,500 mi) of stream and probably inhabit as many as 20,278 km (12,600 mi) of stream in which no potentially hybridizing fishes occur. In our initial status review . . . we reported that nonintrogressed WCT were known to occupy 4,237 km (2,633 mi) of stream.

*Id.* at 47,006.

The Service noted that some of these populations exist within reach of potentially hybridizing fish, such as the rainbow trout, yet have remained free from interbreeding. *Id.* The Multistate Assessment predicted that hybridization would continue to move upstream into areas presently occupied by nonintrogressed WCT, although environmental factors such as altitude, stream size, and water temperature may limit that progression. *Id.* at 47,004–05. Moreover, in the case of 1525 stream miles containing pure WCT, artificial barriers would prevent hybridization altogether. *Id.* at 47,005. The Service also noted that to the degree hybridization persists, some "limited

9

presence" of foreign genes does not preclude classification as WCT — a point the agency made earlier in the policy section of its Reconsidered Finding. *Id.* at 47,006.

Dissatisfied with the Reconsidered Finding, plaintiffs filed another suit in district court under the APA, 5 U.S.C. § 706(2)(A), again claiming the agency's decision was arbitrary and capricious because it still counted hybridized fish in the WCT population. This time the court granted summary judgment for the agency because it found that record evidence supported the agency's decision. *Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 99 (D.D.C. 2007).

American Wildlands filed a timely notice of appeal on May 25, 2007. In addition to challenging the decision not to list, plaintiffs also appeal the district court's order denying their motion for leave to supplement the administrative record. *Am. Wildlands v. Norton*, No. 05-1043, 2006 WL 2780702 (D.D.C. Sept. 21, 2006). The district court had jurisdiction under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and we have jurisdiction to hear the appeal under 28 U.S.C. § 1291.

## II.

The Service's listing determination is subject to review under the APA and must be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see City of Las Vegas v. Lujan*, 891 F.2d 927, 932 (D.C. Cir. 1989). "This standard of review is a highly deferential one. It presumes agency action to be valid." *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976). The Supreme Court has explained that an agency acts arbitrarily or capriciously if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision

10

that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Because the district court ruled on summary judgment, our review is de novo. *See Castlewood Prods., L.L.C. v. Norton*, 365 F.3d 1076, 1082 (D.C. Cir. 2004).

American Wildlands presents several arguments, each of which concludes that the Service's decision not to list WCT was arbitrary and capricious. We disagree.

### A.

American Wildlands' primary challenge is to the Service's reliance on morphological data, which they argue was arbitrary and capricious because the agency wrongly assumed that fish morphologically conforming to WCT will be only slightly hybridized. They contend that evidence in the record shows that fish can have introgression levels up to 50% and still morphologically conform to the subspecies. *See, e.g.*, F.W. Allendorf et al., *Intercrosses and the U.S. Endangered Species Act: Should Hybridized Populations be Included as Westslope Cutthroat Trout?* 7 (2003) (unpublished manuscript), App. 925. "In practice, this means that every last surviving population of [WCT] could be up to 50 percent hybridized before [the Service] would recognize hybridization as a major concern in the ESA listing context." American Wildlands' Opening Br. at 40. This argument, plaintiffs maintain, belies the government's assurance that "individual fish conforming morphologically to the scientific taxonomic description of WCT" will carry foreign genes at a "low frequency." 68 Fed. Reg. at 46,994. Plaintiffs argue that even if the Service reasonably included fish having less than a 20% introgression level in the WCT population when genetic data was available, the agency arbitrarily assumed that

11

populations for which genetic data was not available would also have introgression levels below 20% if they morphologically conformed to WCT.

The Service concedes that its method may count some fish in the WCT population that morphologically conform to WCT but have introgression levels higher than 20%. *See* Service's Br. at 37 ("One of the primary authors of the Service's Finding has acknowledged this possibility, and the Service is well aware of it."); Oral Arg. Recording at 22:10–22:36. Nonetheless, the agency argues that its method is reasonable. We agree and hold that in the absence of genetic data the Service reasonably included fish morphologically conforming to WCT in the population considered for listing. Under the ESA, listing determinations are to be made "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). In *Southwest Center for Biological Diversity v. Babbitt*, we held that "[t]he 'best available data' requirement makes it clear that the Secretary has no obligation to conduct independent studies." 215 F.3d 58, 60 (D.C. Cir. 2000). Rather, that provision " 'merely prohibits the Secretary from disregarding *available* scientific evidence that is in some way better than the evidence he relies on.' " *Id.* (quoting *City of Las Vegas*, 891 F.2d at 933) (emphasis added).

The "best available data" requirement in § 1533(b)(1)(A) requires not only that data be attainable, but that researchers in fact have conducted the tests. Genetic testing is a relatively new technique for classifying fish and though it can provide precision in determining introgression levels not possible on the basis of morphology alone, genetic data is not available for the large majority of WCT populations. Lacking genetic data, the Service did not unreasonably rely on morphological data to classify fish — even though, by the agency's admission, some fish counted as WCT may have introgression levels greater than

12

20%. Aside from morphological assessments and absent genetic data, the Service had nothing else upon which to rely.

At oral argument, American Wildlands asserted that the Service should "look at the genetically pure populations, . . . look at the threat facing those [populations], and . . . decide whether those populations . . . would be able to sustain the species in the future." Oral Arg. Recording at 13:20–13:30. To agree with the plaintiffs would be to require the Service to make its decision only on the basis of genetic data. This rule would demand the absurd result that the Service must deem threatened any species for which it lacks genetic data. Absent a statutory mandate requiring the Service to collect genetic data, however, the Service's method was reasonable. If plaintiffs believe the Service's decision not to list WCT depended on counting fish which, if genetically tested, would have introgression levels greater than 20%, the path for plaintiffs to press their argument is clear: provide sufficient genetic data to substantiate this claim.

American Wildlands also argues that even if the Service reasonably relied on morphological data in some instances, the agency violated the law by relying on such data when genetic information was in fact available. That the plaintiffs make this argument in their opening brief is understandable. In its Reconsidered Finding, the Service stated that morphology would serve as the "principal criterion" for classifying fish as WCT and then stated, "[F]or populations for which molecular genetic data *may be the only data available*, populations with less than 20% introgression will be considered WCT under the Act." 68 Fed. Reg. at 46,995 (emphasis added). The plaintiffs were not unreasonable in interpreting this statement to mean the Service would only use genetic data when morphological data was not available.

13

In its brief, however, the Service made clear that in conducting its status review it always used genetic data when available and never included fish in the WCT population count that carried introgression levels greater than 20%. *See* Service's Br. at 39 ("[M]olecular genetic data was used whenever available, and populations of fish with higher than 20% genetic introgression were rejected for classification as westslope cutthroat trout."); *id.* at 39 n.10 (explaining that in conducting the status review the Service never encountered a population for which it had both morphological data and genetic data showing fish with introgression levels greater than 20%). At oral argument, the government was even more firm:

> [COURT]: "So we've settled that if you have genetic data as well as morphology, you will not ignore the genetic data."
>
> [SERVICE]: "Correct."

Oral Arg. Recording at 21:52–22:01. Although our decision might be different if the Service had refused to rely on available genetic data, that did not happen here.

### B.

Plaintiffs also challenge the agency's decision to include fish in the WCT population count having introgression levels as high as 20%. When pressed at oral argument, American Wildlands would not identify a threshold introgression level. *See* Oral Arg. Recording at 16:13–17:17, 38:50–42:50. And in their briefs, plaintiffs argue that the best available science does not deem any level of introgression benign.

To support this claim, plaintiffs point to a scientific paper in the record suggesting that introgression always risks the loss of

14

genetic diversity, which in turn can reduce resistance to disease and diminish an organism's ability to adapt to changing environmental conditions. *See* F.W. Allendorf & R.F. Leary, *Conservation and Distribution of Genetic Variation in a Polytypic Species, the Cutthroat Trout*, CONSERVATION BIOLOGY 170, 180 (1988), App. 89. In addition, plaintiffs point to a paper which they argue establishes that fish bearing low levels of introgression and morphologically conforming to WCT may nonetheless display behavioral differences. *See* N. Hitt, *Hybridization Between Westslope Cutthroat Trout and Rainbow Trout: Distribution and Limiting Factors* (2002) (unpublished master's thesis), App. 626–713. In particular, they contend, Hitt shows that "slightly hybridized fish are dispersing and colonizing new territory at rates that are atypical of [WCT] in Montana's Flathead River System. Notably, these are fish that are hybridized at low levels that [the Service] deemed to be benign." American Wildlands' Opening Br. at 43 (citation omitted). This tendency is referred to as "straying."

Because we have held that the Service was reasonable to count as WCT fish that morphologically conformed to the subspecies when the agency lacked genetic data, we consider this challenge only in those instances where the Service had genetic data. We conclude the agency did not act arbitrarily or capriciously by including fish with introgression levels below 20%.

As an initial matter, record evidence supports the conclusion that fish having less than 20% foreign genes are morphologically indistinguishable from nonintrogressed populations. *See, e.g.*, 68 Fed. Reg. at 46,993–94 (citing sources). Moreover, scientific papers in the record suggest that low levels of introgression may, in fact, make a positive contribution to the long-term survival of a subspecies. For example, a peer review of another article by Allendorf, which

15

article made the same claim about the harmful effects of any hybridization, warned that some of the paper's statements on this issue amounted to "speculation" and suggested that low levels of genetic introgression could allow WCT to better adapt to extreme environmental conditions, such as fires, floods, or droughts. D. Campton, Peer Review of Draft Report by F.W. Allendorf and L.L. Lundquist, *Hybridization, Fitness, and Conservation of Westslope Cutthroat Trout* (2002), App. 861. Likewise, the Hitt paper did not draw a conclusion based on evidence, but only suggested further research. Hitt, *Hybridization Between Westslope Cutthroat Trout and Rainbow Trout* 53 ("[T]he effects of [rainbow trout] introgression on straying rates *should be assessed*. . . . [Rainbow trout] introgression could introduce a genetic predisposition to stray. . . . To test this hypothesis, one would first have to determine . . . . ") (emphasis added), App. 686.

Under these circumstances, we defer to the agency's decisionmaking. "The rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise: '[I]n an area characterized by scientific and technological uncertainty[,] . . . this court must proceed with particular caution, avoiding all temptation to direct the agency in a choice between rational alternatives.' " *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (quoting *Envtl. Def. Fund v. Costle*, 578 F.2d 337, 339 (D.C. Cir. 1978)); *see also Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983) (noting that a reviewing court must be "at its most deferential" when examining conclusions made "at the frontiers of science"). And again we note that in the absence of available evidence, Congress does not require the agency to conduct its own studies. *See* 16 U.S.C. § 1533(b)(1)(A); *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000). Where the agency used genetic data, we defer to the

16

Service's decision to include fish in the listing population having introgression levels below 20%.

## C.

American Wildlands further argues that the Service's policy of including some introgressed fish in the WCT count is an arbitrary departure from past practice. In at least one previous listing determination, plaintiffs aver, the Service only counted fish as members of the subspecies considered for listing when they had introgression levels below 1%. American Wildlands' Reply Br. at 22 (citing Candidate Status Review for Rio Grande Cutthroat Trout, 67 Fed. Reg. 39,936 (June 11, 2002)).

We need not consider this argument because plaintiffs have forfeited it on appeal, having raised it for the first time in their reply brief. *See Rollins Envtl. Servs. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief."). In the statement of facts section of its opening brief, American Wildlands did explain that in a past assessment the Service only counted fish as Rio Grande Cutthroat Trout having less than 1% introgression. American Wildlands' Opening Br. at 23–25. But explaining the factual basis in the opening brief for an argument not made until the reply brief is insufficient to raise the claim. *See Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1299 (D.C. Cir. 2007); *PDK Labs., Inc. v. U.S. Drug Enforcement Admin.*, 438 F.3d 1184, 1196 (D.C. Cir. 2006).

The only place where plaintiffs mention the argument in their opening brief is at the very end of the section addressing the agency's decision in the Reconsidered Finding, where they state:

17

> [T]he [ESA] does not permit [the Service] to continue
> using inaccurate data simply because it is more
> convenient to do so — particularly when the agency has
> at its disposal the principled genetic criteria developed
> for the Rio Grande cutthroat trout listing. *See id.*; *see
> also, e.g.*, *Friends of the Wild Swan*, 12 F. Supp. 2d at
> 1135 (finding the [Service] violated the [ESA] in
> ignoring the most reliable data *and further stressing that
> "[a]n agency acts arbitrarily when it departs from its
> precedent without giving good reason"*) (citing
> *Northern California Power Agency v. F.E.R.C.*, 37 F.3d
> 1517, 1522 (9th Cir. 1994)).

American Wildlands' Opening Br. at 48 (emphasis added; all
brackets added except final set). A fleeting statement in the
parenthetical of a citation is no more sufficient to raise a claim
than a cursory remark in a footnote, which we have consistently
rejected. *See, e.g.*, *Hutchins v. District of Columbia*, 188 F.3d
531, 539 n.3 (D.C. Cir. 1999) ("We need not consider cursory
arguments made only in a footnote . . . ."); *see also Wash. Legal
Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir.
1997) ("Because the District raises this issue in such a cursory
fashion, we decline to resolve it.") (internal quotation marks
omitted); *Ry. Labor Executives' Ass'n v. U.S. R.R. Ret. Bd.*, 749
F.2d 856, 859 n.6 (D.C. Cir. 1984) (declining to resolve an issue
that "consisted of only three sentences in the [appellant's] brief
and no discussion of the . . . relevant case law").

### III.

Lastly, American Wildlands appeals the district court's
denial of its motion to supplement the record with two letters
from scientists whose work the Service considered in deciding
not to list WCT. We review the district court's refusal to
supplement the administrative record for abuse of discretion.

18

*Novartis Pharm. Corp. v. Leavitt*, 435 F.3d 344, 348 (D.C. Cir. 2006).

When reviewing agency action under the APA, we review "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The record consists of the order involved, any findings or reports on which that order is based, and "the pleadings, evidence, and other parts of the proceedings before the agency." FED. R. APP. P. 16(a). Ordinarily, "review is to be based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see also Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984). We do not allow parties to supplement the record "unless they can demonstrate unusual circumstances justifying a departure from this general rule." *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991). We have recognized such circumstances in at least three instances, *see James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (collecting cases): (1) "[T]he agency deliberately or negligently excluded documents that may have been adverse to its decision," *id.*; (2) "the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors," *id.*; or (3) "the agency failed to explain administrative action so as to frustrate judicial review," *id.* (internal quotation marks and brackets omitted).

We hold the district court did not abuse its discretion in denying the motion to supplement the record. Both letters were written after the Service issued its Reconsidered Finding, and are therefore not part of the administrative record. Moreover, they do not satisfy any of the "unusual circumstances" previously listed. Rather, as the district court correctly concluded, *Am. Wildlands v. Norton*, No. 05-1043, 2006 WL

19

2780702, at *2–4 (D.D.C. Sept. 21, 2006), they merely disagree with the Service's conclusions, *see, e.g.*, Letter from N.P. Hitt, Professor, Dept. of Fisheries & Wildlife Scis., Va. Polytechnic Inst. & State Univ., to L.R. Keading, Chief, Branch of Native Fishes Mgmt. (July 10, 2004), reprinted at App. 1120 ("[W]e disagree with the [Service's] interpretation of our data on several counts and believe that the current introgression policy does not represent the best available scientific information.").

## IV.

Because American Wildlands has not shown that the Service's decision to deny listing the westslope cutthroat trout as a threatened species was arbitrary or capricious, and because plaintiffs have not shown that the district court abused its discretion in denying the motion to supplement the record, we affirm the district court in all respects.

*So ordered.*